**Case No(s). 22-15514, 22-16349**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

United States of America,

*Plaintiff-Appellee*,

v.

Ilija Matusko

*Claimant-Appellant*,

v.

Ross William Ulbricht,

*Respondent,*

Approximately 69,370 Bitcoin (Btc), Bitcoin Gold (Btg) Bitcion Sv
(Bsv) and Bitcoin Cash (Bch),

*Defendant.*

_____

On Appeal from the United States District Court
for the Northern District of California
No. 3:20-cv-07811-RS
Hon. Richard Seeborg

_____

## CLAIMANT-APPELLANT ILIJA MATSUKO'S OPENING BRIEF

_____

Alexander H. Kugelman
KUGELMAN LAW, PC
21 Tamal Vista Blvd. Suite 202
Corte Madera, California, 94925
Telephone: 415.968.1780
Facsimile: 415.534.9441
e-mail: alex@kugelmanlaw.com

*Attorneys for Claimant-Appellant*
Ilija Matsuko

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................iii-iii

I. JURISDICTIONAL STATEMENT ....................................................1

II. ISSUES PRESENTED ......................................................................1

III. STATEMENT OF FACTS ............................................................. 1-6

IV. STATEMENT OF THE CASE ..........................................................6

V. SUMMARY OF THE ARGUMENT ............................................... 7-8

VI. ARGUMENT ............................................................................... 8-22

    A.    STANDARD OF REVIEW ............................................... 8-9

    B.    ILIJA MATUSKO ESTABLISHED THE LOW THRESHOLD OF STANDING BECAUSE HE ASSERTED A FINANCIAL INTEREST, IT WAS ERROR TO STRIKE HIS CLAIM ON THOSE GROUNDS.................................................................... 9-18

        1.    Mr. Matusko alleged a financial interest 1HQ3.......................11

        2.    Mr. Matusko had an account on the Marketplace with a credit for 48 bitcoin in the Marketplace's general pool; he therefore has an interest in the seized bitcoin because 1HQ3 held bitcoin from the general pool. ........................................................ 11-12

        3.    Government statements contradict the notion that Mr. Matusko's bitcoin was seized in 2013. ............................... 13-14

        4.    The Government's statement that Mr. Matusko lacks standing because he is like an account holder at a defaulted bank is misguided and supports Mr. Matusko's standing argument... 14-18

    C.    MR. MATUSKO'S CLAIM IS TIMELY WHERE THE GOVERNMENT DID NOT PROVIDE NOTICE, AND THE

DISTRICT COURT IMPLIED HIS CLAIM WAS UNTIMELY IN ERROR ........................................................................................ 18-22

    1.    The Government Never Provided Adequate Notice To Known Claimants. ......................................................................... 19-21

    2.    If his claim is found to be untimely, then relevant factors weigh in favor of Mr. Matusko's claim. .............................................22

VII. CONCLUSION ........................................................................ 22-23

STATEMENT OF RELATED CASES .................................................24

CERTIFICATE OF COMPLIANCE ...................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Cnty. of San Mateo v. Chevron Corp.*,
  32 F.4th 733, 746 (9th Cir. 2022)..........................................................9

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956, 963 (9th Cir. 2018)........................................................8

*Doleman v. Meiji Mut. Life Ins. Co.*,
  727 F.2d 1480, 1482 (9th Cir. 1984)..................................................11

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
  543 F.3d 586 (9th Cir. 2008)..............................................................11

*In re: Celsius Network, LLC, et al.*,
  No. 22-10964 (Bankr. S.D.N.Y. filed Jul. 13, 2022) ........................16

*Littriello v. United States*,
  484 F.3d 372, 375 (6th Cir. 2007)......................................................16

*Meland v. WEBER*,
  2 F.4th 838, 843 (9th Cir. 2021)..........................................................8

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
  15 F.4th 885, 889 (9th Cir. 2021)........................................................9

*Parks Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480, 1484 (9th Cir. 1995)......................................................9

*United States v. $100,348.00 in U.S. Currency*,
  354 F.3d 1110, 1118 (9th Cir. 2004)..................................................22

*United States v. One Hundred Twenty-Two Thousand Forty-Three Dollars
  ($122,043.00) In U.S. Currency*,
  792 F.2d 1470, 1473 (9th Cir. 1986)..................................................10

*United States v. $133,420.00 in U.S. Currency*,
  672 F.3d 629, 637 (9th Cir. 2012)......................................................10

*United States v. $493,850.00 in U.S. Currency*,
  518 F.3d 1159 (9th Cir. 2008)..............................................................9

*U.S. v. Real Property Located at 17 Coon Creek Road, Hawkins Bar California, Trinity County*,
    787 F3d, 968 (9th Cir. 2015)....................................................... 10, 22

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA,*
    545 F.3d 1134, 1140 (9th Cir. 2008)....................................................10

*United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles,* Cal.,
    385 F.3d 1187, 1191 (9th Cir. 2004)....................................................10

*United States v. Ritchie*,
    342 F.3d 903, 910 (9th Cir. 2003)....................................................9, 18

*United States v. Twenty-Four Cryptocurrency Accts.*,
    473 F. Supp. 3d 1 (D.D.C. 2020) ..................................... 8, 19, 20, 21

*Yamaguchi v. U.S. Dep't of the Air Force*,
    109 F.3d 1475, 1482 (9th Cir. 1997)....................................................9

## Statutes

11 U.S.C. § 101 *et seq.* ....................................................................16

12 U.S.C. § 1811 *et seq.* ..................................................................15

18 U.S.C. § 981(a)(1)(A)......................................................................1

18 U.S.C. § 981(a)(1)(C)......................................................................1

18 U.S.C. § 981(b)................................................................................1

28 U.S.C. § 1291..................................................................................1

28 U.S.C. § 1346..................................................................................1

28 U.S.C. § 1355..................................................................................1

## Regulations

26 C.F.R. § 301.7701-3(b)(1) ...........................................................16

iv

**Rules**

Fed. R. Civ. P. 4(a)(2) ................................................................1

Fed. R. Civ. P. 12(b)(6) ..............................................................9

Fed. R. Civ. P. 12(c) ..................................................................11

Fed. R. Civ. P. G(4)(a), (b), Supplemental Rule ...........................19

Fed. R. Civ. P. G(4)(a)(iv), Supplemental Rule ............................20

Fed. R. Civ. P. G(4)(a)(iv)(C), Supplemental Rule .......................20

**Other Authorities**

Asset Forfeiture Policy Manual (U.S. Department of Justice, 2021) at 86...19

Deposit Insurance FAQs, FDIC (Dec. 8, 2021),
    https://www.fdic.gov/resources/deposit-insurance/faq/ .............. 15, 16

# I.
## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of California (the "District Court") was based on 28 U.S.C. §§ 1346, 1355, and 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 981(b), and 21 U.S.C. § 881(a)(6). This Court has jurisdiction pursuant to 28 U.S.C. § 1291. Ilija Matusko ("Mr. Matusko") filed a timely notice of appeal of the District Court's order for final judgment on Sept. 7, 2022, pursuant to Fed. R. Civ. P. 4(a)(2). [4-ER-749.]

Further, the question of whether this court has jurisdiction over the first notice of appeal filed on Apr. 7, 2022, appealing the District Court's order granting the motion to strike Mr. Matusko's claim is moot. The second notice of appeal was timely filed after the District Court entered final judgment. [1-ER-3-4, 4-ER-749.]

# II.
## ISSUES PRESENTED

1.      Whether the District Court erred by finding that Mr. Matusko lacks standing to challenge the forfeiture action.

2.      Whether the government is obligated to notify Silk Road users of the forfeiture action.

# III.
## STATEMENT OF FACTS

The Silk Road (also referred to herein as the "Marketplace") was a virtual marketplace used to facilitate anonymous transactions between users and vendors.

1

[2-ER-61, 4-ER-724.] The Marketplace exclusively used bitcoin as its medium of exchange. [4-ER-724] The Marketplace was operated by an individual, Ross Ulbricht. [4-ER-700, 724.] There is no indication that the Marketplace was an entity, rather it was simply operated as a sole proprietorship.

To access the Marketplace, a user created a profile and sent bitcoin to cryptocurrency wallets exclusively controlled by Ross Ulbricht.[1] [4-ER-724, 725.]

When a user registered with the Marketplace, that user "would send bitcoin to a Bitcoin address assigned to the [user] but controlled by Silk Road." [4-ER-681.] Silk Road then "tumbled" all user deposits so "[p]ayments going into Silk Road    . . . could not be traced back to a particular user." [4-ER-681.] This was possible because a key feature of Bitcoin's functionality is fungibility. [2-ER-123, 124.]

Upon sending bitcoin to a Silk Road address, a user never received a private key; rather, the user's profile "would be credited with the requisite amount of bitcoin." [4-ER-681.] The user could then use that credit to engage in a transaction with a Silk Road vendor, however the "actual bitcoin received by the vendor was not the same bitcoin the [user] used to fund his account." [4-ER-681.]

The Silk Road operated two (2) computer servers: one server operated the

---

[1] In this brief "Bitcoin" refers to the underlying blockchain-based network protocol, and "bitcoin" refers to the unit of exchange used to transact on Bitcoin's network.

user interface (the "Marketplace Server"), and the other server contained the Silk Road's Bitcoin wallet and all addresses (the "Bitcoin Server"). [2-ER 233, 235, 240, 238, 3-ER-341.] The Bitcoin Server's wallet had more than 2.1 million Bitcoin addresses and held all user Bitcoin. [2-ER-124.]

Ross Ulbricht solely controlled the private keys associated with all addresses maintained on the Bitcoin Server, including corresponding user addresses. [2-ER 125.] Though users knew their Bitcoin address, they did not have access to the associated private key. [2-ER-73, 125.] Only Ross Ulbricht could send or spend bitcoin held by the Silk Road – it was his role to settle transactions and collect commissions on each sale. [2-ER-119, 125, 156.]

In 2011, Ilija Matusko, a German national, created a Silk Road user profile named "hanson5" and sent 48 bitcoin to the Silk Road wallet address. [2-ER-111.] Silk Road then credited his account with 47.52 bitcoin ("48 bitcoin") and deposited those bitcoin to the Silk Road's general pool. [2-ER-117, 118, 4-ER-681.] The government has verified Mr. Matusko's username, timeline, and transfer of 48 bitcoin to the Silk Road Bitcoin address. [2-ER-71.] Mr. Matusko accessed the Silk Road website several times through his user profile, but never transacted on the Marketplace. [2-ER 111, 112.] He has never been contacted by any US governmental official regarding the Silk Road or his user profile. [2-ER-111, 112.]

The government seized the Silk Road's servers in October 2013. [4-ER-660, 725.] The government "preserved its servers, which contain the entire transaction history and users of the website." [4-ER-660.] This seizure led to the prosecution of Ross Ulbricht and a related forfeiture of the bitcoin on the servers seized in 2013. [2-ER-37, 4-ER-680.] Mr. Matusko's user profile continued to reflect the 48 bitcoin credit at the time the servers were seized. [2-ER-73.]

The government never notified any of the 100,000-plus Silk Road users by email, physical mail, or any other direct manner. [2-ER-29, 30.] When the Silk Road's website was seized, the government uploaded a seizure notice in English only. [4-ER-726]. This notice did not provide a link to forfeiture.gov or otherwise provide information regarding affected users. [4-ER-726.] No Silk Road users filed a claim in that forfeiture action. [2-ER-38.]

In 2020, the government located a Bitcoin wallet (referred to here as "1HQ3") containing 70,411.62 bitcoin stolen from the Silk Road's general pool in 2012. [4-ER-726, 746.] On May 6, 2012, a third party (Mr. X) stole from "addresses controlled by the Silk Road and transferred it to two Bitcoin addresses, namely [1BAD] and [1BBq]." [4-ER-747.] These bitcoin were ultimately transferred to the 1HQ3 Bitcoin address, from which the bitcoin subject to this forfeiture were seized. [4-ER-744, 745.] IRS-CI Special Agent Jeremiah Haynie IRS-CI Special Agent Jeremiah Hayne ("Special Agent Haynie") "personally

4

conducted blockchain analysis of the bitcoin at issue in this case" and "personally conducted the tracing and analysis of the 1HQ3 Bitcoin address." [4-ER-674.] Special Agent Haynie's sworn testimony indicates that "the transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular user accounts." [4-ER-675.] He further clarifies that "[i]n total, 1BAD and 1BBq was funded by approximately 3,056 sending addresses . . . [o]f the . . . sending addresses, 3014 were deposit addresses for Silk Road users." [4-ER-680.] Therefore "98 percent of the sending addresses that funded 1BAD & 1BBq and therefore 1HQ3, were addresses used by Silk Road users." [4-ER-680.]

The government instituted this forfeiture action and provided notice to a single party: Ross Ulbricht. [4-ER-739, 746.] The government never attempted to notify any of the Marketplace's users or vendors. [2-ER-29.] Mr. Matusko is the only Marketplace user to ever make a claim in either forfeiture action.

The government moved to strike the claim based on standing and the timeliness of the claim. [4-ER-691, 698.] The District Court struck Mr. Matusko's claim, reasoning, that Mr. Matusko "has not presented a colorable claim to any of the seized Bitcoin . . .[because] Matusko does not dispute that his Bitcoin remained in has account at Silk Road and available for his use or withdrawal at all times up until the 2013 government seizure and shut down . . . [a]ccordingly, it forms no part of the Bitcoin stolen from the Silk Road in 2012 that was later seize in this

action." [2-ER-13.] While it did not explicitly conclude that the claim was untimely, the order did imply that the claim was untimely. [2-ER-13, 14.]

Mr. Matusko appealed the order granting the motion to strike and the final judgment. Those appeals were consolidated.

## IV.
## STATEMENT OF THE CASE

This appeal arises out of the seizure and civil forfeiture of bitcoin taken from Bitcoin wallet address 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3") on November 3, 2020. [4-ER-741.] Around April 2013, these bitcoins were stolen from a general fund of bitcoin individual users deposited to an anonymous online marketplace called the "Silk Road." [4-ER-744.] In December 2011, (prior to the theft), Mr. Matusko opened an account with the Silk Road and deposited 48 bitcoins into the general fund, of which 47.52 bitcoin were credited to his user balance. [2-ER-111.] The government shut down the Silk Road website in October 2013, seized all bitcoin contained on the Silk Road's servers, and filed a forfeiture of all the bitcoins contained in wallet files residing on Silk Road servers. [4-ER-727.]

Mr. Matusko was never notified of his right to claim bitcoin in that forfeiture proceeding. [2-ER-27, 112.] The government later located additional bitcoins stolen from the Silk Road before the shutdown. Mr. Matusko, among others, filed a claim to the stolen bitcoins in the 1HQ3 wallet address because they were stolen

6

from the Silk Road's general fund after Mr. Matusko had deposited his bitcoins into his user account. Mr. Matusko now appeals from the order of the District Court striking his claim for lack of Article III and prudential standing.

## V.
## SUMMARY OF THE ARGUMENT

Mr. Matusko is the only Marketplace user to ever assert a claim to the Marketplace's bitcoins seized by the government. The government verified Mr. Matusko's Marketplace user profile, his bitcoin deposit into the Marketplace, and his continued credit on the Marketplace.

The government challenges Mr. Matusko's standing on the basis that Mr. Matusko's property was subject to an earlier forfeiture proceeding. Essentially, the government reasons that Mr. Matusko's bitcoin were in the servers seized in 2013 and subject to forfeiture in 2015. This conclusion is demonstrated to be false by virtue of the government's explanation of the Marketplace's operations and the very nature of Bitcoin.

Bitcoin is a fungible asset. Marketplace users did not have a right to the return of any specific bitcoin, just an equivalent amount. The Marketplace "tumbled" the bitcoin when sent to the Marketplace's servers. The specific bitcoin sent to the Marketplace no longer existed upon sending to the Marketplace. Thus,

there is a material difference between the actual bitcoin deposited by a user and the user's marketplace credit.

Only Ross Ulbricht controlled the bitcoin. The user simply had a credit on the Marketplace and could request to use the bitcoin for purchase or withdrawal. The Marketplace held all users' bitcoin in a few Bitcoin wallets.

Even if Mr. Matusko had to trace his deposit to the 1HQ3 wallet, the government verified that the bitcoin held in the 1HQ3 wallet were sourced from 3,014 user deposits. It is entirely possible those bitcoins were part of the 3,014 users' bitcoins that comprised the stolen assets.

While the District Court did not explicitly rule that Mr. Matusko's claim is untimely, the government argued that it was. The claim is timely, however, because the government did not provide adequate notice to any Marketplace user despite the knowledge that at least 3,014 users' bitcoin were recovered. The government is obligated to directly notify users of illicit cryptocurrency Marketplaces, as it has in similar forfeiture proceedings. *See United States v. Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020).

Mr. Matusko has alleged a clear financial interest in the property subject to forfeiture. His claim should proceed.

8

# VI.
# <u>ARGUMENT</u>

## A.    STANDARD OF REVIEW

This Court reviews a district court's determination whether a party has standing *de novo*. *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (reviewing de novo order granting motion to dismiss for lack of standing).

Ordinarily, this Court reviews a district court's ruling on a motion to strike as an abuse of discretion. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018) (as amended).  However, because the district court grant of this motion effectively dismissed all of Mr. Matusko's legal claims, this Court treats this ruling as a dismissal for failure to state a claim, which is reviewed *de novo. Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475, 1482 (9th Cir. 1997).

This Court reviews a district court's decision to grant or deny a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim *de novo. See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021) (reviewing de novo an order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)).  All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Id.* at 889. A complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

9

This Court reviews a district court's interpretation of a statute and subject matter jurisdiction *de novo*. *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022)

Finally, it is well established that forfeiture statutes are strictly construed against the government and not favored in the law. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) (citation omitted); *United States v. Ritchie*, 342 F.3d 903, 910 (9th Cir. 2003) (citation omitted).

**B.     ILIJA MATUSKO ESTABLISHED THE LOW THRESHOLD OF STANDING BECAUSE HE ASSERTED A FINANCIAL INTEREST; IT WAS ERROR TO STRIKE HIS CLAIM ON THOSE GROUNDS**

A claimant must demonstrate "a colorable interest in the property" such as "title or financial stake" to have standing in a civil forfeiture. *United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA,*, 545 F.3d 1134, 1140 (9th Cir. 2008) (citation omitted). Standing is a low threshold: a lesser property interest such as possession is sufficient to grant standing. *United States v. One Hundred Twenty-Two Thousand Forty-Three Dollars ($122,043.00) In U.S. Currency*, 792 F.2d 1470, 1473 (9th Cir. 1986). Therefore, a claimant's burden to establish standing is "not a heavy one." *United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles,* Cal., 385 F.3d 1187, 1191 (9th Cir. 2004).

The precise "manner and degree of evidence required" to demonstrate standing varies according to the stage of litigation. *United States v. $133,420.00 in*

10

*U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012) (citation omitted). At the judgment on the pleadings stage, a claimant's unequivocal assertion of ownership is sufficient to establish statutory standing in a civil forfeiture proceeding. *U.S. v. Real Property Located at 17 Coon Creek Road, Hawkins Bar California, Trinity County* 787 F3d, 968 (9th Cir. 2015), *reviewing under the judgment on the pleadings standard*. All material allegations in a complaint are accepted as true and construed in a light most favorable to the non-moving party. Fed.R. Civ. P. 12(c); *see Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586 (9th Cir. 2008). Conversely, the allegations of the moving party that have been denied are assumed false. *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984).

### 1.     Mr. Matusko alleged a financial interest 1HQ3

Mr. Matusko's verified claim alleges financial interest in 1HQ3 and established standing. [4-ER-731.]  Mr. Matusko unequivocally asserted financial interest in the seized bitcoin. [4-ER-731.] He created a user profile on the Marketplace, he sent 48 bitcoin to the Marketplace's Bitcoin wallet, and he has always had a credit on the Marketplace for that amount. [4-ER-731.] Therefore, Mr. Matusko has asserted a financial interest in bitcoin recovered by the government because 1HQ3 contained bitcoin that belonged to the Marketplace's Bitcoin wallet. [4-ER-731.]

11

**2.    Mr. Matusko had an account on the Marketplace with a credit for 48 bitcoin in the Marketplace's general pool; he therefore has an interest in the seized bitcoin because 1HQ3 held bitcoin from the general pool.**

The government advanced a tracing argument that Mr. Matusko lost "his" 48 bitcoin as a result of 2013 Silk Road takedown and seizure. [1-ER-11, 2-ER-23.] The District Court erred in its reasoning that Mr. Matusko is unable to have an interest in the seized bitcoin because those bitcoin were stolen before the government shutdown the Marketplace. [1-ER-11, 12.] It concluded that it is impossible for the disputed bitcoin to be in both the IHQ3 wallet and the seized Marketplace Servers. [1-ER-11.] This reasoning is based on a flawed understanding of Bitcoin, the Marketplace's operation, and the government's own conclusions of the bitcoin held in 1HQ3. There is a material difference between the actual bitcoin sent to the Marketplace versus a user's credit logged by the Marketplace.

Fungibility is a fundamental aspect of how Bitcoin operates. [2-ER-123.] A bitcoin is equivalent to any other bitcoin. [2-ER-123, 124.] Marketplace users did not hold a right to any specific bitcoin. [2-ER-72.] This concept is demonstrated by the Marketplace's operation. Each bitcoin sent to the wallet was "tumbled" "so that the bitcoin could not be traced to a particular user." [4-ER-681.] Further, if a user engaged in a transaction, the "actual bitcoin received by the vendor was not the same bitcoin the [user] used to fund his account." [4-ER-681.]

12

It is impossible, however, for a user to retrieve "his" bitcoin after sending it to the Marketplace's Bitcoin wallet. When the government seized the Marketplace's Bitcoin wallet, it also seized the bitcoin. This seizure, however, did not affect any user's Marketplace credit. Therefore, any user with an outstanding credit has a financial interest the Marketplace's bitcoin, to include stolen Marketplace bitcoin that ended up in 1HQ3.

**3.    Government statements contradict the notion that Mr. Matusko's bitcoin was seized in 2013.**

The notion that Mr. Matusko's bitcoin was seized in 2013 is contradicted by the government's statements. If a user engaged in a transaction, the "actual bitcoin received by the vendor was not the same bitcoin the [user] used to fund his account." [4-ER-681.] Therefore, any user with an outstanding credit has a financial interest in the Marketplace's bitcoin, to include bitcoin the Marketplace lost as a result of the hack.

To bolster its theory, the government asserts that that the hacked bitcoin came from a "general pool." Specifically, the government's motion stated: "In fact, the BTC Individual X stole came from the general pool of Silk Road bitcoin and not from any particular user accounts, meaning that no user balances were impacted by the hack." [4-ER-709.]

13

While this ignores the fungibility aspect and contrives the idea of specific user accounts, Special Agent Haynie's testimony regarding the "general pool's" composition directly contradicts that notion:

> In this case, Individual X sent the stolen bitcoin to 1BAD and 1BBq in 54 separate transactions. Each of those transactions was funded by multiple bitcoin addresses associated with Silk Road. In total, 1BAD and 1BBq was funded by approximately 3,056 sending addresses … Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users. I determined this by having an IRS-CI analyst compare each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road servers. This means that 98 percent of the sending addresses that funded 1BAD & 1BBq and therefore 1HQ3, were addresses used by Silk Road users[.]

[4-ER-680.]

While the government represents that "no user balances were impacted" by the hack, Special Agent Haynie confirms that at least 3,014 user deposit addresses directly funded the wallets used to accomplish the hack. [4-ER-680, 726.] Put another way, user account credits were not affected.

Even if Mr. Matusko had to trace untraceable bitcoin from a wallet that he did not control to the hacked bitcoin, it is undisputed that 3,014 user addresses were affected. One of those addresses may have been assigned to Mr. Matusko. This certainly presents a colorable claim.

### 4. The Government's statement that Mr. Matusko lacks standing because he is like an account holder at a defaulted bank is misguided and supports Mr. Matusko's standing argument.

The government analogized Matusko's claim as follows:

14

> Individual A deposits money in a bank. A year later, a robber walks into the bank and steals thousands of dollars. Individual A does not find out about the robbery and his account balance is not affected . . . Individual A keeps his money in the bank for another year, able to withdraw it but choosing not to . . . The bank then shuts down (due to any reason unrelated to the robbery) and Individual A loses his money . . . [Y]ears later, the bank robber is captured, and the police find the stolen money untouched under his mattress. Individual A . . . makes a claim to the money under the robber's mattress as part of the funds he lost . . . This absurd scenario is precisely what Matusko argues in his brief."

[2-ER-23.]

This analogy is an appropriate framework to view the issue, however, the interpretation and assumptions are fundamentally flawed. Examined critically, this example highlights why Mr. Matusko has standing because his credit remains.

First, the scenario demonstrates the fungible nature of the deposit. Individual A is entitled to the return of the amount deposited but not to any specific dollar bill. Rather, he has a credit with the bank.

Second, the government reasons that the account holder is unreasonable because the loss occurred with the bank's closing. However, the government glosses over several underlying assumptions distinguishing of a bank defaulting to the seizure of the Marketplace's assets.

If this scenario occurred, account holders would be protected by the Federal Deposit Insurance Corporation ("FDIC"). 12 U.S.C. § 1811 *et seq*. FDIC, by law, would take two actions: First, it would pay depositors insurance within a few days by providing the account holder a new account at another bank or issuing a check.

15

*See* Deposit Insurance FAQs, FDIC (Dec. 8, 2021),

https://www.fdic.gov/resources/deposit-insurance/faq/. Second, FDIC serves as the

failed bank's receiver to sell and collect the failed bank's assets and settling its

debts, including claims for deposits in excess of the insured limit. *Id.* Here, the

depositor's recourse would be immediately addressed by FDIC. Account holders

would be made whole through a completely different process, thus, a later claim in

a forfeiture would be unnecessary.

The Marketplace was not an FDIC bank. However, this comparison

demonstrates the shallowness of the government's analogy. Individual A would be

made whole by operation of the FDIC. In fact, a fully covered depositor does not

need to take any action. *Id.* For claims exceeding insurance, the matter would be

resolved through receivership. *Id.* And certainly, Individual A would be directly

notified by the FDIC. *Id.* Any claims the depositor had would have been resolved

through insurance and legal proceedings instituted upon the bank's closing.

Even if the bank was not FDIC insured, the bank would address its liabilities

through a bankruptcy or other civil proceeding. *See* 11 U.S.C. § 101 *et seq*. Again,

this would require direct notice to the bank's creditors, including depositors, to

discharge or otherwise address any liabilities. *Id.* Multiple cryptocurrency

platforms have filed for bankruptcy protection and provided ample notice to

16

potential claimants. *See In re: Celsius Network, LLC, et al.* No. 22-10964 (Bankr. S.D.N.Y. filed Jul. 13, 2022).

In comparison, the Silk Road was simply a sole proprietorship. *Littriello v. United States,* 484 F.3d 372 (6th Cir. 2007) (describing a sole proprietorship as an entity "in which a single individual owns all the assets, is liable for all debts, and operates in an individual capacity") *see also* 26 C.F.R. § 301.7701-3(b)(1). Mr. Matusko is unaware of any bankruptcy proceeding or any civil action taken by Ross Ulbricht resolving his or the Marketplace's outstanding obligations. While the government instituted a criminal action to address the Marketplace's actions seven years ago, there was no civil proceeding to address the Marketplace's liabilities. Mr. Matusko and all marketplace users still have rights to their assets.

This concept is demonstrated by the fact that the government obtained a stipulation to consent to the forfeiture from Ross Ulbricht as an individual. [4-ER 736-738.] There is no stipulation from an entity, or any other party related to the Marketplace.

Further, the bank scenario demonstrates the financial harm to the depositors, the bank, and its shareholders. The government proposes to keep the money under the mattress rather than return the proceeds to those that suffered the loss—money that would have been available to depositors but for the earlier theft, and that depositors undoubtedly have a colorable financial interest in.

17

The government's defaulted bank example is ineffective in disproving Mr.

Mr. Matusko's standing. There are ample protections in place to ensure bank

customers would never need to make a claim against money found under a bank

robber's mattress.

The inference here is that the government believes all Marketplace users

were involved in criminal conduct because the marketplace was primarily a

conduit for criminal activity. The Marketplace's administrator committed serious

crimes. The government has the right to make that argument in this matter;

however, it does not equate to a lack of standing.

Mr. Matusko's verified claim is sufficient to establish standing. He has a

colorable interest in the property seized in 1HQ3 and it was error for the District

Court to determine otherwise. According to this Court, "forfeitures are disfavored"

and their "laws . . . are to be 'strictly construed . . . against the government.'"

*United States v. Ritchie*, 342 F.3d 903, 910 (9th Cir. 2003). Here, the facts viewed

in a manner most favorable to Mr. Matusko (the non-moving party) unequivocally

establishes his interest and standing.

**C.    MR. MATUSKO'S CLAIM IS TIMELY WHERE THE
GOVERNMENT DID NOT PROVIDE NOTICE, AND THE
DISTRICT COURT IMPLIED HIS CLAIM WAS UNTIMELY IN
ERROR.**

Though the District Court did not directly hold Mr. Matusko's claim was

untimely, the order implied the claim was untimely.

Mr. Matusko is a potential known claimant, and his claim is timely. It is the

government that has not met statutory requirements. The government has

information on every Silk Road user to this day. Despite available methods to link

cryptocurrency transactions with individuals, the government appears to have

determined that notice was not required on the basis that "all [seized] bitcoin was

tainted because it all came from individuals wishing to purchase illicit goods and

services." [4-ER-681.].  Consequently, it apparently made no effort to notify users

of either forfeiture action. The government has not met its initial notice

requirements to proceed with the forfeiture.

Even if Mr. Matusko's claim is untimely, the facts demonstrate he has acted

in good faith and the government is not prejudiced by the filing of the claim.

**1.    The Government Never Provided Adequate Notice To Known
Claimants.**

The government did not provide Mr. Matusko—or any Silk Road user—with

direct notice here or in the earlier forfeiture.  However, in similar bitcoin forfeiture

actions, the government traced all transactions on the bitcoin blockchain and

provided direct notice via certified mail and email to all potential users.  *United States v. Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020).

In a forfeiture action, the government must provide two manners of notice: (1) direct notice to persons who reasonably appear to be a potential claimant, and (2) notice by publication. Supp. R. G(4)(a)-(b).  To identify potential claimants, "reasonable efforts must be taken . . . to identify any person or entity with a likely ownership interest" before a complaint is filed. Asset Forfeiture Policy Manual (U.S. Department of Justice, 2021) at 86, n. 45.  Publication is typically satisfied by posting notice on the government's website (forfeiture.gov). Asset Forfeiture Policy Manual at 111; Supp. R. G(4)(a)(iv)(C).  However, if known potential claimants are in a foreign country, then notice may need to be published in a newspaper of general circulation "in the appropriate foreign language, in the country in which known potential claimants are located." *Id*.; *see* Supp. R. G(4)(a)(iv).

These notice principles have been applied to users of another illicit, internet marketplace in *United States v. Twenty-Four Cryptocurrency Accts.*  In that case, the government seized cryptocurrency accounts associated with a website engaging in the sale of illicit content. *Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1.  There, the government analyzed the blockchain, transactions on the website,

and other information to identify claimants, and then notified the users by certified mail and email. *Id.*

Here, the government knows and has information on thousands of Silk Road users both domestic and abroad but chose to notify only Ross Ulbricht. [4-ER-743.] ("purchases appear to have been filled by vendors located in over ten different countries"). The government verified that Mr. Matusko sent "47.52 bitcoin in December 2011" to the corresponding address in the Silk Road wallet. Mr. Matusko's user profile was credited with that amount and that credit always remained . . . [and] had the same balance when the server was seized." [4-ER-727.]. It appears the government believes that Ulbricht is the only party entitled to direct notice despite thousands of Silk Road users with outstanding credits. Nonetheless, the government's conduct here is inconsistent with its effort to notice individual users in *Twenty-Four Cryptocurrency Accts*.

Mr. Matusko is a known claimant in both relevant forfeiture proceedings. The government did not attempt to notify potential claimants and did not follow proper procedure. Rather, it looks to hold an innocent property owner accountable for their own failure. Notice was given to one known potential claimant (Mr. Ulbricht) and then posted on a U.S. government website in English only – even though it was known potential claimants were located abroad, contrary to guidance published in the Forfeiture Policy Manual. Forfeiture Policy Manual at 111

21

("Published notices on forfeiture.gov are limited to English at this time. . . depending on the facts of the case, it may be appropriate to publish notice in a newspaper of general circulation"). It is unclear why the government chose to disregard their own procedural requirements here, especially when they were dutifully observed in *Twenty-Four Cryptocurrency Accts*.

## 2. If his claim is found to be untimely, then relevant factors weigh in favor of Mr. Matusko's claim.

Even if Mr. Matusko's claim is found to be untimely, then a court may exercise its discretion to proceed on the merits.

In a civil forfeiture action, the court has discretion to hear a claim that is untimely filed. Rule G(5)(a)(ii)(A); *see United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,* 787 F.3d 968, 974 (9th Cir. 2015). This Court applies a twelve-factor test when evaluating whether to exercise discretion to let a late claim proceed: *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118 (9th Cir. 2004)).

Whether Mr. Matusko satisfies these factors is not up for review on this appeal. However, these factors favor Mr. Matusko because he acted in good faith to file a claim as soon as he became aware of his potential rights, notified the government attorneys involved, and would be severely prejudiced if his claim were not allowed to proceed.

# VII.
# CONCLUSION

For the foregoing reasons, the final judgment of the District Court should be vacated, the claim should be considered to satisfy standing requirements, the claim should be considered timely and the matter should proceed to the merits.

Date:  Nov. 9, 2022

KUGELMAN LAW, P.C.

*/s/ Alexander H. Kugelman   .*
Alexander H. Kugelman, Esq.

*Attorney for Appellant Ilija Matusko*

23

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**: 22-15514, 22-16349

The undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[x] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:
1. 22-15513 // USA v. Battle Born Investments Company, LLC, et al. (consolidated with 22-16348)
2. 22-15514 // USA v. Ilija Matusko, et al. (consolidated with 22-16349)
3. 22-16085 // USA v. Roman Hossain, et al.
4. 22-16248 // USA v. Lucas Buckley, et al.
5. 22-16348 // USA v. Battle Born Investments Company, LLC, et al.

**Signature** _____/s/ Alexander H. Kugelman_____ **Date** Nov. 9, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**: 22-15514; 22-16349

I am the attorney or self-represented party.

**This brief contains <u>5,194</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ Alexander H. Kugelman_____ **Date** Nov. 9, 2022