**Case No(s). 22-15514, 22-16349**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

United States of America,

*Plaintiff-Appellee,*

v.

Ilija Matusko

*Claimant-Appellant,*

v.

Ross William Ulbricht,

*Respondent,*

Approximately 69,370 Bitcoin (Btc), Bitcoin Gold (Btg) Bitcion Sv
(Bsv) and Bitcoin Cash (Bch),

*Defendant.*

_____

On Appeal from the United States District Court
for the Northern District of California
No. 3:20-cv-07811-RS
Hon. Richard Seeborg

_____

## CLAIMANT-APPELLANT'S EXCERPTS OF RECORD
## VOLUME 2 OF 4

_____

Alexander H. Kugelman
KUGELMAN LAW, PC
21 Tamal Vista Blvd. Suite 202
Corte Madera, California, 94925
Telephone: 415.968.1780
Facsimile: 415.534.9441
e-mail: alex@kugelmanlaw.com

*Attorneys for Claimant-Appellant*
Ilija Matsuko

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-436-7428
     FAX: (415) 436-7234
     claudia.quiroz@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CV 20-7811 RS |
|     Plaintiff, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO** |
|   v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx | Hearing Date:   September 30, 2021<br>Time:          1:30 p.m.<br>Court:         Hon. Richard Seeborg |
|     Defendant. | |
| ILIJA MATUSKO, | |
|     Claimant. | |

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

1

**TABLE OF CONTENTS**

I.  Introduction ........................................................................................................... 1

II. Argument ............................................................................................................... 2

    A.  Matusko Cannot Demonstrate Standing ....................................................... 2

        1.  Neither Matusko nor Silk Road Account Holders Have a Legitimate Interest in the Defendant Property Because It Remained with Silk Road Until it was Forfeited in 2013 ..................................................................................................................... 2

        2.  At Best, Matusko is an Unsecured Creditor ......................................................... 4

        3.  Matusko Abandoned his Property ......................................................................... 4

        4.  By Creating an Account with Silk Road and Willingly Depositing Bitcoin Into It, Matusko Knowingly Contributed to the Illegality of the Site ........................... 5

    B.  Notice was Sufficient ................................................................................... 7

    C.  Matusko Cannot Overcome the Fact that his Claim is Unjustifiably Late ........................... 13

        1.  Matusko Improperly Misconstrues the Ninth Circuit's Factor's to Excuse His Untimeliness ...................................................................................................... 13

        2.  Matusko's Arguments with Respect to the Other Factors Fail to Justify his Untimely Claim ..................................................................................................................... 14

III. Conclusion .......................................................................................................... 15

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

4

*Covelo Indian Community v. F.E.R.C.*,
   895 F.2d 581 (9th Cir. 1990) ................................................................. 12, 14

5

6

*Dusenbery v. United States*,
   534 U.S. 161 (2002) .......................................................................................... 7

7

8

*In re Hewlett-Packard Co. Shareholder Derivative Litig.*,
   716 F. App'x 603 (9th Cir. 2017) .................................................................... 8

9

*In re Hewlett-Packard*,
   719 F. App'x At 608 ................................................................................. 12, 14

10

11

*Inc21.com Corp. v. Flora*,
   No. 08-CV-02967, 2008 WL 5130415 (N.D. Cal. Dec. 5, 2008) ..................... 8

12

13

*Johnson v. United States*,
   No. 1:03 Civ. 00281, 2004 WL 2538649 (S.D. Ind. Oct. 22, 2004) ................. 9

14

*Mullane v. Central Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950) ............................................................................... passim

15

16

*Tulsa Professional Collection Servs., Inc. v. Pope*,
   485 U.S. 478 (1988) ........................................................................................ 12

17

18

*United States v. $100,348.00 in U.S. Currency*,
   354 F.3d 1110 (9th Cir. 2004) ........................................................................ 13

19

20

*United States v. $133,420. in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) ............................................................................ 4

21

*United States v. 8 Gilcrease Lane*,
   641 F. Supp. 2d 1 (D.D.C. 2009) ................................................................. 4, 6

22

23

*United States v. 801 E. Franklin Ave.*,
   No. 13-CR-0117, 2013 WL 2948075 (S.D. Ala. May 17, 2013) ...................... 4

24

25

*United States v. Ferro*,
   473 F. App'x 789 (9th Cir. 2012) .................................................................... 7

26

*United States v. Medina*,
   301 F. Supp 2d 322 (S.D.N.Y. 2004) ............................................................... 5

27

28

1   *United States v. One Hundred Thirty-Three U.S. Postal Money Orders*,
2       496 F. App'x. 723 (9th Cir. 2012) ............................................................................. 4

3   *United States v. Twenty-Four Cryptocurrency Accounts*,
        473 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................8, 9, 12, 13
4

5                                              **Statutes**

6   18 U.S.C. § 983(d)(6)(B)(i) .................................................................................4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2    Ilija Matusko's opposition brief provides no justification for bringing a claim seven years late

3    with no arguable standing. His arguments are based on a series of mistaken assumptions and unfounded

4    premises—none of which enhances the validity of his claim.

5    First, Matusko lacks standing. Neither he nor his 100,000+ fellow Silk Road users have a

6    financial interest in the bitcoins seized from Individual X. The Defendant Property was taken from a

7    pool of bitcoins available to Ross Ulbricht for Silk Road's various expenses—Individual X did not steal

8    from individual user accounts, which is why the theft did not affect any individual account balances.

9    When law enforcement took down the website in 2013 and seized its servers, it also seized the bitcoins

10   contained within them, which included those Matusko now claims. Indeed, it was at that point that

11   Matusko and all other Silk Road users lost their ability to withdraw or use their bitcoins. The Defendant

12   Property is thus separate from the 48 bitcoins (BTC) Matusko claims belong to him. Matusko is, at best,

13   an unsecured creditor with no rights to the Defendant Property. Moreover, per his own admissions, he

14   abandoned his property, thereby further rendering his claim meritless. In addition, Matusko is not an

15   innocent owner of the bitcoin. It is undisputable that Silk Road was a website entirely built upon a

16   criminal enterprise, and that the bitcoins seized from its servers constitute the proceeds of crime and

17   money laundering. While he was purportedly unemployed and receiving limited government assistance,

18   Matusko willingly surrendered twenty percent of his monthly income to a known criminal marketplace,

19   seemingly aware of the risk that he might not get it back and without even attempting to do so, and kept

20   it there even after he purportedly realized he did not want to engage in any criminal activity.

21   Second, Matusko cannot overcome the fact that his claim is unjustifiably, and overwhelmingly,

22   late. The government's notices of the forfeiture actions were proper in both 2013 and 2020. Matusko

23   argues that the government should have used available data and blockchain tracing technology to track

24   down the identities of each of the over 100,000 Silk Road users in order to provide them with direct

25   notice. But the blockchain analytics technology Matusko suggests the government should have used was

26   simply unavailable in 2013, thereby rendering it impossible for the government to have identified and

27   located each of the anonymous Silk Road account holders. With respect to the instant action, Ulbricht

28

received direct notice because he was the only person who reasonably appeared to be a potential

claimant given that he personally absorbed the loss from the theft. Even assuming user balances were

affected by it, the circumstances and peculiarities of the case rendered direct notice to over 100,000

unknown users impracticable and not reasonably calculated to reach them.[1] Notice by publication exists

as an option precisely for cases like this one. This Court should not give Matusko a second chance in a

case in which he has no standing. The Court should grant the government's motion to strike.

## II.  ARGUMENT

### A.  Matusko Cannot Demonstrate Standing

#### 1.  Neither Matusko Nor Any Silk Road Account Holders Have a Legitimate Interest in the Defendant Property Because It Remained with Silk Road Until it was Forfeited in 2013

Matusko argues that because his 48 BTC were pooled with all bitcoins held in Silk Road's

bitcoin wallet, "every [Silk Road] user had and *still has* a financial interest in the bitcoin sent to the

Marketplace's Bitcoin wallet and therefore an interest in both 2013 and 2020 seizures." Opp'n at 7

(emphasis in original). This is demonstrably false. No Silk Road user has a financial interest in the

bitcoins seized in connection with this particular action. Individual X stole the bitcoin from the platform

itself, not the accounts of individual Silk Road users. Declaration of Special Agent Jeremiah Haynie

("Haynie Decl.") ¶¶ 5, 7. As such, the theft did not affect the balances of individual Silk Road users, but

it did affect the balance of bitcoin available for Ulbricht to use for the site's day-to-day operations.

Ulbricht kept the fact that there was a vulnerability on the site quiet and absorbed the cost without

announcing the theft. Accordingly, it was *Silk Road*'s—and, consequently, Ulbricht's—loss.

Matusko has never held an interest in the property at issue in this case. He unquestionably

retained access to his bitcoins after Individual X's theft—he could have withdrawn them at any time up

until the moment the government shut down the website. Haynie Decl. ¶¶ 9-10. Indeed, even after the

takedown, Matusko could have asserted a claim to his bitcoin as part of the 2013 forfeiture proceeding

in New York, as he has admitted he knew Silk Road was shut down. *See* Declaration of Ilija Matusko

---

[1] These circumstances include the large number of users, transactions, and bitcoin addresses; the limited information on each of them available on the Silk Road website; the anonymity protections associated with it; and the fact that Silk Road users spanned the entire globe.

("Matusko Decl."), Dkt. No. 100-2 ¶ 11. Matusko's excuses for not pursuing the claim then are precisely that—just excuses, not legitimate justifications that could overcome a seven-year late claim on a matter that has been properly adjudicated. The most likely scenario is that given the low value of his BTC back then compared to their worth today, Matusko chose not to pursue their recovery at that time—it was probably not worth going through the trouble and decided to forego it.

Matusko incorrectly argues that the timing of Individual X's theft is irrelevant to his "colorable" claim because the fungibility of Bitcoin means that he maintained his credit to his 48 BTC even after the government shut down the website and seized its servers in 2013. Opp'n at 25. As stated above, Individual X's theft was from the platform itself; no user account balances were affected, including "hanson5," the moniker Matusko purportedly used on Silk Road. Haynie Decl. ¶¶ 7-8. In essence, Matusko argues that his 48 BTC existed in two places at the same time: (1) in his Silk Road account between Individual X's theft in May 2012 and the government's takedown in 2013; and (2) in the 1HQ3 bitcoin address for seven years following the theft by Individual X in 2012. Following his reasoning, Matusko would retain ownership of his Bitcoin no matter what happened or how he lost access to it.

Bitcoin operates in novel and remarkable ways, but it is not magic. Like any other asset, when it is lost, it is lost. Matusko's claim is akin to the following scenario: Individual A deposits money in a bank. A year later, a robber walks into the bank and steals thousands of dollars. Individual A does not find out about the robbery and his account balance is not affected by it because the bank absorbs the loss. Individual A keeps his money in the bank for another year, able to withdraw it but choosing not to do so. The bank then shuts down (due to any reason unrelated to the robbery) and Individual A loses his money as a result. Seven years later, the bank robber is captured, and the police find the stolen money untouched under his mattress. Individual A reads about it in the newspaper and makes a claim to the money under the robber's mattress as part of the funds he lost when the bank went bust. This absurd scenario is precisely what Matusko argues in his brief. Unfortunately, a person can lose his or her bitcoin just like any other tangible assets, and it certainly cannot reside in multiple places at once. The fact remains that Matusko could have withdrawn his 48 BTC (or made a purchase with them) at any time after Individual X stole from Silk Road but chose not to do so. He cannot have it both ways.

1   Matusko and the other 100,000+ Silk Road users lost any potential remaining interest in the

2   bitcoins they held on the platform when the District Court in the Southern District of New York issued a

3   default judgment against the bitcoins located on Silk Road's servers on January 15, 2014. Specifically,

4   the court ordered that the government "shall have judgment by default against the Silk Road Hidden

5   Website and the Silk Road Server Bitcoins" and that the website and "the Silk Road Server Bitcoins

6   shall be, and the same hereby are, forfeited to the [government]." Declaration of Claudia Quiroz

7   ("Quiroz Decl.") Ex. 2. When law enforcement shut down Silk Road and seized its servers, all user

8   account balances were seized along with them and were the subject of a forfeiture proceeding. Thus,

9   even after the takedown, claimants had the opportunity to appear and make claims in accordance with

10  Rule G and all applicable forfeiture statutes. That forfeiture matter was properly and finally adjudicated

11  in 2014. Accordingly, no Silk Road user retains a financial interest in the 2013 seizure, including

12  Matusko. The Court should accordingly strike Matusko's claim.

13  **2.    At Best, Matusko is an Unsecured Creditor**

14  When Matusko willingly deposited his bitcoin into a known criminal platform he became, at

15  best, an unsecured creditor of Silk Road. But unsecured creditors do not have standing in civil forfeiture

16  claims. *United States v. One Hundred Thirty-Three U.S. Postal Money Orders*, 496 F. App'x. 723, 724

17  (9th Cir. 2012) (citing 18 U.S.C. § 983(d)(6)(B)(i)). Unsecured creditors categorically lack the requisite

18  "ownership interest or []possessory interest" in specific property. *Id.* (quoting *United States v. $133,420

19  in U.S. Currency*, 672 F.3d 629, 637-38 (9th Cir. 2012)); *see also United States v. 8 Gilcrease Lane*, 641

20  F. Supp. 2d 1, 5-6 (D.D.C. 2009) (concluding that unsecured creditors lack specific interest in a property

21  sufficient to satisfy standing requirements). Because Matusko has no rights to the Defendant Property

22  and no standing even as an unsecured creditor, the Court should strike his claim.

23  **3.    Matusko Abandoned his Property**

24  Matusko abandoned his bitcoin, which deprives him of standing to bring a claim. A person "who

25  abandons property and leaves it to the devices of those using it as an illegal drug operation and does

26  nothing to try and stop it cannot be an innocent owner" for purposes of a civil forfeiture action. *United

27  States v. 801 E. Franklin Ave.*, No. 13-CR-0117, 2013 WL 2948075, at *1 (S.D. Ala. May 17, 2013).

28

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

Indeed, individuals who abandon property generally forfeit their ability to challenge the government

from seizing it at all. *See United States v. Medina*, 301 F. Supp 2d 322, 331 (S.D.N.Y. 2004).

Matusko claims that as soon as he saw the depth of illegal trades on Silk Road, he "decided

against buying anything." Matusko Decl. ¶ 9. He nonetheless made the decision not to withdraw his

bitcoins from the platform at that point even though he purportedly did not intend to use them.

Moreover, although Matusko reportedly forgot his password to his hanson5 user account and lost his

access to it, he seemingly made no effort to retrieve it.[2] *See* Matusko Decl. ¶ 10. In combination, these

series of actions—or inactions—indicate an abandonment of his bitcoins. Matusko further abandoned

his interest in his 48 BTC when he learned that law enforcement had intercepted Silk Road's illegal

activities and took down the website. Yet, he did nothing to preserve his rights to his property.

Matusko's abandonment vitiates his standing, and the Court should strike Matusko's claim accordingly.

### 4. By Creating an Account with Silk Road and Willingly Depositing Bitcoin into It, Matusko Knowingly Contributed to the Illegality of the Site

There should be no dispute that Silk Road was a criminal site with a criminal purpose that sold

criminal goods and services. The bitcoins seized from Silk Road and Ulbricht are criminal proceeds

subject to forfeiture. This includes the bitcoins located in the Silk Road server when it was seized in

2013, the bitcoins found on Ulbricht's laptop when he was arrested, and the bitcoins Individual X stole

from the platform in 2012. Matusko argues that not all bitcoins seized from Silk Road are subject to

forfeiture because not everything associated with the site was illegal. *See* Opp'n at 12 ("Silk Road was

not exclusively used for the purchase of illicit goods and services" because it also sold "art, apparel, and

---

[2] Due to the anonymity Silk Road provided to its users, Silk Road did not have an official password recovery option for its users. Haynie Decl. ¶ 10. However, Matusko could have tried to reset his password but seemingly chose not to even try. *Id.* Indeed, a Google search of "Silk Road password reset" leads to the following internet post dated June 7, 2013:

> *"If you forgot your password, unfortunately you will not be able to retrieve it. Some people have had success by creating a new account and messaging mods either on the forum or via the Road. If you can prove that you are the owner of the other account (By stating order history, bitcoin balance, pin code, etc.) then you **might** have some luck getting the account back."*

Haynie Decl. ¶ 10 (citing https://www.reddit.com/r/SilkRoad/comments/1fve2n/password_reset/).

books."). This flies in the face of the overwhelming evidence that Silk Road prosecutors presented at Ulbricht's trial demonstrating the site's criminality.[3] *See* Quiroz Decl. Exs. 8-10.

Matusko attempts to justify his involvement with Silk Road by treating it like a regular bank, where people deposit their funds for no illicit purpose. Silk Road was not a bank—it was a criminal marketplace. Matusko may not have purchased drugs or other illicit goods using his hanson5 account. However, by knowingly contributing funds to the marketplace and leaving them there for two years where his and other users' funds were pooled and available for Ulbricht to use as he wished—which may have included to further the website, for payroll, to pay himself commissions, to make refunds to the site's customers, and to commission murders in order to protect his interests in the site—Matusko indirectly, yet unquestionably, contributed to the operations and illegality of the Silk Road website.

Ross Ulbricht gave Silk Road life, yet the thousands of narcotics traffickers and consumers of illegal goods and services fueled its expansion and growth, resulting in massive drug distribution worldwide and the death of several individuals who overdosed using products sold on the site. That case was tried before a jury in New York in 2015. The government presented overwhelming evidence of the criminal activity that permeated the website and satisfied its burden beyond a reasonable doubt. As a result, Ross Ulbricht was sentenced to two life terms in prison. Ulbricht will spend the rest of his life in prison not because he sold books or art, but because he set up and managed an illegal online marketplace for drugs and criminal goods and services of unprecedented scope.

By willingly opening an account with the website, depositing funds in it, and leaving them there, Matusko was complicit—albeit in a small scale—in the operations of Silk Road. Matusko was not required to deposit Bitcoin to open an account on the site[4]—he chose to do it. In one of his forum posts

---

[3] In an Opinion & Order denying Ross Ulbricht's Motion for New Trial, Hon. Katherine B. Foster noted that at trial, the jury "heard extensive testimony that Silk Road was a website used to buy and sell narcotics and other illicit goods and services. . . . saw printouts from the website showing advertisements for a variety of such narcotics, and heard testimony from a law enforcement agent who had seized a large volume of narcotics purchased through Silk Road." *United States of America v. Ross William Ulbricht*, Case No. 1:14-cr-99968-KBR, Dkt. No 237 at 5 (S.D.N.Y. April 27, 2015).  The jury "also saw documents which demonstrated that the Dread Pirate Roberts attempted to protect his interests in Silk Road by commissioning the murder of several individuals . . . ." *Id.* at 5-6.

[4] In his declaration, Christopher Wajda states that the "final stage in opening the user profile on the Silk Road Marketplace was to fund the profile with Bitcoin(s)." Dkt. No. 100 ¶ 8. Users were not required to deposit bitcoin or pay a fee to register an account on Silk Road, however. Haynie Decl. ¶ 2.

to the Silk Road community on January 10, 2012, Ulbricht told the site's users that "[w]hether you like it or not, I am the captain of this ship. You are here Voluntarily and if you don't like the rules of the game, or you don't trust your captain, you can get off the boat." Quiroz Decl. Ex. 6. Matusko was on the site voluntarily and chose to stay on it and contribute to it until the site was taken down in 2013.

## B. <u>Notice was Sufficient</u>

Matusko argues that the government should have provided him (and thousands of Silk Road users) with direct notice of the forfeiture action, asserting that it was not only possible in 2020, but that it was also possible in 2013 in connection with the Southern District of New York's forfeiture case. Opp'n at 14-15. Preliminarily, putative claimants without standing are not due notice of a pending forfeiture action. *United States v. Ferro*, 473 F. App'x 789, 790 (9th Cir. 2012). As Matusko lacks standing, he was not due direct notice. But even assuming the Court concludes that Matusko does have standing, Matusko had sufficient notice of the pending action in both 2013 and 2020.

Rule G specifically provides that the government must send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i). This language generally tracks the due process requirements set forth by the Supreme Court of the United States for the adequacy of notification in *Dusenbery v. United States*, 534 U.S. 161 (2002). In *Dusenbery*, the Court determined the extent of process due to a prisoner whose property was subject to an administrative forfeiture proceeding. 534 U.S. at 164-65. The Court relied on the test articulated in *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950), in determining "the adequacy of the method used to give notice" for forfeiture claims. *Id.* at 167-68. In short, *Mullane* and *Dusenbery* require the government to ensure that notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 168 (quoting *Mullane*, 339 U.S. at 314, 319). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* (quoting *Mullane*, 339 U.S. at 315). Those means, however, do not require the government to accomplish actual

notice; the government must only attempt to provide it. *Dusenbery*, 534 U.S. at 169-70.

These cases do not prescribe any particular method of service. Rather, service must be provided in a manner that is "practicable," with "due regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314, 317. Thus, in cases where individuals with potential claims are "missing or unknown," the application of indirect notification procedures, such as notice by publication, are constitutionally permissible. *Id.* at 317; *see also In re Hewlett-Packard Co. Shareholder Derivative Litig.*, 716 F. App'x 603, 608 (9th Cir. 2017) (mail notice is required for due process where "'practicable,' and depending on the circumstances."); *Inc21.com Corp. v. Flora*, No. 08-CV-02967, 2008 WL 5130415, at *6 (N.D. Cal. Dec. 5, 2008) (citing *Mullane* to approve notice by publication).

Matusko asserts that the government "knows and has information on thousands of Silk Road users both domestic and abroad" and thus had the ability to link cryptocurrency transactions with individuals and provide direct notice to all Silk Road users. *See* Opp'n at 13, 15. To support his argument, Matusko cites to *United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1 (D.D.C. 2020) (hereinafter "*Welcome To Video*").[5] Opp'n at 15. He specifically asserts that, because the government was able to provide direct notice to potential claimants in that case, the government should have done the same here. *Id.* Matusko further asserts that because the government was able to verify the transfer of bitcoin to his Silk Road moniker, "hanson5," the government should have been able to determine that this transfer originated from Matusko. These arguments lack merit.

This case differs in critical respects from *Welcome To Video*, primarily with respect to the location from where the different cryptocurrencies were seized and the manner in which the investigations were conducted (guided by the goals of each investigation)—both of which allowed greater access to information in the *Welcome to Video* case. In that case, the government seized funds from 24 accounts at specific cryptocurrency exchanges, some of which were held in the names of the individuals that were noticed.[6] Accordingly, the exchanges provided Know Your Customer ("KYC")

---

[5] Welcome to Video was a Tor-based Internet site that hosted and distributed images and video files depicting child pornography. *Id.* at 3. Customers received content from the site by redeeming "points," which could be obtained by, among other things, paying Bitcoin. *Id.*

[6] In *Welcome to Video*, two potential claimants were not provided direct notice—one who provided no email or mailing address to the exchanges and another who provided no mailing address

information, which consisted of either actual names for the individuals whose cryptocurrency was seized or the email/physical addresses where notices could be sent. *See* 473 F. Supp. 3d at 3, 5-6. In Silk Road, the 2013 seizures of funds were from the Silk Road servers and Ulbricht's personal laptop. In 2020, it was from a well-known bitcoin address in an unhosted wallet[7] that sat untouched for five years. None of these sources of information—Ulbricht's personal laptop, the Silk Road servers, and the unhosted wallet—had the same identifying information available to the prosecutors in *Welcome to Video*. Moreover, the accounts at the exchanges in *Welcome to Video* were identified as potentially linked to targets of the criminal investigation.[8] Haynie Decl. ¶¶ 12-13. In other words, the information that was used to provide direct notice was obtained as part of the investigation itself, not through the forfeiture process, and occurred before the forfeiture complaint was even filed. *Id.*

The impracticability of providing direct notice to Silk Road users is further compounded by the fact that the entire premise of Silk Road was to provide an anonymous platform for its users. Ulbricht went to great lengths to ensure that buyers and sellers on Silk Road were able to operate anonymously. The subtitle of Silk Road was "anonymous market." *Id.* ¶ 2. Consistent with the operation of an anonymous market, Silk Road users were required to provide little identifying information. *Id.* Users that registered with Silk Road were required to provide a username and a password, but notably were not required to provide identifying information such as a real name, physical address, social security number, date of birth, email address, or phone number. *Id.* This applied to the hanson5 account as well. *See id.* ¶ 4. Ulbricht went so far as to create a Silk Road "Buyer's Guide" for the site's users, which

and a defunct email address. 473 F. Supp. 3d at 6. The court found that for those two individuals the government was unable to reach directly, notice via publication satisfied the government's obligations. *Id.* (*citing See Johnson v. United States*, No. 1:03 Civ. 00281, 2004 WL 2538649, at *4 (S.D. Ind. Oct. 22, 2004) (citing *Mullane*, 339 U.S. at 317–319) (finding publication of a forfeiture notice satisfies due process requirements where "the government does not know or reasonably cannot discover the [claimants'] whereabouts"). The court thus found that the government had met the notice requirements of Supplemental Rule G. *Id.*

[7] "An unhosted wallet is not hosted by a third-party financial system. It can be very difficult or impossible to determine who is accessing or in control of the use of cryptocurrencies in an unhosted wallet. Unhosted wallets allow for anonymity and concealment of illicit financial activity." https://home.treasury.gov/system/files/136/2020-12-18-FAQs.pdf

[8] Over 300 people were arrested and at least 23 children were rescued from their abusers in connection with the *Welcome to Video* case.

1  emphasized the site's anonymity and stated that users "*are totally anonymous on Silk Road . . .*" and

2  "[w]e do everything we can to protect your anonymity . . . ." *See* Quiroz Decl., Ex. 3 at 2 (emphasis

3  added). From its inception, the "idea was to create a website where people could buy anything

4  anonymously, with no trail whatsoever that could lead back to them." *See* Quiroz Decl., Ex. 7 at 2.

5      Ascertaining the identities of Silk Road account holders to provide direct notice of the 2013

6  forfeiture action would have been impossible for the simple reason that blockchain tracing technology

7  did not exist at the time.[9] *See* Haynie Decl. ⁋ 15. Notice by publication was thus entirely appropriate.

8      With respect to the 2020 seizure at issue in this case, notice by publication was also appropriate

9  for two main reasons. First, as noted above, Ulbricht absorbed the loss of Individual X's theft, as no user

10  account balances were impacted by it. Thus, pursuant to Rule G, the government sent direct notice to the

11  person who "reasonably appear[ed] to be a potential claimant on the facts known to the government

12  before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i).

13  Second, assuming Silk Road users had been impacted by the theft, direct notice would not have been

14  practicable given the "peculiarities of the case," *Mullane*, 339 U.S. at 314, 317, or "reasonably

15  calculated to reach the potential claimant," Fed. R. Civ. P. Supp. R. G(4)(b)(i), (iii)(A). Matusko argues

16  that the government should have analyzed "Silk Road users' transactions or other data in an effort to

17  notify known claimants as in [*Welcome to Video*]. Opp'n at 15. Matusko avers that "the government

18  knows and has information on thousands of Silk Road users both domestic and abroad" and that the

19  government can verify specific user transactions "because it verified that [] Matusko sent '47.52 bitcoin

20  in December 2011' to the corresponding address in the Silk Road wallet. . . .'" *Id.* As a preliminary

21  matter, these statements are based on the incorrect assumption that the government identified hanson5 as

22  Matusko.[10] The government has never said that. The government confirmed that "hanson5" had a Silk

23

24      [9] The leading companies providing blockchain analytics and cryptocurrency tracing technology
     include Chainalysis (founded on October 1, 2014), Elliptic (founded on October 1, 2013), Ciphertrace

25  (founded on May 30, 2015), Elementus (founded in 2018), and Coin Metrics (founded in 2017). Haynie
     Decl. ⁋ 15.

26      [10] Matusko asserts the following: "The government has made clear it can verify specific user

27  transactions because it verified that Mr. Matusko sent '47.52 bitcoin in December 2011' to the
     corresponding address in the Silk Road wallet. Mr. Matusko's user profile was credited with that amount

28  and that credit always remained . . . [and] had the same balance when the server was seized.'" Opp'n at
     15 (citing and quoting paragraph 12 of the Declaration of Jeremy Haynie in support of the government's

1  Road account with 47.52 BTC in it, but it never linked that moniker with Matusko. The government has

2  taken the assertion that Matusko created the hanson5 account as true for purposes of his claim, but he

3  very well may be someone else. Indeed, Silk Road had no identifying information on hanson5 other than

4  the moniker, the number of bitcoins available, and the user's general location ("Germany," which was

5  not independently verified). *See* Haynie, Ex. 2. Accordingly, it is inaccurate to argue that because the

6  government linked hanson5 and Matusko, it can link all Silk Road users with actual people.

7          Moreover, given the "practicalities and peculiarities" of this case, it simply would not have been

8  practicable to identify over 100,000 individuals just to provide them with direct notice, particularly

9  because nobody other than Ulbricht reasonably appeared to be a potential claimant based on the facts

10  known to the government during the 69,370 BTC seizure investigation—which centered on identifying

11  the person responsible for stealing bitcoin from Silk Road in 2012. *See* Haynie Decl. ¶ 13. To determine

12  real-life identities for over 100,000 Silk Road users, the government would have had to conduct tracing

13  analysis on each of the bitcoin transactions of those users.[11] With modern bitcoin tracing tools and old-

14  fashioned investigative techniques, the government has had success in the past identifying owners of

15  bitcoin addresses; however, these types of investigations require significant time and resources to

16  identify one user, let alone more than 100,000. Moreover, such an attempt would have been entirely

17  conjectural as there would have been no guarantee that such an investigation would yield potential

18  claimants given the intensive security measures taken by Silk Road users. And to the extent this process

19  revealed any contact information that could be used to send notices, that information is seven years old.

20  Accordingly, when considering "all the circumstances," this exceedingly burdensome and extensive

21

22  motion to strike Matusko's claim). Matusko's citation is plainly misleading. Nowhere in paragraph 12 of
   SA Haynie's declaration does he reference "Matusko"—he says "hanson5."

23

24      [11] According to the criminal complaint against Ulbricht "[a]s of July 23, 2013, there were
   approximately 957,079 registered user accounts reflected on the server . . . this volume of user accounts

25  indicates that the site has been visited by hundreds of thousands of unique users." *See* Ninth Circuit
   appellate record, Case No. 15-1815, Dkt. No. 31-1 at 72." Moreover, "[a]ccording to the country-

26  location information provided by these users upon registering, 30 percent represented they were from
   the United States, 27 percent chose to be 'undeclared,' and the remainder claimed to hail from countries

27  across the globe . . . ." *Id.* In addition, "[f]rom February 6, 2011 to July 23, 2013, there were
   approximately 1,229,465 transactions completed on the site, involving 146,946 unique buyer accounts,
   and 3,877 unique vendor accounts." *Id.* Indeed, even Wajda acknowledges the large number of Bitcoin

28  addresses associated with Silk Road—"2,105,527 Bitcoin addresses to be exact." Wajda Decl. ¶ 47.

1   endeavor would not have been "reasonably calculated . . . to apprise interested parties of the pendency of

2   the action." *See Dusenbery,* 534 U.S. at 164-65 (quoting *Mullane,* 339 U.S. at 314, 319).

3         Matusko has not cited to a single case with facts like this one where direct notice was required.

4   Indeed, he cannot—courts only require the government to issue direct notice in cases where potential

5   claimants are "reasonably ascertainable." *Covelo Indian Community v. F.E.R.C.*, 895 F.2d 581, 587 (9th

6   Cir. 1990). Reasonableness and practicality are the touchstones of determining when direct notice is

7   required; in situations like these, where the investigation of over 100,000 users would: (1) potentially

8   yield little information; (2) require multiple forms of international notice likely to be ineffective; and (3)

9   likely run into false identities and addresses created solely to assist in international drug trafficking,

10  notice by publication is more than sufficient precisely because the identities of putative claimants are not

11  reasonably ascertainable. *See In re Hewlett-Packard*, 719 F. App'x at 608 (direct notice required in

12  cases only where such notice is "practicable"); *Covelo Indian Community*, 895 F.2d at 587-88

13  (concluding that notice by publication is appropriate when dealing with claimants whose interests *might*

14  be affected by government action); *Tulsa Professional Collection Servs., Inc. v. Pope*, 485 U.S. 478, 487

15  (1988) (actual notice is required when the identities of those due notice are reasonably ascertainable).

16  Cases like these illustrate why notice by publication exists and is essential in forfeiture matters. If that

17  option does not apply to a situation like this one, where a dark net marketplace holds little or no

18  identifying information on thousands upon thousands of users whose identities cannot be reasonably

19  ascertained without going on a wild goose chase for each one of them without any certainty that the

20  information obtained (if any) is accurate, then it does not apply in any situation.

21        Matusko further argues that the fact that nobody came forward to make a claim in 2013 proves

22  that the government's notice was deficient. Opp'n at 12 (stating that the government "never notified any

23  of the 100,00-plus Marketplace users by email, physical mail, or any other direct manner. . . . It is

24  therefore unsurprising that no Marketplace users filed a claim in that forfeiture action.") It is telling that

25  in the same case Matusko cites where the government provided direct notice, no claimants came forward

26  either.[12] 473 F. Supp. 3d at 4. The fact that individuals involved in criminal activity in dark web

27

28      [12] And by the same token, the fact that several individuals have come forward and made a claim in this action further demonstrates that the notice was in fact proper.

marketplaces—whether it is narcotics trafficking or child pornography and exploitation—do not come forward to claim seized property is not a product of the adequacy or the sufficiency of the notice. The more logical explanation is that thousands of drug traffickers and purchasers of illicit goods and services did not come forward and expose their criminal activity because protecting themselves from criminal prosecution and likely incarceration is more valuable than the number of bitcoins in their accounts.

Matusko's arguments that the government failed to provide proper notice are woefully inadequate and should be disregarded. The Court should strike Matusko's claim.

### C. Matusko Cannot Overcome the Fact that his Claim is Unjustifiably Late

#### 1. Matusko Improperly Misconstrues the Ninth Circuit's Factors to Excuse His Untimeliness

Matusko acknowledges that the first factor articulated by the Ninth Circuit as set forth in the government's opening brief is when the claimant became aware of the currency's seizure. Opp'n at 17-18. Yet, Matusko gives this factor an enhanced interpretation. Specifically, he complains that the government argues that because law enforcement shut down Silk Road and he became aware that the account had been seized, this should have put him "on notice that he had certain legal rights to reclaim his property." Opp'n at 18. He also argues that "[i]t is not reasonable to conclude that [he]—a foreign national residing in Berlin—was aware of the seizure *and his rights*." *Id.* (emphasis added). This is not what the government has argued, however, and improperly morphs the requirement into an awareness "of the legal implications of the seizure when it occurred." Opp'n at 17-18. What the Ninth Circuit requires is for the court to determine when a claimant becomes aware that a seizure occurred. In this case, Matusko and his counsel concede that Matusko was aware of the seizure of Silk Road as early as 2013. Opp'n at 18; Matusko Decl. ¶ 11.

As for the sixth factor—whether the claimant informed the government and the court of its interest *before the claim deadline*—Matusko argues that he informed the U.S. Attorney's office that he intended to make a claim. That occurred *after* the deadline, however, and at no point has Matusko petitioned the Court for an extension of time to file his claim. He could have done so immediately after conferring with the government while he prepared his claim but failed to do so.

**2.     Matusko's Arguments with Respect to the Other Factors Fail to Justify his Untimely Claim**

Matusko's arguments with respect to the other factors concerning timeliness similarly fail. *See United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118 (9th Cir. 2004). As noted above, despite Matusko's assertions to the contrary, no Silk Road user was due notice as their respective claims to Silk Road bitcoin expired with the entry of default judgment in 2014 in the Southern District of New York. Moreover, as further detailed above, there were no procedures with respect to Silk Road users that would have yielded a list of "reasonably ascertainable" claimants on a reasonable basis. *See In re Hewlett-Packard*, 719 F. App'x at 608; *Covelo Indian Community*, 895 F.2d at 587-88. With respect to prejudice, *all* parties would be prejudiced by the extraordinary volatility of the Defendant Property; Bitcoin experiences massive fluctuations in value and accordingly it is exceedingly important to resolve claims as quickly as possible, especially when the proposed claimants lack standing.

The government further contests Matusko's good faith. Matusko readily admits that he was aware that Silk Road, and his bitcoin, were subject to seizure as early as 2013. Matusko Decl. ¶ 11. Matusko, while unaware of his rights, did not seek to *become* aware of his rights until 2021, when he realized the immense value Bitcoin had accrued over the previous seven years. *Id.* ¶ 13.

Matusko asserts that the Court should forgive his failure to file a motion to enlarge the time to file a claim because of the government's failure to properly serve him. Opp'n at 22. Matusko's arguments in this respect lack merit in light of the above—notice by publication was more than warranted in this case, and in any event, Matusko was aware of the downfall of Silk Road and accompanying ramifications as early as 2013. Matusko Decl. ¶ 11. The fact that Matusko sought informal counsel from the government does not support Matusko, and in fact weighs against him as he *still* failed to file a motion to enlarge time, even after learning his claim was late.

Finally, as indicated above, Matusko's claim lacks merit as he has no standing because he has no ownership or possessory interest in the Defendant Property. The remaining factors have little bearing on the Court's decision because of their inapplicability, such as Matusko's health, his representation, and the lack of trial date. The factors weigh heavily in favor of the Court striking Matusko's claim for its

1    untimeliness.

2    **III.    CONCLUSION**

3       Matusko's claim fails because he lacks both standing and a justification for filing a late claim.

4 Matusko offers no valid ownership or possessory interest—his interest in Silk Road Bitcoin was

5 extinguished upon the entry of default in the Southern District of New York in 2014. The Defendant

6 Property contains none of the property to which Matusko lays a claim; instead, the Defendant Property

7 represents an entirely distinct pool of Bitcoin that is completely independent of any ownership interest

8 by users of Silk Road apart from Ross Ulbricht, who alone bore the loss associated with the theft. At

9 best, Matusko is an unsecured creditor, divesting him of any standing. In addition, he abandoned his

10 interest in his Bitcoin. Regardless, the Court should strike his claim for lack of standing.

11       Even assuming Matusko has standing, the noticing procedures in this case were proper. There

12 was no reasonable manner through which to ascertain the identities of any potential claimants. Notice by

13 publication exists for cases just like these, where any investigation produces, at best, conjectural

14 claimants whose identities might be false.

15       Finally, Matusko's claim is unjustifiably late. None of the factors he cites weigh in his favor;

16 instead, he admits to knowing about Silk Road's downfall since 2013 and declining to do anything about

17 it until 2021, when the value of Bitcoin happened to skyrocket. His attempts at morphing the

18 requirements to suit his needs do little to justify his blatant tardiness, and indeed, cuts against him at

19 times. Despite knowing he was late, he failed to file a motion to enlarge time with the Court.

20       Matusko lacks standing and has filed an inexcusably late claim. The Court should strike his

21 claim accordingly.

22 DATED:  September 9, 2021               Respectfully submitted,

23

24                                  STEPHANIE M. HINDS
                                 Acting United States Attorney

25                                  */s/ Claudia A. Quiroz*

26                                  DAVID COUNTRYMAN
                                 CHRIS KALTSAS

27                                  CLAUDIA A. QUIROZ
                                 WILLIAM FRENTZEN

28                                  Assistant United States Attorneys

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

 450 Golden Gate Avenue, Box 36055
 San Francisco, California 94102-3495
 Telephone: (415) 436-436-7428
 FAX: (415) 436-7234
 claudia.quiroz@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CV 20-7811 RS |
| Plaintiff, | DECLARATION OF CLAUDIA A. QUIROZ IN SUPPORT OF UNITED STATES' REPLY IN SUPPORT OF MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO |
| v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx | |
| Defendant. | Hearing Date:  September 30, 2021 |
| | Time:  1:30 p.m. |
| ILIJA MATUSKO, | Court:  Hon. Richard Seeborg |
| Claimant. | |

I, CLAUDIA A. QUIROZ, state as follows:

1. I am an Assistant United States Attorney in the Northern District of California. I am an attorney of record in the above-referenced matter. I respectfully submit this declaration in Support of the United States' Reply in Support of Motion to Strike the claim filed by Claimant Ilija Matusko.

2. On October 2, 2013, the United States commenced a civil action in the Southern District of New York by filing a verified complaint seeking, among other things, forfeiture of the Silk Road hidden website, any and all bitcoins contained in wallet files residing on Silk Road Servers, and all property traceable thereto ("Defendants in Rem"). *See United States v. Any And All Assets of Silk Road, Including But Not Limited To The Silk Road Hidden Website And Any And All Bitcoins Contained In Wallet Files Residing On Silk Road Servers, Including The Servers Assigned The Following Internet Protocol Addresses [] And All Property Traceable Thereto*, Case No. CV-13-06919, Dkt. No. 4 (S.D.N.Y. Oct. 2, 2013) (hereinafter "SDNY Civil Forfeiture Action"). The complaint sought forfeiture of the Defendants in Rem pursuant to Title 18, United States Code, Section 981(a)(1)(A), on the grounds that they constituted property involved in money laundering transactions, in violation of 18 U.S.C. § 1956. *Id.* The complaint also sought the imposition of civil money laundering penalties. *Id.*

3. On January 2, 2014, the United States Attorney's Office for the Southern District of New York filed a Declaration of Publication that attached a Notice of Forfeiture for the Silk Road assets seized on or about October 2, 2013. Attached to the Declaration of Claudia Quiroz in Support of the Government's Motion to Strike the Claim of Claimant Ilija Matusko is Exhibit, a true and accurate copy of the Declaration of Publication filed by the United States Attorney's Office in the SDNY Civil Forfeiture Action on January 2, 2014 (Dkt. No. 13). The Notice of Forfeiture listed the property against which the government filed a verified Complaint for Forfeiture pursuant to 18 U.S.C. 981. This included "[a]ny and all assets of Silk Road, including but not limited to Silk Road Hidden Website," "[a]ny and all assets of Silk Road, including but not limited to any and all Bitcoins contained in wallet files residing on Silk Road servers, including the servers assigned to" six different Internet Protocol Addresses; and "[a]ny and all assets of Silk Road, including but not limited to 27,618.69843, Silk Road Market Place Bitcoins as of block chain Account Number 262280 which was seized on or about October 02, 2013."

4.      On January 8, 2014, the United States Attorney's Office for the Southern District of New York filed a separate Declaration of Publication that attached a second Notice of Forfeiture for the property seized from Ulbricht's computer and residence, including "all proceeds of all Bitcoins on Ulbricht's computer hardware traceable to the operation of Silk Road with public Key: 1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 at 2825 Diamond Street, San Francisco, CA." Attached hereto as **Exhibit 1** is a true and accurate copy of the Declaration of Publication filed by the United States Attorney's Office in the SDNY Civil Forfeiture Action on January 8, 2014 (Dkt. No. 14).

5.      On January 15, 2014, the District Court in the Southern District of New York entered a Partial Judgment by Default and Order of Forfeiture ordering the forfeiture of the Silk Road website and "any and all Bitcoins contained in the wallet files residing on Silk Road servers" (i.e., the "Silk Road Server Bitcoins"). The Court ordered that the government "shall have judgment by default against the Silk Road Hidden Website and the Silk Road Server Bitcoins" and ordered them forfeited to the United States. Attached hereto as **Exhibit 2** is a true and accurate copy of the District Court's Order (Dkt. No. 19.)

6.      Attached hereto as **Exhibit 3** is a true and accurate copy of Government's Trial Exhibit 119 (Silk Road's "Buyer's guide"), which the government introduced into evidence in the trial of Ross Ulbricht in the matter of *United States of America v. Ross William Ulbricht*, Case No. 1:14-cr-99968-KBR (S.D.N.Y). This and Exhibits 4 through 10 can be found on PACER in the matter of the *United States of America v. Ross William Ulbricht, also known as Dread Pirate Roberts, also known as Silk Road, also known as Sealed Defendant 1, also known as DPR*, Case No. 15-1815 (9th Cir.), Dkt. No. 121 (hereinafter the "Silk Road Appellate Record"). The guide emphasized the site's anonymity and advised users on how to protect their identities. In the section discussing "receiving address" it states: "From the moment you submit your order, to the moment it is displayed to your vendor, the information is fully encrypted and totally unreadable . . . as soon as your vendor marks your package with the address and confirms shipment, the address is deleted forever and is not retrievable. For the extra cautious, you can encrypt your information yourself with your vendor's public key so that even we at Silk Road would be unable to view it, even if we wanted to." *Id.* (SA-4–SA-5). Furthermore, the section

for "receiving packages" states: "Use a different, unrelated address than the one your item will be kept such as a friends house or P.O. box. Once it arrives, transport it discretely to its final destination." *Id.* at 2. It adds: "Do not sign for your package", "[d]o not use your real name", and "[i]f you follow these guidelines, your chances of being detected are minimal." *Id.*

7.      Attached hereto as **Exhibit 4** is a true and accurate copy of Government's Trial Exhibit[1] 940F, which is a map depicting the countries with 10 or more Silk Road vendors (Silk Road Appellate Record at SA-132).

8.      Attached hereto as **Exhibit 5** is a true and accurate copy of Government's Trial Exhibit 940G, which is a map depicting the countries with 100 or more Silk Road buyers (Silk Road Appellate Record at SA-133).

9.      Attached hereto as **Exhibit 6** is a true and accurate copy of Government's Trial Exhibit 125J, which is a forum post by Ross Ulbricht addressed to the Silk Road community on January 10, 2012.

10.     Attached hereto as **Exhibit 7** is a true and accurate copy of Government's Trial Exhibit 240A, which is an excerpt of Ross Ulbricht's 2010 journal.

11.     Attached hereto as **Exhibit 8** is a true and accurate copy of Government's Trial Exhibit 940A (Breakdown of Total Categorized Silk Road Sales).

12.     Attached hereto as **Exhibit 9** is a true and accurate copy of Government's Trial Exhibit 940B (Sales of Fake IDs, Forgeries, and Passports).

13.     Attached hereto as **Exhibit 10** is a true and accurate copy of Government's Trial Exhibit 940C (Sales in Money-Related Categories).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 9th day of September 2021 in San Francisco, California.

*Claudia A. Quiroz*
CLAUDIA A. QUIROZ
Assistant United States Attorney

---

[1] Exhibits 4 through 10 attached to this declaration all consist of trial exhibits the government introduced into evidence in the trial of Ross Ulbricht in the matter of *United States of America v. Ross William Ulbricht*, Case No. 1:14-cr-99968-KBR (S.D.N.Y). All highlighted text in the exhibits attached to this declaration are the government's.

DECLARATION OF AUSA CLAUDIA A. QUIROZ    4
CASE NO. CV 20-7811 RS

Exhibit 1

PREET BHARARA
United States Attorney for the
Southern District of New York
By: CHRISTINE I. MAGDO
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2297

- - - - - - - - - - - - - - - - x

UNITED STATES DISTRICT COURT          :
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,             :

         Plaintiff,          :          <ins>DECLARATION OF</ins>
                                                 <ins>PUBLICATION</ins>
     - v. -                 :          No. 13 Civ. 6919 (JPO)

ROSS WILLIAM ULBRICHT,                :          ECF Case
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"                        :
  a/k/a "Silk Road,"

                     :

        Defendant,           :

ANY AND ALL ASSETS OF SILK ROAD,
INCLUDING BUT NOT LIMITED TO THE      :
SILK ROAD HIDDEN WEBSITE AND ANY AND
ALL BITCOINS CONTAINED IN WALLET      :
FILES RESIDING ON SILK ROAD
SERVERS, INCLUDING THE SERVERS        :
ASSIGNED THE FOLLOWING INTERNET
PROTOCOL ADDRESSES:                   :
46.183.219.244; 109.163.234.40;
193.107.86.34; 193.107.86.49;         :
207.106.6.25; AND 207.106.6.32;
                                      :
And all property traceable thereto,

                                      :

        Defendants-in-rem.   :

- - - - - - - - - - - - - - - - x

**ER-041**

I, CHRISTINE I. MAGDO, pursuant to Title 28, United States Code, Section 1746, hereby declare under the penalty of perjury:

That I am an Assistant United States Attorney in the office of the United States Attorney for the Southern District of New York, and

That attached to this declaration are (1) a true and correct copy of a notice of civil forfeiture in this action, (2) a true and correct copy of an Advertisement Certification Report, indicating that the aforementioned notice was posted on an official government internet site (www.forfeiture.gov) for at least 30 consecutive days, beginning on November 8, 2013 as required by Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and

That both documents referenced-above were obtained from a Consolidated Asset Tracking System maintained by the Department of Justice.

Dated: New York, New York
      January 8, 2014

CHRISTINE I. MAGDO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## COURT CASE NUMBER: 13 CIV. 6919; NOTICE OF FORFEITURE ACTION

Pursuant to 18 U.S.C. § 981, the United States filed a verified Complaint for Forfeiture against the following property:

50% of all proceeds of all Bitcoins on Ulbricht's computer hardware traceable to the operation of Silk Road with public Key: 1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 at 2825 Diamond Street, San Fransisco, CA (14-DEA-590810)

50% of all proceeds of all Bitcoins on Ulbricht's computer hardware traceable to the operation of Silk Road with public Key: 1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 at 2825 Diamond Street, San Fransisco, CA (14-FBI-000267)

Any person claiming a legal interest in the Defendant Property must file a verified Claim with the court within 60 days from the first day of publication (November 08, 2013) of this Notice on this official government internet web site and an Answer to the complaint or motion under Rule 12 of the Federal Rules of Civil Procedure within 21 days thereafter. 18 U.S.C. § 983(h)(1) permits a court to impose a civil fine on anyone asserting an interest in property which the court determines was frivolous.

The verified Claim and Answer must be filed with the Clerk of the Court, United States District Court, 500 Pearl Street, Room 120, New York, NY 10007, and copies of each served upon Assistant United States Attorney Christine Magdo, One St. Andrew's Plaza, New York, NY 10007, or default and forfeiture will be ordered. See, 18 U.S.C. § 983(a)(4)(A) and Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.



**Advertisement Certification Report**

The Notice of Publication was available on the www.forfeiture.gov web site for at least 18 hours per day between November 8, 2013 and December 07, 2013. Below is a summary report that identifies the uptime for each day within the publication period and reports the results of the web monitoring system's daily check that verifies that the advertisement was available each day.

U.S. v. Ross William Ulbricht, Silk Road et. al

**Court Case No:** 13 CIV. 6919
**For Asset ID(s):** See Attached Advertisement Copy

| Consecutive Calendar Day Count | Date Advertisement Appeared on the Web Site | Total Hours Web Site was Available during Calendar Day | Verification that Advertisement existed on Web Site |
|---|---|---|---|
| 1 | 11/08/2013 | 23.9 | Verified |
| 2 | 11/09/2013 | 24.0 | Verified |
| 3 | 11/10/2013 | 24.0 | Verified |
| 4 | 11/11/2013 | 24.0 | Verified |
| 5 | 11/12/2013 | 24.0 | Verified |
| 6 | 11/13/2013 | 24.0 | Verified |
| 7 | 11/14/2013 | 24.0 | Verified |
| 8 | 11/15/2013 | 24.0 | Verified |
| 9 | 11/16/2013 | 24.0 | Verified |
| 10 | 11/17/2013 | 24.0 | Verified |
| 11 | 11/18/2013 | 24.0 | Verified |
| 12 | 11/19/2013 | 24.0 | Verified |
| 13 | 11/20/2013 | 24.0 | Verified |
| 14 | 11/21/2013 | 24.0 | Verified |
| 15 | 11/22/2013 | 24.0 | Verified |
| 16 | 11/23/2013 | 24.0 | Verified |
| 17 | 11/24/2013 | 24.0 | Verified |
| 18 | 11/25/2013 | 23.7 | Verified |
| 19 | 11/26/2013 | 24.0 | Verified |
| 20 | 11/27/2013 | 24.0 | Verified |
| 21 | 11/28/2013 | 24.0 | Verified |
| 22 | 11/29/2013 | 24.0 | Verified |
| 23 | 11/30/2013 | 24.0 | Verified |
| 24 | 12/01/2013 | 24.0 | Verified |
| 25 | 12/02/2013 | 24.0 | Verified |
| 26 | 12/03/2013 | 24.0 | Verified |
| 27 | 12/04/2013 | 24.0 | Verified |
| 28 | 12/05/2013 | 24.0 | Verified |
| 29 | 12/06/2013 | 24.0 | Verified |
| 30 | 12/07/2013 | 23.4 | Verified |

Additional log information is available and kept in the archives for 15 years after the asset has been disposed.

Exhibit 2

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/15/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

          Plaintiff,

   -against-

ROSS WILLIAM ULBRICHT,
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"
  a/k/a "Silk Road,"

          Defendant,

ANY AND ALL ASSETS OF SILK ROAD, INCLUDING
BUT NOT LIMITED TO THE SILK ROAD HIDDEN
WEBSITE AND ANY AND ALL BITCOINS CONTAINED
IN WALLET FILES RESIDING ON SILK ROAD
SERVERS, INCLUDING THE SERVERS ASSIGNED
THE FOLLOWING INTERNET PROTOCOL
ADDRESSES: 46.183.219.244;
109.163.234.40; 193.107.86.34;
193.107.86.49; 207.106.6.25; AND
207.106.6.32;

And all property traceable thereto,

          Defendants-in-rem.

PARTIAL JUDGMENT BY
DEFAULT AND ORDER
OF FORFEITURE

No. 13 Civ. 6919 (JPO)

ECF Case

      WHEREAS, on September 30, 2013, the United States

commenced a civil action for the forfeiture of the above-referenced

Any and All Assets of Silk Road, Including but not Limited to the

Silk Road Hidden Website (the "Silk Road Hidden Website") and Any

and All Bitcoins Contained in Wallet Files Residing on Silk Road

Servers, Including the Servers Assigned the Following Internet

Protocol Addresses: 46.183.219.244; 109.163.234.40; 193.107.86.34; 193.107.86.49; 207.106.6.25; And 207.106.6.32, (the "Silk Road Server Bitcoins"); and all property traceable thereto (the "Traceable Property")(collectively, the "Defendants in Rem") by the filing of a Verified Complaint;

WHEREAS, the Traceable Property includes but is not limited to any and all bitcoins contained in wallet files residing on certain computer hardware belonging to Ross William Ulbricht ("Ulbricht"), that were seized on or about October 24, 2013 by the United States pursuant to a Court-ordered protective order (the "Computer Hardware Bitcoins");

WHEREAS, on or about November 8, 2013 a notice letter and copy of the Verified Complaint were sent by Federal Express to the following as counsel for Ross William Ulbricht:

> Joshua Dratel, Esq.
> Law Offices of Joshua L. Dratel P.C.
> 29 Broadway, Suite 1412
> New York, NY 10006

WHEREAS, Ulbricht is the only individual known by the Government to have a potential interest in the Defendants in Rem;

WHEREAS, on or about December 12, 2013, Ulbricht filed a timely verified claim in this proceeding, asserting an ownership interest in the Computer Hardware Bitcoins;

2

**ER-047**

WHEREAS, notice of the Verified Complaint against the Silk Road Hidden Website and the Silk Road Server Bitcoins was posted on the official government internet site, www.forfeiture.gov, for at least 30 consecutive days, beginning on October 18, 2013, and proof of such publication was filed with the Clerk of this Court on January 2, 2014;

WHEREAS, no claims or answers have been filed or made in this judicial forfeiture action as to Silk Road Hidden Website and the Silk Road Server Bitcoins, and the requisite time periods in which to do so, as set forth in 18 U.S.C. § 983(a)(4)(A) and Rule G of the Supplement Rules for Admiralty or Maritime Claims and Asset Forfeiture Claims, have expired;

NOW THEREFORE, on the motion of Preet Bharara, United States Attorney for the Southern District of New York, attorney for the plaintiff United States of America, by Assistant United States Attorney Christine I. Magdo, of counsel;

IT IS HEREBY ORDERED THAT:

1. Plaintiff United States of America shall have judgment by default against the Silk Road Hidden Website and the Silk Road Server Bitcoins.

2. The Silk Road Hidden Website and the Silk Road Server Bitcoins shall be, and the same hereby are, forfeited to the plaintiff United States of America.

3. The United States Marshals Service shall dispose of the Silk Road Hidden Website and the Silk Road Server Bitcoins according to law.

4. This action shall remain pending with respect to Any and All Assets of Silk Road and All Property Traceable Thereto, including but not limited to the Computer Hardware Bitcoins.

SO ORDERED:

_____
J. PAUL OETKEN
United States District Judge

January 15, 2014

4

**ER-049**

Exhibit 3

# SA-4

File Edit View History Bookmarks Tools Help

Books | Silk Road | Buyer's guide - Sil... | Security | BTC $18.65? | Browser-based wallet... | Bitcoin Transaction b... | Toolbox | DNSstuff

dkn255hz262ypmii.onion/wiki/index.php/Buyer's_guide | magicaltux bitcoin forum

Log in

Page Discussion | Read View source View history | Go Search

Navigation

- Main page
- Community portal
- Current events
- Recent changes
- Random page
- Help

Toolbox

- What links here
- Related changes
- Special pages
- Printable version
- Permanent link

GOVERNMENT EXHIBIT 119
14 Cr. 68 (KBF)

## Buyer's guide

The currency used to buy stuff on Silk Road are Bitcoin. Bitcoin uses encryption and a system of peer-to-peer double checking to create a completely digital currency. No personal information is associated with your bitcoins at all, making them ideal for anonymous transactions. Additionally, Silk Road employs a built-in tumbler that mixes all incoming bitcoins through a series of dummy transactions before they ever leave. Click here for instructions on how to get Bitcoins, or visit Bitcoin.org to learn more.

Silk Road employs a escrow system for all transaction. This means that when you make a order the bitcoins are deducted from you wallet, moves into a temporary escrow account, then after the vendor sends to order they confirm it being sent. When you receive the package, you confirm it being received and the vendor revives the coin. If for whatever reason you do not receive the package you can send the order into resolution, where you and the vendor can resolve the problem or should that not work Silk Road well step in an resolve the issue. Keep in mind this system is to prevent fraud on both the end of the seller and the buyer.

**Contents** [hide]

1 Connecting to Hidden Services
2 Getting bitcoins
3 Shopping Cart
3.1 Receiving address
4 Payment
4.1 Tumbler
5 Escrow
5.1 Escrow hedge
6 Receiving packages
7 Purchasing statistics
8 Final note

### Connecting to Hidden Services

*Connecting to Hidden Services main article*

If you are reading this now, you have at least figured out how to access a tor hidden service, good job :) You have either installed tor and configured your browser to use it, or you are using a proxy such as tor2web. We strongly encourage you to connect to the hidden service directly rather than going through a proxy as it is much more secure and anonymous. The Tor Browser Bundle is available for all major platforms.

### Getting bitcoins

*Bitcoin main article*

Click here for a list of reputable exchangers that will take many different forms of payment for Bitcoins. When they ask for your receiving address, give them the address on your account page that looks something like this:

1E8sKdGWSy9ysm5ndCbBfdySzRhiPwmYDr

Your deposit will appear in your account once the Bitcoin network confirms your transfer. This can take up to an hour or more. If for some reason your transfer doesn't come through, just let us know and be sure to include the address you sent the coins to.

Your account has a built-in eWallet for Bitcoins, so you can buy and sell here without ever having to worry about third-party services at all. When you sell something, your account is credited, and when you buy something, it is debited.

### Shopping Cart

*Shopping Cart main article*

The first step to placing an order is selecting the items you want to purchase by adding them to your shopping cart. From the cart, you may increase the quantity of your purchase, and select the appropriate postage option. See your vendor's page or the item description for postage instructions. When you've chosen your postage and quantity, click "update cart" to confirm the changes. Once your cart is ready, you must enter the address you would like your items sent to. This is the one point in the process where some kind of personal information is revealed. We take this very seriously and have taken every precaution to protect it.

#### Receiving address

From the moment you submit your order, to the moment it is displayed to your vendor, the information is fully encrypted and totally unreadable. Then, as soon as your vendor marks your package with the address and confirms shipment, the address is deleted forever and is not retrievable. For the extra cautious, you can encrypt your information yourself with your vendor's public key so that even we at Silk Road would be unable to view it, even if we wanted to. See below for more ways to be safe.

### Payment

If you have enough funds in your account to cover your purchase, then your order will be validated instantly and sent on to your vendor. If not, then you must deposit enough Bitcoins into your account to cover your total.

When your order ships, its status will change from "processing" to "in transit." Now just kick back and wait for it to arrive. Once it does, don't forget to click "finalize" next to your order and leave feedback :)



# SA-5

## Tumbler

Just when you thought Silk Road couldn't be more secure, we went one step further. The tumbler sends all payments through a complex, semi-random series of dummy transactions, each with a new, one-use receiving address, making it nearly impossible to link your payment with any coins leaving the site. The quantity, frequency, and number of transactions are all varied chaotically in a way that mimics the transactions of the bitcoin economy as a whole.

## Escrow

*Escrow main article*

Our commitment is to total satisfaction for each and every purchase you make here. If your package never arrives or is not in the condition you expected, you may have a chance at a full or partial refund of the purchase price. Just click "resolve" next to your order. Our resolution center gives you total flexibility in working out a mutually agreeable outcome with your vendor, whether you want to request a full or partial refund, release payment to your vendor, or extend the time you wait for arrival. In the rare event that an agreement can't be made, a Silk Road admin will be right there to mediate and investigate if necessary. The vast majority of orders are filled exactly as expected, but to avoid even the rare hang up, we strongly encourage you to read your vendor's feedback and ask questions of them ahead of time.

NEVER go around the escrow and pay a vendor directly. We will be totally unable to protect you in this event and the vendor will have much less motivation to serve you well. People HAVE been scammed this way. If a seller requests that you pay them directly, please let us know so we can address the situation.

## Escrow hedge

Unfortunately, the Bitcoin exchange rate isn't as stable as we would all like it to be, and can fluctuate wildly in a matter of hours, let alone the days or weeks it takes for a package to arrive. Because of this, there is a real danger that the Bitcoins being held in your escrow account will lose value by the time your vendor gets paid or you are refunded. So, we've given the option to vendors to hedge the future payments they are expecting from escrow such that the dollar value of the payment doesn't change as the Bitcoin exchange rate changes.

For example, a vendor is hedging the escrow for a 10 btc order you place with them, and the dollar value of your order when you purchase it is $100. Now, let's say your order never arrives and your vendor agrees to a full refund, but those 10 btc are no longer worth $100, they're worth $50! Because your vendor hedged the escrow, you won't get a refund of 10 btc, you'll get 20 btc equaling the original value of $100. Of course, the opposite is also true. If Bitcoins appreciate in value while your order is in escrow, your refund will be fewer Bitcoins, but still equaling the original dollar value.

When checking out, you will see which orders will be hedged and which won't. After the order is placed, your escrow balance will reflect the dollar value of your hedged orders and the Bitcoin value of your unhedged orders. All hedged orders are hedged as soon as the order is placed. So when getting a refund for hedged items, don't be surprised if the number of Bitcoins you get back is not the same as the amount you paid.

## Receiving packages

Use a different, unrelated address than the one where your item will be kept such as a friends house or P.O. box. Once the item arrives, transport it discretely to its final destination. Avoid abandoned buildings or any place where it would be suspicious to have mail delivered.

*Do not sign for your package.* If you are expecting a package from us, do not answer the door for the postman, let him leave it there and then transport it as described above. Do not use your real name. This tactic doesn't work in some places because deliveries won't be made to names not registered with the address. If you think this is a problem, send your self a test letter with the fake name and see if it arrives.

If you follow these guidelines, your chances of being detected are minimal. In the event that you are detected, deny requesting the package. Anyone can send anyone else anything in the mail.

## Purchasing statistics

Because you are totally anonymous on Silk Road, the vendors here have no way of knowing if they can trust you at first. To help them judge whether they want to do business with you or not, some statistics are kept about your past purchases. When you purchase an item, before the order is accepted, your vendor can see how long you have been a member on the site, how many orders have been shipped out to you, and what percentage of the payments you made for those purchases were ultimately refunded to you. They can also see how many orders you ignored and allowed to "auto-finalize." So, the best way to keep a good reputation and eventually be accepted by all of the vendors here is to finalize your orders as soon as they arrive and you confirm they are good, and to only request a refund when you deserve it. The statistics are weighted toward the present, so you must keep up your good behavior, but if you have a bad streak, you can recover by doing well going forward. You can view your own stats at any time by clicking the link on your account page.

## Final note

We do everything we can to protect your anonymity and ensure that your visits here bring you great satisfaction. However, you should understand the risks of possessing and using any of the items you purchase here. Research these matters before jumping in and be responsible for your actions. Learn how Tor and Bitcoin work so you can understand how to use them and where their limitations are. If you have any questions or concerns, we are here to support you.

This page was last modified on 1 April 2012, at 22:26.

This page has been accessed 14,998 times.

Privacy policy · About Silk Road wiki · Disclaimers



Exhibit 4

**SA-132**



Countries with 10 or More Vendors



GOVERNMENT
EXHIBIT
940 F
14 Cr. 68 (KBF)

Exhibit 5

SA-133



Countries with 100 or More Buyers



GOVERNMENT
EXHIBIT
940G
14 Cr. 68 (KBF)

ER-056

Exhibit 6

## 658 Silk Road discussion / Re: State of the Road Address
« **on:** January 10, 2012, 02:17 am »

**GOVERNMENT EXHIBIT**
**125 J**
14 Cr. 68 (KBF)

Thank you everyone for your comments and suggestions. One suggestion I especially like is the one about commission being affected by trade volume. To those of you that are either supportive of the change, or have faith in what I am doing regardless of whether you see the point or not, thank you for your support! I have done everything I can to earn that trust and I cherish it.

To those of you chalking my actions up to pure greed and ignoring the context for the changes, I say shame on you. When have I lied? When have I cheated or stolen from anyone here? When have I treated anyone unfairly? When have I lead you astray? Why do you turn on me now when I have poured my heart and soul into this community and project?

10% on $50 orders? We are talking about an extra $1.88! A $10 order? An extra 38 cents! Do you think this site built itself? Do you think it runs itself? Do you have any clue what goes on behind the scenes to keep this going? Do you have any idea the risk the people operating this site are taking? Do you have any clue what we've been through to get here today? Do you have any clue what it's going to take to get through the next year?

Whether you like it or not, I am the captain of this ship. You are here voluntarily and if you don't like the rules of the game, or you don't trust your captain, you can get off the boat. For those that stay, we at Silk Road will continue to do everything in our power to keep this market running smoothly and safely, and thank you again for your support!

 Reply  Quote  Notify Remove

Exhibit 7

SA-26

2010

I started the year in the middle of my stint with Good Wagon Books. Donny and I had worked on it the last quarter of 2009 and were trying to ramp up by hiring people to go door-to-door. It was a real struggle and by the end of our trial partnership, it was clear that we hadn't grown the business to the point that it made sense for me to stay on. I also had an offer for a job from Peter and David that sounded great and I was ready to move on and work for them on their private equity venture. Unfortunately, they were all smoke and mirrors and after several weeks of them not returning my calls, I realized there was not an opportunity for me there. This was extremely discouraging. There I was, with nothing. My investment company came to nothing, my game company came to nothing, Good Wagon came to nothing, and then this.

I had to find a job quickly, so I turned to Craig's List and found American Journal Experts. For the next six months, I edited scientific papers written by foreigners. It sucked. The hours were flexible, but it drained me. I hated working for someone else and trading my time for money with no investment in myself.

Up to this point, I had been working on selling my rental house in Pennsylvania. It had helped me stay afloat with around $600/mo in cashflow, but finally the sale came to a close. I made about $30k off the whole thing, and could finally start trading again. I had been practice trading for a while and saw an opportunity to take my $30k and make it as a day trader. $30k isn't alot to start with, and I didn't get off to a very good start with my trading.

Around that time, another opportunity came into my life. Donny had gotten a job offer from his brother in Dallas to be the VP of sales at their milling company. He didn't know what to do about Good Wagon, which he had grown somewhat to the point that he was making around $6k per month in sales. He made me an offer. 50% of the company and a $3k per month salary to take over and run the business going forward. I took the deal and we went to work on it. By the end of the



GOVERNMENT
EXHIBIT
240 A
14 Cr. 68 (KBF)

**ER-060**

year, we had our best month on record with around $10k in sales in December.

    While all of this was happening, I began working on a project that had been in my mind for over a year. I was calling it Underground Brokers, but eventually settled on Silk Road. The idea was to create a website where people could buy anything anonymously, with no trail whatsoever that could lead back to them. I had been studying the technology for a while, but needed a business model and strategy. I finally decided that I would produce mushrooms so that I could list them on the site for cheap to get people interested. I worked my ass off setting up a lab in a cabin out near Bastrop off the grid. In hindsight, this was a terrible idea and I would never repeat it, but I did it and produced several kilos of high quality shrooms. On the website side, I was struggling to figure out on my own how to set it up. Driving out to Bastrop, working on Good Wagon, and trying to keep up my relationship with Julia was taking all of my time. By the end of the year, I still didn't have a site up, let alone a server.

      I went through a lot over the year in my personal relationships as well. I had mostly shut myself off from people because I felt ashamed of where my life was. I had left my promising career as a scientist to be an investment adviser and entrepreneur and came up empty handed. More and more my emotions and thoughts were ruling my life and my word was losing power. At some point I finally broke down and realized my love for people again, and started reaching out. Throughout the year I slowly re-cultivated my relationship with my word and started honoring it again.

      My relationship with Julia was pretty rocky throughout the year. We even broke up for about a month and half toward the end. I

SA-28

couldn't even tell you now why it was a struggle, or why we broke up. On my side, I wasn't communicating well at all. I would let little things build up until I got mad. We eventually got back together and even moved in together, and it has been amazingly good since.

In 2011, I am creating a year of prosperity and power beyond what I have ever experienced before. Silk Road is going to become a phenomenon and at least one person will tell me about it, unknowing that I was its creator. Good Wagon Books will find its place and get to the point that it basically runs itself. Julia and I will be happy and living together. I have many friends I can count on who are powerful and connected.

Exhibit 8



**Breakdown of Total
Categorized Silk Road Sales**

Other
$8,523,725
4%

Drugs
$182,960,285



SA-127



GOVERNMENT
EXHIBIT
940 A
14 Cr. 68 (KBF)

ER-064

Exhibit 9

## Sales of Fake IDs, Forgeries & Passports

|  | Total Number of Sales | Total Sales Revenue |
|---|---|---|
| Fake IDs | 3,642 | $ 699,053 |
| Forgeries | 3,487 | $ 197,291 |
| Passports | 103 | $ 105,292 |
| **TOTAL** | **7,232** | **$ 1,001,636** |



GOVERNMENT
EXHIBIT
940 B
14 Cr. 68 (KBF)

Exhibit 10

# Sales in Money-Related Categories

|  | Total Number of Sales | Total Sales Revenue |
|---|---|---|
| Money | 14,345 | $ 2,846,025 |
| Digital Currencies | 18,134 | $ 177,167 |
| Gold | 81 | $ 159,944 |
| Bullion | 122 | $ 80,952 |
| Silver | 138 | $ 9,746 |
| **TOTAL** | **32,820** | **$ 3,273,833** |



GOVERNMENT
EXHIBIT
940 C
14 Cr. 68 (KBF)

1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA A. QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-436-7428
        FAX: (415) 436-7234
9       claudia.quiroz@usdoj.gov

10 Attorneys for United States of America

11            UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15 UNITED STATES OF AMERICA,            )  CASE NO. CV 20-7811 RS
                                        )
16              Plaintiff,              )  **DECLARATION OF JEREMIAH HAYNIE IN**
                                        )  **SUPPORT OF UNITED STATES' MOTION TO**
17         v.                           )  **STRIKE THE VERIFIED CLAIM OF**
                                        )  **CLAIMANT ILIJA MATUSKO**
18 Approximately 69,370 Bitcoin (BTC), Bitcoin )
   Gold (BTG), Bitcoin SV (BSV), and Bitcoin )  Hearing Date:    September 30, 2021
19 Cash (BCH) seized from                )  Time:            1:30 p.m.
   1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx )  Court:           Hon. Richard Seeborg
20                                      )
              Defendant.                )
21 _____ )
                                        )
22 ILIJA MATUSKO,                       )
                                        )
23              Claimant.               )
                                        )
24 _____ )

25      I, JEREMIAH HAYNIE, state as follows:

26      1.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue

27 Service ("IRS-CI"). I am a case agent assigned to this case. I respectfully submit this declaration to

28

1  provide certain relevant information in support of the United States' Motion to Strike the Verified Claim

2  of Ilija Matusko.  I personally conducted the blockchain analysis of the bitcoin at issue in this case and

3  was involved in the investigation from its inception to the present day.

4  **A.**   **Silk Road User Registration**

5      2.      Ross Ulbricht went to great lengths to ensure that buyers and sellers on Silk Road were

6  able to operate anonymously.  The subtitle of Silk Road was "anonymous market."  *See* Exhibit 1

7  attached hereto. Consistent with the operation of an anonymous market, Silk Road users were required

8  to provide very little identifying information.  Users that registered with Silk Road were required to

9  provide a username and a password.  Users could optionally provide a country of residence, write a

10 description, and upload an image.  Of note, the user was not required and was not asked to provide

11 identifying information such as a real name, physical address,[1] social security number, date of birth,

12 email address, or phone number.  In addition, a user was not required to deposit bitcoin or pay a fee to

13 register an account on Silk Road.  I know this because various law enforcement agents opened accounts

14 with Silk Road as part of different investigations and did not have to deposit bitcoin or pay a fee.

15     3.      The registration process for Silk Road differs greatly from the processes required from

16 cryptocurrency exchanges such as Coinbase, Kraken, Binance, and others. Unlike Silk Road, reputable

17 exchangers and cryptocurrency companies require users of their respective platforms to conform with

18 relevant laws and regulations, including those set forth by the Bank Secrecy Act and related regulations,

19 such as "Know Your Customer" (or "KYC") requirements. Prospective customers of those exchanges

20 are thus required to confirm their identities prior to trading or purchasing cryptocurrencies on those

21 exchanges, and anything used to obtain confirmation of that identity is obtainable by law enforcement.

22 Conversely, Silk Road went to great lengths to maintain privacy and anonymity of its users, and so

23 required no proof of identity. Indeed, doing so would have completely undermined the purpose of Silk

24 Road.

25

26

27

28

---

[1] In some instances, buyers provided vendors with a physical mailing address in order to receive drug shipments.  Due to the fact that users were receiving drugs, individuals in online forums often advised buyers to use addresses not associated with the buyer in case the packages were interdicted.

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

2

**ER-070**

4. On approximately October 2, 2013, as part of their investigation into Silk Road and Ross Ulbricht, the FBI seized a server that contained information about Silk Road users. Within this data was a table[2] labeled "users" that contained registration information about Silk Road users. Exhibit 2, attached and shown below, is an export of the information that the table labeled "users" contained for hanson5.[3]

| | |
|---|---|
| index | 123591 |
| id | cfaf83c718 |
| user | hanson5 |
| pass | [Redacted] |
| pin | |
| pin_attempts | 0 |
| bc_addr | |
| usalt | [Redacted] |
| available | 47.52 |
| tx_lock | 0 |
| credit_limit | 0 |
| average_rating | 0 |
| total_weight | 0 |
| rank | 0 |
| rating | 0 |
| buyer_weight | 0 |
| vendor_weight | 0 |
| transactions | 0 |
| description | This user has yet to enter a description |
| location | Germany |
| ship_from | |
| ship_to | |
| domestic_only | 1 |
| sort_by | |
| rating_sort | weight |
| role | 0 |
| active | 0 |
| peg | 36 |
| hedge | 0 |
| display_price | 0 |
| currency_id | 37 |
| incognito | 0 |
| commission_pricing | 0 |
| stealth_mode | 0 |
| auto_withdraw | 0 |
| auto_withdraw_address_1 | |
| auto_withdraw_address_2 | |
| auto_withdraw_address_3 | |
| last_action | 1352091317 [Converts from Unix Time to November 5, 2012 04:55:17 UTC] |
| last_bitcoin_request | 1344382552 [Converts from Unix Time to August 7, 2012 23:35:52 UTC] |
| read_announcement | 1 |
| seller_start | 0 |
| seller_ban | 0 |
| discussion_ban | 0 |
| alias | hanson5 |
| bond_refund | 0 |
| last_user_agent | |
| created | 1325034975 [Converts from Unix Time to December 28, 2011 01:16:15 UTC] |
| modified | 1325034975 [Converts from Unix Time to December 28, 2011 01:16:15 UTC] |

---

[2] SQL databases are made up of tables that store data in rows and columns, similar to spreadsheets.

[3] The "pass" value appeared to be a hashed password, meaning that it was not stored in clear text. The "usalt" value suggested that the password was salted, meaning extra characters were added to it before it was hashed. I redacted the password and salt values to protect the claimant from password re-use attacks. I also converted the Unix time to a readable date/time format where noted.

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

3

**ER-071**

**B.** **Flow of Bitcoin Through Silk Road**

5.      Once a user deposited bitcoin to their assigned bitcoin address on Silk Road, their Silk Road account was credited with the requisite bitcoin, which Silk Road then used as it saw fit.  For example, if User A deposited one bitcoin to the bitcoin address Silk Road assigned him, User A's account was credited with one bitcoin.  The actual bitcoin contained within the Bitcoin address assigned to the user could then be used by Silk Road as needed.  If, in the same example, User B requested a withdrawal of one bitcoin, Silk Road could have sent User B the one bitcoin it just received from User A.  Even though the one bitcoin came from a Bitcoin address assigned to User A, User A's balance would not change.

6.      This method of internal accounting is common outside the bitcoin world as well.  For example, if a bank customer hands a $100 bill to a bank teller with instructions to deposit it to her account, the customer's account is credited with $100 and the actual $100 bill is put into the teller's till.  The bank can do whatever it wants with the $100 bill and it will not affect the customer's account.  For example, if a bank robber is next in line and demands the money from the teller, and the teller gives the bank robber the $100 bill, the customer's account is not reduced by $100.

7.      When Individual X stole 70,411.46 bitcoin from Silk Road, the balance of the hanson5 account was not affected; it remained at 47.52 bitcoin.  The bitcoin that Individual X stole originated from bitcoin addresses that were assigned to Silk Road users as deposit addresses, but just like the scenario in which $100 was stolen from the bank, the Silk Road user accounts had already received their credit, so the bitcoin stolen by Individual X was part of the Silk Road pool.  Ulbricht did not deduct the user account balances by the amount that was stolen because the funds were not taken from specific user accounts.  I am unaware of any public announcement of this theft by Ulbricht.  This was also not a fatal event to the operation of Silk Road since Silk Road continued to operate for another 17 months before Ulbricht was arrested.

8.      In summary, once a Silk Road user deposits bitcoin to their assigned address, their account is credited and the actual bitcoin that was deposited becomes part of the Silk Road pool.

**C.** **Withdrawing Bitcoin from a Silk Road User Account**

9.      Matusko asserts that "[a]t no time did the Marketplace provide, nor did Mr. Matusko

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

4

**ER-072**

know, the private key to access the Marketplace wallet or thereafter control the 48 bitcoin."  The

hanson5 accountholder did not require the Silk Road private key to withdraw bitcoin.  Silk Road users

could withdraw bitcoin from their account by simply accessing their account, entering the amount they

wanted to withdraw, and the bitcoin address to send it to.  All hanson5 had to do was log into the

account and request a withdrawal.

10.     Matusko wrote that, "Sometime later I realized that I had forgotten my password to my

'hanson5' user account and that I no longer had access to my account."  Due to the anonymity Silk Road

provided to its users, Silk Road did not have an official password recovery option for its users.

However, a Google search of "Silk Road password reset" led to the following internet post dated June 7,

2013:

> *"If you forgot your password, unfortunately you will not be able to retrieve it. Some people have had success by creating a new account and messaging mods either on the forum or via the Road. If you can prove that you are the owner of the other account (By stating order history, bitcoin balance, pin code, etc.) then you **might** have some luck getting the account back."* [4]

**D.      _United States v. Twenty-Four Cryptocurrency Accounts_ (Welcome to Video)**

11.     Matusko asserts that, "in similar bitcoin forfeiture actions, the government traced all

transactions on the bitcoin blockchain and provided direct notice via certified mail and email to all

potential users." He cites to *United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1

(D.D.C. 2020).  The investigation that gave rise to *United States v. Twenty-Four Cryptocurrency*

*Accounts* was an investigation of "Welcome To Video," a Tor-based website engaged in the sale of child

sexual abuse material. I am familiar with this investigation and provided a small amount of assistance to

the Special Agent charged with investigating the case. [5]

12.     A major goal of the Welcome To Video investigation was to identify the purchasers of

child sexual abuse material.  The team recognized that a portion of bitcoin that was used to purchase

child sexual abuse material originated from three specific exchanges known to require KYC information

from their customers. The team used the identifying information collected by the exchanges as a

---

[4] https://www.reddit.com/r/SilkRoad/comments/1fve2n/password_reset/

[5] In October 2017, I, along with others in my group, were asked to conduct open-source searches to identify social media profiles of individuals who had purchased child sexual abuse material from Welcome To Video.

beginning step to identify the individuals that sent bitcoin to Welcome To Video. The team conducted additional investigative actions such as open-source searches, bitcoin tracing, interviews, surveillance, and physical search warrants to gather evidence about each accountholder. Numerous purchasers of child pornography on the site were prosecuted as a result of the investigation. On October 16, 2019, the United States filed a verified complaint for forfeiture *in rem* to seize the funds that remained in the exchange accounts held by the Welcome To Video customers.

13. In contrast, the investigation of the stolen Silk Road bitcoin did not require the identification of Silk Road users to determine the identity of the person responsible for stealing bitcoin from Silk Road. Moreover, Silk Road itself did not require its users to provide any KYC information, rendering information on Silk Road users unobtainable. Indeed, bitcoin sent to Silk Road did not need to flow through a hosted exchange; the bitcoin used to fuel accounts at Silk Road could have stemmed from either exchanges or unhosted wallets, which are far more difficult to trace than hosted wallets.

14. Finally, the technology to trace the deposits of cryptocurrency utilized in the Welcome to Video case was not widely available at the time of the Southern District of New York's seizure in 2013. Most commercial cryptocurrency tracing services in existence today did not exist, or were not fully established, at the time of the initial seizure.

15. Elliptic was founded in October 2013 (*see www.elliptic.co/our-story*). Chainalysis was founded in 2014 (*see https://web.archive.org/web/20170601100217/https://www.chainalysis.com/*). CipherTrace was founded in 2015 (*see https://ciphertrace.com/about-us/*).

E.    **Price of Bitcoin**

16. The U.S. government seized the Silk Road servers and arrested Ross Ulbricht on or about October 2, 2013. The closing price of bitcoin on that date was approximately $140.30.[6] Accordingly, on October 2, 2013, the 47.52 bitcoin contained in the hanson5 account was valued at approximately $6,667.06.

F.    **Illegal Drugs Made Up More than 95 Percent of the Listings on Silk Road**

17. According to exhibits (940 and 940A) presented during the Ulbricht trial, more than 95

---

[6] https://www.investing.com/crypto/bitcoin/historical-data

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

6

**ER-074**

percent of all listings on the Silk Road Marketplace were illegal narcotics. The "Other" category included some illegal items, such as fake passports, and some legal items such as books.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 9th day of September, 2021 in East Lansing, Michigan.

*/s/ Jeremiah Haynie*
JEREMIAH HAYNIE
Special Agent
Internal Revenue Service – Criminal Investigation

Exhibit 1



messages **0** | orders **0** | account Ƀ**0.0000** *$0.00*

**Search** [                    ] Go

Hi, **cirrus**
logout

## Shop by Category

Drugs *13,810*
Cannabis *2,934*
Dissociatives *199*
Ecstasy *1,274*
Intoxicants *75*
Opioids *367*
Other *82*
Precursors *62*
Prescription *4,659*
Psychedelics *1,754*
Stimulants *1,634*
Tobacco *219*
Apparel *767*
Art *15*
Books *1,322*
Collectibles *27*
Computer equipment *101*
Custom Orders *86*
Digital goods *886*
Drug paraphernalia *512*
Electronics *234*
Erotica *584*
Fireworks *35*
Food *10*
Forgeries *152*
Hardware *35*
Home & Garden *27*
Jewelry *104*
Lab Supplies *29*
Lotteries & games *165*
Medical *60*
Money *258*
Musical instruments *6*
Packaging *95*
Services *168*
Sporting goods *4*
Tickets *4*
Writing *8*


Boldabol 200 (B. Dragon), 10ml, 200mg.ml
$66.11


PIRACETAM tbl. 100x1200mg (nootropil
$92.64


25X LSD BLOTTER
$421.19


7 grams of PURE MDMA Moonrocks.
$378.58


100x Green Android™ ( The New Mortal Kombat™ )
$547.65


2mg Xanax Bars from Wallgreens
$5.42


10.0g MDA - Reagent Tested
$550.00


HYDRO BUDS 2G
$40.00


SCIROXX - Nandrodex 300mg/ml 10ml USA ONLY
$114.21


10g Amnesia Haze
$194.77


4 Orange sunshine 300ug
$90.49

1/4 Bubba Kush
$90.20

### From the forum
- Buyer ratings discussion
- Feedback system changes
- HOW TO: Run your own relay and help the Tor network!
- Ask a drug expert physician about drugs and health
- Winning the war on drugs
- New display currencies
- Try Tails for a more secure OS

### Favorite vendors
- Dread Pirate Roberts *5.0*
  *remove*
- Libertas *1.0*  *remove*
- inigo *0.0*  *remove*

Ƀ1 = $133.74

community forums | wiki | support

Case 3:20-cr-00415-RS Document 16-3 Filed 09/03/21 Page 63 of 100

SA-9

**GOVERNMENT EXHIBIT 132**
14 Cr. 68 (KBF)

Exhibit 2

| index | 123591 |
|---|---|
| id | cfaf83c718 |
| user | hanson5 |
| pass | [Redacted] |
| pin | |
| pin_attempts | 0 |
| bc_addr | |
| usalt | [Redacted] |
| available | 47.52 |
| tx_lock | 0 |
| credit_limit | 0 |
| average_rating | 0 |
| total_weight | 0 |
| rank | 0 |
| rating | 0 |
| buyer_weight | 0 |
| vendor_weight | 0 |
| transactions | 0 |
| description | This user has yet to enter a description |
| location | Germany |
| ship_from | |
| ship_to | |
| domestic_only | 1 |
| sort_by | |
| rating_sort | weight |
| role | 0 |
| active | 0 |
| peg | 36 |
| hedge | 0 |
| display_price | 0 |
| currency_id | 37 |
| incognito | 0 |
| commission_pricing | 0 |
| stealth_mode | 0 |
| auto_withdraw | 0 |
| auto_withdraw_address_1 | |
| auto_withdraw_address_2 | |
| auto_withdraw_address_3 | |
| last_action | 1352091317 [Converts from Unix Time to November 5, 2012 04:55:17 UTC] |
| last_bitcoin_request | 1344382552 [Converts from Unix Time to August 7, 2012 23:35:52 UTC] |
| read_announcement | 1 |
| seller_start | 0 |
| seller_ban | 0 |
| discussion_ban | 0 |
| alias | hanson5 |
| bond_refund | 0 |
| last_user_agent | |
| created | 1325034975 [Converts from Unix Time to December 28, 2011 01:16:15 UTC] |
| modified | 1325034975 [Converts from Unix Time to December 28, 2011 01:16:15 UTC] |

**ER-079**

1   ALEXANDER KUGELMAN (SBN 255463)
    Kugelman Law, P.C.
2   21 Tamal Vista Blvd., Suite 202
    Corte Madera, CA 94925
3   Telephone: (415) 968-1780
    Facsimile: (415) 534-9441
4   alex@kugelmanlaw.com

5   Attorney for Claimant
    ILIJA MATUSKO

6

7             **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**

8

9

10  UNITED STATES OF AMERICA,        Case No. CV 20-7811 RS

11           Plaintiff,        **OPPOSITION TO MOTION TO STRIKE**
                        **THE VERIFIED CLAIM OF CLAIMANT**
12            v.         **ILIJA MATUSKO**

13  Approximately 69,370 Bitcoin (BTC), Bitcoin    Date:        September 30, 2021
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin    Time:        1:30 pm
14  Cash (BCH) seized from             Ctrm:        3 (Via Zoom)
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,
15

16           Defendant.      The Hon. Richard Seeborg

17  _____   Trial Date:   None Set

18  ILIJA MATUSKO,

19           Claimant.

20

21

22

23

24

25

26

27

28

                              **ER-080**

1

**<u>TABLE OF CONTENTS</u>**

I   INTRODUCTION ............................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................... 2

    A.   Bitcoin Wallets, Public Keys and Private Keys ..................... 3

    B.   Only Mr. Ulbricht Could Send or Withdraw Bitcoin from
        the Marketplace .................................................................... 3

    C.   Mr. Matusko's and His Marketplace User Profile. .................. 5

    D.   2013 Seizure and Notice of Earlier Forfeiture Action ............. 5

    E.   The Sources of the 1HQ3 Bitcoin ........................................ 6

    F.   Mr. Matusko Acted Precipitously to File Verified Claim........... 7

III.   MR. MATUSKO'S CLAIM IS TIMELY AND THE GOVERNMENT HAS NOT
      SATISFIED NOTICE REQUIREMENT FOR MARKETPLACE USERS.......... 7

    A.   Forfeiture Statutes Are to be Strictly Construed Against
        the Government. ................................................................... 7

    B.   The Government Never Provided Adequate Notice To
        Known Claimants................................................................... 8

    C.   Relevant Factors Support Allowing Mr. Matusko's Claim
        to Proceed.......................................................................... 10

        i.   Claimant was not aware that he had any rights in the seizure
            and his counsel informed the U.S. attorney's office that he
            intended to make a claim even though he was not properly
            served (First and Sixth Factor). ..................................... 11

        ii.   The government disregarded procedural and notice requirements
            that encouraged the delay in Mr. Matusko's claim (Second,
            Fourth, and Ninth Factors). .......................................... 13

        iii.   Mr. Matusko had no health issues inhibited him from making a
            claim (Third Factor). .................................................... 13

        iv.   Mr. matusko would be prejudiced with his claim were
            dismissed, not the government (Fifth Factor). .............. 14

        v.   No Trial Date Has Been Set (Seventh Factor). .............. 15

        vi.   Mr. Matusko's reason for delay is made in good faith (Eighth
            Factor). ......................................................................... 15

**ER-081**-i-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

vii.    Mr. Matusko was unrepresented for two months before retaining counsel (Tenth Factor). ............................................... 15

viii.   Mr. Matusko informally notified the government of the potential claim through counsel (Eleventh Factor). .................................... 16

ix.    Sufficient claim (Twelfth Factor). ................................................ 16

IV.    MR. MATUSKO'S CLAIM, CONFIRMED BY THE GOVERNMENT, ASSERTS AN INTEREST IN THE BITCOIN ................................................. 17

   A.    Standing is Established By Asserting Financial Interest Under Civil Forfeiture's Forgiving Standards ............................................. 17

   B.    Mr. Matusko Alleged a Financial Interest in the Subject Property ........... 18

   C.    Special Agent Haynie's Testimony Contradicts the Government's Theory ................................................................................................. 19

   D.    The Government Should be Estopped From Challenging Mr. Matusko's Claim Because He Did Not Make Claim in the 2013 Forfeiture Action ..................................................... 21

V.    CONCLUSION ................................................. 22

**ER-082**

-ii-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

*Austad v. U.S.,*
      386 F.2d 147, 149 (9th Cir. 1967)…………………………………………………...18

*Commodity Futures Trading Comm'n v. McDonnell,*
      287 F. Supp. 3d 213 (E.D.N.Y.), *adhered to on denial of reconsideration,*
      321 F. Supp. 3d 366 (E.D.N.Y. 2018)………………………………………....…..4

*Doleman v. Meiji Mut. Life Ins. Co.,*
      727 F.2d 1480, 1482 (9th Cir. 1984)…………………………………………...18

*Dusenbery v. U.S.,*
      534 U.S. 161, 167 (2002)…………………………………...………….8, 9, 10

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,*
      543 F.3d 586 (9th Cir. 2008)…………………………………………...……18

*Longenette v. Krusing,*
      322 F.3d 758, 765 (3d Cir. 2003)………………………………………………10

*Ox Labs, Inc. v. Bitpay, Inc.,*
      No. CV 18-5934-MWF (KSX), 2020 WL 1039012 (C.D. Cal. Jan. 24, 2020),
      *aff'd,* 848 F. App'x 795 (9th Cir. 2021)……………………………..……...……4

*United States v. $100,348.00,*
      354 F.3d 1110, 1118 (9th Cir. 2004)…………………………….......... 11, 12, 13, 15, 16

*United States v. $11,500.00 in U.S. Currency,*
      710 F.3d 1006, 1012 (9th Cir. 2013)…………………………………………...18

*United States v. $133,420.00 in U.S. Currency,*
      672 F.3d 629, 637 (9th Cir. 2012)………………………………………………18, 19

*United States v. $493,850.00 in U.S. Currency,*
      518 F.3d 1159 (9th Cir. 2008)……………………………………………...…..7

*United States v. 17 Coon Creek Road, Hawkins Bar Cal.,*
      787 F.3d 968 (9th Cir. 2015)…………………………………………...11, 17, 18

*United States v. 4492 S. Livonia Rd.,*
      889 F.2d 1258, 1262 (2nd Cir. 1989)…………………………………....11, 18

*United States v. 5208 Los Franciscos Way,*
      385 F.3d 1187, 1191 (9th Cir. 2004)…………………………………………...17

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

*United States v. All Assets Held at Bank Julius Baer & Co. (In re Rem),*
    959 F. Supp. 2d 81 (D.D.C. 2013)……………………………………………………17

*United States v. All Assets Held in Acct. No. XXXXXXX in name of Doraville Properties Corp.,*
    299 F. Supp. 3d 121 (D.D.C. 2018)…………………………………………………....17

*United States v. Marolf,*
    173 F.3d 1213, 1217 (9th Cir. 1999)………………………………………......10

*United States v. One Ford Coach,*
    307 U.S. 219 (1939)……………………………………………………………8

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA,*
    545 F.3d 1134, 1140 (9th Cir. 2008)…………………………………………......17

*United States v. Real Properties located at 7215 Longboat Drive (Lot 24),*
    750 F.3d 968 (8th Cir. 2014)……………………………………………………....12

*United States v. Real Property at 2659 Roundhill Dr., Alamo, Cal*.,
    194 F.3d 1020, 1024 (9th Cir. 1999)……………………………………11, 18

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003)…………………………………………………......8

*United States v. Twenty-Four Cryptocurrency Accts*.,
    473 F. Supp. 3d 1 (D.D.C. 2020)……………………………………......1, 8, 9, 10

**Statutes & Rules**

Federal Rules of Civil Procedure Rule 12(c)…………………………………………......17

Federal Rules of Civil Procedure Rule 56………………………………………………..17

Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)-(b)…………….…………8

..
Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)(iv)………………….....8

Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)(iv)(C)……………….…...8

**Other Authorities**

*Asset Forfeiture Policy Manual* (U.S. Department of Justice, 2021)…………………….....8, 10

U.S. Constitution, Fifth Amendment…………………………………………………….9

Satoshi Nakamoto, Bitcoin: *A Peer-to-Peer Electronic Cash System*, Bitcoin.org (2009)
    https://bitcoin.org/en/bitcoin-paper (last visited August 26, 2021)…………………….4

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Products,* Silk Road (marketplace), Wikipedia
https://en.wikipedia.org/wiki/Silk_Road_(marketplace) (last visited Aug. 25, 2021)......6

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**I**      **INTRODUCTION**

The government has confirmed Claimant Ilija Matusko's ("Mr. Matusko") Silk Road marketplace (hereinafter the "Marketplace" or "Silk Road") user profile ID, the initial transfer of 48 bitcoin, ending credit of 48 bitcoin, and that Mr. Matusko participated in no illegal Marketplace transactions whatsoever. The government's actions and representations have constructively established Marketplace users' financial interest in the 69,370 bitcoin seized in November 2020. Mr. Matusko and each user has a potential financial interest in the seizure, and the government should have directly notified those users of the forfeiture. Mr. Matusko's verified claim should be evaluated on its merits.

Rather than acknowledge the claim, the government offers two hollow challenges against the claim's timing and Mr. Matusko's standing. These arguments are dubious in light of the government's failure to notify potential known claimants, contrary to the government's developed record, and inconsistent with established law.

First, Mr. Matusko's claim is timely. As a Marketplace user, Mr. Matusko has a financial interest in the seized bitcoin and is a potential known claimant requiring direct notice by the government. *See United States v. Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020). It is undisputed that Mr. Matusko sent 48 bitcoin[1] to the address associated with his Marketplace user profile. Further, those bitcoin were simply pooled with all bitcoin held in the Marketplace's Bitcoin wallet. Thus, every user had and *still has* a financial interest in the bitcoin sent to the Marketplace's Bitcoin wallet and therefore an interest in both 2013 and 2020 seizures. However, the government believes no Marketplace user, except Ross Ulbricht ("Mr. Ulbricht"), deserves notice of this forfeiture action as a known claimant.

Now, the government attempts to use its own misfeasance to challenge Mr. Matusko's valid claim. Any delay in filing his claim is the direct result of the government failure to satisfy notice requirements. The government has not met its duty, or demonstrated even an attempt, to identify and notify known potential claimants. Rather, it appears the government unilaterally

---

[1] Mr. Matusko's initial and final credit on his Marketplace user profile was 47.52 bitcoin. His balance is rounded up to 48 bitcoin here to remain consistent with his initial claim and the government's Motion to Strike.

-1-

OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO

1 determined it had no obligation to notify any Marketplace users except Mr. Ulbricht. Even if the
2 Court deems Mr. Matusko's claim to be late, relevant factors indicate that justice supports
3 allowing Mr. Matusko's verified claim to continue.

4      Second, Mr. Matusko's claim is valid against any bitcoin maintained by the Silk Road.
5 The government's forfeiture theory relies on sourcing the seized bitcoin from the 1HQ3 wallets
6 back to the Marketplace. There is a straight line from the seized bitcoin back to Mr. Matusko's
7 48 bitcoin that was credited to his user profile. While the government goes to great lengths to
8 discredit Mr. Matusko's claim, he nonetheless has an interest in the seized bitcoin sourced from
9 the Marketplace's wallet because bitcoin is a fungible unit of exchange.

10      This is not simply Mr. Matusko's opinion, rather it is the only conclusion that can be
11 drawn from the sworn testimony of IRS-CI Special Agent Jeremiah Haynie. Special Agent
12 Haynie confirms Mr. Matusko's Marketplace profile, his initial transfer of bitcoin, and ending
13 credit of 48 bitcoin. Special Agent Haynie explains that Marketplace users do not control the
14 Bitcoin wallet and any transfer results in a "credit" that is assigned to a user's profile. Further,
15 Special Agent Haynie explains that no user owns any specific bitcoin held in the Silk Road
16 wallet. In fact, the bitcoin transfer to the Silk Road wallet is untraceable because Silk Road
17 "tumbled" each transfer. Finally, Special Agent Haynie explains that the hacked bitcoin were
18 from a "general pool" that was "funded by … 3,014 [] deposit addresses for Silk Road users."

19      Those statements undercut the arguments against Mr. Matusko's standing and confirm his
20 claim. To this day, Mr. Matusko still has a financial interest in any and all bitcoin from the
21 Marketplace to satisfy his 48 bitcoin credit.

22      Mr. Matusko requests the Court deny the motion to strike.

23 **II.**    **FACTUAL AND PROCEDURAL BACKGROUND**

24      This action seeks the forfeiture of approximately $3.3 billion of assets without providing
25 notice to all but one interested party. Silk Road had more than 100,000 users, with likely more
26 than half residing overseas. The government maintains the servers that contain information on
27 every user and transaction. While bitcoin is an emerging technology, it is still simply another
28 manner to complete a financial transaction. The government's motion focuses on Mr. Matusko's

-2-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1  inability to proceed with his claims on the merits.  However, it has substantially larger

2  implications for the rights of millions and millions of cryptocurrency owners in future forfeiture

3  actions.

### A.  Bitcoin Wallets, Public Keys and Private Keys

5  A Bitcoin wallet is comprised of two keys: a public key and a private key.  Declaration of

6  Christopher Wajda ("Wajda Decl."),  ¶ 33.  The wallet owner can use the public key to generate

7  to create hundreds, thousands of addresses in one wallet file " *Id.* ¶ 35 (*quoting* sworn testimony

8  of former FBI Special Agent Ilhwan Yum, January 29, 2015).  A Bitcoin address is public

9  information that allows a wallet owner to send or receive bitcoin to the wallet.  *Id.*  ¶¶ 32-8.  This

10  allows a wallet owner "to operate multiple Bitcoin addresses at any given time" and the wallet

11  owner can generate "a unique Bitcoin address for each transaction." *Id.* ¶ 35.

12  Each Bitcoin wallet's private key is a very secure passcode that is used to lock and unlock

13  the Bitcoin wallet. *Id.*  ¶ 36.  The private key is necessary to send bitcoin from a wallet.  *Id.*

14  "Only the holder of a Bitcoin address' private key can authorize transfers of Bitcoin from that

15  address to other Bitcoin addresses." *Id.*  ¶ 46 (*quoting* Haynie Decl. dated July 27, 2021).  The

16  person who controls the private key is the person who controls the Bitcoin wallet and all

17  associated addresses.  In fact, holding the private key is critical.  Declaration of Jeremiah Haynie,

18  Dkt. No. 90-1, ¶ 17 ("Haynie Decl. dated July 13, 2021").  Indeed, there is a reason for the

19  phrase, 'not your keys, not your bitcoin,' because it "exemplifies the importance of actually

20  possessing the private key to a Bitcoin address to establish true ownership." *Id.*

21  "There is a significant distinction between a cryptocurrency wallet and an address.  A

22  wallet is a collection of private keys and corresponding addresses.  It is typically under the control

23  of a single private individual or service.  An address is a digital destination used to send and

24  receive cryptocurrency funds."  Declaration of Jeremiah Haynie, Dkt. No. 99-2, ¶ 22 ("Haynie

25  Decl. dated August 24, 2021").

### B.  Only Mr. Ulbricht Could Send or Withdraw Bitcoin from the Marketplace

27  The Silk Road relied on two (2) computer servers. *Id.* ¶¶ 43, 46, 58.  One server operated

28  the market interface that users and vendors would see via the website (the "Marketplace Server").

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    *Id.* The second server contained the Marketplace's Bitcoin wallet and all addresses (the "Bitcoin

2    Server"). The Marketplace's wallet had more than 2.1 million Bitcoin addresses. *Id.* The

3    Bitcoin Server held all user bitcoin. Together, these servers contained the bitcoin and the "entire

4    transaction history and users of the website." Reply Brief, Dkt. No. 99 at 3:10-11.

5            Upon a user registering via the website, the Marketplace assigned the user a Bitcoin

6    address. *Id.* at 44. A user "would send bitcoin to a Bitcoin address assigned to the [user] but

7    controlled by Silk Road." Haynie Decl. dated August 24, 2021, Dkt. No. 99-2, ¶ 30. Silk Road

8    then "tumbled" all user deposits. *Id.* As explained by Special Agent Haynie, "[p]ayments going

9    into Silk Road were tumbled so that the bitcoin could *not be traced back to a particular user*."

10   *Id.* (*emphasis* added). This was possible because a key feature of bitcoin's functionality is

11   fungibility. Wajda Decl. ¶ 39-46; *see* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic*

12   *Cash System,* BITCOIN.ORG (2009) https://bitcoin.org/en/bitcoin-paper; *Ox Labs, Inc. v. Bitpay,*

13   *Inc., No.* CV 18-5934-MWF (KSX), 2020 WL 1039012 (C.D. Cal. Jan. 24, 2020), *aff'd,* 848 F.

14   App'x 795 (9th Cir. 2021); *also see Commodity Futures Trading Comm'n v. McDonnell,* 287 F.

15   Supp. 3d 213 (E.D.N.Y.), *adhered to on denial of reconsideration,* 321 F. Supp. 3d 366

16   (E.D.N.Y. 2018).

17           Upon sending bitcoin to a Silk Road address, the user was never provided a private key

18   associated with the address. Rather, the user's profile "would be credited with the requisite

19   amount of bitcoin." Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30. The user could use

20   that credit to engage in a transaction with a Silk Road vendor. *Id.* "The actual bitcoin received

21   by the vendor was not the same bitcoin the [user] used to fund his account." *Id.* A user could

22   access the Marketplace but did not control the movement of bitcoin.

23           Mr. Ulbricht solely controlled the private keys associated with all addresses maintained on

24   the Bitcoin Server, including corresponding user addresses. Wajda Decl. ¶ 50-5. Users knew

25   their Bitcoin address only, and they did not have access to the associated private key. *Id.* ¶ 56.

26   Only Mr. Ulbricht could send or spend bitcoin held by the Marketplace. *Id.* ¶ 57-8. His role was

27   to settle Marketplace transactions and collect commissions on each sale. *Id.* 22

28

**ER-089**

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**C.   Mr. Matusko's and His Marketplace User Profile**

Mr. Matusko is a German citizen residing in Berlin, Germany. Declaration of Ilija Matusko ("Matusko Decl."), ¶ 1.  German is his first language. *Id.*  He has no legal education. *Id.* ¶ 2.  He has worked as a content editor since 2012 and he presently works for the German newspaper "taz." *Id.* ¶ 3.  He has never been contacted by any US governmental official regarding the Silk Road or his user profile. *Id.* ¶ 13.

In 2011, Mr. Matusko became curious about the Silk Road. *Id.* ¶ 6.  He discovered that the Marketplace required a user profile to view the Marketplace website. *Id.* at ¶ 7.  This required him to create a user profile and transfer bitcoin to the Marketplace's wallet.  He purchased 48 bitcoin from a friend for EUR150 obtained from legal sources. *Id.* ¶¶ 3, 8.

He then set up a user profile, "hanson5" and sent the 48 bitcoin to the Bitcoin address assigned by the Marketplace. *Id.* ¶ 8.  The government has verified the username, the timeline, and the transfer of 48 bitcoin. Declaration of Jeremiah Haynie, Dkt. 95-1 ¶ 12 ("Haynie Decl. dated July 28, 2021") ("A copy of the Silk Road server when it was seized in October 2013 showed that the hanson5 account received 47.52 bitcoin in December 2011.").  At no time did the Marketplace provide, nor did Mr. Matusko know, the private key to access the Marketplace wallet or thereafter control the 48 bitcoin. *See* Wajda Decl. ¶¶ 55-6.

Mr. Matusko accessed the Marketplace through his user profile a handful of times, but never purchased anything. Matusko Decl. ¶ 9. Those 48 bitcoin remained in the Marketplace's wallet until the government seized the Bitcoin wallet. Haynie Decl. dated July 28, 202 ¶ 13.

**D.   2013 Seizure and Notice of Earlier Forfeiture Action**

As is well documented, the government seized the Marketplace Servers and Bitcoin Servers on or about October 2, 2013. Reply Brief, Dkt. 99 at 3.  "The extent of the government's investigation into [Silk Road] . . .  cannot be overstated. When the government seized the Silk Road website in 2013, it preserved its servers, which contain the entire transaction history and users of the website." *Id*.  This investigation led to the prosecution of Mr. Ulbricht and a related forfeiture of the bitcoin seized in 2013.

The government falsely believes that "all of the bitcoin was tainted because it all came

from individuals wishing to purchase illicit goods and services." Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30. However, Silk Road was not exclusively used for the purchase of illicit goods and services. *Products,* Silk Road (marketplace), WIKIPEDIA https://en.wikipedia.org/wiki/Silk_Road_(marketplace) (last visited Aug. 25, 2021). Rather, the Silk Road had some lawful goods and services, to include art, apparel, and books. *Id.*

The government, however, never notified any of the 100,000-plus Marketplace users by email, physical mail, or any other direct manner. In seizing the Marketplace website, the government uploaded a seizure notice in English only. *See* Haynie Decl. dated July 28, 2021 ¶ 8. It did not provide a link to forfeiture.gov or otherwise provide information regarding affected users. *Id.* It is therefore unsurprising that no Marketplace users filed a claim in that forfeiture action. *See* Filing History, *United States of America v. Ulbricht et al* (No. 13-cv-06919).

### E. The Sources of the 1HQ3 Bitcoin

On May 6, 2012, a third party stole 70,411.62 bitcoin from "addresses controlled by Silk Road and transferred it to two Bitcoin addresses [1BAD] and [1BBq]." Haynie Decl. dated July 28, 2021, ¶ 9. IRS-CI Special Agent Jeremiah Haynie "personally conducted blockchain analysis of the bitcoin at issue in this case and was involved in the investigation from its inception to the present day." Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 1. This analysis includes Special Agent Haynie "personally conduct[ing] the tracing and analysis of the 1HQ3 Bitcoin address." Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 3.

Special Agent Haynie's sworn testimony initially indicates that "the transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular user accounts." Motion to Strike, Dkt. 95-1, ¶ 9; Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 7. Special Agent Haynie, however, clarifies this analysis as follows:

> In this case, Individual X sent the stolen bitcoin to 1BAD and 1BBq in 54 separate transactions. Each of those transactions was funded by multiple bitcoin addresses associated with Silk Road. In total, 1BAD and 1BBq was funded by approximately 3,056 sending addresses ... Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users. I determined this by having an IRS-CI analyst compare each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road servers. This means that 98 percent of the sending addresses that funded 1BAD & 1BBq and therefore 1HQ3, were addresses used by Silk Road users . . .

Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 30.

-6-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**F.**     <u>Mr. Matusko Acted Precipitously to File Verified Claim</u>

Mr. Matusko was unaware of either forfeiture action or his rights to file a claim. In early 2021, a friend suggested that he consult German counsel, Tom Westermann ("Mr. Westermann"). Mr. Westermann began contacting counsel located in the United States. Declaration of Tom Westermann ("Westermann Decl.") ¶ 3. On or about April 28, 2020, he contacted the undersigned and inquired whether Mr. Matusko had any remedies at law. *Id.* ¶ 4. The undersigned evaluated the underlying facts and determined that Mr. Matusko may have a viable claim. The undersigned contacted AUSA Countryman by telephone and email to discuss the matter. AUSA Countryman simply responded by email that the government viewed the claim to be untimely. He did not return the phone call or request any additional information. The undersigned worked with Mr. Matusko and Mr. Westermann to formalize the engagement and verify facts. Mr. Matusko filed his verified claim on July 2, 2021. Verified Claim, Dkt. 87.

**III.**     <u>MR. MATUSKO'S CLAIM IS TIMELY AND THE GOVERNMENT HAS NOT SATISFIED NOTICE REQUIREMENT FOR MARKETPLACE USERS</u>

Mr. Matusko is a potential known claimant, and his claim is timely. It is the government that has not met statutory requirements. The government has information on every Silk Road user to this day. Despite available methods to link cryptocurrency transactions with individuals, the government appears to have determined that notice was not required on the basis that "all [seized] bitcoin was tainted because it all came from individuals wishing to purchase illicit goods and services." Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30. Consequently, it apparently made no effort to notify users of either forfeiture action. The government has not met its initial notice requirements to proceed with the forfeiture.

Even if the Court concludes Mr. Matusko's claim is untimely, the facts demonstrate the Mr. Matusko has acted in good faith and the government is not prejudiced by the filing of the claim.

**A.**     <u>Forfeiture Statutes Are to be Strictly Construed Against the Government.</u>

It is well established that forfeiture statutes are strictly construed against the government and not favored in the law. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159 (9th

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1   Cir. 2008; *citing $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994)); *see also*

2   *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ("[b]ecause forfeitures are disfavored, *see*

3   *United States v. One Ford Coach*, 307 U.S. 219 (1939)  forfeiture laws and their notice provisions

4   are 'strictly construed . . . against the government'" *citing United States v. Marolf*, 173 F.3d 1213

5   (9th Cir. 1999); *United States v. Real Properties located at 7215 Longboat Drive (Lot 24)*, 750

6   F.3d 968 (8th Cir. 2014) ("[o]ur circuit has noted that 'forfeitures are not favored' in the law"

7   *citing United States v. One 1980 Red Ferrari*, 875 F.2d 186, 188 (8th Cir.1989) (per curiam)).

8          The government asks this Court to construe forfeiture rules against a claimant who is an

9   innocent owner, who's property was acquired legally, and never used in any unlawful

10  transactions.  The strict construction the government advances should be rejected.

11         **B.        The Government Never Provided Adequate Notice To Known Claimants.**

12         Each Silk Road user is a known potential claimant.  The government did not provide Mr.

13  Matusko—or any Silk Road user—with direct notice here or in the 2013 forfeiture.  However, in

14  similar bitcoin forfeiture actions, the government traced all transactions on the bitcoin blockchain

15  and provided direct notice via certified mail and email to all potential users.  *United States v.*

16  *Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020).

17         In a forfeiture action, the government must provide two (2) types of notice: (1) direct

18  notice to persons who reasonably appear to be a potential claimant, and (2) notice by publication.

19  Supp. R. G(4)(a)-(b).  To identify potential claimants, "reasonable efforts must be taken . . . to

20  identify any person or entity with a likely ownership interest" before a complaint is filed. Asset

21  Forfeiture Policy Manual (U.S. Department of Justice, 2021) at 86, n. 45.  Publication is typically

22  satisfied by posting notice on the government's website (forfeiture.gov). Asset Forfeiture Policy

23  Manual at 111; Supp. R. G(4)(a)(iv)(C).  However, if known potential claimants are in a foreign

24  country, then notice may need to be published in a newspaper of general circulation "in the

25  appropriate foreign language, in the country in which known potential claimants are located." *Id*.;

26  see Supp. R. G(4)(a)(iv).  These notice requirements give individuals whose property interest are

27  at stake due to governmental actions notice and opportunity to be heard, thereby satisfying

28  constitutional due process requirements.  *Dusenbery v. U.S.,* 534 U.S. 161, 167 (2002); U.S.

**ER-093**
-8-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1     CONST. Amend. V. The Supreme Court has specified that due process is satisfied when the

2     government's effort is "'reasonably calculated' to apprise a party of the pendency of the action."

3     *Dusenbery*, 534 U.S. 161 at 170 (*quoting Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S.

4     306, 315 (1950)).

5         These notice principles have been applied to users of another illicit, internet marketplace

6     in *United States v. Twenty-Four Cryptocurrency Accts.* In that case, the government seized

7     cryptocurrency accounts associated with a Tor-based website engaging in the sale of illicit

8     content. *Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1. There, the government analyzed

9     the blockchain, transactions on the website, and other information to identify claimants. *Twenty-*

10    *Four Cryptocurrency Accts.*, 473 F. Supp. 3d at 3. The government then notified the users by

11    certified mail and email. *Id.* The D.C. District Court held that the government's efforts and

12    notice were appropriate when dealing with otherwise unidentified users of an online marketplace.

13    *Id.*

14        Here, the government knows and has information on thousands of Silk Road users both

15    domestic and abroad but chose to notify to Mr. Ulbricht only. Haynie Decl. dated July 28, 2021,

16    Dkt. 95-1 ¶ 4 ("purchases appear to have been filled by vendors located in over ten different

17    countries"). The government has made clear it can verify specific user transactions because it

18    verified that Mr. Matusko sent "47.52 bitcoin in December 2011" to the corresponding address in

19    the Silk Road wallet. Mr. Matusko's user profile was credited with that amount and that credit

20    always remained . . . [and] had the same balance when the server was seized." *Id.* ¶ 12. The

21    government offers no explanation why it did not analyze Silk Road users' transactions or other

22    data in an effort to notify known claimants as in *Twenty-Four Cryptocurrency Accts*. The extent

23    of the government's investigation "can not be overstated". Reply Brief, Dkt. No. 99 at 3.

24    However, it appears the government believes that Mr. Ulbricht—who's seized bitcoin was

25    primarily comprised of commission payments from brokering the sale of illegal goods—is the

26    only party entitled to direct notice, rather than numerous Silk Road users who engaged in no

27    illegal transactions. Nonetheless, the government's conduct here is inconsistent with its effort to

28    notice individual users in *Twenty-Four Cryptocurrency Accts*.

**ER-094**

-9-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

Mr. Matusko is a known claimant in both relevant forfeiture proceedings. The government has yet to demonstrate an attempt identify and notice potential claimants and did not follow proper procedure. Rather, it looks to hold an innocent property owner accountable for their own failure. Notice was given to one known potential claimant (Mr. Ulbricht) and then posted on a U.S. government website in English only – even though it was known potential claimants were located abroad, contrary to guidance published in the Forfeiture Policy Manual. Forfeiture Policy Manual at 111 ("Published notices on forfeiture.gov are limited to English at this time. . . depending on the facts of the case, it may be appropriate to publish notice in a newspaper of general circulation"). It is unclear why the government chose to disregard their own procedural requirements here, especially when they were dutifully observed in *Twenty-Four Cryptocurrency Accts*. Now the government asks this Court to turn a blind eye to its inaction and—contrary to precedent—strictly construe these forfeiture rules against Mr. Matusko and an untold number of potential claimants who never received proper notice. Indeed, the government's effort to notice potential claimants misses the mark of being "'reasonably calculated' to apprise a party of the pendency of the action." *Dusenbery*, 534 U.S. 161 at 170.

If a court determines notice is insufficient, then the remedy is to void and vacate the original proceeding. *United States v. Marolf*, 173 F.3d 1213, 1217 (9th Cir. 1999) (denying forfeiture where government "erred" by failing to provide due notice to property owner); *see also Longenette v. Krusing*, 322 F.3d 758, 765 (3d Cir. 2003) ("Four appellate courts—the Courts of Appeals for the Second, Fifth, Ninths, and Tenth Circuits—have held that a forfeiture conducted without adequate notice is void" *citing Alli–Balogun v. United States*, 281 F.3d 362, 370–71 (2d Cir.2002); *Kadonsky v. United States*, 216 F.3d 499, 506–07 (5th Cir. 2000); *United States v. Marolf*, 173 F.3d 1213, 1218–20 (9th Cir.1999); *Clymore v. United States*, 164 F.3d 569, 574 (10th Cir.1999)).

Here, since notice was inadequate, the forfeiture action is void.

**C.     Relevant Factors Support Allowing Mr. Matusko's Claim to Proceed.**

In the event the Court finds Mr. Matusko's claim to be untimely, then Mr. Matusko requests the Court exercise its discretion to proceed on the claim's merits. Mr. Matusko acted in

good faith, has demonstrated a direct interest in the subject property and has a right to due process.

In a civil forfeiture action, the court has discretion to hear a claim that is untimely filed. Rule G(5)(a)(ii)(A); *see United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,* 787 F.3d 968, 974 (9th Cir. 2015); *United States v. Real Property at 2659 Roundhill Dr., Alamo, Cal*., 194 F.3d 1020, 1024 (9th Cir. 1999) ("The plain language of Rule 6(C) provides that claims must be filed within ten days of service of process or 'within such additional time as may be allowed by the court. Here, the district court exercised its discretion and allowed the late filings."); *see also United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1262 (2nd Cir. 1989) ("When, as here, a claimant has made a sufficient showing of interest in the property through filing with the court a motion and accompanying affidavits, technical noncompliance with the procedural rules governing the filing of claims may be excused."). The Ninth Circuit applies a factor test when evaluating whether to exercise discretion to let a late claim proceed: Those factors are argued below in the same order as the government's Motion to Strike. These twelve factors are taken from *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118 (9th Cir. 2004)).

The government asks this court to ignore precedent to weigh forfeiture rules against the government and further ignores the facts, which demonstrate that these factors weigh in Mr. Matusko's favor.[2]

    **i.**     <u>**Claimant was not aware that he had any rights in the seizure and his counsel informed the U.S. Attorney's office that he intended to make a claim even though he was not properly served (First and Sixth Factor).**</u>

The first factor is when claimant became aware of the currency's seizure, and the sixth factor is whether the claimant informed the government and the court of its interest before the claim's deadline. *Id.*

The first factor should favor Mr. Matusko because he was not aware of the legal

---

[2] These factors are argued in the same order as the government presented them in their Motion to Strike.

-1-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

implications of the seizure when it occurred. The sixth factor should favor Mr. Matusko because he was never properly served and his counsel informed the U.S. Attorney's office that he intended to make a claim.

The government argues that because Mr. Matusko was aware that the government shut down Silk Road, he was similarly aware that the bitcoin in his user account had been seized, which in turn should have put the Claimant on notice that he had certain legal rights to reclaim his property. *See* Motion to Strike, Dkt. 95 at 19.

The government's argument that Mr. Matusko was aware of the seizure necessitates a close examination of the relevant case law that established this factor, as well as the definition of a "seizure." A claimant is "aware" as a matter of fact when the record reflects actual knowledge. *United States v. $100,348.00 in U.S. Currency,* 354 F.3d 1110, 1117 (9th Cir. 2004). There, the claimant filed the claim months after submitting declaration supporting another claimant in the same matter. *Id.* This demonstrated the claimants' actual knowledge of the forfeiture proceeding.

Here, Mr. Matusko filed a claim even though he did not receive direct notice as a known potential claimant. Mr. Matusko is a German citizen that resides in Berlin, Germany. Matusko Decl. ¶ 1. His first language is German. *Id.* He has no formal knowledge of U.S. laws generally or forfeiture actions. *Id*. ¶ 2. Although Mr. Matusko was admittedly "generally aware" that Silk Road has been seized by the FBI, he had no meaningful awareness of what this meant in terms of his right to the bitcoin he sent to the Silk Road wallet. After the Silk Road takedown and seizure, Mr. Matusko assumed his was lost, and he had no notion that he had legal rights to recover his property. Mr. Matusko did not realize that recovery was even a possibility until U.S. counsel, contacted via German Counsel, investigated the circumstance. *Id*. ¶¶ 11-4. It is not reasonable to conclude Mr. Matusko—a foreign national residing in Berlin—was aware of the seizure and his rights. Also, the seizure notice published on the Silk Road website makes no mention of forfeiture.gov and does not give any information regarding the rights innocent owners may have to reclaim their property.

The government further argues that Mr. Matusko never informed the Court of his interest in the Defendant Property before the claim deadline. Motion to Strike, Dkt. 95 at 19. At stated in

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1  the analysis above. Mr. Matusko was wholly unaware of the forfeiture action prior to the claim

2  deadline.

3       This factor supports allowing Mr. Matusko's claim to proceed.

4      **ii.**    **The government disregarded procedural and notice requirements that**

5                **encouraged the delay in Mr. Matusko's claim (Second, Fourth, and Ninth**

6                **Factors).**

7       The second factor is whether the Unites States Attorney may have encouraged the delay;

8  the fourth factor is whether the claimant was properly served; and the ninth factor is whether the

9  government complied with its procedural rules. *$100,348.00 in U.S. Currency*, 354 F.3d 1110,

10  1118.

11       The government apparently made a unilateral determination that no Silk Road user

12  (except Ross Ulbricht) is entitled to notice.  It did not meet its statutory requirement to provide

13  notice that was reasonably calculated to notify known claimants, especially in light of the fact that

14  Mr. Matusko (and thousands of other users) reside outside of the United States.  As discussed

15  below, this factor supports allowing Mr. Matusko's claim to proceed to the merits.

16       The government had the resources to identify and notice known potential claimants.  Yet,

17  the government made no effort to identify known claimants in this action except only notifying

18  Mr. Ulbricht.  As a result, the government encouraged delay, failed to provide adequate notice,

19  and skirted procedural rules.  The government's failure here delayed Mr. Matusko's claim.  As a

20  known potential claimant, Mr. Matusko—along with all other users of the Silk Road—were

21  entitled to direct notice of the forfeiture action.  Simply publishing the notice on forfeiture.gov in

22  English does not follow the government's established procedural requirements to identify and

23  provide direct notice to potential claimants.  This factor supports the Court exercising its

24  discretion to allow the claim to proceed.

25      **iii.**    **Mr. Matusko had no health issues inhibited him from making a claim (Third**

26                **Factor).**

27       The third factor is whether the claimant's health prevented him from making a timely

28  claim. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

Mr. Matusko did not have health issues that inhibited him from making a claim. However, because Mr. Matusko was not properly served, this factor should not be weighed against him and is not relevant in this matter.

iv.  **Mr. Matusko would be prejudiced with his claim were dismissed, not the government (Fifth Factor).**

The fifth factor is whether there is any prejudice to the government in permitting the claim to go forward. *Id.*

Dismissing the claim would substantially prejudice Mr. Matusko as his property rights would be terminated without consideration of the claim's merits.  As previously discussed, Mr. Matusko is a known potential claimant entitled to direct notice.  Mr. Matusko received no notice in 2013 and no notice in this forfeiture action.  As such, he received no procedural protections and stands in a state of severe prejudice: He has been divested of legally acquired property that is presently worth over $2 million USD and was used for no illegal transaction.  Hearing Mr. Matusko's claim will not prejudice the government.

The government suffers no prejudice if Mr. Matusko's claim is allowed.  Multiple claims are still pending in this matter, and the government filed motions to strike to each verified claim—both late-filed and timely-filed—on the same day.  Mr. Matusko's claim has not delayed or otherwise impeded the government's forfeiture action.

The government points to bitcoin's volatility and argues that "Matusko's continued participation in these proceedings would . . . complicate the matters before the Court . . . [and] contribute to the uncertainty of the value of the Defendant Property." Motion to Strike, Dkt. 95 at 20.  This argument values the government's potential windfall over the due process rights of property owners.[3]

The potential deprivation of Mr. Matusko's property rights far outweighs any speculative prejudice claimed by the government.  This factor favors Mr. Matusko.

---

[3] Since the government first took custody of the 69,370 Bitcoin from Individual X on November 3, 2020, Bitcoin has increased in value from approximately $14,000 to consistently holding above $30,000 since July 2021, this represents a nearly 100% increase from the subject property's seizure. Price of Bitcoin, COINDESK, https://www.coindesk.com/price/bitcoin (last visited Aug. 25, 2021).

**ER-099**-4-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

v.  **No trial date has been set (Seventh Factor).**

The seventh factor is whether the claimant expended resources preparing for trial. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

This factor is irrelevant because this matter is still in its early stages and has not been set for trial.

vi.  **Mr. Matusko's Reason For Delay Is Made In Good Faith (Eighth Factor).**

The eight factor is the claimant's good faith. *Id.*

Mr. Matusko's late claim is made in good faith. Mr. Matusko has no prior training or background in U.S. legal matters and had no reason to know he had the ability to make a claim. He received no notice and had no knowledge that he could assert his right to the forfeited property. Mr. Matusko believed that his property was lost.  Mr. Matusko learned he may have legal recourse on in early 2021, he sought counsel in Germany contacted the undersigned counsel to file the claim. Matusko Decl. ¶¶ 11-6.

The government suggests Mr. Matusko lacks good faith because he published two (2) short articles on bitcoin and the Silk Road:  The government does not explain, however, how Mr. Matusko's awareness of Silk Road's influence on bitcoin's 2013 zeitgeist demonstrates bad faith. Mr. Matusko has never claimed that he was ignorant to Silk Road's shutdown and seizure. Rather, Mr. Matusko asserts that he did not know he had any legal recourse to claim property following the seizure.  Here, the government failed to give direct notice to Mr. Matusko as a potential claimant on two separate occasions and now suggests he is acting in bad faith.  Here, the government is the bad actor.

vii.  **Mr. Matusko was unrepresented for two months before retaining counsel (Tenth Factor).**

The tenth factor is whether the claimant is acting pro se. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

Mr. Matusko was unrepresented when the complaint was first filed in November 2020 and until June 2021.  His claim was filed shortly after retaining local counsel to vet and prepare the verified claim.  Mr. Matusko is not pro se, however, any delay resulted from his ignorance of the

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

forfeiture action and his potential rights.

viii. **Mr. Matusko informally notified the government of the potential claim through counsel (Eleventh Factor).**

The eleventh factor is whether the claimant petitioned for an enlargement of time. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

This factor should not be weighed against Mr. Matusko because he was never properly served. The undersigned contacted AUSA David Countryman by telephone and email to notify the government of a potential claim. AUSA David Countryman simply informed the undersigned that they would seek to have any "late" claims dismissed. Mr. Countryman did not express any interest in learning about the facts of the claim or related legal issues. Simply stated, the government was aware of the claim before it was filed and already knew that it intended to challenge the timeliness. This factor does not support the government.

ix. **Sufficient claim (Twelfth Factor).**

The twelfth factor is the claim's sufficiency. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

As discussed below, Mr. Matusko's claim is sufficient and he has standing in this matter. The government argues that Mr. Matusko has no "real interest in the property" and observes that "[e]ntirely frivolous claims may be filed by people who have no connection with the forfeiture case, except that they read about it on the Internet." Motion to Strike, Dkt. 95 at 12. The suggestion that Matusko's claim is "frivolous" flies in the face of the government's own admissions. The government confirms Mr. Matusko's (1) Marketplace user profile, (2) that Mr. Matusko sent 48 bitcoin to the Silk Road wallet, and (3) that the Marketplace credited his user profile with that amount at all times relevant. Further, Mr. Matusko's account remained dormant and was never used any transaction – illicit or otherwise. And while the government has record of every transaction and user, it continues to imply that Mr. Matusko has unclean hands without factual support.

As is more thoroughly discussed below, the testimony of Special Agent Haynie undercuts the government's theories challenging standing. This factor supports Mr. Matusko.

**ER-101**-16-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**IV.    MR. MATUSKO'S CLAIM, CONFIRMED BY THE GOVERNMENT, ASSERTS AN INTEREST IN THE BITCOIN**

Mr. Matusko's standing in this matter is undeniable. The allegations in the verified claim assert a direct financial interest, let alone a colorable interest, in the property. These allegations alone are sufficient to deny the government's motion[4]. However, Special Agent Haynie's statements in his declarations in this matter directly undercut the government's arguments against standing. Finally, Mr. Matusko requests that the Court estop the government from arguing that this verified claim is precluded by the earlier forfeiture action.

Ultimately, the claim's material allegations as confirmed by the government demonstrate a colorable claim. Mr. Matusko has standing and requests the Court deny the motion with prejudice.

**A.    Standing is Established By Asserting Financial Interest Under Civil Forfeiture's Forgiving Standards**

To satisfy standing in a forfeiture proceeding, a claimant must simply demonstrate "a colorable interest in the property" such as "title or financial stake." *United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA,*, 545 F.3d 1134, 1140 (9th Cir. 2008); *see also United States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004); *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,* 787 F.3d 968, (9th Cir. 2015). A claimant need not "definitively prove the existence of [his] interest*." United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 95 (D.D.C. 2013). The requirements for a claimant to establish standing to contest a forfeiture are "very forgiving." *United States v. All Assets Held in Acct. No. XXXXXXX in name of Doraville Properties* Corp., 299 F. Supp. 3d 121 (D.D.C. 2018) (quoting *United States v. Emor,* 785 F.3d 671, 676 (D.C. Cir. 2015)).

The term "standing" is something of a misnomer, as "courts have 'discretion to overlook

---

[4] The government's motion should be denied for failing to identify whether it seeks relief under Fed. R. Civ. P. 12(c) or 56. It is curious that Mr. Matusko (and other claimants) are left to infer the applicable standard. For this reason, the motion should be denied. Nonetheless, Mr. Matusko will address the motion under both standards.

-7-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

the failure to conform to the requirements of [forfeiture claim rules].' " *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1012 (9th Cir. 2013) (quoting *United States v. 2659 Roundhill Dr.*, 194 F.3d 1020, 1024 (9th Cir. 1999)) (alteration in original); *see also United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1262 (2d Cir. 1989) (excusing technical noncompliance with procedural rules governing filing of claims on ground that claimant made sufficient showing of interest in property).

The precise "manner and degree of evidence required" to demonstrate standing will vary according to the stage of litigation. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012) (*quoting Lujan*, 504 U.S. at 561, 112 S.Ct. 2130). A claimant's unequivocal assertion of ownership is sufficient, at the judgment on the pleadings stage, to establish statutory standing in a civil forfeiture proceeding. *U.S. v. Real Property Located at 17 Coon Creek Road, Hawkins Bar California, Trinity County*. 787 F3d, 968 (9th Cir. 2015) (reviewing under the judgment on the pleadings standard).

### B. Mr. Matusko Alleged a Financial Interest in the Subject Property

The allegations in the verified claim, accepted as true[5], establish Mr. Matusko's standing. Mr. Matusko unequivocally asserted financial interest in the seized bitcoin. He created a user profile on the Marketplace, he sent 48 bitcoin to the Marketplace's Bitcoin wallet, and he has always had a credit on the Marketplace for that amount. Therefore, Mr. Matusko has asserted a financial interest in bitcoin recovered by the government.

Further, the forfeiture complaint relies on the unlawful actions conducted on the Marketplace as the legal basis for forfeiting the recovered bitcoin. If not, the assets would be returned to the Marketplace and its users would have right for the return of any credit.[6] Thus, Mr.

---

[5] The moving party must demonstrate is entitled to judgment as a matter of law. Fed.R. Civ. P. 12(c); *see Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586 (9th Cir. 2008). The non-moving party's allegations must be accepted as true, while the allegations of the moving party that have been denied are assumed false. *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984). Only if, on the facts so admitted, the moving party is clearly entitled to prevail can the motion be granted. *Austad v. U.S.*, 386 F.2d 147, 149 (9th Cir. 1967). Hence, the government motion must meet the high burden.

[6] And for reasons discussed below, the timing of the hack is irrelevant to Mr. Matusko's colorable claim.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    Matusko has alleged colorable claim in the property.

2    **C.    Special Agent Haynie's Testimony Contradicts the Government's Theory**

3    A challenge to a claimant's standing is appropriately addressed at the motion for summary

4    judgment stage. *See US v. $133,420.00 in U.S. Currency*, 672 F3d 629, 639 (9th Cir. 2012).  And

5    certainly, the government's motion is supported by evidence in the form of declarations.

6    Nonetheless, the government has fallen well short of its burden of demonstrating no material

7    issue of fact.

8    The thrust of the government's argument is that Individual X did not steal Mr. Matusko's

9    bitcoin.  Consequently, Mr. Matusko, the government reasons, has no interest in the subject

10   property.  Motion to Strike, Dkt. 95 at 2. It is essentially a tracing argument.  In other words, Mr.

11   Matusko lost "his" 48 bitcoin as a result of 2013 Silk Road takedown and seizure.  This argument

12   relies on flawed interpretations of how the Marketplace functioned and bitcoin generally.

13   First, Marketplace users did not hold a right to any specific bitcoin.  Fungibility is a

14   fundamental aspect of how Bitcoin operates.  A bitcoin is equivalent to any other bitcoin.  This

15   concept is demonstrated by the Marketplace's operation.  Each bitcoin sent to the wallet was

16   "tumbled" "so that the bitcoin could not be traced back to a particular user."  Further, if a user

17   engaged in a transaction, the "actual bitcoin received by the vendor was not the same bitcoin the

18   [user] used to fund his account."  Haynie Decl., Dkt. No. 99-2 ¶ 30.

19   Thus, the concept that Mr. Matusko lost "his" bitcoin is flawed.  It is impossible for a user

20   to retrieve "his" bitcoin after sending it the Marketplace's wallet.  When the government seized

21   the Marketplace's bitcoin wallet, it also seized the bitcoin.  This seizure, however, it did not affect

22   any user's Marketplace credit.  Therefore, any user with an outstanding credit has a financial

23   interest the Marketplace's bitcoin, to include bitcoin the Marketplace lost as a result of the hack.

24   Besides being fungible and untraceable, a Marketplace user lost any control of bitcoin sent

25   to an address in the Marketplace's wallet.  A user "would send Bitcoin to a bitcoin address

26   assigned to the [user] but controlled by Silk Road."  Haynie Decl., Dkt. No. 99-2 ¶ 30.  There is a

27   "significant difference" between a wallet and an address.  A "wallet is a collection of private keys

28   and corresponding addresses.  It is typically under the control of a single private individual or

**ER-104**-9-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1  service. An address is a digital destination used to send and receive cryptocurrency funds." Here,

2  the single user was Mr. Ulbricht.

3      Mr. Matusko was only "assigned" a wallet address. He never held the private keys and

4  lost all control of the 48 bitcoin after sending it to the address. Mr. Ulbrict alone controlled the

5  movement of bitcoin in that address. Again, "not your keys, not your bitcoin." Thus, Mr.

6  Matusko did not have private keys to send the bitcoin from the Marketplace wallet to a wallet that

7  he controlled.

8      Finally, the government advances a factual assertion that that the hacked bitcoin came

9  from a "general pool." Specifically, the government motion states as follows: "In fact, the BTC

10  Individual X stole came from the general pool of Silk Road bitcoin and not from any particular

11  user accounts, meaning that no user balances were impacted by the hack. Motion to Strike, Dkt.

12  95 at 2.

13      While this ignores the fungibility aspect and contrives the idea of specific user accounts,

14  Special Agent Haynie's testimony regarding the "general pool's" composition directly contradicts

15  that notion:

16      In this case, Individual X sent the stolen bitcoin to 1BAD and 1BBq in 54 separate
        transactions. Each of those transactions was funded by multiple bitcoin addresses

17      associated with Silk Road. **In total, 1BAD and 1BBq was funded by approximately
        3,056 sending addresses … Of the 3,056 sending addresses, 3,014 were deposit**

18      **addresses for Silk Road users.** I determined this by having an IRS-CI analyst compare
        each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road

19      servers. This means that 98 percent of the sending addresses that funded 1BAD & 1BBq
        and therefore 1HQ3, were addresses used by Silk Road users . . .

20

21  Haynie Decl., Dkt. 99-2 ¶ 30 (emphasis added).

22      While the government represents that "no user balances were impacted by the hack,"

23  Special Agent Haynie confirms that at least 3,014 user deposit addresses directly funded the

24  wallets used to accomplish the hack. The government's argument is directly contrary to its own

25  agent's testimony.

26      Even if the Court concluded Mr. Matusko had to trace untraceable bitcoin from a wallet

27  that he did not control to the hacked bitcoin, Special Agent Haynie's statements reflects that

28  3,014 user addresses were affected. One of those addresses could have been assigned to Mr.

-20-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1     Matusko. This certainly raises a material dispute of fact and even confirms Mr. Matusko's

2     colorable claim. Again, the government is challenging Mr. Matusko's standing. And that

3     argument is dubious at best.

4         **D.**     **The Government Should be Estopped From Challenging Mr. Matusko's**

5            **Claim Because He Did Not Make Claim in the 2013 Forfeiture Action**

6        The government attacks Mr. Matusko's standing because in the government's view Mr.

7     Matusko should have filed a claim in the 2013 forfeiture. This position should be viewed with

8     skepticism as it challenges basic notions of due process. Boiled down, the government is

9     asserting that Marketplace user credits, including Mr. Matusko's 48 bitcoin credit, were seized

10    and adjudicated in the earlier forfeiture action. As discussed above, that contention is

11    demonstrably incorrect.

12        Mr. Matusko was never afforded notice of that action. This is in spite of the government's

13    admission that it can and does connect wallet addresses to actual owners. The government took

14    no efforts to contact Mr. Matusko or any of thousands of other Marketplace users. Put another

15    way, the government denies any legal requirement to identify rightful owners of seized bitcoin. It

16    seems tangibly unfair to argue the claim is invalid simply because he should have filed a claim in

17    an earlier action that the same government never provided notice. Even more concerning it the

18    complete lack of any indication that the government undertook any efforts to take reasonable

19    steps to identify any Silk Road user in either action. Consequently, the government should be

20    estopped from relying on arguments that Mr. Matusko's only remedy was in the earlier forfeiture

21    action.

22    //

23    //

24    //

25    //

26    //

27    //

28    //

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1  **V.**  **<u>CONCLUSION</u>**

2       Mr. Matusko has standing and is a known potential claimant.  He received no direct notice

3  as required by law.  The court should deny the government's Motion to Strike and allow further

4  discovery in this matter.

5

6

7  DATED:      August 26, 2021                    KUGELMAN LAW, P.C.

8

9

10                                         By: _____/s/ Alexander Kugelman_____

11                                              ALEXANDER KUGELMAN
                                                Attorney for Claimant
12                                              Ilija Matusko

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1   ALEXANDER KUGELMAN (SBN 255463)
    Kugelman Law, P.C.
2   21 Tamal Vista Blvd., Suite 202
    Corte Madera, CA 94925
3   Telephone: (415) 968-1780
    Facsimile: (415) 534-9441
4   alex@kugelmanlaw.com

5
    Attorney for Claimant
6   ILIJA MATUSKO

7

8                          **UNITED STATES DISTRICT COURT**
9                        **NORTHERN DISTRICT OF CALIFORNIA**

10
    UNITED STATES OF AMERICA,                  Case No. CV 20-7811 RS
11
                    Plaintiff,
12                                             **DECLARATION OF TOM**
                                               **WESTERMANN IN SUPPORT OF**
13              v.                             **CLAIMANT ILIJA MATUSKO'S**
                                               **RESPONSE TO UNITED STATES'**
14  Approximately 69,370 Bitcoin (BTC), Bitcoin   **MOTION TO STRIKE VERIFIED CLAIM**
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin
15  Cash (BCH) seized from                     Date:      September 30, 2021
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,        Time:      1:30 pm
16                                             Ctrm:      3 (Via Zoom)

17              Defendant.
                                               The Hon. Richard Seeborg
18  _____
                                               Trial Date:   None Set
19
    ILIJA MATUSKO,
20
                    Claimant.
21

22

23

24                          **DECLARATION OF TOM WESTERMANN**

25      I, TOM WESTERMANN, declare as follows:

26      1.      I am a principal attorney at the law offices of Westermann-Scholl located at

27  Schomburgstraße 87, 22767 Hamburg and Anzengruberstraße 21, 12043 Berlin.  I am a German

28                                      - 1 -
                                 Case No. CV 20-7811-RS
    **DECLARATION OF TOM WESTERMANN IN SUPPORT OF CLAIMANT ILIJA MATUSKO'S RESPONSE**
          **TO UNITED STATES' MOTION TO STRIKE VERIFIED CLAIM**

**ER-108**

1  citizen and licensed to practice law in Germany. This declaration is based on my own personal

2  knowledge. If called upon to testify, I could and would testify competently to the contents of this

3  declaration.

4      2.     On or about January Ilija Matusko ("Mr. Matusko") contacted me to determine

5  whether I could assist him with a claim to recover 48 Bitcoin he deposited to his Silk Road account in

6  2011.

7      3.     Around the same time, I began to research and contact attorneys to serve as U.S.-based

8  counsel.

9      4.     On April 21, 2021, I first contacted Alex Kugelman at Kugelman Law, P.C. Mr.

10  Kugelman requested additional information to evaluate whether Ilija had a viable claim. I provided

11  additional information regarding Mr. Matusko's initial Bitcoin purchase and interaction with the Silk

12  Road marketplace.

13      5.     I declare under the penalty of perjury under the laws of the United States and that the

14  foregoing is true and correct to the best of my knowledge and belief.

15      Executed this 26 day of August, 2021 in Hamburg , Germany.

16

17

18

19

20  Tom Westermann
    Principal Attorney

21      Westermann-Scholl Rechtsanwälte

22      Schomburgstraße 87
    22767 Hamburg, Germany

23

24

25

26

27

28  - 2 -
**DECLARATION OF TOM WESTERMANN IN SUPPORT OF CLAIMANT ILIJA MATUSKO'S RESPONSE
TO UNITED STATES' MOTION TO STRIKE VERIFIED CLAIM**

1  ALEXANDER KUGELMAN (SBN 255463)
Kugelman Law, P.C.
2  21 Tamal Vista Blvd., Suite 202
Corte Madera, CA 94925
3  Telephone: (415) 968-1780
Facsimile: (415) 534-9441
4  alex@kugelmanlaw.com

5  Attorney for Claimant
ILIJA MATUSKO
6

7  **UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**
8

9

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CV 20-7811 RS |
| Plaintiff, | **DECLARATION OF ILIJA MATUSKO IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MATUSKO** |
| v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx, | Date:  September 30, 2021<br>Time:  1:30 pm<br>Ctrm:  3 (Via Zoom) |
| Defendant. | |
| | The Hon. Richard Seeborg |
| ILIJA MATUSKO, | Trial Date:  None Set |
| Claimant. | |

22                  **DECLARATION OF ILIJA MATUSKO**

23      I, ILIJA MATUSKO, declare as follows:

24      1.    I am a citizen of the Federal Republic of Germany (Germany) and have been since

25  my birth in 1980. I have continuously resided in Germany. My primary language is German. I do

26  have some proficiency in English.

27      2.    I was educated in Germany and I received a degree from a University in Munich in

28  sociology. I have no education, training, or experience as it relates to law in Germany. I have no

# ER-110

1  education, training, or experience as it relates to U.S. laws. I do not know what rights U.S.
2  citizens have as it relates to U.S. laws and the seizure of assets. I do not know what rights, if any,
3  a German citizen would have as it relates to U.S. laws and the seizure of assets.

4      3.      In December of 2011 I was unemployed, and I was receiving a form of
5  unemployment compensation from the government of €719 per month as I was seeking a full time
6  job. In mid-2012 I was hired by a communication firm in Berlin as a content editor. In 2014 I
7  was offered and accepted a position with the newspaper publication company "taz". I was hired
8  as an online content editor and over the past few years I have been assigned as the content editor
9  for the taz crowdfunding model. With my interest in Bitcoin I became involved in the integration
10 of Bitcoin as a payment option for "taz"[1].

11     4.      Recently, I started writing and my last paper was on "class and social injustice."
12     5.      In approximately 2011, I learned of an alternative digital currency that was
13 decentralized, with no central bank, and that the digital currency may provide some anonymity.
14 This alternative virtual currency was Bitcoin. The concept of anonymity intrigued me.

15     6.      During the latter part of 2011, I learned about the Silk Road Market from a friend.
16     7.      In approximately December of 2011, I accessed the Silk Road Market and created
17 a new user account under the username of "hanson5". I clicked on an area in the Silk Road
18 Marketplace user interface and a Bitcoin address was provided to me on the screen so I could
19 send Bitcoin to the Silk Road Marketplace.

20     8.      In December of 2011, I purchased 48 Bitcoin from a third party for €150 Euros.
21 The third party sent 48 Bitcoin to the Bitcoin address to my Bitcoin wallet that I provided to him.
22 Upon receipt of the 48 Bitcoin to my Bitcoin wallet, I sent the 48 Bitcoin to the Bitcoin address
23 that was provided to me by the Silk Road Marketplace when I opened the "hanson5" user
24 account. Within a few days I saw that the 48 Bitcoin were credited to my "hanson5" user account.

25     9.      After viewing the Silk Road Marketplace, I decided against buying anything. I
26 didn't want to be involved in something illegal. At no time did I purchase anything, legal or
27 illegal, on the Silk Road Marketplace.

28
---
[1]  https://taz.de/Zahlen-per-Bitcoins/!142454/

-2-

Case No. CV 20-7811-RS
**DECLARATION ILIJA MATUSKO**

# ER-111

1      10.    Sometime later I realized that I had forgotten my password to my "hanson5" user

2  account and that I no longer had access to my account.

3      11.    Sometime in 2013, I heard that the platform was taken down by the FBI.

4      12.    At no time was I aware of my rights to recover my 48 Bitcoin from the FBI.

5      13.    At no time did I receive any notification from the FBI or the U.S. government as to

6  my rights to recover my 48 Bitcoin.

7      14.    In early 2021, a friend convinced me that I should talk to an attorney and this

8  friend introduced me to Tom Westermann who is a German attorney. I spoke with Mr.

9  Westermann to see if there is a way to get my 48 Bitcoin back.

10      15.    Even Mr. Westermann was not aware of U.S. seizure laws and the rights that

11  German individuals have to recover these assets. Tom contacted several law firms in the U.S. and

12  in May of 2021, I retained Kugelman Law.

13      16.    The first time that I heard of the seizure of approximately 69,370 Bitcoin was

14  when Alex Kugelman told me about it on June 8, 2021.

15      17.    I declare under penalty of perjury under the laws of the United States of America

16  that the foregoing is true and correct.

17      Executed on this _26_ day of August 2021, at _____Berlin_____, Germany.

18

19

20

21

22  ILIJA MATUSKO
     Claimant

23

24

25

26

27

28

-3-

**ER-112**

1  ALEXANDER KUGELMAN (SBN 255463)
   Kugelman Law, P.C.
2  21 Tamal Vista Blvd., Suite 202
   Corte Madera, CA 94925
3  Telephone: (415) 968-1780
   Facsimile: (415) 534-9441
4  alex@kugelmanlaw.com

5  Attorney for Claimant
   ILIJA MATUSKO
6

7              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
8

9

10  UNITED STATES OF AMERICA,          Case No. CV 20-7811 RS

11              Plaintiff,

12       v.                            **DECLARATION OF ALEXANDER
                                       KUGELMAN IN SUPPORT OF
13  Approximately 69,370 Bitcoin (BTC), Bitcoin   CLAIMAINT'S OPPOSITION TO
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin     MOTION TO STRIKE THE VERIFIED
14  Cash (BCH) seized from                        CLAIM OF ILIJA MATUSKO**
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,
15                                     Date:      September 30, 2021
                                       Time:      1:30 pm
16              Defendant.             Ctrm:      3 (Via Zoom)

17  _____  The Hon. Richard Seeborg

18  ILIJA MATUSKO,                      Trial Date:   None Set

19              Claimant.

20

21

22             __DECLARATION OF ALEXANDER KUGELMAN__

23       I, ALEXANDER, declare as follows:

24       1.    I am an attorney licensed to practice in the State of California. This declaration is

25  based on my own personal knowledge. If called upon to testify, I could and would testify

26  competently to the contents of this declaration.

27       2.    On April 21, 2021, Tom Westermann contacted my office for the first time. At

28  that time, I had never met, corresponded or otherwise communicated with Mr. Ilija Matusko or

                                    -1-

1    Mr. Westermann. I was unfamiliar with any facts related to Mr. Matusko's claim.

2          3.    I proceeded to confirm facts regarding Mr. Matusko and his factual assertions.  As

3    an initial matter, it seemed that Mr. Matusko may have a viable claim.

4          4.    On or about May 20, 2021, Mr. Matusko engaged our firm as counsel.

5          5.    We further confirmed facts, reviewed documentation, and researched law to

6    determine that there was a basis in law and fact for Mr. Matusko to file a claim in this forfeiture

7    action.

8          6.    I declare under the penalty of perjury that the foregoing is true and correct to the

9    best of my knowledge and belief.

10         Executed this 26 day of August, 2021 in Corte Madera, California.

11

12                                              /s/ Alexander Kugelman

13                                         ALEXANDER KUGELMAN
                                           Kugelman Law, P.C.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALEXANDER KUGELMAN IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MATUSKO

1   ALEXANDER KUGELMAN (SBN 255463)
    Kugelman Law, P.C.
2   21 Tamal Vista Blvd., Suite 202
    Corte Madera, CA 94925
3   Telephone: (415) 968-1780
    Facsimile: (415) 534-9441
4   alex@kugelmanlaw.com

5   Attorney for Claimant
    ILIJA MR. MATUSKO
6

7            **UNITED STATES DISTRICT COURT**
         **NORTHERN DISTRICT OF CALIFORNIA**
8

9

10   UNITED STATES OF AMERICA,     |  Case No. CV 20-7811 RS

11            Plaintiff,

12               v.     |  **DECLARATION OF CHRISTOPHER
WAJDA IN SUPPORT OF CLAIMAINT'S
OPPOSITION TO MOTION TO STRIKE
THE VERIFIED CLAIM OF ILIJA MR.**

13   Approximately 69,370 Bitcoin (BTC), Bitcoin   **MATUSKO**
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin
14   Cash (BCH) seized from     Date:     September 30, 2021
15   1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,   Time:     1:30 pm
                   Ctrm:     3 (Via Zoom)
16            Defendant.

17                      |  The Hon. Richard Seeborg

18   ILIJA MR. MATUSKO,     |  Trial Date:   None Set

19            Claimant.
20

21

22          **DECLARATION OF CHRISTOPHER WAJDA**

23       I, CHRISTOPHER WAJDA, declare as follows:

24       1.     I am currently the Managing Director of the Black Raven Advisory Group LLC, a

25   niche firm that specializes in complex criminal and civil financial investigations. I am a retired

26   Assistant Special Agent in Charge, Internal Revenue Service – Criminal Investigation ("IRS-CI").

27   I have over 32 years of experience with the Internal Revenue Service; 21 years as a Special Agent

28   in the field and as a leader with IRS-CI focusing solely on criminal investigations related to white

-1-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1   collar criminal offenses with a specialty in federal tax crimes and money laundering violations.

2   My time as a leader in IRS-CI includes over 2 years as a Senior Analyst/Special Agent in IRS-CI

3   headquarters in the Financial Crimes section, Washington D.C. As a Senior Analyst in Financial

4   Crimes, I oversaw and managed several program areas to include the Virtual Currency program

5   and I was the IRS-CI liaison at the Financial Crimes Enforcement Network ("FinCEN").

6   2.      In this capacity as a program manager for IRS-CI's Virtual Currency investigative

7   efforts; I made policy recommendations to senior leadership within IRS-CI, I provided guidance

8   to Special Agents in the field who were working cases with a virtual currency nexus, and I

9   provided virtual currency training for IRS-CI and other law enforcement agencies at the

10  international, federal, state and local levels.

11  3.      As the FinCEN liaison for IRS-CI, I was the sole IRS management official

12  responsible for IRS-CI's strategic plan as it relates to the criminal enforcement of the Bank

13  Secrecy Act ("BSA") and coordinated with IRS civil on civil regulatory enforcement matters.

14  4.      Before joining IRS-CI, I served 11 years as an Internal Revenue Agent assigned to

15  a specialized branch called Special Enforcement Program ("SEP"). SEP's primary focus is to

16  conduct civil detailed examinations where fraud may be present. These civil examinations were

17  conducted on both legal and illegal enterprises.

18  5.      During my government service with Internal Revenue Service, I earned a Bachelor

19  of Business Administration with a focus in accounting from the Illinois Institute of Technology.

20  6.      Kugelman Law, P.C. retained the Black Raven Advisory Group LLC on May 20,

21  2021 to assist in a matter that may involve the recovery of Bitcoin.

22  7.      In support of this declaration, I have reviewed the following documents or sources

23  of information, these include but are not limited to:  Complaint for Forfeiture filed 11/05/2020

24  Case 3:20-CV-07811, Verified Claim and Statement of Interest of Ilija Mr. Matusko filed

25  07/02/2021 Case CV 20-7811,  Motion to Strike the Verified Claimant Ilija Matusko filed

26  07/29/2021 Case 3:20-CV-07811, Reply In Support Of Motion To Strike The Claims Of

27  Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred

28  Holdings, LLC filed 08/24/2021 Case No. CV 20-7811 RS, Declaration of Jeremiah Haynie,

-2-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1　Attachment A, Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Mr.

2　Matusko, Case 3:20-vc-07811 filed 07/29/2021, Declaration Of Jeremiah Haynie In Support Of

3　United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born

4　Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case No. CV

5　20-7811 RS filed 08/24/2021,　transcripts of sworn testimony of Former FBI Special Agent

6　Ilhwan Yum January 29, 2015 – *United States of America v. Ross William Ulbricht*, Silk Road

7　wiki web page, Sealed Ex Parte Application for a Second Post-Complaint Protective Order dated

8　October 24, 2013, Declaration of Ilija Mr. Matusko dated August 26, 2021, bank statements,

9　deposit receipts, various articles relating to the Silk Road Marketplace written by journalists,

10　various academic papers written by scientists and university professors, the blockchain and

11　certain transactions within the blockchain, historical prices of Euros, historical prices of Bitcoin,

12　articles related to the fungibility of crypto currency,　the Internal Revenue Service Internal

13　Revenue Manual, the U.S. Department of Justice – Criminal Division – Money Laundering and

14　Asset Recovery Section – Asset Forfeiture Policy Manual 2021, and　other open-source

15　information available via the internet.

16　　　　　　　　　**SILK ROAD MARKETPLACE USER PROFILE "hanson5"**

17　　　　　8.　　In approximately December of 2011, Ilija Matusko ("Mr. Matusko") accessed the

18　Silk Road Market and created a new user profile under the moniker of "hanson5". The final stage

19　in opening the user profile on the Silk Road Marketplace was to fund the profile with Bitcoin(s).

20　Mr. Matusko clicked on an area in the Silk Road Marketplace user interface that provided

21　information on how to fund the respective user profile. Mr. Matusko was provided a Bitcoin

22　Address by the Silk Road Marketplace to fund the profile.

23　　　　　9.　　In December of 2011, Mr. Matusko purchased 48 Bitcoin from a third party, who

24　also resided in the Federal Republic of Germany (Germany), for approximately €150 Euros. Mr.

25　Matusko thereafter transferred these 48 Bitcoin to the Silk Road Marketplace Bitcoin wallet. "A

26　copy of the Silk Road server when it was seized in October 2013 showed that the hanson5

27

28

-3-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1    account received 47.52 Bitcoin in December 2011."[1]

2         10.    At no time during the period that the "hanson5" user profile was in existence did

3    Mr. Matusko purchase anything illegal or legal on the Silk Road Marketplace. This has been

4    acknowledged by the government: "Although the government does not question Mr. Matusko's

5    assertion that he did not purchase any items from Silk Road using his hanson5 account,…"[2].

6         11.    Attached as Exhibit 1 is a graphical representation of the purchase of Bitcoin(s) by

7    Mr. Matusko from a third party and the subsequent transfer of the 48 Bitcoin(s) from the third

8    party's Bitcoin wallet to Mr. Matusko's Bitcoin wallet.  Included with this graphical

9    representation is the analysis that was performed by your declarant and source documents utilized

10   for the analysis and to reconstruct the respective transaction(s).

11        12.    From my analysis, education, training, and experience as a professional in private

12   practice, as a law enforcement officer and senior leader with the IRS-CI I was able to conclude

13   the following:

14        13.    That the account balance in Mr. Matusko's bank account were from legal sources,

15   specifically from his receipt of unemployment compensation from Germany.

16        14.    The funds (€150) used by Mr. Matusko to purchase the 48 Bitcoin from the third

17   party were from legal sources, specifically from his receipt of unemployment compensation from

18   Germany.

19        15.    The character of the 48 Bitcoin after the completed purchase and subsequent

20   transfer from the third party's Bitcoin wallet to Mr. Matusko's Bitcoin wallet are legal source

21   Bitcoin.

22        16.    The character of the 48 Bitcoin after the transfer from Mr. Matusko's Bitcoin

23   wallet to the Silk Road Market wallet remained legal source Bitcoin.

24        17.    The character of the "hanson5" 48 Bitcoin remained legal source Bitcoin for the

25   entire life of the Silk Road user profile of Mr. Matusko under the moniker of "hanson5".

26        18.    That only the actions of Mr. Matusko can change the character of the "hanson5"

27   [1] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of
     Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 6 ¶ 12:10-11
28   [2] Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS,
     filed 07/29/2021 at 20:15-16

-4-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

48 Bitcoin. These are referred to as "downstream transactions". At no time did Mr. Matusko purchase any item(s), legal or illegal on the Silk Road website. Because there were no purchases by Mr. Matusko through the "hanson5" profile on the Silk Road Marketplace, there were no "downstream transactions" that would have changed the character of the "hanson5" 48 Bitcoin.

19.     That the transfer of Bitcoin to fund a Silk Road Marketplace user profile by itself is not illegal.

20.     That maintaining a profile credit in a Silk Road Marketplace user profile by itself is not illegal.

21.     That the Bitcoin(s) that are maintained on the Silk Road Marketplace Bitcoin wallet become proceeds of illegal activity when the Silk Road Marketplace user purchases goods or services from a vendor that are illegal in nature and the transaction has been completed. The completed transaction is considered the downstream transaction.

22.     In the case of the Silk Road Marketplace, the illegal transaction is completed when the Bitcoin are released by the settlement agent (Mr. Ross Ulbricht, hereinafter "Ulbricht") to the Silk Road Marketplace vendor. It is at this point that the Bitcoin become proceeds of the illegal activity. Any commission(s) earned by Ulbricht that are derived from the sale of illegal items on the Silk Road Marketplace are also considered proceeds of illegal activity.

23.     Individuals and groups involved in illegal activity attempt to hide their illegal activities and attempt to disguise financial transactions, specifically; sources, uses and profits of funds directly or indirectly tied to illegal activity. From my analysis in Exhibit 1, Mr. Matusko did not make any effort to hide the purchase of the Bitcoin. In fact, Mr. Matusko did the complete opposite. He clearly documented the purchase of Bitcoin by notating "48 BTC Ilija" when he authorized a transfer of €150 (debit) from his bank to the third-party's bank account. This Bitcoin purchase transaction is also clearly documented in the counter transaction (credit) of €150 with the third-party's financial institution. Again, the purpose of the transaction is clearly noted on the financial institution's documents as "48 BTC Ilija".

### SILK ROAD MARKETPLACE OVERVIEW

24.     From my education, training, and experience as a professional in private practice,

Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1  as a law enforcement officer, as a senior leader with the IRS-CI, and through open-source

2  information available via the internet, I know the following:

3      25.    The Silk Road Marketplace was a darknet marketplace where both unlawful and

4  lawful goods and services were sold by Silk Road Marketplace vendors and purchased by Silk

5  Road Marketplace purchasers. A majority of these sales were illegal items, such as illicit

6  narcotics, and these purchases and sales were nefarious in nature. But there were some sales of

7  legal goods on the Silk Road Marketplace[3] and there were other purchases that may have

8  involved illegal items, but the nature of the purchases may not have been nefarious in nature.  An

9  example of this is shown below.

10      26.    A simple Google search for "Silk Road Marketplace" will reveal numerous articles

11  and academic papers written by journalist, scientists and university professors, all of whom may

12  have created user profiles on the Silk Road Marketplace; funded these user profiles with Bitcoin;

13  made purchases on the Silk Road Marketplace; gathered data through daily web crawls of the Silk

14  Road Marketplace; or used other techniques to gather data on the Silk Road Marketplace. The

15  data that was gathered throughout this process were used to write journalistic articles[4] or

16  academic articles that appeared in peer reviewed journals. These are examples of activity on the

17  Silk Road Marketplace where the activity was not nefarious in nature.

18      27.    "Silk Road was owned and operated by its creator Ross William Ulbricht, a/k/a

19  "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road". Ulbricht controlled and oversaw all

20  aspects of Silk Road. He maintained the computer infrastructure and programming code

21  underlying the Silk Road website; he determined vendor and customer policies, including

22  deciding what could be sold on the site; he managed a small staff of online administrators who

23  assisted with the day-to-day operations of the site; and he alone controlled the massive profits

24  generated from the operation of the business"[5].

25      28.    Ulbricht not only controlled the massive profits, but Ulbricht also controlled all

26  _____

[3] https://en.wikipedia.org/wiki/Silk_Road_(marketplace)

27  [4] Gawker published what is thought to be one of the first articles on the Silk Road Marketplace which may have led
to an increase notoriety of the darknet site, and it may have drawn the attention of U.S. Law Enforcement, including
the attention of Senator Charles E. Schumer, United States Senator for New York.

28  [5] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of
Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 3 ¶ 6:10-16

Case No. CV 20-7811-RS

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1  Bitcoin transactions within the Silk Road Market sphere because Ulbricht alone controlled the

2  Silk Road Market Bitcoin wallet. Ulbricht controlled the private key(s) and the public key(s)

3  (Bitcoin addresses) of the Silk Road Market Bitcoin wallet and thereby maintained dominion and

4  control of the Silk Road Market Bitcoin wallet. "A wallet is a collection of private keys and

5  corresponding addresses. It is typically under the control of a single private individual or

6  service."[6] In this case the single person who controlled the Silk Road Marketplace wallet was

7  Ulbricht.

8         29.     Ulbricht through the Silk Road Marketplace was a settlement agent.[7,8] This

9  provided a level of trust between vendors and purchasers.

10         30.     When dealing with the sale or purchase of illegal items, especially illegal

11  narcotics, there is always a level of mistrust between all parties. Ulbricht through the Silk Road

12  Marketplace provided a platform where this mistrust may have been lessened.

13         31.     As the government clearly established in the criminal trial of Ulbricht, he and only

14  he controlled all aspects of the Silk Road Marketplace to include the Silk Road Marketplace

15  Bitcoin wallet. This control of the Silk Road Marketplace Bitcoin wallet is critical. It established

16  trust between vendors and purchasers, and it assured that Ulbricht generated and "controlled

17  massive profits"[5] from this enterprise.

18  **OVERVIEW OF BITCOIN WALLET PUBLIC KEYS AND PRIVATE KEYS**

19         32.     From my education, training, and experience as a professional in private practice,

20  as a law enforcement officer and senior leader with IRS-CI, and through open-source information

21  available via the internet, I know the following:

22         33.     A Bitcoin wallet is comprised of two keys: a private key and a public key

23  (product(s) of the public key are Bitcoin addresses).

24         34.     The wallet uses the private key to create a public key, then it "hashes" the public

25

26  [6] Declaration Of Jeremiah Haynie In Support Of United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case No. CV 20-7811 RS filed 08/24/2021 at 7 ¶ 22:26-27

27  [7] A settlement agent is an independent party who helps complete a transaction between a buyer and a seller and settles any disputes between the parties.

28  [8] Graphic depiction labeled "Government Exhibit 113A" Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/292 021 at 21:1-13

-7-

Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1     key to generate a Bitcoin address. The Bitcoin address serves as a "destination address" that can

2     be shared with anyone so that Bitcoin can be received by the specific Bitcoin address. Anyone

3     with a Bitcoin wallet can receive Bitcoin. The sender of Bitcoin only needs to know the

4     "destination address" also known as the Bitcoin address. It is this Bitcoin address that appears on

5     the blockchain. To receive Bitcoin, the sender only needs to know the Bitcoin address of the

6     recipient.

7         35.     A Bitcoin wallet can have as many Bitcoin addresses as the Bitcoin wallet user

8     wishes: "you could create hundreds, thousands of addresses in one wallet file"[9] (Attached as

9     Exhibit 2 is a copy of the transcript of sworn testimony of former FBI Special Agent Ilhwan

10     Yum, January 29, 2015). "Users can operate multiple Bitcoin addresses at any given time and can

11     use a unique Bitcoin address for each transaction."[10]

12         36.     The private key is a critical part of keeping a Bitcoin wallet secure. Each Bitcoin

13     wallet's private key is a very secure passcode that is used to lock and unlock the Bitcoin wallet so

14     that the Bitcoin wallet owner can send or spend the Bitcoin that reside in the Bitcoin wallet. The

15     only way to send or spend Bitcoin from a wallet is to have access to the private key(s). "Only the

16     holder of a Bitcoin address' private key can authorize transfers of Bitcoin from that address to

17     other Bitcoin addresses."[11]   The person who controls the private key(s) is the person who

18     controls the Bitcoin wallet.

19         37.     The importance of the private key and who controls the wallet is illustrated by the

20     government in three examples[12]: the government seizure of the Silk Road Marketplace Bitcoin

21     wallet in or about October 2, 2013, and two instances in which Bitcoin were stolen from the Silk

22     Road Marketplace Bitcoin wallet.

23         38.     From my education, training, and experience as a professional in private practice,

24     and as a law enforcement officer and senior leader with IRS-CI, I know that the seizures and/or

25

---

26   [9] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1669:12-15
  [10] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of

27   Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 7 ¶15:7-8
  [11] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of

28   Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 7 ¶15:6-7
  [12] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of
  Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 4 ¶ 8, and at 5 ¶ 9-10

-8-

Case No. CV 20-7811-RS

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1  thefts were accomplished because the government, Individual X, and former U.S. Secret Service

2  Special Agent Shaun Bridges accessed the private key(s) which controlled the Silk Road

3  Marketplace Bitcoin wallet. The person(s) who has access to the private key(s) can unlock a

4  Bitcoin wallet and can send or spend the Bitcoin in the Bitcoin wallet.

**FUNGIBILITY OF BITCOIN**

6      39.      From my education, training, and experience as a professional in private practice,

7  as a law enforcement officer, senior leader with IRS-CI, and other open-source information

8  available via the internet, I know the following:

9      40.      That a feature of currencies, commodities and certain crypto currencies (like

10  Bitcoin) is fungibility.[13] [14]

11      41.      Meaning that units of the currency, commodity or crypto currency are

12  interchangeable. Fungibility is a core pillar of any currency, commodity, or crypto currency (like

13  Bitcoin), that will be used as a means of exchange that is going to be widely used for daily

14  transactions.  It establishes that the good or commodity is reliable to be used on a consistent basis

15  as a means of exchange. [15]

16      42.      For example, the U.S. one-dollar bill; there are a great number of U.S. one-dollar

17  bills in circulation, every U.S. one dollar bill is worth the same, and is interchangeable with any

18  other U.S. one dollar bill. The same is true for U.S. five, ten, twenty, etc… dollar bills.

19      43.      Some examples of items that are fungible: fiat currencies, Bitcoin, bonds, shares,

20  precious metals, and sweet/light crude oil.

21      44.      Some examples of items that are non-fungible include: art work, real estate,

22  people, diamonds (unique in size, shape/cut, brilliance, color and grade), digital non-fungible-

23  goods (NFGs) such as crypto kitties[16], which are a one-of-a-kind digital pets.

24      45.      Bitcoin(s) meets the definition of fungibility and is fungible in nature. Bitcoin are

25  interchangeable, uniform, substitutable and equivalent in nature and therefor fungible.

26  ────────────────
[13] https://www.investopedia.com/terms/f/fungibility.asp - Investopedia.com defines fungibility as "Fungibility is the ability of a good or asset to be interchanged with other individual goods or assets of the same type."
27  [14] Article 415 of the NAFTA defines fungible goods as "Fungible goods are goods that are interchangeable for commercial purposes, and have essentially identical properties."
28  [15] https://www.worldcryptoindex.com/fungibility-explained/
[16] https://www.cryptokitties.co

-9-

Case No. CV 20-7811-RS

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

46.     For example, if two people exchanged one Bitcoin for another, there would be no loss of value and neither party would be better off than the other. That is because there is no value distinction between any two Bitcoin. This is the definition of fungible. Just as one $20 bill is just as valuable as another $20 bill, 1 Bitcoin is just as valuable as another 1 Bitcoin.

## SILK ROAD MARKETPLACE BITCOIN WALLET

47.     Ulbricht maintained the Bitcoin server which contained the Bitcoin wallet[17] for the Silk Road Marketplace. That Bitcoin wallet was in Iceland. The Silk Road Marketplace Bitcoin wallet had a great number of Bitcoin addresses (destination addresses) associated with it: 2,105,527 Bitcoin addresses[18] to be exact.

48.     "Upon registering an account with Silk Road, users were assigned a Bitcoin address. Bitcoin sent to the user's Bitcoin address was credited to the user's account".[19]

49.     From my education, training, and experience as a professional in private practice, as a law enforcement officer, and senior leader with IRS-CI, I know the following:

50.     That the Silk Road Marketplace Bitcoin wallet that was controlled by Ulbricht was composed of private key(s) to keep it secure, and within the wallet were 2,105,527 Bitcoin addresses.

51.     That the unique Bitcoin address that was assigned to the Silk Road Marketplace user was created by the Silk Road Marketplace Bitcoin wallet.

52.     That the 2,105,527 Bitcoin addresses represent Bitcoin addresses that were assigned (at least in part) to users of the Silk Road Marketplace when they created a profile.

53.     That an important feature of any Bitcoin wallet is the ability to create and manage multiple Bitcoin addresses. The ability to create and assign a unique Bitcoin address to each user of the Silk Road Marketplace was a key internal control; it allowed Ulbricht to easily track all Bitcoin(s) sent to the Silk Road Marketplace Bitcoin wallet and associate each respective Bitcoin(s) transfer with a specific Silk Road Marketplace user.

54.     Ulbricht "controlled and oversaw all aspects of Silk Road"[5] and this included the

---

[17] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1656:12-18.
[18] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1685:3
[19] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 3 ¶ 7:26-27

-10-

Case No. CV 20-7811-RS

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMANT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1  Silk Road Marketplace Bitcoin wallet private key(s).

2      55.    Ulbricht's control of the Silk Road Marketplace Bitcoin wallet private key(s) was

3  another critical internal control; as a settlement agent, Ulbricht needed control of the Silk Road

4  Marketplace wallet in the event of a dispute between a Silk Road Marketplace vendor and a Silk

5  Road Marketplace purchaser. This level of oversight also ensured that Ulbricht "alone controlled

6  the massive profits generated from the operation of the business"[5]. These profits that Ulbricht

7  controlled were commissions from all sales on the Silk Road Marketplace.

8      56.    At no time did users of the Silk Road Marketplace have access to the private

9  key(s) of the Silk Road Marketplace Bitcoin wallet. Users only knew the Bitcoin address that

10  were assigned to their respective profile.

11      57.    Only Ulbricht could send or spend Bitcoin from the Silk Road Marketplace

12  Bitcoin wallet, because only he had access to and controlled the private key(s).

13      **SEIZURE OF SILK ROAD MARKETPLACE BITCOIN WALLET**

14      58.    The government was able to identify a server in Iceland that contained the Silk

15  Road Marketplace Bitcoin wallet and all the Bitcoin that resided in this wallet.[20]

16      59.    On or about October 2, 2013[21] the government seized the Silk Road Marketplace

17  Bitcoin wallet that was located in Iceland. During this same U.S. Law Enforcement action, the

18  government gained control of the Silk Road Marketplace Bitcoin wallet private key(s), accessed

19  the Silk Road Marketplace Bitcoin wallet, and seized all of the Bitcoin that resided in the Bitcoin

20  wallet.[22]

21      60.    This U.S. Law Enforcement action in Iceland was a challenging, well-coordinated

22  operation that had specific goals.[23]

23      61.    One of these goals was to seize all the Bitcoin from the Silk Road Market Bitcoin

24  wallet.[24]

25      62.    The operational goal of seizing the Bitcoin from the Silk Road Market Bitcoin

26  _____

27  [20] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1649:6-20
[21] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1646:10-11

28  [22] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1650:25 and at 1651:1- 10
[23] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1646:14-20
[24] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1648:22-23

-11-

Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

wallet involved the following steps:

      (1) Go to the data center in Iceland with Icelandic Police[25]
      (2) Locate the Silk Road Marketplace servers in the Icelandic data center[26]
      (3) Examine the Silk Road Marketplace server to assess how it was set up[27]
      (4) Turn off the Silk Road Marketplace server and seize the duplicate server hard drive as the true, best original evidence[28]
      (5) After turning off the server, assess if the Silk Road Marketplace was offline[29]
      (6) Turn the Silk Road Marketplace server back on[30] to create a ruse[31]
      (7) Assess if the Silk Road Marketplace was back online[32]
      (8) Turn off the "update process"[33] to complete the ruse; and finally
      (9) Access the Silk Road Marketplace Bitcoin wallet that was on the other server[34] (the Bitcoin server) and seize/transfer the Silk Road Marketplace user's[31] Bitcoin to a government-controlled Bitcoin wallet.[35]

63.    The ruse to deceive the Silk Road Market user(s) who concurrently might have been viewing the marketplace or signed into their Silk Road Marketplace user profile, was devised for one purpose: disguising the users Bitcoin(s) credit on the Silk Road Marketplace user interface. As stated in the transcript of the Sworn testimony of Former FBI Special Agent Ilhwan Yum, "we didn't want to alert the users of the Silk Road Marketplace that their Bitcoin are being seized [emphasis added]," and "as I was seizing the Bitcoin, the users wouldn't be aware that the balance of the Bitcoin on the Silk Road was depleting." [36]

64.    The Bitcoin that were seized by the government from the Silk Road Marketplace Bitcoin wallet on or about October 3, 2013 belonged to the "users" [31] of the Silk Road Marketplace.

\\

\\

---

[25] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1647:10-11
[26] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1647:13-15
[27] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1647:22-24
[28] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1648:4-6
[29] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1648:9-16
[30] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1648:16-17
[31] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1650:11-12
[32] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1648:17-18
[33] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1650:18-20
[34] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1651:6-7, and at 1648:22-24
[35] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1650:25, and at 1651:1-10
[36] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1650:20-22

-12-
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1    **U.S. GOVERNMENT SEIZURE OF APPROXIMATELY 69,370 BITCOIN FROM**

2    **1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx (1HQ3)**

3    65.    The U.S. Government conducted an investigation into the movement of some

4    Bitcoin from a Bitcoin address that was dormant, specifically Bitcoin address 1HQ3 and other

5    Bitcoin address(s) associated with 1HQ3. The U.S. government describes the investigation and

6    results of the investigation as follows:

7    66.    "According to an investigation conducted by the Criminal Investigation Division

8    of the Internal Revenue Service and the U.S. Attorney's Office for the Northern District of

9    California, Individual X was the individual who moved the cryptocurrency from Silk Road.

10   According to the investigation, Individual X was able to hack into Silk Road and gain

11   unauthorized and illegal access to Silk Road and thereby steal the illicit cryptocurrency from Silk

12   Road and move it into wallets that Individual X controlled."[37]

13   67.    "This pattern of withdrawals and the amount that was withdrawn was not typical

14   for a Silk Road user. Specifically, a review of other withdrawals from Silk Road revealed Bitcoin

15   amounts that were mostly less than 100 Bitcoin. These 54 transactions were not noted in the Silk

16   Road database as a vendor withdrawal or a Silk Road employee withdrawal and therefore appear

17   to represent Bitcoin that was stolen from Silk Road."[38]

18   68.    "In fact, the BTC (Bitcoin) Individual X stole came from the general pool of Silk

19   Road Bitcoin and not from any particular user accounts, meaning that no user balances were

20   impacted by the hack."[39]

21   69.    The government has affirmatively concluded that the Bitcoin from this theft

22   originated from the Silk Road Marketplace. "I was able to determine that the ultimate source of

23   the funds in 1HQ3 originated from addresses managed by the same entity: the Silk Road

24   marketplace."[40]

---

[37] Complaint for Forfeiture – USA, Plaintiff v. Approximately 69,370 bitcoin, Case 3:20-CV-07811-VC filed November 5, 2020 at 5 ¶ 22

[38] Complaint for Forfeiture – USA, Plaintiff v. Approximately 69,370 bitcoin, Case 3:20-CV-07811-VC filed November 5, 2020 at 4 ¶ 16

[39] Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 8:19-21

[40] Declaration Of Jeremiah Haynie In Support Of United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case

-13-

Case No. CV 20-7811-RS

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO**
**MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

70.     Below is an image of a graphic representation[41] of the theft by Individual X that shows and establishes that the theft was from the Silk Road Marketplace. This graphic representation was created by the third-party Bitcoin attribution company that was utilized by the government in this investigation and seizure.



71.     The government in a declaration used a similar graphic representation as above and provide an explanation: "The series of transactions begins on the left side of Exhibit 1, when on May 6, 2012, Individual X, without authorization, transferred 70,411.46 BTC from Silk Road to two Bitcoin addresses Individual X controlled, 1BAD and 1BBq."[42] Again, the government clearly established that the theft on or about May 6, 2012 originated from the Silk Road Marketplace Bitcoin wallet.

72.     The government conducted an extensive analysis of the originating Bitcoin addresses that were affected by the theft that occurred on or about May 6, 2012 and concluded the following: "Individual X sent the stolen Bitcoin to 1BAD & 1BBq in 54 separate transactions. Each of those transactions was funded by multiple Bitcoin addresses associated with Silk Road. In total, 1BAD & 1BBq were funded by approximately 3,056 sending addresses."[43]

No. CV 20-7811 RS filed 08/24/2021 at 5 ¶ 15:26-27
[41] https://blog.chainalysis.com/reports/silk-road-doj-seizure-november-2020
[42] Declaration Of Jeremiah Haynie In Support Of United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case No. CV 20-7811 RS filed 08/24/2021 at 6 ¶ 16:1-3
[43] Declaration Of Jeremiah Haynie In Support Of United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case No. CV 20-7811 RS filed 08/24/2021 at 8 ¶ 24:7-9

-14-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

73. This extensive analysis concluded the following: "Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users."[44]

74. From my education, training, and experience as a professional in private practice, as a law enforcement officer and senior leader with IRS-CI, and based on documents and other sources of information reviewed for this declaration, I know the following:

75. That the Bitcoin that were seized by the government in or about October 2, 2013 came from the Silk Road Marketplace Bitcoin wallet.

76. That the Bitcoin seized by the government in or about October 2, 2013 were the property of the Silk Road Marketplace users[31].

77. I know that the theft/illegal transfer of Bitcoin by Individual X on or about May 6, 2012 came from the Silk Road Market Bitcoin wallet.

78. That the Bitcoin stolen by Individual X originated from the Silk Road Marketplace Bitcoin wallet and that the Bitcoin in this wallet was the property of the Silk Road Marketplace users[31].

79. I know that that if there is an authorized or unauthorized transfer of Bitcoin from any Bitcoin wallet, that this transfer will reduce the total number of Bitcoin in the respective wallet by the amount of the transfer.

80. That the seizure by the government in or about October 2, 2013 affected the total credit of the Silk Road Marketplace Bitcoin wallet, by "a little over 20,000 Bitcoin".[45]

81. I know that the theft/illegal transfer of Bitcoin in or about May 6, 2012 by Individual X affected the total credit of the Silk Road Marketplace wallet, by exactly 70,411.46 Bitcoin.

82. I know that the Bitcoin in the Silk Road Marketplace wallet is the property of the Silk Road Market users, to include Mr. Matusko.

**U.S. LAW ENFORCMENT PRE-SEIZURE PLANNING**

83. From my education, training, and experience as a professional in private practice,

---

[44] Declaration Of Jeremiah Haynie In Support Of United States' Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC Case No. CV 20-7811 RS filed 08/24/2021 at 8 ¶ 24:11-12
[45] Exhibit 2 Transcript Sworn testimony of Former FBI Special Agent Ilhwan Yum at 1651:9-10

-15-

Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMANT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1    as a law enforcement officer, and senior leader with the IRS-CI, I know the following:

2        84.    That the Department of Justice – Asset Forfeiture and Money Laundering Section

3    now known as the Money Laundering and Asset Recovery section provides guidance in money

4    laundering investigations and in seizure/forfeiture matters to the appropriate United States

5    Attorney's Office and to U.S. Law Enforcement. This guidance includes manuals and other aid to

6    assist Assistant United States Attorney's and U.S. Law Enforcement in money laundering

7    investigations and in seizure/forfeiture matters.

8        85.    Attached as Exhibit 3 is an aide that is titled "Basic Criminal Forfeiture Checklist"

9    and is often provided to Assistant United State Attorney's and U.S. Law Enforcement.

10       86.    The first five steps as outlined in this aide are:

11           (1) Identify assets that are subject to forfeiture
             (2) Determine ownership of the assets
12
             (3) Determine the net value of the assets
13           (4) Determine the statutory basis for the forfeiture
             (5) Identify and investigate possible third-party interests [emphasis added].
14

15       87.    Attached as Exhibit 4 is Internal Revenue Service – Internal Revenue Manual

16   (IRM) Part 9. Chapter 7. Section 4. – Asset Seizure and Forfeiture -Pre-Seizure Planning.[46]

17       88.    IRM 9.7.4.1 (2) states "Pre-seizure planning should occur, in both civil and

18   criminal seizure and forfeiture actions, prior to the actual physical seizure of property, and prior

19   to the filing of a civil judicial forfeiture complaint or an indictment with a forfeiture count or

20   allegation."

21       89.    IRM 9.7.4.2 (1) states "The Assistant United States Attorney (AUSA) is

22   responsible for ensuring that proper and timely pre-seizure planning occurs in civil judicial and

23   criminal forfeiture actions. In administrative forfeiture actions, the Asset Forfeiture Coordinator

24   (AFC) has this responsibility."

25       90.    IRM 9.7.4.2 (2) states "Although the AUSA may be ultimately responsible for pre-

26   seizure planning in civil judicial and criminal forfeiture actions, the AFC is responsible for

27   initiating the pre-seizure planning process set forth in this section and ensuring that they are

28
     _____

[46] https://www.irs.gov/irm/part9/irm_09-007-004

Case No. CV 20-7811-RS
DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO

1  followed in all seizure and forfeiture actions."

2      91.    This pre-seizure planning by the Special Agent and the Asset Forfeiture

3  Coordinator includes but is not limited to: identifying and investigating the ownership interest(s)

4  in those who may have an interest in the property that is being seized.

5      92.    Attached as Exhibit 5 is the Money Laundering and Asset Recovery section Asset

6  Forfeiture Policy Manual 2021.[47]

7      93.    Asset Forfeiture Policy Manual 2021, Chapter 1 Section C.2 Seizure Planning

8  Overview, states, "seizure planning consists of anticipating issues and making fully informed

9  decisions concerning what property should be seized or restrained, how and when it should be

10  seized or restrained, and, most importantly, whether the property should be forfeited at all."

11      94.    Chapter 1 Section C.2 Seizure Planning Overview continues "Seizure planning

12  discussions should answer at least the following questions, depending on asset type and

13  circumstance: What is being seized, who owns it, and what are the liabilities against it [emphasis

14  added]? Determine the full scope of the seizure to the extent possible. For example, if a house is

15  being seized, will the contents also be seized? If a business is being seized, are the buildings in

16  which it operates, the property upon which it is located, the inventory of the business, and the

17  operating or other bank accounts, accounts receivable, accounts payable, etc., also to be seized?

18  All ownership interests and any existing or potential liabilities in each asset must be identified to

19  the extent possible [emphasis added]."

20      95.    Asset Forfeiture Policy Manual 2021, Chapter 4 Section I. Pre-forfeiture

21  Considerations states: "All real property pre-seizure procedures rely upon the accurate calculation

22  of value and the identification of ownership interests [emphasis added]."

23      96.    Since at least on or about October 2, 2013 the government knew that it was

24  planning to seize the assets of the Silk Road Marketplace users. Each Silk Road Marketplace user,

25  like Mr. Matusko, who had a profile credit at the time of the government seizure on or about of

26  October 2, 2013, may have an ownership interest in Bitcoin seized by the government in or about

27  October of 2013 and again in or about November of 2020.

28

---

[47] https://www.justice.gov/criminal-mlars/publications

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

97. As demonstrated in the government's response to the Mr. Matusko claim, the government maintains a copy of Silk Road Marketplace server. At the will of the government, they can access and check users profiles, as they did with the Mr. Matusko "hanson5" profile. "A copy of the Silk Road server when it was seized in October 2013 showed that the hanson5 account received 47.52 Bitcoin in December 2011. The hanson5 Silk Road account had the same balance when the server was seized in October 2013."[48]

98. The government has always had the ability to export all Silkroad Marketplace user data in an attempt to identify third parties who may have a financial interest in the seizure that occurred in or about October 2, 2013, and again in this seizure that occurred in or about November of 2020. "When the government seized the Silk Road website in 2013, it preserved its servers, which contain the entire transaction history and users of the website."[49]

99. Each Silk Road Marketplace user, to include Mr. Matusko, who had a profile credit at the time of the government seizure in October of 2013 is a potential third party who may have a financial interest in the Bitcoin seized in October of 2013 and again in November of 2020.

**BITCOIN ADDRESS OWNER'S IDENTITY & INFORMATION AVAILABLE TO U.S. LAW ENFORCEMENT**

100. "While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless the owner chooses to make information about the owner's Bitcoin address publicly available), investigators can often use the blockchain to identify the owner of a particular Bitcoin address. Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to, among other recipients, virtual currency exchanges."[50]

101. From my education, training, and experience as a professional in private practice, as a law enforcement officer, senior leader with the IRS-CI, and through open-source information available via the internet I know the following:

---

[48] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 6 ¶ 12:10-12
[49] Reply In Support Of Motion To Strike The Claims Of Claimants Battle Born Investments Company, LLC, First 100, LLC And 1st One Hundred Holdings, LLC filed 08/24/2021 Case No. CV 20-7811 RS at 6:10-11
[50] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 7 ¶ 17.

-18-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

102.     That U.S. Law Enforcement has access to certain information that is not available to the public when it comes to identifying Bitcoin transactions and Bitcoin address owner(s). This information includes but is not limited to the following:

103.     Reports that are mandated by FinCEN, due to FinCEN's regulatory authority under Title 31 and FinCEN's authority over crypto currency exchanges that operate as money service business in the United States. These reports that are filed with FinCEN are made available to U.S. Law Enforcement almost immediately upon filing and typically provide the following: a narrative as to suspect activity, the identity of the owner of the exchange account(s), physical address, social security number, e-mail addresses, other identifying information, IP addresses used in transaction(s) and the Bitcoin address utilized by the individual(s). These reports are available to U.S. Law Enforcement through FinCEN. They can be easily accessed at any time by U.S. Law Enforcement by logging into the FinCEN system containing these reports.  In fact, the Internal Revenue Service receives weekly, if not more frequent, downloads of these reports and other reports from FinCEN that are integrated into a very powerful software program that is utilized by IRS-Criminal Investigation.

104.     That U.S. Law Enforcement maintains copies of servers from past U.S. Law Enforcement actions. A simple Google search of "IRS-Criminal Investigation Cyber Crime Unit" will reveal numerous articles, podcasts, presentations by Cyber Crime Unit Special Agents. That search will also show that IRS-CI has taken the lead and assisted on many darknet investigations, including those of child exploitation sites, darknet marketplaces, unlicensed cryptocurrency money exchangers, tumbler services, seizure of terrorist funds and more. Each of these types of criminal investigations are serious enough to result in a U.S. Law Enforcement action(s) involving the seizure of the servers of these illicit and in certain circumstances heinous criminal acts. The data on these servers are invaluable to U.S. Law Enforcement as they link data from one criminal matter to other criminal matters.

105.     We know in this seizure of the approximate 69,370 Bitcoin that the government utilized data from an unrelated criminal investigation, specifically, BTC-e[51], to positively identify

---

[51] Complaint for Forfeiture filed 11/05/2020 Case 3:20-CV-07811-VC at 5 ¶ 18

Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

Individual X, who is known to the government.[52] This data from the BTC-e servers tied Individual X to Bitcoin address 1HQ3 and provided key identifying information to make him known to the government. This is just one example of data from unrelated criminal cases that are warehoused with the IRS and other U.S. Law Enforcement.

106. Over the past six years the IRS has been issuing John Doe Summons to various crypto currency exchangers including but not limited to: Coinbase, Kraken, Circle, and other U.S.-based crypto currency exchangers. The data that the government has obtained, or will obtain, includes account holder information and transactional information for those who had $20,000 or more in gross transactions. These U.S. domiciled exchangers must be registered with FinCEN as a money service business and as a result the must have a robust anti-money laundering ("AML") program to be in compliance with FinCEN and the Bank Secrecy Act. A major part of any AML program is to "know your customer". The account holder information and transaction information that these exchangers have provided or will provide to the IRS will be extremely valuable in identifying Bitcoin transactions and Bitcoin address owners.

107. IRS-Criminal Investigation utilizes extremely powerful software called Palantir to harvest raw data, to digest the raw data, to analyze the data, and to identify cryptocurrency patterns and connections.

108. "In 2020, law enforcement officers used a third-party Bitcoin attribution company to analyze Bitcoin transactions executed by Silk Road. From this review they observed 54 transactions that were sent from Bitcoin addresses controlled by Silk Road, to two Bitcoin addresses:1BADznNF3W1gi47R65MQs754KB7zTaGuYZ and 1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN totaling 70,411.46 BTC (valued at approximately $354,000 at the time of transfer)."[53] Since at least 2015[54], IRS-Criminal Investigation has utilizes the services of Chain Analysis for complex tracing of blockchain transactions, in addition to its analysis software and did so in this seizure.[55]

109. The government, especially the IRS, has collected a great quantity of data in its

---

[52] Complaint for Forfeiture filed 11/05/2020 Case 3:20-CV-07811-VC at 5 ¶ 21
[53] Complaint for Forfeiture filed 11/05/2020 Case 3:20-CV-07811-VC at 4 ¶ 15.
[54] https://www.documentcloud.org/documents/3935924-IRS-Chainalysis-Contract.html
[55] https://blog.chainalysis.com/reports/silk-road-doj-seizure-november-2020

-20-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1   efforts to identify owners of Bitcoin addresses and related transactions on the blockchain. The

2   government also possesses very powerful software. With this data and the powerful data that the

3   IRS has, the government can easily identify third parties who have an interest in these type of

4   cases and seizures.

5                          **DIRECT NOTICE OF SEIZURE**

6       110.   From my education, training, and experience as a professional in private practice,

7   as a law enforcement officer, senior leader with the IRS-CI, and through open-source information

8   available via the internet I know the following:

9       111.   That when a third party's interest in an asset that was seized by the government is

10   discovered in the pre-seizure investigative phase or afterwards, the government must provide

11   direct notice to this third party.

12       112.   That at least one user and third party who may have had a financial interest in this

13   seizure of approximately 69,370 Bitcoin was provided direct notice. "The government sent direct

14   notice to Ulbricht in prison. Ulbricht is the only individual known to the government with a

15   potential interest in the Defendant Property and is therefore the only person who received direct

16   notice."[56]

17       113.   Ulbricht was a user and maintained a user profile on the Silk Road Marketplace.

18   "The contents of the Silk Road web server included Ulbricht's own user account page, which

19   reflected, among other things, his history of Bitcoin transactions on the site. Ulbricht's transaction

20   history reflects that he received a continuous flow of Bitcoin into his Silk Road account. For

21   example, on July 21, 2013 alone, Ulbricht received approximately 3,237 separate transfers of

22   Bitcoin into his account. Virtually all of those transactions were labeled "commission" in the

23   "notes" appearing next to them, indicating that the money represented commissions from Silk

24   Road sales. Ulbricht's account page further displayed the total amount of Bitcoin deposited in his

25   Silk Road account, which, as of July 23, 2013, equaled more than $3.4 million."[57]

26       114.   Even though the Bitcoin credit in Ulbricht's Silk Road Marketplace user profile

27   [56] Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 16:13-15

28   [57] Declaration of Jeremiah Haynie, Attachment A, Notice of Motion and Motion To Strike The Verified Claim of Claimant Ilija Matusko, Case 3:20-vc-07811-RS, filed 07/29/2021 at 3 ¶ 6:16-23

**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMANT'S OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

1   was proceeds from illegal activities, commission earned from the sale of illegal items, Ulbricht
2   was still provided direct notice.

3       115.    I know that the 48 "hanson5" Bitcoin in Mr. Matusko's user profile were legal
4   source Bitcoin.

5       116.    I know that Mr. Matusko did not engage in an illicit activity on the Silk Road
6   Marketplace.

7       117.    I know that the Bitcoin in the Silk Road Marketplace wallet is the property of the
8   Silk Road Marketplace users[31], to include Mr. Matusko and Ulbicht.

9       118.    I know that Mr. Matusko did not receive direct notice from the government as a
10  third party who may have an interest in the assets seized in or about October 2, 2013, or in this
11  seizure of approximately 69,370 that occurred in or about November of 2020.

12      I declare under penalties of perjury under the laws of the United States of America that the
13  foregoing is true and correct to the best of my knowledge and belief.

14      Executed on this 26th day of August 2021, in Clifton, Virginia

15

16

17

18

19  CHRISTOPHER WAJDA,
    Managing Director
20  Black Raven Advisory Group LLC

21

22

23

24

25

26

27

28

-22-
Case No. CV 20-7811-RS
**DECLARATION OF CHRISTOPHER WAJDA IN SUPPORT OF CLAIMAINT'S OPPOSITION TO
MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MR. MATUSKO**

Case 3:20-cv-07811-RS Document 31-00 Filed 01/26/21 Page 1 of 800

# <u>EXHIBIT 1</u>

Ilija Matusko Purchase of Bitcoins
From Third Party



Transfer of Bitcoins From Third Party to Ilija Matusko





December 27, 2011

Transfer (input) 48 BTC

<u>From Wallet / Public Key(s)</u>
1JFGBmzD5dQcVC9EGcwBQCJuE4P3NxoMpE
1GajKVNTXQVoxjDmi1tzMh8gjvzWAGGcrt
1KGezXPKJJDXaTZfsJ481T99nKmpf9PD6x

<u>Sender / Wallet Holder Ingmar Schaaf</u>





December 27, 2011

Receive (outputs) 48 BTC

<u>To Wallet / Public Key(s)</u>
1MwN8903B8wt1WbU3SFDByMRF7TGJc39VF

<u>Recipient / Wallet Holder Ilija Matusko</u>

Purchase of bitcoins has been completed

**ER-139**

Ilija Matusko
Limited Withdrawl / Deposit Analysis
Account 90641093
Account 17409491

| Date | BLZ Number | Account Number | Account Holder | Debit | Credit | Reference | Notes | Exchange Rate € EUR = $USD |
|------|-----------|----------------|----------------|-------|--------|-----------|-------|-----------------------------|
| 12/22/11 | 70020270 | 90641093 | Ilija Matusko | € 150.00 | | Bank Statement - Account number 90641093 - Account Holder Ilija Matusko | Bank Statement Identifies purpose of transfer/debit - "48 BTC Ilija" | € 1 EUR = $1.3055 |
| 12/27/11 | 12030000 | 17409491 | Ingmar Schaaf | | € 150.00 | Bank Statement - Account Number 17409491 - Account Holder Ingmar Schaaf<br><br>Transaction Receipt dd. 12/27/2011 - Account Number 17409491 - Account Holder Ingmar Schaaf | Bank Statement and transaction receipt identifies purpose of deposit/credit - "48 BTC Ilija" | € 1 EUR = $1.3069 |

CJW 08/09/2021

**ER-140**

Bank Statement for Ilija Matusko

MONATSKONTO                          31.05.2021

```
**** 34427 90641093  EUR  IBAN DE28700202700090641093  Le.Buchg.Tag 30.11.2011
**** MATUSKO ILIJA         BIC HYVEDEMMXXX            Ktotyp: 111000/AccType: C1
****                           12/2011                Produkt: HVB Girokto Plu


Buta  PN-Nr Text   Verwendungszweck              Wert Saldo-/Umsatz-Betrag Wae


0712   894 PO      GA NR00003217 BLZ70020270 3 0712              20,00S EUR
                   07.12/11.42UHR BERLIN,KARL
                   EUR     20,00 GEB.EUR 0,00
                   **Auszugnummer 001  Saldo*******************742,13H EUR
0912   804 PO      GA NR07001740 BLZ10070024 3 0912              10,00S EUR
                   08.12/02.08UHR B-HERM.P.2
                   EUR     10,00 ENTGELT 0,00
       801 PD      KAISERS TENGELMANN GMBH     0912              12,15S EUR
                   ELV61244401 08.12 12.53 ME3
                   VIELEN DANK
                   **Auszugnummer 001  Saldo*******************719,98H EUR
1212   804 PD      PAYPAL                      1212              49,55S EUR
                   QQI484J25EZY3L6L * THOMANN,

                    IHR EINKAUF BEI THOMANN
                   111209P3TX3996YL
                   **Auszugnummer 001  Saldo*******************670,43H EUR
1412   820 PO      E-AKTIV WUEST BERLIN        1412               9,80S EUR
                   EC 58050952 131211135532FE3
                   E-AKTIV SAGT DANKE
                   **Auszugnummer 001  Saldo*******************660,63H EUR
2012   891 DS      PC: JOSHUA DIETZ            2012               4,91S EUR
                   8HVBNV
                   INTERNET-UEBERWEISUNG AN
                   BLZ 63050000 KTO 1010414568
                   AM 19.12.11 UM 18.20 UHR
                   TAN 619041

       891 DS      PC: BERNHARD GEIGER         2012             103,00S EUR
                   YO
                   INTERNET-UEBERWEISUNG AN
                   BLZ 72169756 KTO 0001407635
                   AM 19.12.11 UM 18.21 UHR
                   TAN 682218
                   **Auszugnummer 001  Saldo*******************552,72H EUR
2312   891 DS      PC: INGMAR SCHAAFF          2312             150,00S EUR
                   48 BTC ILIJA
                   INTERNET-UEBERWEISUNG AN
                   BLZ 12030000 KTO 0017409491
                   AM 22.12.11 UM 18.40 UHR
                   TAN 703347
                   **Auszugnummer 001  Saldo*******************
```

Ilija Matusko clearly
identifies the reason for
the transfer of Euros

Transfer from Ilija
Matusko's bank account
12/22/2011

150 Euros

Seite:   2                                              BLÄTTERN

**ER-141**

Bank Statement for Ingmar Schaaf

StarMoney                                                    29.05.2021

**DKB** Deutsche
Kreditbank AG

Bankleitzahl: 12030000
SWIFT-BIC: BYLADEM1001
IBAN: DE22120300000017409491

| Ingmar Schaaff | Konto | Kontoauszug | Seite |
|---|---|---|---|
| | 17409491 | 13 | 9 von 12 |
| DKB-CASH | | | |

| Buch.-Tag | Wert | Verwendungszweck/Erläuterungen | Umsatz (EUR) |
|---|---|---|---|



| 23.12 | 23.12.11 | Überweisung | −260,76 |
| | | DATUM 23.12.2011, 10.01 UHR | |
| 27.12 | 27.12.11 | Zahlungseingang | 102,62 |
| 27.12 | 27.12.11 | | 31,18 |
| 27.12 | 27.12.11 | Zahlungseingang | 16,81 |
| 27.12 | 27.12.11 | Zahlungseingang | 1.106,83 |
| 27.12 | 27.12.11 | sonstige Buchung | 2.621,74 |
| 27.12 | 27.12.11 | SEPA GUTSCHRIFT | 3,11 |
| 27.12 | 27.12.11 | Zahlungseingang MATUSKO ILIJA 48 BTC ILIJA | 150,00 |

Includes description of what
the 150 Euros are for.

Deposit of 150 Euros
into Ingmar Schaaf's
bank account

12/27/2011

**ER-142**

Transaction Receipt for Ingmar Schaaf Bank Account.

StarMoney 11 · 29.05.2021 17:39:56

**Selektierte Kontoumsätze**

**DKB 17409491 (DE22120300000017409491)**

**Deutsche Kreditbank Berlin**

| Startsaldo: | 6.127,21 EUR |
| --- | --- |
| Endsaldo: | 6.277,21 EUR |

| Buchu.. Texts.. | Empfänger/Abs.. | Verwendungszweck | Kateg.. | Koste.. | Split.. | Steuer.. Steuer.. | Betrag | Saldo |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 27.12. 2011 51 | MATUSKO ILIJA | 48 BTC ILIJA | | | 0 | | 150,00 EUR | 6.277,21 EUR |

Summe Soll: 0,00 EUR

Summe Haben: 150,00 EUR

Saldo der selektierten Beträge: 150,00 EUR

Description of what deposit is for.

48 BTC ILIJA

Total Credit - 150 EUR

Date of Transaction 12/27/2011

Seite 1 von 1

**ER-143**

# Transaction Summary of Ilija Matusko Bitcoin Address



**Address**

## 1MwN89o3B8wt1WbU3SFDByMRF7TGJc39VF

A Bitcoin address for Ilija Matusko's wallet

Current balance

## Balance

0 BTC · 0 USD

Total received

48.00 BTC · 193.92 USD

Total spent

48.00 BTC · 192.96 USD

# Transaction history

Ilija Matusko's transactions confirmed



Transfer of BTC to Silk Road Market Place

### ⊖ Sent

**Confirmed**

48.00000000 BTC · 192.96 USD

Dec 28, 2011 2:01 PM UTC

Transaction: **b4e0c ••• ab3dc**

Senders: 3   Recipients: 2

Purchase and receipt of BTCs from third party

### ⊕ Received

**Confirmed**

48.00000000 BTC · 193.92 USD

Dec 27, 2011 7:05 PM UTC

Transaction: **31072 ••• 6c0e8**

Senders: 3   Recipients: 2

**ER-144**

# EXHIBIT 2

F1tgulb1                        Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6              Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        January 29, 2015
9                                       9:10 a.m.

10

    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                        District Judge
13

14                        APPEARANCES

15

    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17   BY:  SERRIN A. TURNER
         TIMOTHY HOWARD
18           Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
         Attorneys for Defendant
21
              – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24

25

F1tgulb1                        Trial

1          (In open court; jury not present)

2          THE DEPUTY CLERK:  This is the continuation of the

3    matter now on trial.  The United States of America v. Ross

4    William Ulbricht, 14 Cr. 68.  Counsel, state your names for the

5    record.

6          MR. TURNER:  Good morning, we're down to our skeleton

7    crew, Serrin Turner and Timothy Howard for the government and

8    Molly Rosen, paralegal.

9          THE COURT:  Good morning.

10         MR. DRATEL:  Joshua Dratel for Mr. Ulbricht who is

11   standing beside me.  Joshua Horowitz is here as well.  Lindsay

12   Lewis from my office is on her way.

13         THE COURT:  Thank you.  Good morning to all of you.

14         MR. DRATEL:  Good morning.

15         THE COURT:  My intention was to proceed through the

16   jury instructions and to pick up where we left off, unless you

17   folks had other things that you would like to deal with first.

18   Are there any housekeeping matters or other matters that we

19   should deal with right now before we start?

20         MR. DRATEL:  No, your Honor.

21         THE COURT:  Mr. Turner.

22         MR. TURNER:  No, your Honor.  Thank you.

23         THE COURT:  Thank you.  We are in the jury

24   instructions.  We're working from the same version as

25   yesterday, which is that which you folks have provided to the

**ER-147**

F1tgulb1                    Trial

1    Court, and we are on objects of the conspiracy, page 54.  The

2    single-versus-multiple-conspiracy issue is one that I think we

3    briefed.  I think that, unless anybody has anything else they'd

4    like to say in addition to what has been said, I'll go through

5    everything carefully and make a determination as to whether we

6    should have a single versus multiple charge.  If there are

7    additional points you'd like to make, go ahead.

8              MR. DRATEL:  We would like to do research and perhaps

9    have a letter perhaps by mid-day tomorrow perhaps.

10             THE COURT:  I will then hold off on going through

11   that.  It's something that I need to give thought to, so having

12   your letter would be very helpful.

13             MR. DRATEL:  Okay.  Thank you.

14             THE COURT:  So that's the changes for 52 and 53.

15   That's pages 52 and 53, so we'll hold on those.  In terms of

16   the objects of the conspiracy, on page 54, there are two

17   changes, one of which doesn't appear to be objected to.  That's

18   the insertion of the "beyond a reasonable doubt" language which

19   is fine with me.

20             MR. TURNER:  No objection.

21             THE COURT:  I take it that was then a defense point,

22   so we'll accept that.

23             MR. DRATEL:  Yes.

24             THE COURT:  The other point was the deletion of "or to

25   aid and abet such activity," and this appears in several

F1tgulb1                          Trial

1    places.  I wanted to find out from Mr. Dratel the basis of the

2    deletion.

3         MR. DRATEL:  I don't think you can aid and abet a

4    conspiracy.  Aiding and abetting is the complete -- and while a

5    conspiracy is completed upon agreement, that's different than

6    completing a substantive offense, so I don't see any basis for

7    aiding and abetting a conspiracy.  That's a multilevel inchoate

8    crime, which I think is a due process violation.

9         THE COURT:  I was just reading, and I think it's a

10   Judge Oakes case, Second Circuit in the 80's, it could be the

11   *Perry* case -- but I'm not sure if that's the right case I have

12   written down here, actually, I have it in my robing room, I

13   have the pink highlighter on it -- where this exact issue was

14   debated.  And Oakes writes the decision for the panel.  The

15   panel believes that there is a crime of aiding and abetting a

16   conspiracy.  He suggests that he would have reached the same

17   result on a different basis.  So it's sort of a funny opinion

18   in some ways because it says my colleagues, my colleagues, my

19   colleagues in the majority opinion as opposed to what sounds

20   almost like a dissent.  And that opinion I believe has been

21   cited again, and that's the *Orozco-Prada* case, which does

22   suggest that this kind of crime exists.  I looked that issue

23   because I, like you, didn't know how you would aid and abet

24   something that itself is a conspiracy, but it does appear to be

25   something which the Second Circuit has addressed.

**ER-149**

F1tgulb1                        Trial

1      Have you found any cases, Mr. Dratel, which have said

2  that it's not a crime?

3      MR. TURNER:  Can I clarify for the record, the charge

4  is conspiracy to aid and abet, not to aid and abet a

5  conspiracy.

6      THE COURT:  I'm sorry.  Correct.  Conspiracy to aid

7  and abet.  My mistake flows from the fact that I find this a

8  somewhat confusing concept.

9      MR. DRATEL:  That, I don't think you can have a

10  conspiracy to aid and abet either because the conspiracy to

11  commit is to the unlawful act, not to aid and abet an unlawful

12  act, and there are cases on that.  I don't have them.  Maybe

13  we'll put that all in our letter tomorrow, your Honor, okay?

14  We'll include that.

15      THE COURT:  Actually, it is the *U.S. v. Perry* case.

16  If you've got anything, Mr. Dratel, that suggests that *U.S. v.*

17  *Perry* and that line is not good law, I would need to see that;

18  otherwise, I would be bound to follow Second Circuit law.

19      MR. DRATEL:  I understand.

20      THE COURT:  It's 643 F.2d 18, and that was the case

21  that I was referring to.

22      MR. DRATEL:  Thank you.  Can we address that in our

23  letter tomorrow?

24      THE COURT:  Yes.

25      Is there anything that you wanted to say further on

**ER-150**

Case 3:20-cr-00681-RBS-DD Document 3396 Filed 09/16/21 Page 7 of 920
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 6 of 234    1567
F1tgulb1                    Trial

 1    that topic, Mr. Turner, other than what's laid in and out your

 2    papers?

 3            MR. TURNER:  On that topic, yes.  This has already

 4    been briefed.  It was in the motions to dismiss.  This is the

 5    charge in the indictment.  It specifically alleges conspiracy

 6    to aid and abet.  The indictment has been upheld in response to

 7    the motion to dismiss, and we're now entitled to present that

 8    indictment to the jury.  So as far as we're concerned, it's the

 9    law of the case.

10            THE COURT:  I hear your position.  Let's go on to the

11    next change, which really starts on 57, and it's the inclusion

12    of additional language on participation in a conspiracy, and

13    it's that whole page, 57.  I didn't know if this was agreed-to

14    language or not agreed-to language.

15            MR. TURNER:  This is the government's proposal.  I'm

16    not sure whether he agrees to it.

17            THE COURT:  Defense.

18            MR. DRATEL:  Our defense is not withdrawal, and on its

19    face, the instruction appears not to be objectionable; however,

20    I just want to go back and look to see if we want to add any

21    language.

22            THE COURT:  The Court was fine with the language.

23            Page 58, extent of participation, the first change is

24    the insertion of "He need not have been a part of the

25    conspiracy when it ended."  And I think that that is a correct

F1tgulb1                    Trial

1    statement of the law.

2              MR. DRATEL:  Yes.

3              THE COURT:  And I think it's a government change.

4              MR. TURNER:  Yes, your Honor.

5              THE COURT:  I don't have any problem with the

6    inclusion of "participated in" as opposed to "join" in that

7    first paragraph on page 58.

8              Mr. Dratel, do you have any problem with that?

9              MR. DRATEL:  No.

10             THE COURT:  The next change is also the similar one.

11   We'll just take both of those joining/participating changes.

12   The following one is "before or after he joined" in addition to

13   all that was done, and then the language that follows that and

14   then the other insertion.

15             MR. DRATEL:  I know what the state of the law is, but

16   I'm just objecting to "before."

17             THE COURT:  You're making a principled objection

18   recognizing the law is against you on that?

19             MR. DRATEL:  Right.

20             MR. TURNER:  Your Honor, this was actually my

21   language, but can we change "before or after he joined" to

22   "before or after he participated"?  It's just a small concern

23   there.  If he started the conspiracy, it's a little awkward to

24   say he joined, so if we can make it a little more open.

25             THE COURT:  I think the effect of participation or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**ER-152**

F1tgulb1                    Trial

1   joining is the same.

2           The next page, page 59, without reading it in, it's

3   the first full paragraph, I was fine with these changes.  Does

4   anybody have a problem with them?

5           MR. TURNER:  No.  That was the government's change.

6           MR. DRATEL:  Yes.  It's the same concept.

7           THE COURT:  So I'll take those.  Then we are on page

8   64.  There was a typo which was the first change.  That's fine.

9   Deletion of the word "to."  And then the inclusion of the word

10  specific.

11          MR. DRATEL:  I'm sorry, page 60 --

12          THE COURT:  Four.  This is continuing criminal

13  enterprise charge, the CCE charge.  So the inclusion of the

14  words "specific violations."

15          MR. TURNER:  My only concern there, your Honor, is

16  that there's clear circuit law holding that a conspiracy can be

17  one of the predicate violations.  So, if the idea here is that

18  it has to consist in, like, one specific act, I don't think

19  that's accurate.  I think three or more violations says enough.

20          THE COURT:  Well, let's take that as part of some of

21  the -- and this I think is the issue that we should spend the

22  rest of our time talking about this morning, perhaps -- which

23  is, the issues with respect to CCE more generally; and I think

24  that point fits into the extent to which the three or more

25  series of violations need to be laid out someplace.

**ER-153**

F1tgulb1                   Trial

1      I think the law is clear that they need not be laid

2  out in the indictment.  There have been some views expressed by

3  judges that perhaps they should be, but the law has developed

4  that indictments have passed muster without the violations

5  being specified.  So, I believe under the law, that ship has

6  sailed.  The question is whether or not they need to be spelled

7  out in the instructions or in closing or somewhere.  And here,

8  the government does reference "these offenses include," but

9  violations I think are potentially broader than that.

10      Go ahead, Mr. Turner.

11      MR. TURNER:  Sure.  Your Honor, if it's permissible

12  for the indictment to just have this level of specificity which

13  is reflected in the instruction that it includes violations of

14  these various offenses, that's, again, the charge we're

15  entitled to present to the jury.  There's no sort of sudden

16  bill of particulars that can be thrust on the government.  I

17  think the language in some of the opinions when they talk about

18  specifying the offenses, all they're really talking about is

19  specifying offenses as reflected in something like page 66.  I

20  haven't seen any law suggesting that the government is suddenly

21  required to choose three specific acts and argue only those

22  acts.  The jury is free to select whatever acts they want to

23  from the evidence they have heard.

24      THE COURT:  I want to separate analytically a couple

25  of things just to make sure that I understand exactly where the

F1tgulb1                    Trial

1     issues between the parties join.

2              One is listing the counts on page 66, Count One, Count

3     Two, Count Three and then another Count Three is listing

4     offenses.  If the jury convicted the defendant on those counts,

5     they could certainly be predicate counts that would constitute

6     the continuing series.  That's one issue.

7              There's a separate issue as to whether or not if the

8     defendant were to be acquitted on one or more of those counts,

9     whether or not there would be sufficient other violations in

10    whatever counts either he was convicted of or there need not be

11    convictions under the CCE case law for violations to be found.

12             In other words, you can have somebody who is acquitted

13    of a particular charge but found to have violated the narcotics

14    law in a continuing series, so without having a conviction on

15    that series.  That seems to be clear.

16             So I need to understand if the government's position

17    is that they're only seeking to have the series be Counts One

18    Two, Three and Three, because Three is mentioned twice, or

19    whether it is that there are potentially numerous violations

20    embedded within any one of those counts.

21             MR. TURNER:  It's the latter, your Honor.  When we

22    reference the counts here, it's just that these offenses are

23    defined in discussing Count One, Count Two, Count Three.  For

24    example, the last paragraph there, using a communication

25    facility in committing or in causing or facilitating violations

F1tgulb1                    Trial

1    of narcotics laws, that's not charged anywhere in a count.

2    It's one of the objects of Count Three, but it's not something

3    the jury is required to find.  They can find that another

4    object was part of the conspiracy.  But nonetheless, the point

5    is that that violation is defined in discussing Count Three.

6           So we could argue to the jury there have been numerous

7    electronic communications you've seen where we would argue the

8    defendant is using a communications facility in furtherance of

9    narcotics trafficking or of aiding and abetting narcotics

10   activity.  The law is very clear that each time a

11   communications facility is used in that way, that is a separate

12   violation.  So the jury can pick three of those and say --

13          THE COURT:  I think the communication facility, agree

14   with you, there is a case on that.  I don't think it's the most

15   clear of all of the CCE continuing series of violations.

16   There's been some criticism of using repeated phone calls all

17   in furtherance of the same object, but I don't disagree with

18   you that there is a case on that.  Certainly I think there are

19   cases which say if you distributed drugs or participated in the

20   distribution of drugs on three or more occasions, that's

21   enough.

22          MR. TURNER:  Right.  We'll have thousands of

23   transactions that the defendant participated in to the extent

24   that he facilitated those transactions through the site, got a

25   commission through the site.  Each one of those can be taken

**ER-156**

1    separately.

2         THE COURT: So your position is that the government

3    does not need to anywhere lay out, for instance, on January 1,

4    2012, the following happened on December 1, the following

5    happened November 1, the following happened, etc.

6         MR. TURNER: Right. There's no need for us to specify

7    in advance "Here are the ones you are limited to finding." The

8    jury is free to look at the evidence and decide whether the

9    charge in the indictment has been proven.

10        THE COURT: Let me hear from Mr. Dratel as to the

11   basis for deleting these. And I've looked at the cases, by the

12   way, that you folks have cited in your original pieces.

13        Go ahead, Mr. Dratel.

14        MR. DRATEL: If the government doesn't have to specify

15   the series of violations that constitute the crime, then the

16   jury is not tethered to anything legally in the context of what

17   the elements of the offense are and what the charge is. So,

18   for example, we don't know what was in the grand jury. I doubt

19   Mr. Duch's material was in the grand jury. He signed a

20   cooperation agreement in December. So they're going to put in

21   front of the jury a series of violations to establish the CCE

22   that the grand jury never saw. So, this is a variance of

23   significant proportion.

24        Also, essentially what the government wants to do is

25   have the option of a charge that is duplicitous in the sense

F1tgulb1                    Trial

1    that it includes many other offenses without defining them, and

2    that's something that's obviously a problem with respect to due

3    process, double jeopardy, all of that.

4         The question of the indictment is very different.  If

5    the government's position were correct, all the Court would do

6    on these instructions would read the indictment and not read a

7    series of instructions about what the elements are of an

8    offense and explain them to the jury.

9         Also, you know, with respect to Counts One, Two and

10   Three, I don't think it's necessarily the case that they alone

11   would constitute a series because they may all be based on the

12   same single act.  In other words, they can find Count One and

13   Count Two based on the same single transaction.

14        THE COURT:  Well, in fact, there's case law about some

15   of the points that you have raised, and let's just take the

16   double jeopardy point, and the way it appears to be dealt with

17   is if there's a conviction on the CCE charge, then you deal

18   with that at sentencing.  And you may end up dismissing, for

19   instance, a conviction on a conspiracy charge, but it's a

20   sentencing issue.  That's the way I read the case law for the

21   double jeopardy issue.

22        In terms of the violations for the grand jury, let me

23   hear from you, Mr. Turner.  It does strike me that certainly

24   there were statements in the indictment as to thousands of

25   transactions and that was part of the indictment and,

F1tgulb1                    Trial

1    therefore, the fact that you have put on evidence of one of

2    those vendors and buyers is just proof of that.

3           MR. TURNER:  I don't think that has anything to do

4    with what we can prove to the jury.  To give your Honor an

5    example from a different context.  Overt acts:  Where you have

6    to specify an overt act as part of a conspiracy, part of the

7    standard instruction the to the jury is you don't have to find

8    that that specific overt act was the overt act.  You're free to

9    find that any other overt act satisfies the overt act

10   requirement.

11          It's the same here.  We're not suggesting -- of course

12   we're not suggesting that the elements of the crime should not

13   be instructed to the jury, but that's different from limiting

14   the government to a specific theory or limiting the jury to a

15   specific finding that it has to make when numerous alternative

16   findings would satisfy the elements.

17          THE COURT:  How about the point Mr. Turner just made,

18   Mr. Dratel, on the overt act?  That does seem to have some

19   traction.

20          MR. DRATEL:  I think it's really more like a R.I.C.O.

21   where you have predicate offenses that are the underlying bases

22   for the count and those have to be enumerated, charged and

23   proven separately; otherwise, you have no idea what the jury is

24   doing.  If the government has thousands of transactions, it

25   shouldn't be that difficult to list them for the jury or to

**ER-159**

F1tgulb1                    Trial

1    identify them for the jury in a way that protects Mr. Ulbricht

2    from this moving target that we'll never know what is the basis

3    for this count.  Just by saying, well, there's drug-dealing on

4    the site, you won't be able to do that in a R.I.C.O.  Well,

5    it's an organized crime operation, so therefore pick -- and

6    those cases initially were like that, they were all reversed or

7    changed to the extent that you couldn't just have predicate

8    acts floating out there that were not specific and identified.

9              THE COURT:  I'll let you respond.  Let me find out how

10   the jury is doing.  We're waiting on five.

11             MR. TURNER:  You can say this with respect to any

12   crime, your Honor.  You can say wire fraud, unless the

13   government has spelled out in the instructions what were the

14   constituent acts of the wire fraud, then we'll never know what

15   the jury was thinking.  It's the jury's business to determine

16   what proof meets the elements.  That's the way it works.

17             So here, we have the charge in the indictment.  It's

18   up to the jury to decide whether the proof the government has

19   presented meets the elements of the crime and the government

20   doesn't have to again instruct the jury that only if you find

21   the proof is met, that the proof meets the elements in this

22   particular way, can you find the defendant guilty.  No.  It's

23   up to the jury to figure out on their own whether there is

24   sufficient proof to meet the elements.  That's their job.  And

25   this charge is no different from any other in that respect.

**ER-160**

Case 3:20-cr-07311-RBT-D1D, entry30096, File 08/26/21, Page 147 of 282
Case 1:14-cr-00068-RBF Document 212, Filed 02/25/15, Page 16 of 281

1577

F1tgulb1                    Trial

1    MR. DRATEL:  If he's talking about wire fraud, a

2    substantive wire mail fraud count has the actual transmission

3    as the crime.  It's identified in the indictment.  This is not

4    a conspiracy.

5    THE COURT:  Let me consider those arguments against

6    the case law and we'll take it from there.

7    While we're waiting for the jurors, let's just go on.

8    Page 69, there are two changes.  I agree that as to the first

9    shaded language, it's unnecessary and confusing actually to the

10   Court, that's the shaded language, the insertion of "but any

11   such person."  I assume that the next portion of language is a

12   governmental insertion, and I would like to hear from the

13   defendant whether or not he agrees.

14   Mr. Turner, am I right about that?

15   MR. TURNER:  Yes, your Honor.

16   THE COURT:  I don't think either of these insertions

17   are frankly necessary.

18   MR. TURNER:  I can explain the reason why we thought

19   it was necessary.

20   THE COURT:  Why don't you tell me your reason.

21   MR. TURNER:  Because the language in the instruction

22   as it exists focuses on employer/employee-like supervision, and

23   we have actually two theories on the organizer supervisor

24   manager relationship, and one is the fact that this individual,

25   this defendant, supervised a number of employees or contractors

Case 3:20-cr-07311-REP-D Document 2006, Filed 09/26/21, Page 148 of 282
Case 1:14-cr-00068-KBF Document 212, Filed 02/23/15 Page 148 of 281      1578
F1tgulb1                    Trial

 1   who were working under him, that's one theory, but he was also
 2   an organizer of others.  The vendors, he organized all of their
 3   activities into essentially one orderly enterprise in the sense
 4   there is very specific Second Circuit language approving of
 5   that theory.  That's a theory we want to argue to the jury and
 6   that's why we'd like it reflected in the instructions.
 7            THE COURT:  Let me understand that argument.  Is it
 8   the government's position that to focus for a moment on the
 9   word "organize" or "organizer" as this element can be read to
10   do, or it has three different parts but focusing on
11   "organizer," is it the government's position that the
12   defendant, if he had no other administrators, would nonetheless
13   have organized whatever number of vendors there are and, in
14   fact, organized whatever buyers there are through the
15   implementation of electronic processes?
16            MR. TURNER:  I think we focus on the vendors, but the
17   answer is yes.  So if you had a kingpin who, let's say, didn't
18   have anybody who was his employee, not that you would
19   characterize it that way, but he nonetheless had a whole
20   network of vendors and that his activity was crucial into
21   organizing them all into one effective project or one effective
22   enterprise, that would meet the terms of the statute as the
23   Second Circuit has specifically defined organizer in this
24   context.  This is verbatim Second Circuit language.
25            MR. DRATEL:  Applied in a very, very different

**ER-162**

F1tgulb1                    Trial

1    context, --

2              MR. TURNER:  I don't think so.

3              MR. DRATEL:  -- not in the context that they're

4    talking about, people, buyers and sellers out in the world,

5    completely disconnected from the defendant on a real-world

6    level.

7              MR. TURNER:  We're talking about a continuing criminal

8    enterprise.

9              THE COURT:  This is a mob case.  I forgot which one

10   you cited.  What's the name of the case?

11             MR. TURNER:  I was just going to check my notes, your

12   Honor.  I can pull it up.  I believe the circuit is just

13   defining those terms supervisor, organizer, manager generally

14   and that's the way it defines "organizer," but I can pull it

15   up, your Honor.

16             THE COURT:  I can look back at your original

17   instruction and see what you cited.

18             MR. TURNER:  I think the whole point of the statute is

19   to go after someone who builds an enterprise, and you can do

20   that in a number of ways.

21             THE COURT:  Let me throw this out there, but tell me

22   what your view is on how it's different from -- and it's

23   somebody who is a broker and what they do is they send out

24   instructions for everybody to call an automated phone line and

25   push the button "I'd like to buy now," and 15 people call in.

**ER-163**

1   So it's one person working out of his own home, he's got a

2   bunch of stray cats wandering around wanting to sell drugs, he

3   says "Fine, if you want drugs, call this number and push the

4   button, press one," he's organized them.  Does that constitute

5   organizer?

6          MR. TURNER:  I think it could.  I think if you're

7   creating an enterprise there that is something different than

8   what existed before.  If you are building a substantial

9   enterprise and you are the key organizer of that enterprise,

10  then you can do that in a number of ways.  There are other

11  elements of the statute, as well.  You have to yourself receive

12  substantial profits from the enterprise.  It can't just be some

13  guy in the street who is brokering some deals --

14         THE COURT:  Although $1,400 was found to be

15  substantial in one of the cases.  I'm saying the word

16  "substantial" is --

17         MR. TURNER:  That's the flexibility of the statute, I

18  suppose.  There are differences between the terms organizer

19  supervisor and manager.  Supervisor and manager mean something

20  different than organizer; and the way the Second Circuit has

21  specifically defined it is exactly the way we put it in the

22  instruction.

23         MR. DRATEL:  I don't think the Second Circuit ever

24  defined it as customers.

25         MR. TURNER:  Again --

Case 3:20-cv-07811-RS  Document 12  Filed 09/26/21  Page 151 of 382
Case 1:14-cr-00068-KBF  Document 212  Filed 02/25/15  Page 20 of 251            1581
F1tgulb1              Trial

 1              THE COURT:  He was focusing on vendors.  What's your
 2   view on the point regarding vendors?
 3              MR. TURNER:  The vendors are -- the organizational
 4   aspect of it in the context of those cases is much more clearly
 5   connected in terms of an organization.
 6              This is not an organization.  There is no way the
 7   government can claim this is an organization.  So in the
 8   context of organize, organize is a root of organization.
 9   Vendors are not part of an organization.  Even under the
10   government's theory, they avail themselves of a website; it's
11   not an organization.  And that's what this statute is about.
12              It's not about a landlord, even if the landlord is
13   liable being the organizer because he rents out space to people
14   who deal drugs, that's not a CCE.  It's never been.
15              THE COURT:  Let me consider all of that.
16              We have also got on page 72 -- are we still waiting
17   for some folks?
18              THE DEPUTY CLERK:  Two more.
19              THE COURT:  We have conspiracy to commit or aid and
20   abet computer hacking.  Now, the indictment does charge aiding
21   and abetting for computer hacking.
22              MR. DRATEL:  That's just the same question, but it
23   says to commit or aid and abet.  I know it charges that.  I
24   think it's just the same argument as before about the
25   conspiracy to aid and abet.  I don't think this is an aid and

**ER-165**

F1tgulb1                    Trial

1    abet conspiracy.  This is a conspiracy to aid and abet.  My

2    objection is to the legal concept of a conspiracy to aid and

3    abet.  That would not be appropriate.

4         THE COURT:  Tell me, Mr. Turner, how you folks read

5    this.  Do you read it as a conspiracy to commit or a conspiracy

6    to aid and abet computer hacking, or do you read it as a

7    conspiracy to commit computer hacking and separately

8    potentially aiding and abetting computer hacking?

9         MR. TURNER:  It's a conspiracy to commit or to aid and

10   abet computer hacking; that's the way it's charged.  So there's

11   an agreement with others to commit computer hacking or to aid

12   and abet others in computer hacking.

13        THE COURT:  In other words, the jury could not find

14   conspiracy but could find aiding and abetting computer hacking?

15        MR. TURNER:  No.  It's a conspiracy charge.

16        THE COURT:  I think that's what I'm trying to figure

17   out in terms of how you read it, because one could parse the

18   language in two different ways.

19        MR. TURNER:  The object of the conspiracy is to commit

20   or aid and abet computer hacking.

21        THE COURT:  So it is exactly the same issue.  Then

22   we've got the same issues appear on page 73.  I think those are

23   the same issues.

24        MR. DRATEL:  Yes.

25        THE COURT:  It's the same issue on page 75, so those

**ER-166**

Case 3:20-cr-03811-REF D Doc 125-1006 Fild 09/26/21 Page 123 of 282
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 23 of 281          1583
F1tgulb1                      Trial

 1    all flow from that issue.

 2              The next change I have is on page 83.  It's the

 3    deletion of the term "funds."  Did anybody disagree with that

 4    deletion?

 5              MR. TURNER:  Your Honor, I'm sorry.  Could we go back

 6    to 73.  I think there was an additional change --

 7              THE COURT:  I'm sorry.  You're right.

 8              MR. TURNER:  -- which would include any computer

 9    connected to the Internet.

10              THE COURT:  Correct.  Whose change was that?

11              MR. DRATEL:  That was mine.  And the reason would be I

12    think that's the equivalent of a directed verdict on that

13    element.  It's kind of like with the interstate commerce and

14    some of the other aspects about drugs.  I think the current

15    state is not to tell the jury that a specific piece of evidence

16    satisfies that element.  It may not be a dispute, but I think

17    it's somewhat of a directed verdict on that issue.

18              THE COURT:  Mr. Turner.

19              MR. TURNER:  Well, your Honor, I think it's providing

20    an example to the jury of what a protected computer can mean.

21    All it says is "...which would include any computer connected

22    to the Internet."  It doesn't say that the computers in this

23    case have been proven to be connected to the Internet or

24    anything like that.

25              THE COURT:  I now understand the back and forth on

1   that issue, so let me circle back to it.  Then if there is

2   nothing else, let's go to page 83, and that's a deletion by the

3   defendant.  Does anybody have a problem with that deletion?

4           MR. TURNER:  Yes, your Honor.  I think it's an

5   accurate statement of the law.  They need to understand that

6   "funds" includes a medium of exchange so that the government

7   can argue that bitcoins are funds under the statute.

8           THE COURT:  Mr. Dratel, do you disagree that it's a

9   correct statement of the law?

10          MR. DRATEL:  The basis for the objection is consistent

11  with our pretrial motions in respect to the money laundering

12  counts.

13          THE COURT:  I will then keep the fund language

14  consistent with my ruling on that motion.

15          Page 85, there is a deletion and insertion.  Is it

16  your deletion?

17          MR. DRATEL:  It's my deletion.

18          THE COURT:  It's Mr. Dratel's deletion.

19          MR. DRATEL:  Both are mine.

20          THE COURT:  Why don't you tell me the basis.

21          MR. DRATEL:  Sure.  I'll take the second one first.

22  It just says "each potential conspirator."  I think there has

23  to be a conspirator, not a potential conspirator, but the

24  larger one in the first paragraph is --

25          THE COURT:  Let me make sure we're in the same place.

F1tgulb1                    Trial

1    Page 85, this is on money laundering?

2               MR. DRATEL:  Yes.

3               THE COURT:  The third element.

4               MR. DRATEL:  Yes.  And the first one I mentioned is

5    just that the last word of the second paragraph, the word

6    "potential."

7               THE COURT:  I see.  There's also the insertion in

8    between.

9               MR. DRATEL:  Right.

10              THE COURT:  That's not yours?

11              MR. DRATEL:  Wait.  No.  I think they're all mine, but

12   the first sentence that is deleted, with the one that begins

13   with "The government does not have to," it's our position --

14   and I understand what the state of the law may be -- but it's

15   our position that it would have to be specified because

16   otherwise, again, we'd have the same problem of the jury

17   basically passing on something that is not even in the case.

18   It says -- I take out the word "only," that the government has

19   to prove that the individuals agreeing knew that the defendant

20   knew the transactions involved the proceeds, because I believe

21   that's an element of the offense is the defendant's knowledge.

22              THE COURT:  We're waiting on two jurors who have been

23   among those coming in a little bit later on another occasion.

24   One of them number three has said that he's on his way.  He has

25   communicated with Joe, but we haven't heard from number six, so

**ER-169**

Case 3:20-cv-07311-RFB-D Document 212 Filed 09/26/23 Page 156 of 282
Case 1:14-cr-00068-RJF Document 212 Filed 02/23/15 Page 25 of 281      1586

F1tgulb1                    Trial

1    he's going to try to find out where she is.

2            Mr. Turner, why don't you respond to what Mr. Dratel

3    just said.

4            MR. TURNER:  I think this is a pretty simple one, your

5    Honor.  The defendant's view of the law, I mean, basically is

6    an instruction which reflects what the defendant desires the

7    law to be but not what it is.  1956 is very clear that while

8    the government has to prove that the proceeds actually did come

9    from specified unlawful activity, as far as the defendant's

10   state of mind is concerned, the government only has to prove

11   the defendant knew the proceeds came from some form of unlawful

12   activity.  The statute is explicit about that.

13           THE COURT:  I do agree with you, Mr. Turner, that that

14   is the current state of the law.

15           MR. DRATEL:  What about "potential"?

16           THE COURT:  The word "potential"?

17           MR. TURNER:  No objection.

18           THE COURT:  We'll take out the word "potential."

19           The next page, page 86, the first change is simply a

20   typo.  "It concerns," and then the insertion of the words "the

21   purpose."  And then down at the bottom there's an additional

22   sentence, which I think is a correct statement of the law.

23           MR. DRATEL:  I would take out the "again."

24           MR. TURNER:  No objection.

25           THE COURT:  No objection?

**ER-170**

F1tgulb1                    Trial

1          MR. TURNER:  No.

2          THE COURT:  Page 89, variance in dates.  This struck

3   me as language changes and not anything particularly

4   substantive.

5          MR. TURNER:  I think that's right.  We just wanted to

6   make clear that there's case law holding that as long as we

7   prove that conduct occurred within the dates, not even

8   necessarily around the dates.  This is basically in response to

9   the defense's argument that oh, well, he was involved, but then

10  he left.  We would argue that, if so, that's conduct within the

11  date range and is still leaves him liable.

12         THE COURT:  Mr. Dratel, do you have any problem with

13  this?

14         MR. DRATEL:  I think the second sentence, the Court

15  instruction was the correct instruction and the traditional

16  instruction.  That's what I think it should be as far as the

17  second sentence.

18         THE COURT:  In other words, you would not have any

19  conduct alleged, you object to the insertion of that and would

20  keep "These events or transactions occurred."

21         MR. DRATEL:  I'm sorry.  Third sentence.  I'm sorry.

22         THE COURT:  Third sentence.  As long as there is a

23  substantial similarity between the dates alleged, etc., etc.,

24  that was the way it was.

25         MR. DRATEL:  Yes.

**ER-171**

F1tgulb1                    Trial

1         THE COURT:  And you prefer that over "the conduct

2    occurred around any dates or within any time periods."

3         MR. DRATEL:  Correct.  Because that means it could

4    occur without -- that language could have it occur outside the

5    time period of the indictment.

6         MR. TURNER:  Which is fine, as long as it's around the

7    time period.

8         MR. DRATEL:  I don't think so.

9         MR. TURNER:  No.  That's what substantially similar

10   means.

11        THE COURT:  It's within any time period the indictment

12   alleges.

13        MR. TURNER:  That's what we want to make clear.

14        THE COURT:  The cases I think talk about substantial

15   similarity.  Let me see what you cited, Mr. Turner, as to

16   whether or not the breadth of it supports what you're saying,

17   but I'm more used to substantial similarity language.

18        MR. TURNER:  Can we provide that case law later in the

19   day?

20        THE COURT:  You may have had it already in your

21   initial instructions.  I just didn't think there was a --

22        MR. TURNER:  This is a modification based on the

23   defense's opening, but there is support in the law for the

24   "within" concept.

25        THE COURT:  Give me what you have.

**ER-172**

Case 3:20-cr-07311-RFD Document 13096 Filed 09/26/23 Page 159 of 282
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 23 of 251          1589
F1tgulb1                    Trial

1            MR. TURNER:  Sure.

2            THE COURT:  Fine.  Page 90, venue, this is a case in

3    which venue has received more attention than some cases.  I

4    think it is worth inserting the following sentence after the

5    first sentence.  I think it's implicit, but I think in this

6    case it's perhaps more useful than in some cases to hold this

7    out.  The insertion would be "You must make a separate venue

8    determination with respect to each count."  Otherwise, I am

9    fine with the changes that have been proposed.

10           MR. TURNER:  We have no objection to that change, your

11   Honor.

12           MR. DRATEL:  No, your Honor.  No objection.

13           THE COURT:  Now, that's for that page, page 90.  Now,

14   on the next page, it's still in the venue section, but there

15   are debates or disputes between the parties as to the deletions

16   on these pages.  So the *Rowe* case does appear to support the

17   first recitation of the law.

18           Are you folks okay or do we need a very short break

19   before we start?  Let's get going.  Bring Mr. Duch out.

20           The Remiroyer (ph) case is I think the second case for

21   the second paragraph there that, when I was going over it, it

22   does appear that the law is clear, it's preponderance.  I

23   understand your point.  Mr. Dratel, I assume for you, it's your

24   argument for reasonable doubt for that for venue, but you

25   understand the law is against you on that --

**ER-173**

F1tgulb1                     Trial

1          MR. DRATEL:  Yes.

2          THE COURT:  -- for just venue, only venue in terms of

3    the reasonable doubt.

4          MR. DRATEL:  I'm sorry?

5          THE COURT:  The only element which the jury finds by a

6    preponderance is the venue element.  Every other element is

7    beyond a reasonable doubt.

8          MR. DRATEL:  Right.

9          THE COURT:  Let's bring out the jury.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-174**

F1tgulb1                          Trial

 1                  (In open court; jury present)

 2                  THE COURT:  Good morning, ladies and gentlemen.

 3                  Mr. Duch, I remind you that remain under oath from

 4         yesterday.

 5                  THE WITNESS:  Yes.

 6                  THE COURT:  Mr. Dratel, you may proceed.

 7                  MR. DRATEL:  Thank you, your Honor.

 8          MICHAEL DUCH,

 9         CROSS-EXAMINATION CONTINUED

10         BY MR. DRATEL:

11         Q.  Good morning Mr. Duch.

12         A.  Good morning.

13         Q.  Now, going back to your initial meetings with the

14         government back in February of 2014, you were initially told

15         that you would have to plead guilty to everything that you did,

16         right?

17         A.  That's correct.

18         Q.  But you didn't, right?

19         A.  I did not.

20         Q.  And with respect to your cooperation agreement with the

21         government, it's required that you provide substantial

22         assistance to the government, right?

23         A.  Can you repeat the question, please.

24         Q.  Sure.  Your cooperation agreement requires you to provide

25         substantial assistance to the government, correct?

F1tgulb1                    Duch - cross

1   A.  That's correct.

2   Q.  And the government is the sole decider as to whether or not

3   you have provided that substantial assistance, correct?

4   A.  That's correct.

5   Q.  Now, you haven't been asked to testify against anyone with

6   respect to Atlantis, correct?

7   A.  That's correct.

8   Q.  And Atlantis, just to refresh, is another website that you

9   sold drugs on, right?

10  A.  That's correct.

11  Q.  And you haven't been asked to testify about anybody with

12  respect to BMR, right, which is another website of that sort?

13  A.  That's correct.

14  Q.  So the only case you're testifying is this case, right?

15  A.  From what I understand, yes.

16  Q.  Now, you testified yesterday that you sold drugs on

17  Atlantis, correct?

18  A.  Yes, I did.

19  Q.  But initially, you denied that you sold anywhere but Silk

20  Road, right?

21  A.  No.  I did mention that I did have accounts on Atlantis as

22  well as Black Market Reloaded.

23  Q.  And that's BMR, right, Black Market Reloaded?

24  A.  That's correct, BMR.

25  Q.  Let me show you what's marked as 3514-2.  I'm sorry.

**ER-176**

F1tgulb1                    Duch - cross

1    3514-10.  Page two, 3514-10, and just look at the document.

2    I'll show you where to look.

3              But you met with the government on October 14, 2014,

4    correct?

5    A.  That's correct.

6    Q.  Let me just show you this highlighted portion.  Did you not

7    deny -- withdrawn.

8              Did you not at first tell the government that you only

9    sold drugs on Silk Road?

10   A.  No, I did not.  From what I understand, the government was

11   aware I also had accounts on BMR as well as Atlantis, and it

12   was my testimony yesterday that I did transact drug deals on

13   those sites as well.

14   Q.  You testified to that yesterday, but the question is when

15   you first talked to the government or when you talked to them

16   October 14 whether or not you sold only on Silk Road?

17   A.  The statement here says that I sold drugs only on Silk Road

18   but --

19             THE COURT:  Don't read it in.  He's asking you whether

20   or not that refreshes your recollection.  If it doesn't, it

21   doesn't.  If it does, it does.

22             THE WITNESS:  It does not because, again, I did

23   sell --

24             THE COURT:  That's the answer.

25             THE WITNESS:  Okay.

**ER-177**

F1tgulb1                          Duch - cross

1   Q.  So you first saw Silk Road, the website, in October 2012,
2   correct?
3   A.  That's correct.
4   Q.  And you were already back on heroin as of August of 2012,
5   correct?
6   A.  That was the time that I relapsed, yes; that's correct.
7   Q.  And yesterday you said you bought heroin once on Silk Road,
8   correct?
9   A.  Yes, I did.
10  Q.  And didn't you tell the government in your first interview
11  with them that you didn't buy any heroin on Silk Road?
12  A.  I don't remember whether I mentioned that I did purchase
13  heroin at that time on Silk Road.
14  Q.  That's not my question.  My question is, didn't you tell
15  the government that you only bought Oxycontin, Oxycodone and
16  Methadone from Silk Road?
17          MR. TURNER:  Objection; asked and answered.
18          THE COURT:  Overruled.
19  A.  Can you repeat the question.
20  Q.  Sure.  In your first interview back in February of 2014
21  with the government, did you not tell the government that you
22  bought only Oxycontin, Oxycodone and Methadone from Silk Road
23  and did you say that twice in that first interview?
24  A.  Not that I can recall.
25  Q.  Did you -- well, let me show you what's marked as 3514-2.

F1tgulb1                          Duch - cross

 1          MR. TURNER:  The government objects.  There's no prior

 2   inconsistent statement.

 3          THE COURT:  Let's see whether or not he can refresh

 4   his recollection with it.

 5   Q.  Does this refresh your recollection that during the first

 6   meeting with the government, February 6, 2014, you claimed that

 7   you only bought Oxycodone, Oxycontin and Methadone or

 8   Methylone?  Which is it?

 9   A.  It was Methadone.

10   Q.  Okay.  So, did you tell the government that, and then --

11   and that you did it and that you told the government that

12   twice?  Just read that sentence.  See if that refreshes your

13   recollection.

14   A.  No.  I believe I told the government all of the drugs that

15   I purchased on Silk Road.

16   Q.  You first started selling drugs on Silk Road April 2013,

17   correct?

18   A.  That's correct.

19   Q.  That's the first time you were ever involved in the

20   seller's contract or anything like that, correct?

21   A.  That's correct.

22   Q.  And you never saw the site in 2011 or 2012 until you got on

23   in October, right?

24   A.  That's correct.

25   Q.  Now, you claim that you didn't sell any drugs before Silk

F1tgulb1                    Duch - cross

1  Road, right, before you sold on Silk Road, correct?

2  A.  That's correct.

3  Q.  But you were arrested in 2008 for possession with intent to

4  distribute drugs, right?

5  A.  That was the charge at the time.  That's correct.

6  Q.  And you pled guilty to a felony in that regard, correct?

7  A.  Yes, I did.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-180**

F1tdulb2                    Duch - cross

1   Q.  So you went to jail ultimately, too, for that, correct?

2   A.  Yes, I did.

3   Q.  And, in fact, that's where you detoxed, correct?

4   A.  That's correct.

5   Q.  You also told -- well, this -- you also had a DUI in 1993,

6   right?

7   A.  Yes, I did.

8   Q.  And was that from sports injury pain?

9   A.  The DUI?

10  Q.  Yeah.

11  A.  No.

12  Q.  And then in 1997 you had a misdemeanor conviction for

13  possession of drugs, right?

14  A.  I don't recall that.

15  Q.  I show you what's marked as 3514-14.  Look at the first

16  highlighted one.

17          1997, right, possession of drugs?

18  A.  Ah, yes.

19  Q.  You told the government in an interview that you didn't

20  begin using drugs until 2007/2008, right?

21  A.  No, that's not correct.

22  Q.  Well, do you still have -- do you still have 3514-10?

23          You met with the government, again, in October of

24  2014, correct?

25  A.  Yes, I did.

**ER-181**

F1tdulb2                          Duch - cross

1   Q.  Did you not tell the government that you first became a

2   drug user in approximately 2007 or 2008?  Did you not tell the

3   government that?

4   A.  My first drug use was at an earlier --

5   Q.  That's not the question.  The question is didn't you tell

6   the government in that meeting that you didn't become a drug

7   user until 2007 or 2008?

8   A.  I told them that I did become a drug user in 2007/2008 but

9   that was not the first time that I was a drug user.

10  Q.  Is that a technicality?

11          MR. TURNER:  Objection to form.

12          THE COURT:  Why don't you rephrase it.

13  Q.  You told the government you became a drug user in 2007, in

14  2008, correct?

15  A.  Yes, I did.

16  Q.  So you really became a drug user well before that, right?

17  A.  My first drug use is prior to that.

18  Q.  So that was a lie you told the government, right?

19  A.  No, it wasn't.

20  Q.  No, OK.

21          You told them 2007/2008 -- when did you first start as

22  a drug user?

23  A.  I probably used alcohol for the first time when I was 16.

24  Q.  OK.  What about other types of drugs?

25  A.  Marijuana probably when I was 18.

**ER-182**

F1tdulb2                    Duch - cross

1   Q.  And what year was that?

2   A.  1992.

3   Q.  So then 16 years before 2007 -- it was 15 or 16 years

4   before 2007/2008, right?

5   A.  Correct.

6   Q.  So when you say you became a drug user, you didn't include

7   the part from 1992 to 2007?

8   A.  Sure, I did.  I mentioned that at the time.

9   Q.  Look at that again.

10  A.  Mm-hmm.

11  Q.  You told the government it was 2007/2008 is when you became

12  a drug user.

13  A.  That's what it says here, that's correct.

14          THE COURT:  The question is does that refresh your

15  recollection that you said that?

16          THE WITNESS:  It does not because my first drug use

17  was prior to that.

18          MR. DRATEL:  That wasn't my question, your Honor.  It

19  was not a refresh your recollection.

20  Q.  It was:  Didn't you tell the government that?

21  A.  No, I did not.

22  Q.  You just said before that you did, right?

23  A.  My first drug use was prior to 2007 --

24  Q.  No, that is the not question.

25          THE COURT:  You've got to let him finish and then you

F1tdulb2                    Duch - cross

1  can ask him your question.

2  Q.  The record will be what the record will be about what you

3  just said five minutes ago, right, where you said, yes, I told

4  the government I became a drug user in 2007, 2008.

5      You said that five minutes ago, right?

6  A.  I became a drug user and first became a drug user are

7  different.  There are distinctions.

8  Q.  Became a drug user and first became, that is the

9  technicality you are going to rely on?

10 A.  No.  You are asking, you said became a drug user or first

11 became a drug user.

12 Q.  You think there is a difference in that question?

13 A.  I think there was a period of abstinence in between.

14 Q.  Wait.  You think there is a difference in that question?

15      THE COURT:  Hold on.  Let him finish.

16      Do you think there is a difference between those two

17 questions?

18      THE WITNESS:  Yes, I do.  First becoming a drug user

19 and reengaging in drug use --

20 Q.  No.  The word is "become," not "reengage."

21      THE COURT:  Hold on.  Let him finish and then you are

22 going to ask another question.

23      Go ahead.  Mr. Duch, you may finish.

24 A.  My first drug use is prior to 2007/2008, as I mentioned,

25 probable about 1992 for marijuana use.  There was quite a

F1tdulb2                    Duch - cross

1    period of abstinence, and I did reengage in drug use in the

2    years of 2007 and 2008.

3    Q.  But you didn't tell them "reengage," you said became a drug

4    user in 2007/2008, right?

5              MR. TURNER:  Objection, your Honor.

6              THE COURT:  I will allow this last one and --

7    Q.  You didn't use that term, right, "reengage"?

8    A.  I'm not sure what term I used at the time.

9    Q.  Now, you claimed on direct that you started using pain

10   killers first because of sports injuries, right?

11   A.  That's correct.

12   Q.  Didn't you tell the government, though, in October of 2014

13   that it was because of Lyme disease?

14   A.  That was the reason why I was represcribed pain killers was

15   because of Lyme's disease, that's correct.

16   Q.  And then when the doctor found out that you had used heroin

17   before, he refused to write you any more prescriptions for

18   OxyContin, right?

19   A.  I believe that the course of antibiotics, the treatment was

20   successful and I no longer required the pain killers.  And I

21   also did reengage in heroin use.

22   Q.  OK.  That was fine but except it wasn't the actual

23   question.

24              The question was didn't the doctor halt your OxyContin

25   or your oxycodone prescription because he found out you were

F1tdulb2                          Duch - cross

 1   doing heroin?

 2   A.  That was one of the reasons, yes.

 3   Q.  And that was one of the reasons that you went back on

 4   heroin more severely, right, because you couldn't get the

 5   OxyContin any more, right?

 6   A.  Because it became too expensive, that's correct.

 7   Q.  To buy in the street?

 8   A.  That's correct.

 9   Q.  Yeah.  So it was the doctor's fault that you went back on

10   heroin, right?

11   A.  Absolutely not.  It's my fault.

12   Q.  Now, you took various security measures, correct?

13   A.  Regarding what?

14   Q.  Regarding Silk Road.

15   A.  Yes.

16   Q.  Regarding your online drug sales, right?

17   A.  Yes.

18   Q.  And in that seller's contract that we saw, it says,

19   "Security is of paramount importance," right?

20   A.  Of course.

21   Q.  And you used a different buyer's account from your

22   seller's -- withdrawn.

23          You created a different seller's account than your

24   buyer's account, correct?

25   A.  Yes, I did.

**ER-186**

F1tdulb2                      Duch - cross

1    Q.  And that was a security measure, correct?

2    A.  That's one of the security measures that the Silk Road

3    website advised people to do.

4    Q.  Right.  And you did that?

5    A.  Yes, I did.

6    Q.  And one of the things that you did that some other people

7    didn't do on Silk Road was you didn't even put up photos,

8    right?

9    A.  That's correct.

10   Q.  Because you knew from your computer background and your

11   security background that there is metadata in those, right?

12   A.  That's correct.

13   Q.  And so metadata can be of significant use in terms of

14   tracking, right?

15   A.  Yes.

16   Q.  And you wanted to eliminate that so you eliminated the

17   metadata, right?

18   A.  Yes, I did.

19   Q.  And you also down the road instituted limits or conditions

20   for customers, right?

21   A.  Over a period of time, yes.

22   Q.  And one of those reasons was because you were concerned

23   about who your customers were, right?

24   A.  Potentially, yes.

25   Q.  By the way, your technical background made it easier for

**ER-187**

F1tdulb2                          Duch - cross

1    you to operate on Silk Road, correct?

2    A.  I don't think it made it easier.  I don't think that there

3    was any level of complexity required to engage in Silk Road

4    activity.

5    Q.  In that October 14th meeting with the government, didn't

6    you say that your technical background made it easier to

7    operate on Silk Road?

8    A.  I did not.

9    Q.  You did not tell the government that it was easier to learn

10   and operate on Silk Road due to your familiarity with the

11   technologies associated with it?

12   A.  The only technologies that were required is that you use a

13   Google search.

14   Q.  That was not my question.

15          My question is -- use a Google search?  You can find

16   Silk Road on a Google search?

17   A.  Absolutely.

18   Q.  You can get to the Silk Road website on a Google search?

19   A.  You can find out the URL, that's correct.

20   Q.  But don't you have to get on Tor, though, too?

21   A.  Sure.

22   Q.  And you knew Tor already, right?  You were familiar with

23   Tor?

24   A.  I was familiar with it, yes.

25   Q.  Did you not tell the government October 14, 2014, which is

**ER-188**

Case 3:20-cv-07311-RS   Document 212   Filed 02/25/15   Page 175 of 300
Case 1:14-cr-00068-KBF   Document 212   Filed 02/25/15   Page 44 of 231          1605
F1tdulb2                         Duch - cross

1    about three-and-a-half months ago, it was easier for you to

2    learn to operate on Silk Road due to your familiarity with the

3    technologies associated with it?  Did you not tell the

4    government that?

5    A.  Not for the technologies associated with Silk Road.

6    Perhaps things like encryption which helps provide

7    confidentiality of data.

8    Q.  So you did tell them that?

9    A.  Tell them what?

10   Q.  What you just said.  I'm asking a question --

11          THE COURT:  Hold on.  Let me just say, why don't you

12   rephrase the question.

13   BY MR. DRATEL:

14   Q.  You didn't answer the specific question so I will ask it

15   again.

16          Did you not tell the government October 14, 2014 that

17   it was easier for you to learn to operate on Silk Road due to

18   your familiarity with the technologies associated with it?

19   A.  Not to operate with the technologies associated with Silk

20   Road but to --

21   Q.  Didn't you tell the government that?

22   A.  No, I did not.

23   Q.  OK.  Now, explain what you say when you say what

24   technologies enabled you to operate --

25   A.  I think to potentially ensure that there were additional

F1tdulb2                          Duch - cross

1   security measures, like recommending encryption, as well as

2   helping other users of Silk Road in the implementation of

3   encryption.  That was something that my technical background

4   allowed me to at least help other people with and implement it

5   with my use of Silk Road.

6   Q.  Now, you talked about your security measures, and you said

7   potentially you were concerned about who your customers might

8   be, right?

9   A.  Sure.

10  Q.  They might be law enforcement, right?

11  A.  It's very possible.

12  Q.  And because when you're on the computer, you're never quite

13  sure who is on the other side of a transaction or a

14  conversation, right?

15  A.  That's correct.

16          MR. DRATEL:  Nothing further, your Honor.  Thank you.

17          THE COURT:  All right.  Thank you.

18          Mr. Turner, anything further from you?

19          MR. TURNER:  Yes, your Honor.

20  REDIRECT EXAMINATION

21  BY MR. TURNER:

22  Q.  You were asked on cross about an arrest you had in the past

23  for possession with the intent to distribute drugs, is that

24  right?

25  A.  That's right.

F1tdulb2                          Duch - redirect

1   Q.  Were you convicted for possession with intent to distribute

2   drugs or were you convicted for something else?

3   A.  I was convicted -- I was not convicted of possession with

4   intent to distribute.  I was convicted of failure to turn over

5   a controlled dangerous substance to law enforcement.

6   Q.  So it was a possession offense, not a distribution offense?

7   A.  Essentially a possession offense.

8   Q.  Did you ever deal drugs before you dealt drugs on Silk

9   Road?

10  A.  I never have.

11  Q.  You were asked about encryption.  I just want to clarify.

12          At some point while you were dealing on Silk Road, did

13  you start requiring your customers to encrypt their messages to

14  you?

15  A.  Yes, I did, all their messages as well as their addresses.

16  Q.  Even though they were sending it, the messages to you on

17  Silk Road?

18  A.  Yes.

19  Q.  You wanted them to encrypt their messages further?

20  A.  Within Silk Road, that's correct.

21  Q.  Because you were worried about law enforcement?

22  A.  Yes, I was.

23  Q.  But it wasn't necessary -- that wasn't required to deal on

24  Silk Road, right?

25  A.  It was not required.  It was something that I implemented.

F1tdulb2                          Duch - redirect

1             MR. TURNER:  That's all, your Honor.

2             THE COURT:  All right.  Thank you.

3             Mr. Dratel, anything further from you?

4    RECROSS-EXAMINATION

5    BY MR. DRATEL:

6    Q.  What were the facts of that arrest?  In other words, what

7    drug did you have that you were caught in possession of back in

8    two-thousand and -- in that arrest 2008?

9    A.  I believe it was heroin.

10   Q.  So you were allowed to plead to a lesser offense, correct,

11   of not turning over heroin to law enforcement authorities,

12   right?

13   A.  That was -- the plea agreement was for a possession charge.

14   Q.  Right.  But how much heroin did you have on you when you

15   were arrested that you were charged with a felony?

16   A.  I believe it was about 35 bags of heroin.

17   Q.  And you weren't selling any of that?

18   A.  None of it.

19            MR. DRATEL:  Nothing further, your Honor.

20            THE COURT:  All right.  Thank you.

21            MR. TURNER:  Very briefly, your Honor.

22            THE COURT:  All right.

23   REDIRECT EXAMINATION

24   BY MR. TURNER:

25   Q.  35 bags, you mean 35 glassines?

F1tdulb2                    Duch — further redirect

1    A.   That's correct.  35 individual glassine bags.

2    Q.   How many bags were you using a day, approximately, at that

3    point?

4    A.   Probably about that.

5              MR. TURNER:  Nothing further.

6              THE COURT:  All right.  Thank you.  You may step down,

7    Mr. Duch.

8              (Witness excused)

9              THE COURT:  Would the government like to call its next

10   witness?

11             MR. HOWARD:  Yes.  But before we do that, I want to

12   read one chat log.

13             THE COURT:  All right.

14             MR. HOWARD:  The witness is actually here.  He is the

15   case agent.

16             THE COURT:  Right.  All right.

17             MR. HOWARD:  Ms. Rosen, could you please publish

18   Government Exhibit 226B, please.

19             THE COURT:  B, as in boy?

20             MR. HOWARD:  That's correct.

21             This is from page 211 of a 1096-page chat log from

22   December 28, 2011.

23             "myself: anyway, this will be a good measure to see

24   how the new policies are affecting things

25             "vj: yeah — gotta get a solid handle on the old

**ER-193**

F1tdulb2

metrics so that some real time comparisons can be made. But I

think that presented properly the new commish structure will be

greeted with open arms. Now – what happens when someone goes

ooe in 60 days from now?

        "myself: account is terminated. There will be a big

warning in the seller's guide. Safe goes for getting customers

to finalize early. No more working the system

        "vj: do they get a warning? And do we offer a bounty?

Or is that too rat like?

        "myself: No bounty, don't need it. We can search the

pms and listings

        "vj: then how do you know if there is an ooe going on?

        "ahh – but you can't say you search the pms, and smart

cookies will pgp that shit. About 1/2 my clients use pgp all

the time in pm's. Seed buyers are a paranoid bunch. Just food

for thought.

        "myself: ok, yea a bounty is a good idea, why not be

part of the scam prevention team :)

        "vj: doesn't have to be official, just kinda let it be

known that if a vendor insists or asks for ooe, let a mod know,

we'll tip ya for your efforts – after all, why should the oflks

that pay subsidize the freeloaders

        "yeah – make it so ooe is seen as a scam, through and

through."

        The next part starts on page 273 to 274 of the 1,096

F1tdulb2

1    page chat log on January 9, 2012.

2              "myself: added this sellers guide:

3              "NOTICE: Do not create listings that instruct

4    customers to pay outside of escrow, or are used for any purpose

5    other than to list an item to be sold for the listed price

6    using the site checkout system. If you instruct your buyers to

7    pay you in any other way, or to contact you off-site, your

8    seller privileges WILL be revoked without warning. You may

9    provide back up contact methods in case of site failure.

10             "and buyers guide:

11             "NOTICE: If your seller instructs you to pay directly,

12   outside of the escrow system, or with any other method than

13   through the site checkout system, you should report it

14   immediately to our support staff via the "contact us" link

15   along with any evidence you can provide. If you do pay your

16   seller directly, there will be no way for us to protect you

17   from fraud.

18             "vj: pretty fucking clear. Perfect."

19             The government calls FBI Special Agent Vincent

20   D'Agostino.

21             THE COURT:  All right.  Mr. D'Agostino.

22             THE CLERK:  Please raise your right hand.

23    VINCENT D'AGOSTINO,

24        called as a witness by the government,

25        having been duly sworn, testified as follows:

**ER-195**

F1tdulb2

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | THE CLERK:  Please state your full name and spell your                       |
| 2  | last name for the record.                                                    |
| 3  | THE WITNESS:  Sure.  First name Vincent.  Last name is                       |
| 4  | D'Agostino, D-'-A-g-o-s-t-i-n-o.                                              |
| 5  | THE CLERK:  Thank you.                                                        |
| 6  | THE COURT:  And Special Agent D'Agostino, you've heard                        |
| 7  | me give the instructions to folks.  Make sure you adjust the                 |
| 8  | microphone so that you could speak clearly into it.  There is                |
| 9  | water there.  Although is that your cup or somebody else's cup?               |
| 10 | THE WITNESS:  That's OK.  I'm super hydrated.                                 |
| 11 | THE COURT:  All right.  Mr. Howard, you may proceed,                          |
| 12 | sir.                                                                          |
| 13 | DIRECT EXAMINATION                                                            |
| 14 | BY MR. HOWARD:                                                                |
| 15 | Q.  Good morning, Special Agent D'Agostino.                                   |
| 16 | A.  Good morning, Mr. Howard.                                                 |
| 17 | Q.  And who do you work for?                                                  |
| 18 | A.  The FBI.                                                                  |
| 19 | Q.  And how long have you worked at the FBI?                                  |
| 20 | A.  A little over ten years.                                                  |
| 21 | Q.  What is your position?                                                    |
| 22 | A.  Special Agent.                                                            |
| 23 | Q.  Where are you based?                                                      |
| 24 | A.  Manhattan, 26 Federal Plaza.                                              |
| 25 | Q.  And are you assigned to a particular squad?                              |

**ER-196**

F1tdulb2                       D'Agostino - direct

1   A.  I am.

2   Q.  And what squad is that?

3   A.  The Cyber Crime Squad, Squad CY2.

4   Q.  What are your responsibilities as a cyber special agent?

5   A.  Part of my responsibilities are to investigate any

6   violations of federal law as they relate to computer crimes.

7   So you conduct surveillance, interviews, interrogations,

8   forensic analysis, do search warrants, arrests, and testify.

9   Q.  In the course of your responsibilities as an FBI agent on

10  the cyber squad, have you analyzed and reviewed malware?

11  A.  Yes.

12  Q.  What is malware?

13  A.  Malware is short for malicious software.  What it is, it's

14  basically bad programs that end up on people's computers that

15  are designed to steal sensitive information or give control of

16  your computer to somebody else.

17  Q.  What other terms are commonly used to refer to malware?

18  A.  Like adware, spyware.  Other types of malware -- worms,

19  Trojans, viruses.  Those are all types of malware, which is a

20  very generic term.

21  Q.  Now, have you reviewed malware purchased from Silk Road as

22  part of your investigation?

23  A.  I have.

24          MR. HOWARD:  Now, Ms. Rosen, could you please publish

25  Government Exhibit 340A, which is already in evidence.

**ER-197**

F1tdulb2                         D'Agostino - direct

1    Q.  Special Agent D'Agostino, do you recognize what Government

2    Exhibit 340A is?

3    A.  Yes, I do.

4    Q.  And what is it?

5    A.  It's a receipt from a purchase of several packages of

6    malware that was given to me by Special Agent Gary Alford from

7    the IRS.

8           MR. HOWARD:  So, Ms. Rosen, could we just zoom in on

9    the top section of this.  Right here.

10   Q.  Here it says "downers4u."  Was that the undercover account

11   that was used to purchase the malware?

12   A.  Yes, it was.

13   Q.  Here it says:  "From:  Sniffsniff.  HUGE hacking Pack

14   **150+ HACKING TOOLS&PROGRAMS."

15   A.  Correct.

16   Q.  Is that the listing that was purchased?

17   A.  Yes.

18          MR. HOWARD:  Will you zoom back out, please,

19   Ms. Rosen?

20          THE COURT:  I think -- I'm sorry.  Go ahead.  I

21   thought something had gotten missed.  It didn't.

22          Continue.

23   BY MR. HOWARD:

24   Q.  Could we zoom in on this section, please.

25          And so what is this section of this document?

F1tdulb2                        D'Agostino - direct

 1    A.  So since the purchase was made for software, these are

 2    links that will give you access to download that software that

 3    you purchased.  So the top three being the ones you actually

 4    paid for and then the lower six or so being the freebies that

 5    are thrown in as extras.

 6    Q.  Now, after this was provided to you by Special Agent

 7    Alford, did you test any of the links that were provided by the

 8    Silk Road vendor?

 9    A.  I did.

10    Q.  And what did you discover?

11    A.  I tested the first three links and all three links were

12    active.  So you can take any one of those three and drop them

13    into a browser, like Internet Explorer or Mozilla and it will

14    take you to a page where you can download the associated file,

15    which you can see -- like on the first link, for example, the

16    file name is actually huge underscore hacking underscore pack

17    dot rar, and that's the file that will be delivered to your

18    computer.

19    Q.  Special Agent D'Agostino, you said you put these in a

20    browser.  Are you referring to a Tor browser or a regular

21    browser?

22    A.  Just a regular browser.

23    Q.  Could you please flip in your binder to what's been marked

24    for identification purposes as Government Exhibit 1100.

25    A.  OK.

F1tdulb2                          D'Agostino - direct

1   Q.  Do you recognize what this is?

2   A.  I do.

3   Q.  And what is this?

4   A.  It's a screen capture of the download page for one of the

5   files that I downloaded.

6   Q.  Did you take this screenshot?

7   A.  Yes, I did.

8           MR. HOWARD:  The government offers Government Exhibit

9   1100.

10          MR. DRATEL:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 1100 received in evidence)

13          MR. HOWARD:  So could we just zoom in on the center

14  area here.

15  Q.  Special Agent D'Agostino, what is depicted here?

16  A.  So this is showing you the file you're about to download,

17  which is called pack pound sign or I guess hash tag number

18  2.rar, and the file size, which is 2.37 gigabytes.  It is a

19  large file.  If you click "download to your computer," the

20  download begins.

21  Q.  Now, did you in fact download the malware?

22  A.  I did.

23  Q.  Can you please flip in your binder to what has been marked

24  as Government Exhibit 1101.

25  A.  OK.

**ER-200**

F1tdulb2                     D'Agostino – direct

1   Q.  By the way, did you take any precautions before you

2   downloaded this malware?

3   A.  Yes.

4   Q.  And what did you do?

5   A.  I would use a new machine that's disconnected from anything

6   else, not on a network, to avoid infecting that machine and

7   then inadvertently infecting other machines.  So it is done in

8   what is called a sandbox.

9   Q.  Could you please take a look at 1101, please?

10  A.  Sure.

11  Q.  Do you recognize this exhibit?

12  A.  Yes.

13  Q.  And what is this?

14  A.  It's a screen capture I took of the contents, or some of

15  the contents of that file that I downloaded.

16  Q.  Did you take this screenshot?

17  A.  Yes.

18          MR. HOWARD:  The government offers Government Exhibit

19  1101.

20          MR. DRATEL:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 1101 received in evidence)

23  BY MR. HOWARD:

24  Q.  So, Special Agent D'Agostino, can you walk us through

25  what's depicted hire?

**ER-201**

F1tdulb2                    D'Agostino - direct

1   A.  So the file itself comes in a container or a compressed

2   package.  So rather than having to download hundreds of

3   separate files, what they do is it is compressed into one file

4   called pack#2.rar.  Within that file is all the files that you

5   see below.  It is actually -- these are just some of them.

6   This is number 1 through D in alphabetical order.  So these

7   files are contained within that file that I downloaded.

8           And they are organized by category.  So you'll see

9   different piece of malware that are labeled by their brand

10  name, like Blackshades.  You'll see some of these are organized

11  by what they do, like Booters, Botnet, Brute Forcers, Chat

12  Exploits, Anonymity, Admin Page Tools.

13  Q.  Can you just be explain a couple of these?  Do you know

14  what a brute forcer is?

15  A.  Sure.  So a brute forcer would be if we're going to obtain

16  someone's file that is password protected and you wanted to

17  gain access to that file, you can brute force attack it with

18  lists of predetermined password combinations.  So a program

19  will basically take a file that presumably you are not supposed

20  to have access to and run passwords against it until it figures

21  out what that is.

22  Q.  Here's one right above Brute Force that says Botnet.

23  A.  Sure.

24  Q.  Do you know what a botnet is?

25  A.  Yes.  A botnet is when your computer gets infected with bot

**ER-202**

F1tdulb2                          D'Agostino - direct

1  software that turns your computer into essentially a slave, and

2  then a bot master can control that computer and tell it what to

3  do.  So it can tell it to attack another computer so that if it

4  were to be investigated all the information would be back to

5  your computer, as opposed to the person who is really behind it

6  who is controlling it from two or three steps removed.

7  Q.  Are you familiar with what Blackshades is?

8  A.  Yes.

9  Q.  What is it?

10 A.  Blackshades is a RAT, which depending on who you ask can

11 stand for remote administration tool or remote access tool.

12 What it was was a hugely popular piece of software that people

13 could download from a website that would -- they could

14 customize and deploy on a victim's machine, which would give

15 them access to their Web camera, their hard drive contents.

16 They could open and close a CD-ROM tray.  They could move the

17 mouse around.  And that was a very, very popular piece of

18 software for a long time.

19          MR. HOWARD:  Ms. Rosen, could we please slide down to

20 the bottom half of this screen, please.

21 Q.  Here there is one that is he a called DDos, D-D-O-S.

22 A.  Right.

23 Q.  Do you know what that is?

24 A.  Yeah.  That stands for distributed denial of service

25 attacks.  So what that is is there is software contained within

**ER-203**

Case 3:20-cr-00311-REP Document 906 Filed 09/26/23 Page 190 of 282
Case 1:14-cr-00068-RBF Document 212 Filed 02/23/15 Page 59 of 251    1620
F1tdulb2                        D'Agostino - direct

1   that folder that would allow you to attack an IP address or

2   website, let's say, and flood it with traffic to the point

3   where the site will actually go down and be inaccessible.

4           MR. HOWARD:  Now, Ms. Rosen, could we go to the second

5   page of this exhibit, please.  And let's zoom in on the bottom

6   half of this screen.

7   Q.  Special Agent D'Agostino, this is just more folders in the

8   same package you downloaded, correct?

9   A.  Correct.  It is the next series in alphabetical order from

10  I guess H to P.

11  Q.  So here there is one called password stealers.  Do you know

12  what that contains?

13  A.  Yes.  It is software specifically designed to put on

14  someone's computer so that every time the victim would enter in

15  a username and password, it would collect that data and either

16  send it to a separate file that you would collect later

17  physically, or it could send that file out remotely over the

18  Internet to the owner of the program.

19  Q.  And the last one I'll go over is keyloggers up here, which

20  is highlighted in gray.  What is that?

21  A.  Keyloggers are probably some of the most popular forms of

22  malware.  They are what they say they are.  They actually

23  record every keystroke on your computer.  So as you're

24  operating your machine, you're typing in emails, passwords,

25  business documents, there is a program running in the

F1tdulb2                          D'Agostino - direct

1    background that you are unaware of that is copying every letter

2    down and that will send that data to the person who infected

3    your machine to do with what they want.

4    Q.  Now, did you test any of the malware that was included in

5    this hacking pack?

6    A.  Yes.

7    Q.  And generally what did you discover?

8    A.  The software did what it promised to do according to

9    category.  Almost all the software in here was -- worked very

10   well in a Windows-based operating system.

11   Q.  To be clear, did you test all of the software or just did

12   you select some of them?

13   A.  No, I did not test all of it.

14   Q.  Now, focusing on keyloggers, did you test any keylogger?

15   A.  Yes.

16   Q.  Was that the program called syslogger?

17   A.  Correct.

18   Q.  Can you please flip in your binder to what's been marked

19   for identification purposes as Government Exhibit 1102, please?

20   A.  OK.

21   Q.  Do you recognize what this is?

22   A.  Yes.

23   Q.  What is this?

24   A.  It's a screen capture that I took of the syslogger program,

25   the front page when you run that actual program.

F1tdulb2                    D'Agostino - direct

1   Q.  Did you take this screenshot?

2   A.  Yes.

3           MR. HOWARD:  The government offers Government Exhibit

4   1102.

5           MR. DRATEL:  No objection.

6           THE COURT:  Received.

7           (Government's Exhibit 1102 received in evidence)

8           MR. HOWARD:  And could we just zoom in on this window

9   here.

10  Q.  So Special Agent D'Agostino, this is the window that pops

11  up when you open the program?

12  A.  Correct.

13          MR. HOWARD:  May I approach the witness, your Honor?

14          THE COURT:  You may.

15  Q.  I just handed you what's been marked for identification

16  purposes as Government Exhibit 1103.  Do you recognize this

17  exhibit?

18  A.  I do.

19  Q.  And what is this exhibit?

20  A.  It's a CD containing a demonstrative video that I created,

21  which also has my initials on the CD.

22  Q.  Would this video aid your testimony today?

23  A.  Absolutely.

24          MR. HOWARD:  The government offers Government Exhibit

25  1103 for demonstrative purposes.

**ER-206**

F1tdulb2                      D'Agostino - direct

 1          MR. DRATEL:  No objection, your Honor.

 2          THE COURT:  Received.

 3          (Government's Exhibit 1103 received in evidence)

 4          MR. HOWARD:  May I approach the witness, your Honor?

 5          THE COURT:  You may.

 6   Q.  Special Agent D'Agostino, can you just please explain what

 7   is being depicted in the video as it is being played?

 8   A.  Sure.  So we're starting out on what would be the buyer's

 9   machine.  It is a clean installation of Windows, and I'm

10   running the keylogger program, which is called "Syslogger

11   Builder."

12          Can you pause it for a second.

13          And so when you run the program, after you were to

14   purchase the software, you download it, you execute the file,

15   and this is the page that comes up.  And this is what I would

16   call a build a malware screen.  So this screen allows you to

17   design your piece of malware to whatever you want it to do.  It

18   is very, very customizable.

19          So on the top right, you can see under

20   "Specifications," the default setting is to send the data over

21   SMTP.  What this means is that you are going to put in an email

22   address in here on the top right, and that is where all the

23   stolen data from the victim's machine is going to be sent to.

24   Q.  Are you referring to this part of the window?

25   A.  That's correct.

F1tdulb2                    D'Agostino - direct

1          THE COURT:  What does the word "execute" mean?

2          THE WITNESS:  Execute is just a fancy word for like

3    running a program.  So when you execute that file you are just

4    running it.  You just double click on the file.

5    BY MR. HOWARD:

6    Q.  Do you mind using your laser pointer to point out there the

7    screen you are talking about?

8    A.  So that is where you would enter in the email address of

9    where -- once this software is installed on victim's machine,

10   that's where it is going to send all of the stolen date to.  So

11   I created a fictitious account for demonstrative purposes.

12          You could hit play.

13          So that's the Gmail account I created.  And what's

14   nice about this interface, it will allow you to test the

15   settings.  So you click "test mail," it actually goes through

16   and sends a test email to make sure that you had entered in the

17   password correctly.

18          So now on the left side here, you can go through and

19   select what you want the program to do.  And so there's things

20   like Antis is the first option, Stealers, Delete Cookies, Block

21   anti-virus Sites, Melt, Mutex, Startup.

22          You can pause it for a second.

23          And what those allow you to do, like there is also

24   Screen Logger.  So you could tell it, for example, you want

25   this software to, once it builds it, to be able to avoid being

F1tdulb2                          D'Agostino - direct

1   detected by antivirus software like, you know, Kaspersky or

2   Norton antivirus or BitDefender.  So you check that box, which

3   makes the program build in such a way that when it gets sent to

4   the victim's machine, their antivirus will never catch it.

5        You also have stealers so that will look for anytime a

6   password is entered into a browser to log into Gmail or Yahoo!,

7   that will specifically pull that information out for you.

8        Block antivirus sites, that will prevent the victim

9   from going to an online antivirus site to clean their machine.

10  So if they begin to suspect something's up, they can go

11  antivirus.com.  They run a scan.  Only this will actually block

12  certain sites like that from ever appearing.

13       And then screen loggers.  Screen loggers, the program

14  will take an actual screen capture of what your computer's

15  doing at whatever interval you set.  So that screen capture

16  will look very much like what you are looking at on that

17  monitor right now.

18       And, finally, where it says "enable error," here you

19  can customize it so that once it's installed successfully, you

20  can make a message pop up on the victim's machine and say

21  anything you want.  The default setting is so that it posts a

22  message saying that the program never installed correctly,

23  thereby giving the victim a false sense of comfort that, oh,

24  whatever this was never actually installed.  So for the

25  purposes of this demonstration, I just added in a generic

**ER-209**

F1tdulb2                    D'Agostino - direct

 1    message, I believe.

 2              You can hit play.

 3              So the default error message says the application

 4    failed to initialize properly.  And I added "please double

 5    click and try again," which would cause the person to rerun the

 6    malware again to make sure it installed properly.  So that's

 7    what the message allows you to see, what it would look like.

 8    So I clicked "Test Error" and that's what pops up.

 9              Then on the bottom right here, I am setting the

10    interval.  I set it extremely low as to alert me every minute.

11    So every minute it is going to send me data that it's stealing.

12    Ideally, you probably wouldn't want it that often but for the

13    purposes of the demonstration.

14              So then -- pause it for a second.

15              So once you select the options you want, then you

16    click on build, which is "Build Server," which is that button

17    right there.  And then it makes an executable file, a file

18    that's runnable that now does the things that you just set it

19    to do.  So I quickly saved the file.  I think I called it

20    "badfile" initially.  And now the next step is to put it in a

21    package so that I could deliver it to a victim's machine, which

22    you'll see in the next video.

23              You could hit play, please.

24              So there's the "bad file" that I created.  That's the

25    actual malware.

**ER-210**

F1tdulb2                          D'Agostino - direct

1    Q.  Special Agent D'Agostino, that was customized with all the

2    features you selected?

3    A.  Exactly.  It will only do the things that I told it to do

4    and nothing more, nothing less based on those features that I

5    selected.

6         So since nobody would open bad file.exe, I named it

7    cute dogs, because everybody would open cute dogs.exe -- at

8    least I would.  What I'm doing now is putting the file in a

9    container much like when I originally downloaded the malware so

10   that it will slip pass Gmail virus scans.  There is a lot of

11   different ways to do this.  This is the most simple way for

12   purposes of the demonstration.  And what this does is this

13   hides what it actually is within a container.  So when it's

14   emailed out, most of the time your email will catch simple

15   viruses and malware.  By doing it this way it will pass right

16   through.

17        So now I'm sending the attachment to another created

18   email address up here.

19   Q.  The name of the account is victimuser2626?

20   A.  Yes.

21   Q.  You created that account for this demonstration?

22   A.  Yes, something to entice the person to open it.

23   Q.  So here you're delivering the malware by email.  Are there

24   other ways to deliver the malware?

25   A.  Yes.  The most common is via email or through an actual

**ER-211**

F1tdulb2                          D'Agostino - direct

 1  website.  But physical access to the machine we're seeing more

 2  and more where people will -- you'll have a friend or family

 3  member that's, you know, into computers and you'll have him

 4  come over to fix something and they'll actually bring a thumb

 5  drive and drop the file onto your machine without you knowing.

 6  But, still, the most common is by email.

 7  Q.  Now you are attaching the malware?

 8  A.  Yes.  You attach the file, and it should get through the

 9  scan because it's in a compressed format and now it's sent.  So

10  there's the sent email confirming it went out.

11          So now this is the victim's machine.  This is another

12  clean installation of Windows 7, 64-bit.  The victim then would

13  log on to their Yahoo!

14  Q.  Now, to be clear, the video depicts a different computer?

15  A.  This is a completely different computer.

16          So there's the email that was sent by the user of the

17  malware with the irresistible attachment, which will be opened

18  now.

19          So I'm saving the file to the desk-top, and I am going

20  to open that container.

21          I am putting in the password that was sent with the

22  file.  In a normal circumstance, you wouldn't have password

23  protection on it but.

24          So now the file is being dragged to the desk-top and

25  the user, the victim, will run the file, or execute the file.

F1tdulb2                    D'Agostino - direct

1    So it is just a double click.

2            And so you'll see the little busy -- you know, the

3    computer's working.  But other than that, there is no

4    indication of what's going on.

5            Then it just sort of, the busy signal, the icon went

6    away, and the user -- the victim is left wondering, you know,

7    what the deal is.

8            So now the error message pops up, and that lets you

9    know that the malware was actually install successfully.  So

10   that is the error message I created in an earlier step, which

11   prompts the user to double click the file, which -- if you want

12   to pause it for a second.  One of the neat features about this

13   type of keylogger is it has a melt function.  So once it is

14   installed, if you guys noticed, the file actually disappeared;

15   it has been deleted.  And that's to remove traces of itself on

16   that machine.  So in order for me to rerun it, I actually have

17   to open the container again, extract it again, and rerun it,

18   which I think is what I do here.

19           You can hit play, please.

20   Q.  Special Agent D'Agostino, melt is of the options that you

21   selected from the control panel, right?

22   A.  Yes.

23           So now the user's machine is infected.  So from this

24   point forward everything they're doing is being logged.  So for

25   the purposes of the video, I attempt to visit several different

F1tdulb2                      D'Agostino - direct

1   sites, entering in data, login data, to see if it's actually

2   working.  So, again, I'm attempting to log into the victim's

3   Yahoo! account.  You'll notice the password was entered in

4   incorrectly the first time and you'll see that in a minute.

5   Spoiler alert.  So I'm into the email account.

6          So now I'm just going to other sites.  I think

7   eHarmony was the first site I went to.  The second site I went

8   to is Gmail.com, and then I went to Facebook.

9          Now I'm just doing a Bing search.

10  Q.  What is Bing?

11  A.  It's a search engine, believe it or not, just like Google.

12  So just generic photos.

13         So now what I'm going to do is I'm going to switch

14  back over to the malware virus machine.  So if things worked

15  well, and I think they did, you're going to see those emails

16  populating the in box with all the data that I preselected to

17  be stolen.  So there it is.  So you could see initially -- if

18  you want to pause it here -- this is from the moment it was

19  infected, it starts telling you everything that was done.  And

20  so since I ran the program -- when you initially run the

21  program, the first thing that comes up is the D'Agostino fake

22  error message.  It shows you that there was a Yahoo! message

23  that was being viewed.  It tells you what's in the person's --

24  under their start menu, what programs are installed on their

25  program manager, so WinRAR.  And they're right here.  The first

F1tdulb2                    D'Agostino - direct

 1    time I executed -- the second time I opened that file, I had to

 2    enter into a password of 1234 and it actually captured that.

 3    And it shows you some of the other functions that we are

 4    running.

 5            You can hit play now.

 6            So you can see on the right side that these messages

 7    were coming in about every minute.  This is the first screen

 8    grabber, screen capture.

 9            So once it was infected, the first thing it did was it

10    took a screen capture of the desk-top as it appeared.  So any

11    icons you would have on your desk-top, now the person who

12    infected your machine would know what folders, what files were

13    there.

14            You can see here it also is showing you I went to

15    Internet Explorer, I was on the MSN site.  No logs yet for

16    that.  You could see here I went to Yahoo! login.  It logged

17    that.  I visited that site.

18            This would grab what's in your clipboard when you do a

19    copy and paste.  I had nothing in there so there is nothing to

20    report.

21            Here is the second or third screen grab, which is when

22    I went to the Yahoo! site.

23            And so here -- if you want to pause it for a second --

24    when I went to -- I jumped from Yahoo!, which is the first

25    entry, then I went to eHarmony, and then I entered in my

**ER-215**

1  credentials for eHarmony so it was victimuser2626.  I hit the

2  tab button, which actually logs the keystroke with the tab

3  button, and then I wrote "this is my" messed up the spelling

4  and I actually hit backspace, which records that, and

5  "password."  So I was attempting to write in "this is my

6  password," and it captured not only "this is my password" but

7  me backspacing when I hit the wrong button.

8  Q.  To be clear, by "credentials," you mean username and

9  password, correct?

10 A.  Yes.

11           Hit play, please.

12           So here's another screen capture of the Yahoo! page

13 after I logged in successfully.

14           So here's when I went to the Gmail site and typed in

15 my username and password, which also captured right over here.

16           What is effective about keyloggers like this is that

17 if the person were to change their password on their machine,

18 no matter how many times they did it, the purchaser of the

19 software would always know the new password because they would

20 receive these updates continuously.

21           Here's the screen grab from the family photos Bing

22 search that I did, which captured everything that was on the

23 screen at the time.

24           I think that's it.

25 Q.  Thank you.

**ER-216**

1      MR. HOWARD:  No further questions.

2      THE COURT:  All right.  Thank you.

3      Mr. Dratel.

4      MR. DRATEL:  One moment, your Honor.

5   CROSS-EXAMINATION

6   BY MR. DRATEL:

7   Q.  Special Agent D'Agostino, when did you create the video?

8   A.  Within the last week or so.

9      MR. DRATEL:  Nothing further, your Honor.

10      THE COURT:  All right.  Thank you.

11      You may step down, sir.

12      (Witness excused)

13      MR. HOWARD:  The government calls Mr. Ilhwan Yum.

14      THE COURT:  Why don't we get Mr. Yum onto the stand,

15   but why don't we take our mid-morning break just before we have

16   Mr. Yum come in.  So even though we've only been going for an

17   hour and then we'll go until lunch.

18      So, ladies and gentlemen, I want to remind you to

19   continue not to talk to each other or anybody else about this

20   case.  Thank you very much.

21      And if you are using -- one more thing.  If you are

22   using these breaks as an opportunity to check media or read the

23   newspaper or anything like that, I want to make sure I remind

24   you to avoid looking at any media.  If you see anything that is

25   an article or otherwise references this case, you are to turn

F1tdulb2

1    your eyes away.  Do not read it.

2              All right.  Thank you.

3              THE CLERK:  All rise as the jury leaves.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-218**

F1tdulb2

 1      (Jury not present)

 2      THE COURT:  All right.  Is there anything that you

 3 folks would like to go over before we take our own break?

 4      MR. HOWARD:  Not from the government, your Honor.

 5      MR. DRATEL:  No, your Honor.

 6      THE COURT:  All right.  So let's just try to cabin it,

 7 Joe, just sort of make it like a 7- or 10-minute break, Joe, if

 8 that possible.

 9      (the Court conferred with the Deputy Clerk)

10      THE COURT:  About ten minutes.  Thank you.

11      THE CLERK:  All rise.

12      (Recess)

13      (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F1tgulb3                              Yum - direct

1              (In open court; jury present)

2              THE COURT:  We have called Mr. Yum to come to the

3    stand.

4              Swear the witness.

5              (Witness sworn)

6              THE COURT:  Mr. Yum.  Please be seated, sir.  And it

7    will be important for you to adjust your chair and microphone

8    and speak clearly and directly into the mic.

9              Mr. Howard.

10             MR. HOWARD:  Thank you.

11    ILHWAN YUM,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. HOWARD:

16    Q.  Good morning, Mr. Yum.

17    A.  Good morning.

18    Q.  Where do you work?

19    A.  FTI Consulting, that's "T" as in technology.

20    Q.  And back in 2013, where did you work?

21    A.  FBI, the Federal Bureau of Investigation.

22    Q.  And back then, what was your position with the FBI?

23    A.  Special agent.

24    Q.  And where were you based?

25    A.  New York office.

F1tgulb3                          Yum - direct

1   Q.  Were you assigned to a particular squad at the time?

2   A.  Yes.  I was assigned to Squad CY2 which handled

3   cybercriminal intrusion matters.

4   Q.  And how long were you a member of that cybersquad?

5   A.  About five and-a-half years.

6   Q.  Now, while you were working as a cyberagent at the FBI, did

7   you have any experience searching computer servers?

8   A.  Yes, I did.

9   Q.  What is a computer server?

10  A.  It's nothing different than a regular computer but it's

11  dedicated to run services online, services like web pages,

12  email servers and anything else that you do online.

13  Q.  Approximately how many servers did you search during the

14  course of your career as an FBI agent?

15  A.  About 50 or more.

16  Q.  Were you involved in the Silk Road investigation?

17  A.  Yes, I was.

18          MR. HOWARD:  Mr. Evert, can you please publish

19  Government Exhibit 264, which is already in evidence.

20  Q.  Now, Mr. Yum, during your involvement in the Silk Road

21  investigation, did you review files recovered from the

22  defendant's laptop?

23  A.  Yes, I did.

24  Q.  Are you familiar with this file?

25  A.  Yes, I am.

F1tgulb3                          Yum - direct

1   Q.  What is this file generally?

2   A.  It appears to be a list of computer servers and details and

3   descriptions about those computer servers.

4            MR. HOWARD:  Mr. Evert, can we zoom in on the top

5   here, about halfway through the page.

6   Q.  Here we have one that the alias is listed as gala, ggb; the

7   notes column says backup and the IP address says 207.106.6.25.

8   Q.  Are you familiar with that server?

9   A.  Yes, I am.

10  Q.  And how are you familiar with that server?

11  A.  I obtained a warrant to search and seize this server back

12  in September 2013.

13  Q.  Directing your attention to September 9 of 2013, were you

14  involved in an execution of the search warrant on that server

15  on that date?

16  A.  Yes, I was.

17  Q.  Now, where was this server physically located?

18  A.  The server was physically located at a data center that was

19  about 30 minutes in the suburbs of Philadelphia.  Yes,

20  Philadelphia.

21  Q.  And did you go to where it was physically located?

22  A.  Yes, I did.

23  Q.  Now, what was the first thing you did after you arrived at

24  the location where the server was located?

25  A.  So, that day, I went to the data center with computer

F1tgulb3                        Yum - direct

1   scientist Thomas Kiernan.  And when we arrived there, it looks

2   like a warehouse but inside, it's clean.  It has security

3   doors.  We were greeted by the administrator of the data

4   warehouse, data center, and he -- I had called ahead and

5   prearranged so that he was expecting us.  And then upon

6   identifying myself, he took us to the rack space where the

7   server was located.

8   Q.  And what do you mean by "rack space"?

9   A.  It's a metal frame structure in a data center.  It's

10  metal-framed -- rows and rows of metal frames, and each one of

11  those frames contains a bunch of computers that are mounted on

12  to it.

13  Q.  And what did you do after you arrived at the location at

14  the rack space where the server was located?

15  A.  First thing I did was I looked at the outside of the server

16  to make sure I had the right server, and I noticed a sticker

17  that was attached to it, which had the IP address, same thing

18  here, 207.106.6.25, and I was assured that I had the right

19  server that I was looking for.

20  Q.  Could you flip to what's been marked for identification

21  purpose in your binder as Government Exhibit 602.

22  A.  I don't have a binder in front of me.

23          MR. HOWARD:  May I approach.

24          THE COURT:  Mr. Howard will have some binders for you.

25          MR. HOWARD:  Sorry about that.

F1tgulb3                        Yum - direct

1         THE COURT:  That's all right.

2         THE WITNESS:  Thank you.

3   Q.  Now, that you have the binder, could you please flip to

4   Government Exhibit 602.

5   A.  Yes.

6   Q.  Do you recognize Government Exhibit 602?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  It's the picture I took of the server on that date using my

10  FBI Blackberry.

11        MR. HOWARD:  The government offers Government

12  Exhibit 602.

13        MR. DRATEL:  No objection, your Honor.

14        THE COURT:  Received.

15        (Government's Exhibit 602 received in evidence)

16        MR. HOWARD:  Mr. Evert, could you actually leave 264

17  on the top half of the screen and zoom into the same line we

18  were looking at, and then put 602 on the bottom of the screen,

19  please.

20  Q.  Mr. Yum, this sticker was what you just testified about

21  with the description of the server?

22  A.  Yes, it is.

23  Q.  The IP address, the address that matched with what was

24  listed on the defendant's -- the spreadsheet on the defendant's

25  computer, correct?

Case 3:20-cv-07311-RFP-D Document 69096 Filed 09/26/23 Page 211 of 282
Case 1:14-cr-00068-RBP Document 212 Filed 02/25/15 Page 80 of 231          1641
F1tgulb3                            Yum - direct

1    A.  Correct.

2    Q.  And here it says ggb on the sticker.  Is that also found on

3    the spreadsheet that was located on the defendant's computer?

4    A.  Yes, it is.

5    Q.  So after taking the photograph and confirming that this was

6    the right server, what did you do next?

7    A.  So, the data center prepared a separate room for us.

8    There's hundreds of computers in there, so with the fan noise

9    is extremely loud to work in there.  So we turned the computer

10   off and removed the hard drive from the computer and we took it

11   to that designated work area where we began making a forensic

12   copy of the server.

13   Q.  And what did you do to make a forensic copy?

14   A.  For this instance, we used a small device that's

15   preconfigured to make the job a lot easier for us, so this

16   device, what it does is, you plug in the hard drive that you

17   want to copy, and it's preconfigured where it's

18   write-protected, it's read-only, so you can't alter anything on

19   the original hard drive.  And on the other side, you plug in

20   another hard drive that you want to make the copy onto.

21   Q.  By the way, what do you mean by forensic copy?

22   A.  Forensic copy is an exact bit-by-bit copy of any data out

23   of a hard drive so that you have a true, accurate image of

24   anything that you want to copy.

25   Q.  Now, after you make the forensic copy, do you do anything

F1tgulb3                    Yum - direct

1   to verify that it's an identical and accurate copy of the

2   original server?

3   A.  Yes, I do.  So in the forensic industry, we do hashing.  In

4   this case, we did MD5 Hash and a SHA1 hash.  And basically it's

5   an algorithm that calculates through a massive set of data and

6   you get a simple -- it's not really simple -- it's a long

7   string but much simpler than the entire data that you're

8   looking at.  And it serves as a condensed fingerprint of what

9   you're looking at and it's a one-way algorithm.  You can't

10  alter it.  The original always gives you the same value.

11  Q.  So if one bit of data got changed during the copy process,

12  what would have happened to the hash value?

13  A.  So you get a different answer, different hash of the data

14  you calculated.  So if you change anything, you get a different

15  hash value.

16  Q.  And after you imaged -- made a forensic copy of this server

17  located outside of Philadelphia, did you compare the hash

18  values?

19  A.  Yes, I did.

20  Q.  What did you discover?

21  A.  I noted that the original hard drive hash and the copy that

22  I made had the same hash value and they matched.

23          MR. HOWARD:  May I approach.

24          THE COURT:  You may.

25  Q.  So Mr. Yum, I just handed you what's been marked for

**ER-226**

F1tgulb3                          Yum - direct

1    identification purposes as Government Exhibit 604.  Do you

2    recognize what this is?

3    A.  Yes, I do.

4    Q.  And what is it?

5    A.  It's the copy that I made of that server at the data

6    center.

7    Q.  How do you recognize it?

8    A.  I recognize it by the labeling that's on the hard drive

9    that we -- I made on the day the copy was made; and it also

10   matches -- the serial number hard drive matches what I wrote

11   down when I checked this batch -- checked this into FBI

12   evidence.

13          MR. HOWARD:  The government offers Government

14   Exhibit 604.

15          MR. DRATEL:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 604 received in evidence)

18   Q.  Mr. Yum, can you please flip in your binder to what's been

19   marked for identification purposes as Government Exhibit 604A.

20          Do you recognize what this is?

21   A.  Yes, I do.

22   Q.  And what is this?

23   A.  It's the log file that gets generated when you used the

24   device that makes the forensic copy.

25   Q.  Were you involved in generating this log file?

F1tgulb3                         Yum – direct

1   A.  Yes.

2   Q.  And it's the log file for this server, Government

3   Exhibit 604?

4   A.  Yes, it is.

5          MR. HOWARD:  The government offers government

6   Exhibit 604A.

7          MR. DRATEL:  No objection.

8          THE COURT:  Received.

9          (Government's Exhibit 604A received in evidence)

10         MR. HOWARD:  Now, Mr. Evert, can we just zoom into

11  this section here.

12  Q.  Briefly, Mr. Yum, here it says source hash SHA1 and MD5 and

13  to the right of SHA1 and MD5, there are these long string of

14  characters, numbers and letters.

15         What are those?

16  A.  Those are the corresponding hash values.

17  Q.  The hash values for what specifically?

18  A.  Oh.  For the server that came -- for the hard drive that

19  came out of the server.

20  Q.  And then right below that, there's a verification hash,

21  SHA1, MD5 and again, long strings of numbers and letters to the

22  right.

23         What does this represent?

24  A.  So that's the hash value of the image, the copy that I

25  made.

**ER-228**

F1tgulb3                          Yum - direct

1    Q.  And do they match?

2    A.  Yes, they do.

3    Q.  What did you do with the forensic copy of the drive,

4    Government Exhibit 604, after you made the copy?

5    A.  I brought it back to FBI New York and I checked it into

6    evidence.

7    Q.  Now, had you been involved in a review of the contents of

8    the server?

9    A.  Yes, I had.

10   Q.  And generally, what have you found that server to contain?

11   A.  Accurate to the description on the first spreadsheet that

12   was displayed, it contained what appeared to be backup files of

13   Silk Road Marketplace.

14         MR. HOWARD:  Now, Mr. Evert, could you please publish

15   Government Exhibit 264 again, the server spreadsheet, and focus

16   a little high real on the lines that begin with the words "BTC"

17   and "bora."  Go halfway down.

18   Q.  Mr. Yum, here we have the top row says bora and it

19   indicates an IP address of 193.107.86.49.  Under the location

20   column it says Iceland.  And in the notes column it says market

21   backhand.  Is that correct?

22   A.  Correct.

23   Q.  And on the line under it, it says BTC in the left-most

24   column.  The IP address is 193.107.86.34.  The location is

25   listed as Iceland.  And the notes column says live wallets and

F1tgulb3                          Yum - direct

1   in parentheses archive wallets.  Correct?

2   A.  Correct.

3   Q.  Are you familiar with these two servers which are labeled

4   as being located in Iceland?

5   A.  Yes, I am.

6   Q.  How are you familiar with that?

7   A.  Those are the two servers that I searched and

8   seized -- assisted in searching and seizing with the Iceland

9   police back in October of 2013.

10  Q.  Was that on or about October 2, 2013?

11  A.  Yes.

12  Q.  So taking you to October 2, 2013, what initiated the start

13  of your seizure of these servers?

14  A.  So, the plan was to wait for the team that's on-ground in

15  San Francisco, the FBI arrest team, and wait for them to give

16  me a confirmation that the defendant has been arrested.  The

17  reason why we went with that tactic was we wanted to make sure

18  if I touch -- if I altered anything on these servers prior to

19  defendant being arrested, I was afraid that it was going to tip

20  off that there was some kind of law enforcement action.

21  Q.  So where were these servers physically located?

22          THE COURT:  Which servers are you talking about?

23  Q.  We're both -- were these servers located in different

24  locations or were they in the same facility?

25  A.  The same facility.

**ER-230**

F1tgulb3                       Yum - direct

1          THE COURT:  These are the Iceland servers?

2          MR. HOWARD:  Yes.

3   Q.  And where in Iceland was it located?

4   A.  It was, again, hosted or located at a data center in

5   Iceland.

6   Q.  Did you go to the facility?

7   A.  Yes, I did.

8   Q.  What was the first thing you did after you arrived at the

9   facility where these two servers were located?

10  A.  So, we arrived at the data center with Icelandic police

11  officers.  And, again, we were greeted by the data center

12  administrator and he was notified by the Icelandic police that

13  we were on our way.  So when we identified ourselves, he took

14  us to the location, the server rack location where the servers

15  were found in the data center.

16  Q.  Which server did you go to first?

17  A.  The first one we seized was the market backhand up there.

18  It's listed as IP address 193.107.86.49.

19  Q.  Now, once you arrived at where the server was located in

20  the facility, what could you tell about how the server was

21  configured?

22  A.  So, again, we examined the computer server first and we

23  noticed that the way the server was set up had two hard drives

24  that were written to -- identically at the same time.

25          So the reason why is anybody runs a server this way is

**ER-231**

1   you have two identical hard drives and if one of them fails,

2   the other one could take over and the website would never go

3   down.

4          Noting that, we turned the server off and we took one

5   of the hard drives as the true, best original evidence at that

6   point.

7   Q.  Now, were you doing anything to monitor the Silk Road

8   website as this was occurring?

9   A.  Yes.  So when we went into the data center, I had a

10  separate laptop that was configured to use Tor and I had gone

11  to the Silk Road website on Tor.  And prior to turning the

12  server off to seize the hard drive, I was able to view the

13  contents of Silk Road Marketplace on Tor.

14         When I turned the computer off to take the hard drive,

15  the Tor -- the Silk Road website on Tor was no longer

16  accessible.  And once removing the second hard drive, I needed

17  to turn the computer -- the server back on; and soon after, I

18  was able to access the Silk Road website again.

19  Q.  Now, why did you turn the Silk Road Marketplace back on?

20  A.  So there were two phases to the approach that we took that

21  day.  The first thing, after seizing the hard drive, the first

22  thing we needed to do -- the next thing we needed to do was to

23  seize the bitcoins on the other server listed there with IP

24  address 193.107.86.34.

25  Q.  Now, how did you know the bitcoins were located on that

**ER-232**

F1tgulb3                          Yum - direct

1   server?

2   A.  So, if you recall back, the backup server that I seized in

3   Philadelphia back in September, the month prior, I noticed that

4   there were programs in there that indicated that Marketplace

5   was set up with the bitcoins being at a different location to

6   separate the two; and we knew that there was another server

7   containing all the bitcoins related to the Silk Road

8   Marketplace.

9   Q.  Was this code that was located on the backup server itself

10  that referenced the bitcoin server?

11  A.  Yes.

12  Q.  And did it specify the IP address of the bitcoin server?

13  A.  Yes, it did.

14  Q.  So how did you withdraw -- why did you have to keep --

15          THE COURT:  Let me ask, when you say that the

16  Philadelphia server specified the IP address of the bitcoin

17  server, is that equivalent to saying that the Philadelphia

18  server specified the IP address of the server located in

19  Iceland?

20          THE WITNESS:  Correct.

21          THE COURT:  Thank you.

22          You may proceed.

23  Q.  You said that you put the Marketplace back online with

24  one -- there were two -- sorry.  Let me step back.

25          You said there were two hard drives that operated the

Case 3:20-cr-07311-REP-D Document 43996 Filed 09/26/23 Page 220 of 382
Case 1:14-cr-00068-RBF Document 212 Filed 02/25/15 Page 89 of 231        1650
F1tgulb3                          Yum - direct

1    server for the Silk Road Marketplace, correct?

2    A.  Correct.

3    Q.  And you took one of the two hard drives as evidence for the

4    case, correct?

5    A.  Yes.

6    Q.  And then you turned the server back on with one of the hard

7    drives in place because you said you had to seize bitcoins?

8    A.  Right.

9    Q.  Can you explain why you needed to turn the Marketplace back

10   on in order to do that.

11   A.  So, again, we didn't want to alert the users of Silk Road

12   Marketplace that their bitcoins are being seized, so as I

13   mentioned before, the bitcoins in the Marketplace were

14   separated and the Marketplace had a program that reached out to

15   the bitcoin server to get the current balance and it would

16   update every five minutes or periodically.

17          And in order for me to seize all the bitcoins, I

18   needed to leave the Marketplace remaining online, but I

19   discontinued that update process so the balance was stuck at

20   the last known amount.  And as I was seizing the bitcoins, the

21   users wouldn't be aware that the balance of the bitcoins on

22   Silk Road was depleting.

23   Q.  And how did you actually seize the bitcoins?  What did you

24   do?

25   A.  So prior to going over to Iceland, I created a bitcoin

F1tgulb3                         Yum - direct

1   address that was dedicated for the government to seize and

2   transfer and receive the bitcoins that came out of Silk Road

3   Marketplace.

4   Q.  And how did you move them from the bitcoin server in

5   Iceland to the FBI address?

6   A.  I logged onto the Silk Road bitcoin server and executed

7   instructions to move that -- to make that transfer happen.

8   Q.  Approximately how much did you move over to the FBI?

9   A.  On that day of October 2, it was a little over 20,000

10  bitcoins.

11  Q.  What was the approximate value in U.S. dollars that day?

12  A.  There's different bitcoin prices at different indices, so I

13  would say approximately depending on the price that you used

14  before 16- to $18 million.  Oh.  Wait.  I'm sorry.  Let me go

15  back and do my math.

16  Q.  You said there were 20,000?

17  A.  Oh, 2- to $3 million.

18  Q.  Now, earlier you said that there were two reasons that you

19  had to turn the Marketplace back up.  One reason was to seize

20  the bitcoins, correct?

21  A.  Correct.

22  Q.  And prevent the balance from being updated so that users

23  wouldn't know the bitcoins were being seized, correct?

24  A.  Yes.

25  Q.  What was the other reason that you had to turn the

Case 3:20-cv-07311-RBT-DM Document 222, Filed 09/26/23, Page 222 of 282
Case 1:14-cr-00068-RBF Document 212, Filed 02/25/15 Page 91 of 281        1652
F1tgulb3                          Yum - direct

1    Marketplace back on?

2    A.  So the last part of seizing these servers, we did want to

3    make a statement that the U.S. Government had seized and taken

4    over Silk Road Marketplace, so using the Marketplace

5    infrastructure, we had replaced the contents of the Silk Road

6    Marketplace and replaced it with a picture showing the

7    government seized Silk Road Marketplace.

8    Q.  Could you please look in your binder to what's been marked

9    for identification purposes as Government Exhibit 600, please.

10   What is this?

11   A.  It's a picture that I created based on a template that was

12   provided to me to place it on the Silk Road website once the

13   seizure was completed.

14           MR. HOWARD:  The government offers Government

15   Exhibit 600.

16           MR. DRATEL:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibit 600 received in evidence)

19   Q.  Mr. Yum, this was the seizure banner that replaced the

20   contents of the Silk Road homepage.  Is that correct?

21   A.  That's correct.  Another thing that I want to note here is

22   just like when I first turned the computer off, I was

23   monitoring the Silk Road website, and prior to putting this

24   picture up, I needed to turn the web server off.  And I noticed

25   on my laptop I was no longer able to access Silk Road

F1tgulb3                          Yum - direct

1  Marketplace.  And once I swapped the files and put this back

2  on, I turned the web server back on, and on my separate laptop

3  on my Tor browser, the Silk Road Marketplace that wasn't

4  accessible was now showing this page.

5  Q.  So instead of the Silk Road homepage, you would get the

6  seizure banner, right?

7  A.  Correct.

8  Q.  Could users that go to the Silk Road then do transactions

9  on the Silk Road once you'd put that up on the website?

10 A.  No.  They would be stopped at that screen.

11 Q.  Now, did you also seize the bitcoin server?

12 A.  Yes, I did.

13 Q.  The second server in Iceland?

14 A.  Yes.

15 Q.  First, let's focus on what you did on the Marketplace

16 server.

17 A.  Sure.

18 Q.  What did you do with the market -- you said you took one

19 hard drive from there?

20 A.  Yes.

21 Q.  What did you do with that after you took it?

22 A.  I brought it back to New York and then I made a working

23 copy out of that and checked the original hard drive into

24 evidence.

25          MR. HOWARD:  Your Honor, may I approach.

**ER-237**

1    THE COURT:  You may.

2    Q.  Mr. Yum, I'm showing you what's been marked for

3    identification purposes as Government Exhibit 603.  Do you

4    recognize what this is?

5    A.  Yes, I do.

6    Q.  And what is this?

7    A.  It's the original -- one of the original hard drives that

8    came out of the Silk Road Marketplace server.

9    Q.  Is that the server that you had previously identified as

10   having the IP address 193.107.86.49?

11   A.  Yes, it is.

12   Q.  How do you recognize that?

13   A.  I recognize this because the server -- some of the server

14   hard drives they look different than a normal computer hard

15   drive, so it's a little different than what I normally see.  So

16   I recognize it just by the physical appearance, but also the

17   serial number that was marked on it matches my form that I

18   filled out when I checked it into evidence.

19        MR. HOWARD:  And the government offers Government

20   Exhibit 603.

21        MR. DRATEL:  No objection.

22        THE COURT:  Received.

23        (Government's Exhibit 603 received in evidence)

24   Q.  Could you please look in your binder to what's been marked

25   for identification purposes as Government Exhibit 603A.  Do you

F1tgulb3                          Yum - direct

1    recognize this exhibit?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  It's the log file that was generated after I made a working

5    copy from this original hard drive.

6    Q.  Did you make the copy in a similar manner as to the way you

7    copied the server in Philadelphia?

8    A.  Yes.  I used a similar device.

9    Q.  And does this log file -- were you involved in generating

10   this log file?

11   A.  Yes, I was.

12            MR. HOWARD:  Government offers Government

13   Exhibit 603A.

14            MR. DRATEL:  No objection.

15            THE COURT:  Received.

16            (Government's Exhibit 603A received in evidence)

17            MR. HOWARD:  Zoom in on the bottom section.

18   Q.  Mr. Yum, here is another MD5 and SHA1 hash of the working

19   copy that you made?

20   A.  Yes.

21   Q.  Now, this log file only has one MD5 and one SHA1.  Can you

22   explain that?

23   A.  Yes.  So I have the original which I can always go back and

24   confirm that what I have is what I took.  And any time I'm

25   making a copy of this, that device that I'm using, that is

Case 3:20-cr-07311-REF-D  Document 212  Filed 09/26/23  Page 226 of 282
Case 1:14-cr-00068-RBF  Document 212  Filed 02/23/15  Page 95 of 251    1656
F1tgulb3                         Yum - direct

1    write-protected so it can never be altered.  And if it ever

2    gets altered, you could tell right away.

3              So this is the hash value for MD5 and SHA1 that was

4    calculated for the image that I created.  So anyone else who is

5    working on this image afterwards, they could be assured that

6    the copy hasn't been altered since it was first made.

7    Q.  And does anything in this document indicate whether the

8    copy was an accurate copy of the original?

9    A.  Yes.  Right above the highlighted section it says total

10   errors which is zero, and the copy was completed without any

11   problem.

12   Q.  Now, were you also involved in seizing the bitcoin server

13   in Iceland?

14   A.  Yes.

15   Q.  How was that server configured?

16   A.  I believe that one had a hard drive that was in there and

17   after seizing all the bitcoins, at that time I turned it off

18   and I seized the hard drive that was on the server.

19   Q.  What did you do with that hard drive?

20   A.  I also brought that back to FBI New York.

21             MR. HOWARD:  Your Honor, may I approach the witness.

22             THE COURT:  You may.

23   Q.  Mr. Yum, I'm showing you now what's been marked for

24   identification purposes as Government Exhibit 605.  Do you

25   recognize this exhibit?

F1tgulb3                          Yum - direct

1   A.  Yes, I do.

2   Q.  And what is it?

3   A.  It's the original hard drive that came out of the bitcoin

4   server.

5   Q.  How do you know that?

6   A.  Again, I recognize it by the physical appearance of the

7   hard drive itself.  More importantly, the serial number

8   matched -- the serial number on the hard drive matches the form

9   that I used to check it into evidence.

10  Q.  You called it the bitcoin server.  Is that the server you

11  testified earlier had the IP address of 193.107.86.34?

12  A.  Yes, it is.

13  Q.  And how did you make a copy of this one?

14  A.  I used the similar device that I had used previously with

15  the Marketplace server.

16  Q.  Did you also verify that it was an accurate copy based on

17  hash values?

18  A.  Yes.

19  Q.  Both the MD5 and the SHA1?

20  A.  Yes.  I generated the MD5 and the SHA1 and verified that

21  there were no errors triggered when the copy was made.

22  Q.  Could you please take a look at Government Exhibit 605A,

23  please.  Do you recognize what this is?

24  A.  Yes, I do.

25  Q.  What is this?

**ER-241**

F1tgulb3                    Yum - direct

1    A.  This is the log file that was generated once the bitcoin

2    server hard drive was copied.

3    Q.  Were you involved in imaging and creating this log file?

4    A.  Yes, I was.

5            MR. HOWARD:  The government offers Government

6    Exhibit 605A.

7            MR. DRATEL:  No objection.

8            THE COURT:  Received.

9            And did you offer 605?

10           MR. HOWARD:  If I didn't, I mean to offer it now.

11           MR. DRATEL:  No objection.

12           THE COURT:  Received.

13           (Government's Exhibits 605, 605A received in evidence)

14           MR. HOWARD:  Mr. Evert, zoom in on the bottom section.

15   Q.  Again, is this where the MD5 and SHA1 hash values are

16   located, Mr. Yum?

17   A.  Yes, it is.

18   Q.  And does this also indicate that there were no errors, it

19   was made successfully and that the copy was a true and accurate

20   copy of the original?

21   A.  Yes.

22   Q.  What did you do after you made a copy of the bitcoin

23   server?

24   A.  I checked it into evidence.

25   Q.  Now, earlier you testified that you were involved in

F1tgulb3                              Yum - direct

1   putting up the seizure banner on the Silk Road Marketplace

2   server, correct?

3   A.  Correct.

4   Q.  Are you familiar with setting up websites to run on the Tor

5   network?

6   A.  Yes, I am.

7   Q.  Mr. Yum, could you please flip in your binder to what's

8   been marked for identification purposes as Government

9   Exhibit 106D.  Do you recognize what this is?

10  A.  Yes.  It appears to be a simplified diagram of how the Tor

11  network operates.

12  Q.  Would this aid your testimony today?

13  A.  Yes.

14          MR. HOWARD:  The government offers 106D for

15  demonstrative purposes.

16          MR. DRATEL:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 106D received in evidence)

19          THE COURT:  For demonstrative purposes.

20  Q.  Mr. Yum, here we have a diagram of the Tor network,

21  correct, simplified diagram?

22  A.  Yes.

23  Q.  And so, what is required to put -- and right here we have a

24  web server hidden service, right?

25  A.  Correct.

1   Q.  What is required to put a website on the Tor network?

2   A.  The first and most important thing is you need to know how

3   to run a website first, how to run a web server.  Once you know

4   how to do that, if you also know how to use Tor technology, all

5   you need to do is change a couple of lines of code and it's

6   almost plug and play.  Everything is handled by Tor itself and

7   your web server is no longer accessible on the Internet but

8   only through Tor.

9   Q.  Mr. Yum, to be clear, do you need to understand anything

10  about what's going on inside the Tor network?

11  A.  No.  You don't need to understand how exactly Tor works.

12  Q.  That's done for Tor for you?

13  A.  Right.  All the actual transmission back and forth is

14  handled by how Tor is designed.

15  Q.  Now, are instructions available for how to set up a Tor

16  hidden service?

17  A.  Yes, they are.

18  Q.  Where are they located?

19  A.  On the main Tor project page, as well as some other users

20  have their own instructions as well.

21  Q.  Now, Mr. Yum, do you have any experience with bitcoins?

22  A.  Yes, I do.

23  Q.  Have you engaged in any bitcoin transactions?

24  A.  Yes, I have.

25  Q.  And approximately how many?

F1tgulb3                          Yum - direct

1   A.   I would say hundreds of bitcoin transactions.

2   Q.   Including the bitcoin transactions you talked about

3   earlier, you seized bitcoins?

4   A.   Correct, for the government seizure of bitcoins as well.

5   Q.   What are bitcoins?

6   A.   Bitcoins are -- it's digital currency.  It's money that

7   works online to buy products online or even in real person or

8   paid-for services.  It's kind of like cash for the Internet.

9   It's similar to cash in that when people conduct transactions,

10  you don't really see who is doing the transactions, but it's

11  different than cash that every single transaction, the

12  transaction itself, it gets permanently documented on this

13  thing called the block chain.  So even though you don't know

14  who made the transactions, you get to see every single

15  transaction that was performed using bitcoins.

16  Q.   Can you explain the block chain a little more fully,

17  please.

18  A.   So block chain, in accounting terms it's similar to a

19  public ledger which means, you know, published financial

20  records of everything that's taking place.  So block chain,

21  it's a file that's online on the Internet access and shared and

22  used by all the bitcoin users and what it contains is every

23  single transaction of bitcoins ever since the creation of

24  bitcoins.

25  Q.   Now, can bitcoins be used for legitimate purposes?

**ER-245**

F1tgulb3                        Yum - direct

1    A.  Yes, they can.

2    Q.  Can they also be used for illegitimate purposes?

3    A.  Of course.

4              THE COURT:  Let me ask about the block chain again.

5              I'm not clear what information is in the block chain.

6    In other words, I understand from your testimony that you can

7    follow that there has been a transaction, then another

8    transaction, then another transaction and you can follow the

9    transaction history of a particular bitcoin --

10             THE WITNESS:  Right.

11             THE COURT:  -- or a portion of bitcoin.

12             THE WITNESS:  Yes.

13             THE COURT:  What is the information in the block

14   chain?

15             THE WITNESS:  So the information that's contained in

16   the block chain, first of all, you would have the information

17   about the block chain itself, so the size of the current block

18   and the date and the time that block was added to the block

19   chain, so it's constantly growing.  I think the current size of

20   the block chain is over 20 gigabytes I think.  So it's a

21   considerable size because it contains all the history of

22   bitcoins.

23             So within the block, there's additional information of

24   every single transaction that was added to that block, so

25   you'll see all the addresses that were used to send the payment

F1tgulb3                         Yum - direct

1   and all the addresses that were used to receive a payment in

2   bitcoins.

3            THE COURT:  IP addresses?

4            THE WITNESS:  There is no direct IP address of who is

5   sending and receiving bitcoins.

6            THE COURT:  So what kind of address is it?

7            THE WITNESS:  I believe you might be able to obtain

8   the IP address of --

9            THE COURT:  Don't speculate.  I'm wondering when you

10  use the word "address," what were you referring to, what kind

11  of address.

12           THE WITNESS:  Bitcoin addresses.  So it's a long

13  string of alphanumeric value and it works almost like an email

14  address.  You need to give somebody your bitcoin address in

15  order for whoever that wants to pay you to make sure they pay

16  you the correct amount of bitcoins to the right person.

17           So if I were to email Tim, I wouldn't know how to send

18  him an email until Tim gave me his email address.  So in the

19  same manner, if I need to send Tim ten bitcoins, there's no way

20  for me to deliver those bitcoins to him unless he gives me his

21  bitcoin address first.

22  BY MR. HOWARD:

23  Q.  Mr. Yum, let's skip ahead.  We'll come back to where we

24  want to go next to show an example of a block chain.  Look at

25  Government Exhibit 601, which is in your binder, please.

**ER-247**

1    Do you recognize what this is?

2  A.  Yes, I do.

3  Q.  What is this?

4  A.  It's a screenshot of a popular block chain explorer,

5  blockchain.info.  You could obtain information about the block

6  chain and transactions.

7  Q.  Is that website available to the public?

8  A.  Yes.

9  Q.  Were you involved in the preparation of this exhibit?

10  A.  Yes.

11  Q.  Does this exhibit fairly and accurately depict information

12  from the block chain?

13  A.  Yes, it does.

14          MR. HOWARD:  Government offers Government Exhibit 601.

15          MR. DRATEL:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 601 received in evidence)

18  Q.  Mr. Yum, this is something you could pull up in an ordinary

19  Internet processor, correct?

20  A.  Yes.

21  Q.  Let's focus on the top section.

22  A.  So the top section is a high-level summary about that

23  address.

24  Q.  So where is -- do you have your laser pointer up there?

25  A.  Yes, I do.

F1tgulb3                          Yum - direct

1  Q.  Can you point to what a bitcoin address is?

2  A.  It would be the first line right there.

3        MR. HOWARD:  Mr. Evert, can we zoom in on that for a

4  moment.

5  Q.  So it's this long string of numbers and letters, correct?

6  A.  Correct.

7  Q.  Earlier you gave the example of sending an email.  You'd

8  need to know the email address of someone you're sending an

9  email to in order to send the email to them, right?

10 A.  Correct.

11 Q.  Is this what you would need to know from someone else if

12 you wanted to send them bitcoins?

13 A.  Right.  That would be the address that I would need to send

14 the bitcoins to if I owed the owner of that address money or

15 bitcoins.

16 Q.  It's a long, ugly string of numbers and characters, right?

17 A.  Yes.

18        MR. HOWARD:  Can we zoom out.

19 Q.  What other information is there at the top here?

20 A.  On the right side, it has the history of that bitcoin

21 address.  So that bitcoin address was used in six different

22 transactions and it received a total of 7,225 bitcoins and the

23 final balance is zero.  So all of those bitcoins that were

24 received to that address has afterwards been sent to somewhere

25 else.

**ER-249**

1    MR. HOWARD:  Can we zoom out, please.

2  Q.  What does this section of the report include?

3  A.  That would be the detailed transaction of that summary that

4  was mentioned above, the six transactions.

5  Q.  Would that be all the transactions that were associated

6  with that address?

7  A.  Yes.

8  Q.  Let's focus on the bottom one for an example.

9        Can you describe how this depicts information about a

10  bitcoin transaction.

11  A.  Yes.  So I'll go from the top right first.  So that long

12  string of alphanumeric value there, that is a transaction ID.

13  So on the block chain, every transaction is tagged with a

14  unique ID that only represents one unique transaction.  So with

15  that transaction ID, you know this transaction happened.

16        On the block, you also get a timestamp over there,

17  which was -- the transaction occurred in March 31, 2013 and

18  below it on the body of this transaction detail, you see the

19  four addresses on the left.  Those four addresses together sent

20  1,670 bitcoins to that address on the right.

21  Q.  To be clear, it's 1,670 bitcoins in total across all four

22  of those addresses?

23  A.  Yes.

24  Q.  To the one address on the right, correct?

25  A.  Yes.

F1tgulb3                        Yum - direct

1  Q.  So if someone has a bitcoin address, like the one on the

2  right, this is information they can just pull up on a public

3  website, correct?

4  A.  Correct.

5  Q.  If you have the unique transaction number, could you also

6  pull up all these transaction details on a public website?

7  A.  Yes.

8        MR. HOWARD:  Now, can we zoom out, please.

9  Q.  So now if you have the bitcoin address, this is the report

10 you can get that's publicly available, right?

11 A.  Right.

12 Q.  Does the report include any information about who -- the

13 identity of the person who owns the bitcoin address?

14 A.  No, it doesn't.  So you would only get the information what

15 you see up there.  If you were the actual party in that

16 transaction, you could -- if you know who sent you the money,

17 you could kind of -- you could tie in -- certain addresses

18 might belong to somebody.  But other than that, the block chain

19 itself, you can't tell who is sending or receiving bitcoins.

20 Q.  You would need information from somewhere else, correct?

21 A.  Right.

22 Q.  Not from the block chain itself?

23 A.  Correct.

24 Q.  Could you please flip in your binder to what's been

25 premarked for identification purposes as Government

**ER-251**

Case 3:20-cr-07811-JPO Document 212 Filed 08/26/21 Page 238 of 292
Case 1:14-cr-00068-RBF Document 112 Filed 02/25/15 Page 107 of 281          1668
F1tgulb3                    Yum - direct

1   Exhibit 608, please.  Are you familiar with how the basics of a

2   bitcoin transaction works?

3   A.  Yes.

4   Q.  What is Government Exhibit 608?

5   A.  It is a simplified illustration to explain how a bitcoin

6   works.

7   Q.  Would this aid your testimony today?

8   A.  Yes.

9           MR. HOWARD:  The government offers government

10  Exhibit 608 for demonstrative purposes.

11          MR. DRATEL:  No objection.

12          THE COURT:  Received for demonstrative purposes.

13          (Government's Exhibit 608 received in evidence)

14  Q.  Mr. Yum, could you please explain, what is a bitcoin

15  wallet?

16  A.  So a bitcoin wallet, it's a container that holds all the

17  bitcoin addresses relating to a person.  So in this picture

18  here, we had Alice.  Alice is using bitcoin and she has a

19  bitcoin program on her computer.  That program creates a wallet

20  file and inside the wallet file, it contains all the addresses

21  that belong to Alice; as well as you could see the balances

22  that are inside each one of those addresses, but more

23  importantly, the wallet file contains -- and here, it has a red

24  key, but in bitcoin terms, it's called a private key.  And what

25  private key allows is the user, Alice, to control and see all

Case 3:20-cv-07811-RS Document 259-8 Filed 08/26/23 Page 239 of 292    1669
Case 1:14-cr-00068-RBF Document 212 Filed 02/25/15 Page 100 of 284
F1tgulb3                          Yum - direct

1    of the information about her bitcoins.

2    Q.  What else does having the private keys allow you to do with

3    bitcoins?

4    A.  So if you own any bitcoins in any one of these addresses,

5    the corresponding key allows you to spend those bitcoins.

6    Q.  And the wallet is basically just a computer file, correct?

7    A.  Yes.  It's a computer file, yeah.

8    Q.  Is Alice able to see all of her own addresses?

9    A.  Yes.

10   Q.  Just to be clear, on this demonstrative that we say BTC

11   Address 1 and down to 5.

12            How many addresses could a wallet contain?

13   A.  As many as you want.  In here for example purposes there's

14   only five addresses listed, but you could create hundreds,

15   thousands of addresses in one wallet file.

16   Q.  Can anyone else other than Alice see all of the addresses

17   in her wallet?

18   A.  Only if they know what the address is, but if you don't

19   have the private key, you can't just guess someone else's

20   address.

21   Q.  To be clear, each those addresses is one of those long,

22   ugly string of numbers and letters, right?

23   A.  Correct.

24            THE COURT:  Where do you get an address?

25            THE WITNESS:  So, the bitcoin program generates a long

 1   string of numbers and that acts as a seed to the private key.
 2   And the program again uses that private key to calculate
 3   something that is similar to the MD5 hashes and a hash value is
 4   represented as a public key which is a lot easier to pass to
 5   someone else, although it looks very long and confusing.
 6            THE COURT:  All right.
 7   Q.  How easy is it to create a new bitcoin address?
 8   A.  If you're using a bitcoin program all you have to do is
 9   click a button and request the program to create a new bitcoin
10   address.
11   Q.  It will assign a new bitcoin address to you?
12   A.  Yes.
13   Q.  Will it give you the private key necessary to spend the
14   bitcoins in that address?
15   A.  Right.  In the background of the program, you'll get a
16   private key and then you'll get the public address that you can
17   freely give out to other people if you want to receive bitcoins
18   to that address.
19   Q.  Could you explain what is depicted on the second slide,
20   please.
21   A.  I'm going to walk you through a simplified demonstration of
22   how a transaction would occur.  So, again Alice, she owes Bob
23   ten bitcoins, but just as I said, Alice has no idea where to
24   send the bitcoins to, so she needs to ask Bob for a bitcoin
25   address first.

**ER-254**

1          So Alice wants to send ten bitcoins and she's asking
2    where to send it to.  And Bob, in his wallet, he only has two
3    addresses, but as stated before, he could have many more if he
4    wants to.  So Bob picks his Bitcoin Address 2, and can we go to
5    the next screen, please, and tells Alice to send ten bitcoins
6    to Address 2.
7          Alice doesn't really need to worry about where the
8    bitcoins are coming from her wallet.  The program handles that
9    in the most efficient manner it could, so once Alice tells her
10   bitcoin program to send ten bitcoins to Bob's Address 2,
11   Alice's program picks Address 1 and Address 4 in her wallet and
12   sends ten bitcoins to Bob's Address 2.
13   Q.  So Alice doesn't have to pick and choose between her own
14   addresses, correct?
15   A.  Right.  It's very simple to use.
16          THE COURT:  It could be five out of one address, five
17   out of another or two out of one address, eight out of another,
18   or some other combination of pieces?
19          THE WITNESS:  Correct.
20          THE COURT:  All right.
21   Q.  So what's depicted on the third slide?
22   A.  In our demonstration, there were seven bitcoins in Address
23   1 that was sent and three bitcoins in Address 4 of Alice's
24   bitcoin that were sent to Bob's Address 2 in the amount of ten
25   bitcoins.

F1tgulb3                    Yum - direct

1  Q.  And then what's reflected on the bottom of the slide?

2  A.  So the bottom would be an example of what would be recorded

3  onto the block chain as we saw in the prior block chain info

4  screenshot.  So in here, you would see a unique transaction

5  number that identifies this particular transaction and the date

6  and time this transaction was documented onto the block chain.

7          And in here, again, you see only the two addresses

8  that were used to make this transaction of ten bitcoins that

9  were sent to Bob's Address 2.

10  Q.  So now Bob could get this information off the block chain

11  and see what addresses Alice's wallet used to engage in this

12  transaction, correct?

13  A.  Correct.  Bob, he knows his address, so he could easily

14  search his own address and figure out this transaction and note

15  that Alice used these two bitcoin addresses to send Bob ten

16  bitcoins.

17  Q.  Now, would Bob know all of Alice's other bitcoin addresses?

18  A.  No.  Address 2, 3 or 5, Bob would have no idea what

19  the -- who those addresses belong to.

20  Q.  And why couldn't he see those?

21  A.  The addresses aren't announced or anything.  So unless you

22  directly have a transaction with somebody, you can't really

23  figure out who owns what address.

24  Q.  You need the private keys to see all the rest of the

25  wallet?

F1tgulb3                      Yum - direct

1    A.   Right.  The only way Bob may be able to see these addresses

2    is if he had the private key in his wallet allowing him to

3    calculate the same private address -- public address.

4    Q.   Now, Mr. Yum, earlier you testified that you seized

5    approximately 20,000 bitcoins from the Iceland bitcoin server,

6    correct?

7    A.   Correct.

8    Q.   Now, apart from that seizure, were you involved in any

9    other seizures of bitcoins in the Silk Road investigation?

10   A.   Yes, I was.

11   Q.   Where were those bitcoins located?

12   A.   The wallet file for the other bitcoins were obtained from

13   the laptop that was seized from the defendant on the day of his

14   arrest.

15   Q.   And how did you get access to that wallet file?

16   A.   So, Mr. Kiernan actually analyzed and reviewed the laptop

17   and he had located the wallet file and copied it onto a thumb

18   drive and handed it over to me.

19   Q.   And what did you do with that wallet file after it was

20   provided to you by Mr. Kiernan?

21   A.   So, I loaded that wallet file onto my bitcoin program

22   instance, and checked the current balance that was contained

23   inside all the addresses inside the wallet file.

24   Q.   And what was the balance?

25   A.   It was approximately 144,000 bitcoins.

F1tgulb3                        Yum - direct

1    Q.  And what were those bitcoins worth approximately at the

2    time of the defendant's arrest?

3    A.  So at the time of the arrest, which was prior to when I

4    received that wallet file, it was -- again, using the varying

5    bitcoin price of that day, it would have been anywhere between

6    16- to $18 million.

7    Q.  Now, what did you do after you determined the balance of

8    the bitcoins that were in the wallet that was in the

9    defendant's computer?

10   A.  I had another bitcoin address that was prepared for the

11   government's seizure, and I transferred all the bitcoins from

12   the defendant's wallet file into the government address.

13   Q.  You said it was an FBI bitcoin wallet, correct?

14   A.  Correct.

15   Q.  Is this the same or different wallet that you used in

16   Iceland to get the bitcoins from the bitcoin server?

17   A.  Different address.  I wanted to separate the two so the

18   bitcoins didn't mix.

19   Q.  Was there any balance in the FBI controlled log when you

20   created it?

21   A.  No.  It was a newly -- brand new created bitcoin address

22   and since it's never been -- there's never been a transaction

23   conducted using that address, it wouldn't have shown in the

24   block chain, so no one else knew what that address was.

25   Q.  Now, did the wallet file that was provided to you by

Case 3:20-cr-07811-JRS Document 2529080 Filed 08/25/23 Page 245 of 292    1675
Case 1:14-cr-00068-RBJ Document 212 Filed 02/25/15 Page 114 of 281
F1tgulb3                        Yum - direct

1    Mr. Kiernan from the defendant's laptop contain the private

2    keys for the bitcoin addresses in that wallet?

3    A.  Correct.  That would be the most important thing.  Without

4    those private keys, I wouldn't have the right to send the

5    bitcoins from the defendant's wallet to the government seizure

6    address.

7    Q.  Did those private keys also allow you to see all of the

8    bitcoin addresses that were located in that wallet?

9    A.  Yes.

10   Q.  Can you please flip in your binder to what's been marked

11   for identification purposes as Government Exhibit 607.  Do you

12   recognize what this is?

13   A.  Yes, I do.

14   Q.  And what is this?

15   A.  It's a screenshot of a search engine named duckduckgo, and

16   it's the search result for a bitcoin address starting 1FfmbH,

17   which is the address that I created for the government to seize

18   all of the bitcoins from the defendant's laptop.

19   Q.  And had you previously used this website to obtain public

20   information from the block chain?

21   A.  Yes, I have.

22   Q.  Does this website accurately reflect bitcoin transactions

23   that you've conducted in the past?

24   A.  Yes, it does.

25   Q.  You took this screenshot?

F1tgulb3                          Yum – direct

1  A.  Yes.

2         MR. HOWARD:  The government offers Government

3  Exhibit 607.

4         MR. DRATEL:  No objection.

5         THE COURT:  Received.

6         (Government's Exhibit 607 received in evidence)

7  Q.  Mr. Yum, right up here at the top next to the cute little

8  picture of the duck, there's 1Ff and a long string of

9  characters.  What is this?

10 A.  That's the address created for the government.

11 Q.  The bitcoin address?

12 A.  The bitcoin address, yes.

13 Q.  And you were involved in creating that, correct?

14 A.  Yes.

15        MR. HOWARD:  Can we zoom out, please.

16 Q.  Here it says total received, 144,341 and change.  What does

17 that number represent?

18 A.  So that's the total amount of bitcoins that was sent to

19 this address above.

20 Q.  And where were they sent from?

21 A.  So that total number is a little higher than the actual

22 amount, but the majority of those were sent from the

23 defendant's laptop –– the wallet file located in the

24 defendant's laptop.

25        MR. HOWARD:  Mr. Evert, could you please publish

F1tgulb3                      Yum - direct

1   Government Exhibit 201L, which is already in evidence.

2   Q.  Have you seen this before?  It's on the screen.

3   A.  Yes, I have.

4   Q.  And what is this?

5   A.  It's a summary sheet.  It's a picture screenshot of the

6   defendant's laptop when it was seized on the day of his arrest.

7   Q.  So I want to focus here on the fifth line down here.  Can

8   we zoom in here.  And here it says cold BTC and under that

9   144,336.4.

10          How does this number that was on the defendant's

11  computer screen compare to the number of bitcoins that you

12  seized?

13  A.  It matches almost exact to the amount that was seized.

14  Q.  And right above that, there's the word "cold BTC"?

15  A.  Yes.

16  Q.  Are you familiar with the bitcoin term "cold storage"?

17  A.  Yes, I am.  It's a term that's commonly used within the

18  bitcoin community and bitcoin users.

19  Q.  What is it used to refer to?

20  A.  It's a way to store your wallet file.  So it's important to

21  secure your wallet file because it has all the keys that allows

22  you to spend your bitcoins.  So cold storage is -- the most

23  common example is not having your wallet file attached a

24  bitcoin program.  So instead of -- that would be hot, so

25  instead of having a hot wallet, you have a cold storage where

**ER-261**

Case 3:20-cr-07811-LRS Document 2521 Filed 08/26/24 Page 248 of 300   1678
Case 1:14-cr-00068-KBF   Document 212   Filed 02/25/15   Page 147 of 284
F1tgulb3                    Yum - direct

 1  if you separate from a computer that's running a bitcoin
 2  program, so even if the computer gets comprised or damaged or
 3  if it fails, you still have your bitcoins secure and tucked
 4  away in your cold storage.
 5  Q.  What does cold storage refer to with a bitcoin wallet with
 6  respect to a website?
 7  A.  For a website, if you're running a website and if your
 8  website crashes or if your website gets compromised, you don't
 9  want to lose everything that's in there, so you create a cold
10  storage.  And the idea would be to move all the important parts
11  or your bitcoins to cold storage so if anything ever happens to
12  the website, you don't lose your bitcoins.
13  Q.  Now, Mr. Yum, earlier you testified that you are currently
14  working at FTI Consulting, correct?
15  A.  Correct.
16  Q.  What is your position?
17  A.  Senior director.
18  Q.  Now, in your capacity at FTI, have you recently been
19  involved in an analysis of bitcoin transactions related to the
20  Silk Road investigation?
21  A.  Yes, I was.
22  Q.  Now, are you being paid for your work with respect to that?
23  A.  Yes, I am.
24  Q.  And how much are you getting paid for that?
25  A.  For this project, not myself directly, but my company is

F1tgulb3                          Yum - direct

1    charging an hourly rate of $468.

2    Q.  Did you work on this alone or did others at FTI assist you?

3    A.  I worked with one other -- one other person in my team.

4    Q.  To be clear now, you got paid for the work you did on this

5    analysis, correct?

6    A.  Just on analysis.

7    Q.  Are you being paid to testify today?

8    A.  No, I'm not.

9    Q.  Now, what was the overall subject matter of your recent

10   work?

11   A.  I'm sorry --

12   Q.  What is the overall matter of your recent work?

13   A.  I was asked by the government to see if there's any -- if

14   any at all link between the bitcoin addresses that were found

15   on Silk Road and the bitcoin addresses that were found on the

16   defendant's laptop.

17   Q.  So let's break that down.  Where were these bitcoin

18   addresses located?

19   A.  So, one side, we had the Silk Road bitcoins.  I received

20   evidence items from the government and I reviewed the

21   Philadelphia server that was mentioned before, as well as the

22   bitcoin Marketplace -- the Silk Road Marketplace bitcoin

23   servers in Iceland and located -- examined and located,

24   identified all the bitcoin wallet files that were found on

25   those two servers.

F1tgulb3                          Yum – direct

1    Q.  Those are two servers that you were actually personally

2    involved in seizing, correct?

3    A.  Yes, when I was still with the government.

4    Q.  Did you find the private keys on those servers for those

5    wallet files?

6    A.  Yes.  So I obtained the wallet files, so I had all the

7    private keys that are also inside those wallet files.

8    Q.  So did that allow you to see all of the bitcoin addresses

9    that were associated with those wallets on the Silk Road

10   servers?

11   A.  Yes.

12   Q.  Now, how about the defendant's laptop?

13   A.  So, I took the same approach.  I got a forensic image copy

14   of the defendant's laptop and I examined and analyzed the

15   laptop to locate at least three wallet files and extracted all

16   the bitcoin addresses there because I had the private keys that

17   were contained inside those wallet files.

18              (Continued on next page)

19

20

21

22

23

24

25

**ER-264**

F1tdulb4                          Yum - direct

1   Q.  Now, you testified that you examined -- you received

2   certain pieces of evidence from the FBI to perform this

3   analysis, correct?

4   A.  Correct.

5   Q.  So what pieces of evidence did you specifically receive?

6   A.  I got three forensic images -- one of the Philadelphia

7   server, the backup server, one of the Iceland bitcoin server

8   that was seized over in Iceland, and an image of the

9   defendant's laptop, which was seized at the time of his arrest.

10  Q.  So if you could please flip in your binder -- actually,

11  just real fast.  After you received copies of those three

12  pieces of evidence, did you do anything to verify that they

13  were true and accurate copies of the original evidence?

14  A.  Of course.  I calculated my own MD5 and SHA1 hashes.  I

15  calculated those two hash files to make sure my starting point

16  is the same as what was originally copied.

17  Q.  So did you compare those MD5 and SHA1 hash values to the

18  ones that were originally generated for those pieces of

19  evidence?

20  A.  Yes.

21  Q.  What did you discovery?

22  A.  They all matched.

23  Q.  Could you please flip in your binder to what has been

24  marked as Government Exhibit 606, please.

25          How many pages is this exhibit?

Case 3:20-cr-07811-RB DocID 3528098 Filed 06/26/13 Page 252 of 292
Case 1:14-cr-00068-RBF Document 212 Filed 02/25/15 Page 121 of 281    1682
F1tdulb4                        Yum - direct

1   A.  Three pages in total.

2   Q.  And what is it?

3   A.  Each one of those pages are a screenshot that I made after

4   I calculated the hash values.

5   Q.  Those are the hash values of each of the three pieces of

6   evidence that you received from the FBI?

7   A.  Correct.

8          MR. HOWARD:  The government offers Government Exhibit

9   606.

10         MR. DRATEL:  No objection.

11         THE COURT:  Received.

12         (Government's Exhibit 606 received in evidence)

13  Q.  So each contains an MD5 and a SHA1, correct?

14  A.  Correct.

15         MR. HOWARD:  Just flip through the pages, Mr. Evert.

16  Q.  And all of those values match the values on the various log

17  files we've seen today, correct?

18  A.  Yes, they do.

19  Q.  And also match the log file from the image of the

20  defendant's computer that you received from the FBI?

21  A.  Yes.

22  Q.  The laptop computer?

23  A.  Yes.

24  Q.  Could you please look in your binder to what has been

25  marked for identification purposes as Government Exhibit 609.

F1tdulb4                        Yum - direct

1          Do you recognize this exhibit?

2   A.  Yes, I do.

3   Q.  And what is it?

4   A.  It's a simplified illustration of the work that I did to

5   compare all the addresses that was obtained from Silk Road

6   Marketplace and all the addresses that were obtained from the

7   defendant's laptop.

8   Q.  And would this aid your testimony today?

9   A.  Yes.

10          MR. HOWARD:  The government offers Government Exhibit

11  609 for demonstrative purposes.

12          MR. DRATEL:  No objection for demonstrative purposes.

13          THE COURT:  609 is received for demonstrative

14  purposes.

15          (Government's Exhibit 609 received in evidence)

16  BY MR. HOWARD:

17  Q.  Could you please explain what your analysis consisted of?

18  A.  Sure.  So I examined the forensic copy of the defendant's

19  laptop and carefully went through the files and located three

20  Bitcoin Wallet files.  Some of those wallet files may be

21  duplicates or used that one time and then switched over to a

22  different wallet, so there were some duplicates.  But at the

23  end I sorted the addresses down to 11,135 unique individual

24  bitcoin addresses.

25          And this is possible because the wallet file contains

Case 3:20-cr-07811-RP-DacID 4353098, Filed 08/26/21, Page 224 of 292    1684
Case 1:14-cr-00068-RBF   Document 212   Filed 02/25/15   Page 123 of 281
F1tdulb4                        Yum - direct

1  the private key that I was talking about.  So without the

2  private key I would not be able to extract all these addresses.

3  Q.  The fact that the private keys were located on the

4  defendant's computer, what does that indicate?

5  A.  It indicates the defendant's laptop, the wallet file,

6  controlled these bitcoin addresses.  So these are the only keys

7  that could spend the bitcoins that are in these wallet files.

8  Q.  So the user of the computer could spend the bitcoins in

9  those addresses?

10  A.  Correct.  And if we could go to the next page.

11        So from the other side, those are the two servers --

12  images of two servers that I obtained, one from the

13  Philadelphia backup server and one from the Iceland Silk Road

14  bitcoin servers.  So from those two images, I carefully went

15  through them, examined it, and identified and located 22

16  Bitcoin Wallet files.  Again, some of these might be backups or

17  an address that was used at one point and moved on to another

18  address.  So initially I found over 10 million bitcoin

19  addresses.  Some of them are duplicates, but I narrowed it down

20  to a little over 2 million unique bitcoin addresses.

21  Q.  Go to the next page, please.

22  A.  So now I have two sets of addresses, a set of over 2

23  million bitcoins that were found on servers that are related to

24  Silk Road Marketplace.  And on the other side I had over 11,000

25  bitcoin addresses that were recovered from the laptop belonging

1   to the defendant that was seized at the time of the arrest.

2   Q.  Sorry, how many address?  2,105,527 unique addresses?

3   A.  Yes.  The exact number would be 2,105,527 addresses from

4   Silk Road Marketplace and 11,135 bitcoin addresses from the

5   defendant's laptop.

6   Q.  Go to the next page, please.

7   A.  Wait.  Actually, can we go back one?

8           So I could explain using this screen and the next

9   screen, but the analysis that I did, I didn't do any

10  complicated analysis.  I wanted to look for the most simple

11  direct link between those two sets of addresses.  So I had the

12  addresses from the Silk Road Marketplace and I had the

13  addresses from the defendant's laptop, and I went back to the

14  block chain, which is publicly available and agreed by all the

15  bitcoin users, and identified all the transactions where the

16  money was being sent from Silk Road Marketplace and bitcoins

17  were received to the addresses on the defendant's laptop.

18  Q.  Are these direct one-to-one transactions?

19  A.  Direct one-to-one.  It didn't skip over anywhere else.  It

20  went straight directly from Silk Road Marketplace directly to

21  the addresses found on the defendant's laptop.

22          So if you could go to the next screen.

23          So just to give you an example of the raw information

24  that I had to work with, this is not the entire list but just a

25  portion of addresses from each side.  So on the left you see

Case 3:20-cr-07311-JRS-DA ID 452096 Filed 08/26/24 Page 256 of 292
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 129 of 281    1686
F1tdulb4                        Yum - direct

1  all the addresses, the public addresses for Silk Road

2  Marketplace, and the unique list had over 2 million bitcoin

3  addresses and I could obtain these because of the private key

4  that was also inside the wallet files.

5          On the right side you have the laptop addresses in

6  there.  These are the unique addresses, over 11,000 bitcoin

7  addresses that were found on the defendant's laptop and.  I was

8  able to tell these because the wallet file contains the private

9  keys to generate these public addresses, which also allows the

10 owner of those private keys to spend those bitcoins.

11          MR. HOWARD:  Your Honor, may I approach?

12          THE COURT:  Yes.

13 Q.  So I'm handing you what has been marked for identification

14 purposes as Government Exhibits 650 and 651.

15          Do you recognize what these are?

16 A.  Yes, I do.

17 Q.  And what are they?

18 A.  Each one of theses discs contain the text file that you saw

19 a portion of just now.

20 Q.  What are in those text files?

21 A.  One of the text files contains all the addresses -- all the

22 unique list of addresses from the Silk Road Marketplace, and

23 the other disc contains all the unique addresses found on the

24 defendant's laptop.

25 Q.  And just to be clear:  I gave you two CDs.  Which one is

F1tdulb4                          Yum – direct

1   which?

2   A.  Exhibit 650 is the Silk Road Marketplace bitcoins, and

3   Exhibit 651 is all the addresses that were found on the

4   defendant's laptop.

5   Q.  And how do you recognize these CDs?

6   A.  I was involved in the creation of these CDs.

7   Q.  And are your initials on them?

8   A.  Yes.  After I created them, I initialed them and dated the

9   CDs.

10              MR. HOWARD:  The government offers Government Exhibits

11  650 and 651.

12              MR. DRATEL:  No objection.

13              THE COURT:  Received.

14              (Government's Exhibits 650 and 651 received in

15  evidence)

16              MR. HOWARD:  Your Honor, may I approach?

17              THE COURT:  You may.

18              MR. HOWARD:  So, Mr. Evert, could you please publish

19  Government Exhibit 650.  Just bring it up in the text file

20  itself.

21  Q.  So, Mr. Yum, this the list of the two-million-plus unique

22  bitcoin addresses that were recovered from Silk Road-related

23  servers, correct?

24  A.  Correct.

25              MR. HOWARD:  If you can scroll this to show how large

F1tdulb4                          Yum - direct

1    this is.

2              (Indicating)

3              I think we get the idea.

4              Can we go to Government Exhibit 651, please.

5    Q.  Mr. Yum, this is a list of the 11,000-plus unique bitcoin

6    addresses that were found on the defendant's laptop computer,

7    correct?

8    A.  Correct.

9    Q.  And the private keys for all these addresses were also

10   located on the laptop?

11   A.  Yes, they were.

12             MR. HOWARD:  Would you scroll on this one.

13             (Indicating)

14   Q.  Now, Mr. Yum, could you please flip in your binder to

15   what's been marked for identification purposes as Government

16   Exhibit 610.

17             Do you recognize this exhibit?

18   A.  Yes, I do.

19   Q.  What is this?

20   A.  It's a collection of screenshots that I made to spotcheck

21   and go through the link analysis that I performed.

22   Q.  Were you involved in the creation of this exhibit?

23   A.  Yes.

24   Q.  So what are the screenshots taken from?

25   A.  So there is three screenshots.  In the center is the --

F1tdulb4                    Yum - direct

1  Q.  Mr. Yum, we'll describe them once we -- what are the

2  sources of the information for these screenshots?

3  A.  From the block chain and the list of addresses found on

4  Silk Road Marketplace and a list of addresses found on

5  defendant's laptop.

6  Q.  Have you verified that this exhibit reflects true and

7  accurate copies of information from the block chain and true

8  and accurate screenshots from each of the lists of bitcoin

9  addresses?

10 A.  Yes.

11          MR. HOWARD:  The government offers Government Exhibit

12 610.

13          MR. DRATEL:  Just with respect to the screenshots?

14          THE COURT:  Just with respect to the screenshots?

15          MR. HOWARD:  We're offering the entire exhibit as a

16 summary exhibit under 1006.

17          THE COURT:  All right.  Mr. Dratel, this is the one

18 that we were talking about?

19          MR. HOWARD:  It is Government Exhibit 610.

20          THE COURT:  Right.  I only have one page in my --

21          MR. HOWARD:  It is just one page, your Honor.

22          THE COURT:  It is just a single page.

23          MR. DRATEL:  It is one page.

24          THE COURT:  All right.  Received.

25          (Government's Exhibit 610 received in evidence)

**ER-273**

1    MR. HOWARD:  Could you please publish Government

2    Exhibit 610.

3    Q.  So, Mr. Yum, can you please walk us through what this

4    shows?

5    A.  Sure.  I guess it is best to start from the middle.  So

6    that section is, as you've seen before from the example of

7    blockchain.info, the website where you can look up all the

8    bitcoin transactions, this is a transaction that I identified

9    which had bitcoin addresses from the marketplace making 3,900

10   bitcoin transactions to a bitcoin address that was found on the

11   defendant's laptop.

12        So that's the unique transaction ID.  It was -- the

13   transaction was made April 3rd, 2013.  Again, you see the

14   address starting on 1GarVY.  And up top it has a screen capture

15   of the list of the addresses from the marketplace that you had

16   seen previously and a location where that can be found in that

17   list.

18        On the bottom this has the portion of the list of all

19   the addresses from the defendant's laptop, and you could see

20   that the address found in there, starting "17t6V," matches the

21   received bitcoin address in this transaction.

22   Q.  So this exhibit shows 3,900 bitcoins were sent from an

23   address that was located on Silk Road servers to a bitcoin

24   address that was located on the defendant's laptop?

25   A.  Yes.  Exactly.

**ER-274**

F1tdulb4                          Yum - direct

1   Q.  And that happened on April 3rd, 2013, according to publicly

2   available information on the block chain?

3   A.  Yes.

4   Q.  Now, was this the only transaction that you found linking

5   the bitcoin addresses on the Silk Road servers to the

6   defendant's -- the addresses on the defendant's laptop, or were

7   there others?

8   A.  No.  There were almost 4,000 unique transactions from Silk

9   Road Marketplace to the addresses that were found on the

10  defendant's laptop.

11  Q.  So could you please flip in your binder to what's been

12  marked for identification purposes as Government Exhibit 620.

13          Do you recognize this exhibit?

14  A.  Yes, I do.

15  Q.  And what is this exhibit?

16  A.  This is a list of all the transactions that I was

17  successfully able to identify.

18  Q.  Did you participate in the creation of this exhibit?

19  A.  Yes.

20  Q.  Does this exhibit accurately summarize information from the

21  bitcoin addresses that you found -- that you reviewed from

22  wallets found on the Silk Road servers and the defendant's

23  computer?

24  A.  Yes.

25  Q.  Does this exhibit accurately summarize information that you

Case 1:14-cr-00068-RBF  Document 212  Filed 02/26/15  Page 151 of 281

F1tdulb4                        Yum - direct

1   retrieved from the block chain regarding bitcoin transactions?

2   A.  Yes.

3          MR. HOWARD:  The government offers Government Exhibit

4   620.

5          MR. DRATEL:  Objection, your Honor.  *Crawford*,

6   foundation, hearsay.

7          THE COURT:  All right.  Those objections are

8   overruled.  Government Exhibit 620 is received.

9          (Government's Exhibit 620 received in evidence)

10  BY MR. HOWARD:

11  Q.  So, Mr. Yum, what was the date range of the transactions

12  that you located?

13  A.  The first transaction occurred in September 24th, 2012, and

14  the latest transaction I was able to identify was August 21st,

15  2013.

16  Q.  And were the transactions spread across -- the thousands of

17  transactions were spread across that time period?

18  A.  Right.  It was spread across almost all of that entire

19  one-year span.

20         MR. HOWARD:  So, Mr. Evert, could you just go to the

21  top, please.  Just zoom in on the first few rows.

22  Q.  Could you just describe what is depicted here?

23  A.  So it is a simplified version of all the screenshots that

24  you saw before, prior.  So that's -- the first column is there

25  is the time stamp, the time that this transaction was included

F1tdulb4                          Yum - direct

1    onto the block chain.  The second column there is the unique

2    transaction ID that you could locate, pinpoint to the exact

3    transaction that's happened.  So behind those transactions you

4    would actually see the addresses that are used to send bitcoins

5    to another receiving address, but you could easily also refer

6    to those two transactions by that transaction ID.

7           And the last column there, that's all the bitcoins

8    that were involved in that transaction that ended up in the

9    wallets found on bitcoin addresses found on the defendant's

10   laptop.

11   Q.  So to be clear, Mr. Yum, you could put that unique

12   transaction number into the block chain on the website to get

13   the addresses that were involved in the transaction?

14   A.  Correct.

15   Q.  And those addresses matched the addresses that you found on

16   the Silk Road servers and the defendant's laptop?

17   A.  Yes.

18           MR. HOWARD:  Can we just scroll to the bottom of the

19   chart.

20           (Indicating)

21           MR. HOWARD:  This is page 64 of the exhibit.  Could

22   you zoom in on the bottom.

23   Q.  And so the total was 700,253.91 bitcoins, is that correct?

24   A.  That's correct.

25   Q.  Now, Mr. Yum, can you please flip in your binder to what's

F1tdulb4                         Yum - direct

1   been marked for identification purposes as Government Exhibit

2   620C.

3              What is this?

4   A.   It appears to be a price index from a website coindesk.com.

5   It shows the date and the closing price of the bitcoins in U.S.

6   dollar amount.

7   Q.   According to coindesk?

8   A.   According to coindesk.

9   Q.   Is that information available on a public website?

10  A.   Yes.

11  Q.   Now, is coindesk widely recognized and used by the bitcoin

12  community for bitcoin pricing?

13  A.   Yes, not only bitcoin pricing but other data and news and

14  information about bitcoins.

15  Q.   Now, based on your knowledge of the bitcoin community,

16  would you agree that the reputation of coindesk carries some

17  weight and is recognized as accurate in the community?

18  A.   Yes.

19  Q.   Does this exhibit accurately summarize pricing information

20  for bitcoins from coindesk?

21  A.   Yes, it does.

22            MR. HOWARD:   The government offers Government Exhibit

23  620C.

24            MR. DRATEL:   No objection.

25            THE COURT:   Received.

F1tdulb4                          Yum - direct

 1   (Government's Exhibit 620C received in evidence)

 2         THE COURT:  We're going to -- Mr. Howard, in about

 3   three minutes we are going to break for lunch.

 4   Q.  Can you just briefly explain what is depicted here?

 5   A.  So on the left column it has the date of these records.  On

 6   the right column it has the end-of-the-day closing price of

 7   bitcoins, represented in U.S. dollar amounts, for each

 8   corresponding date.

 9   Q.  Now, could you please flip in your binder to what's been

10   marked for identification purposes as Government Exhibit 620A.

11         What is this exhibit?

12   A.  It is a summary spreadsheet of the analysis that I

13   conducted.

14   Q.  Did you participate in the creation of this exhibit?

15   A.  Yes.

16   Q.  Does the exhibit accurately summarize information from the

17   bitcoin addresses you reviewed from bitcoin wallets found on

18   the Silk Road servers and on the defendant's computer?

19   A.  Yes, it does.

20   Q.  Does the exhibit accurately summarize information from the

21   block chain regarding bitcoin transactions?

22   A.  Yes.

23         MR. HOWARD:  The government offers Government Exhibit

24   620A.

25         MR. DRATEL:  Objection.  The same grounds, your Honor.

F1tdulb4                          Yum - direct

1    Hearsay, foundation --

2                THE COURT:  All right.  Those objections are

3    overruled.  Government Exhibit 620A is received.

4                (Government's Exhibit 620A received in evidence)

5                MR. HOWARD:  Can we zoom in on the top, please.

6    Q.  Mr. Yum, could you please describe what's depicted in this

7    chart?

8    A.  Yes.  So it's a monthly summary breakdown of all the

9    transactions that took place between addresses found on Silk

10   Road Marketplace sending bitcoins to the addresses found on the

11   defendant's laptop.

12               So the span, again, starts from September 2012 all the

13   way down to August 2013.  And for each month the second column

14   shows you the number of transactions that were conducted.  The

15   third column shows you how many bitcoins in those transactions

16   were sent from Silk Road Marketplace to the addresses found on

17   the defendant's laptop.  And the last column is the, I guess,

18   realtime conversion of U.S. dollar amounts for each one of

19   those dates where the transactions were identified.

20   Q.  And did you use the coindesk information to convert to U.S.

21   dollars?

22   A.  Yes.

23   Q.  What do you mean by "realtime" conversion?

24   A.  So I didn't just take one day, let's say -- you were asking

25   me before how much bitcoins were at the time of the arrest.  I

**ER-280**

F1tdulb4                        Yum - direct

1   didn't use one dollar amount.  From the prior exhibit, I took

2   each individual day's closing and matched it to each of the

3   individual day's transactions and correctly calculated how much

4   bitcoins were worth at the time of that transaction.

5   Q.  So this exhibit reflects that there was a total of $13

6   million worth of transactions at the time that each transaction

7   took place?

8   A.  Yes.

9   Q.  And a total of 700,254 bitcoins received --

10  A.  Correct.

11  Q.  -- from Silk Road servers to the defendant's laptop

12  wallets?

13  A.  Yes.

14  Q.  And 3,760 transactions, correct?

15  A.  Correct.

16  Q.  Could you please take a look at 620B in your binder.

17          Do you recognize what this is.

18  A.  Yes, I do.

19  Q.  And what is this?

20  A.  It's a pie chart that I created also summarizing an

21  analysis that I did.

22  Q.  Did you participate in the creation of this exhibit?

23  A.  Yes, I did.

24  Q.  Does this exhibit accurately summarize information from the

25  bitcoin addresses you reviewed from wallets found on the Silk

F1tdulb4                        Yum - direct

1    Road servers and the defendant's computer?

2    A.  Yes.

3    Q.  And does it accurately summarize information from the block

     chain regarding bitcoin transactions?

5    A.  Yes.

6            MR. HOWARD:  The government offers Government Exhibit

7    620B.

8            MR. DRATEL:  The same objections, your Honor.

9            THE COURT:  All right.  Those objections are

10   overruled.  620B is received.

11           (Government's Exhibit 620B received in evidence)

12   Q.  Mr. Yum, could you please explain what is depicted here?

13   A.  So you see a pie chart in there, and the biggest, red part

14   has the 700,254 bitcoins that I correctly identified coming

15   from Silk Road Marketplace and being transferred to the

16   addresses found on the defendant's laptop.

17           I didn't stop there.  I went back and analyzed all the

18   addresses on the defendant's laptop.  And I've also found

19   89,000 other bitcoins that were sent to the addresses that were

20   found on the defendant's laptop.

21           So to, I guess, give you a summary of what I just

22   said, the defendant's -- addresses found on the defendant's

23   laptop received a total of almost 790,000 bitcoins, and out of

24   that 88 -- almost 89 percent were bitcoins that were

25   transferred from the Silk Road Marketplace directly to the

**ER-282**

1    defendant's laptop in the amount of 700,254 bitcoins.

2    Q.  When you say "directly," you mean one-to-one transfers,

3    correct?

4    A.  One-to-one transfers.

5            So that 89,854, it could have came from other sources

6    but it could have also --

7            MR. DRATEL:  Objection.

8            THE COURT:  Sustained.

9            MR. HOWARD:  This might be a natural breaking point,

10   your Honor.

11           THE COURT:  All right.  Ladies and gentlemen, we're

12   going to take our lunch break now and come back at 2 o'clock.

13           I want to remind you all not to talk to each other or

14   anybody else about this case.  And, also, if you see any news

15   articles about this case, you are to not read those news

16   articles.  Turn away your eyes.  All right?  I instruct you to

17   do so.

18           Thank you.  We'll see you after lunch.

19           THE CLERK:  All rise as the jury leaves.

20           (Continued on next page)

21

22

23

24

25

F1tdulb4                          Yum - direct

 1              (Jury not present)

 2              THE COURT:  You may step down.  Have lunch until

 3     2 o'clock.  I will see you back on the stand at 2.

 4              (Witness not present)

 5              THE COURT:  All right, ladies and gentlemen.  Let's

 6     all be seated.

 7              I wanted to make certain that we addressed the two

 8     exhibits and I have one other matter and then whatever else you

 9     folks would like to address before we break for lunch

10     ourselves.

11              There were objections by Mr. Dratel to Government

12     Exhibits 620 and 620A on *Crawford*, which I take it, Mr. Dratel,

13     was because of an argument that we discussed yesterday

14     afternoon of insufficient notice?

15              MR. DRATEL:  No.  It is really about the underlying --

16     in other words, you have a couple of preliminary steps in

17     Mr. Yum's analysis.  Then you have an intermediate step and

18     then you have a final step, and we don't know how we get from

19     the intermediate step to the final step.

20              THE COURT:  You can take him through that on

21     cross-examination.

22              MR. DRATEL:  I understand.  But there is no foundation

23     for it, and I believe that it is probably something that

24     creates a *Crawford* confrontation issue, similar to other sort

25     of scientific or computerized issues, where something is done

F1tdulb4

```
 1    and then someone comes in and presents something that is

 2    essentially the work of a computer program and it is not -- you

 3    know, it hasn't been verified.  You know, I don't know what his

 4    relationship is with the program.  We don't know any of that.

 5    We don't have any underlying stuff as to how it was done.  It

 6    is not a simple process, and I don't think it was done

 7    manually.

 8              THE COURT:  Was that the nature of your *Crawford*

 9    objection both for 620 and 620A?

10              MR. DRATEL:  Yes, your Honor.

11              THE COURT:  All right.  So at this point I don't find

12    there to be any traction to that objection and so it was

13    overruled before.  If after cross-examination you have some

14    basis to renew the application, then you can go ahead and do

15    so.  See what you want, what you can develop on

16    cross-examination.  You are certainly entitled to go into all

17    aspects of how he performed this exercise.

18              MR. DRATEL:  And with respect to the notice, your

19    Honor, my application would be, again, to put off the cross

20    until Monday morning so that we can absorb stuff that we were

21    actually hearing for the first time about a document that has,

22    as you can see now, an extraordinary number of transactions.

23    There is zero backup.  Zero anything for it.  We have been

24    trying to develop what we can but we still need more time to do

25    that.
```

**ER-285**

Case 3:20-cr-00111-KBF Document 212 Filed 02/25/15 Page 272 of 292      1702
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 141 of 161
F1tdulb4

1          THE COURT:  When you say that there is zero backup,

2     zero anything, my understanding from our conversation yesterday

3     afternoon was that all of this information, which is the very

4     information at the heart of this case, was produced during

5     discovery.

6          Mr. Howard.

7          MR. HOWARD:  That's correct.  On Sunday night we

8     provided the spreadsheets --

9          THE COURT:  Let's go back first to what was --

10          MR. DRATEL:  The analysis, how the analysis was done.

11          THE COURT:  Mr. Dratel, let me just make sure I have

12     got the facts in order.

13          Tell me when and what was produced that underlies this

14     analysis during the discovery.

15          MR. HOWARD:  Yes.  For almost a year now, the

16     defendant has had access to images of his laptop and the

17     various servers where these log files were contained, including

18     what's been referred to as the Philadelphia backup server and

19     the Iceland bitcoin server.  Those images included all of these

20     bitcoin wallets and the private keys for those wallets, which

21     is the same images the witness just talked about.  Based on

22     that, all of this information, all of the bitcoin addresses

23     were stored in those wallet files that have been available to

24     the defendant for over a year.

25          THE COURT:  All right.  And then, as I understand it

1  from our conversation just before we all adjourned last night,

2  the analysis that is at 620 and the summary of that, where the

3  comparison was done, that analysis was performed during the

4  course of this trial and was produced on Sunday; is that right?

5         MR. HOWARD:  Yes, you are right, your Honor.  And

6  within a couple of hours of actually us receiving the

7  spreadsheets that had all the data in them and, you know, the

8  much more complicated and much more voluminous than the summary

9  charts that we're pushing into evidence, but that was produced

10  promptly to the defense as soon as we had them generated.

11         THE COURT:  All right.  Mr. Dratel.

12         MR. DRATEL:  A couple of things.  One is they had it,

13  too.  So why are we getting this in week three of trial if they

14  had all of this information before as well?  Why did they

15  prepare this analysis -- they've only started once the trial

16  started.

17         THE COURT:  Well, as I understand it, this all went

18  back to your opening statement.

19         MR. DRATEL:  Yes.  But what I'm saying is to say that

20  we had all the wallets and the addresses is immaterial in the

21  sense that they had it too.  If they wanted to put together an

22  exhibit that linked all of that, they should have done it in

23  advance of trial, not -- and they've done it during trial, OK,

24  but I should have the opportunity -- this witness, it took more

25  than a hundred hours to prepare this analysis.  I've had it for

F1tdulb4

1    maybe 80, not including the time in court and sleeping and

2    doing all the other stuff that needs to be done in this case.

3    So it's really no time at all.  This witness took a hundred

4    hours.  They got paid $55,000 for this.

5          THE COURT:  Well, the objections are overruled, as

6    I've said.  And in terms of timing, we will go into

7    cross-examination right after the government is done with its

8    direct examination with this witness.

9          The materials that underlie the analysis were produced

10   long ago.  Based upon the opening statement and based upon one

11   of the theories of the defense, which is that the defendant was

12   a bitcoin trader and that any bitcoins in his possession were

13   from bitcoin trading, it was reasonable to expect that you

14   yourself had done such an analysis and, therefore, that you had

15   some intention of presenting something that would have shown

16   the opposite.  In any event, you've opened the door to it, and

17   we're going to proceed.  And the fact that the government

18   adjusted and was able to do so is not something that is

19   particularly problematic or unusual.  So that's my ruling on

20   that.

21         So we'll proceed with cross-examination with this

22   witness after lunch.

23         MR. DRATEL:  Your Honor, what I'm asking for, in

24   functional terms, is a two-and-a-half hour accommodation so

25   that I can prepare a proper cross-examination of this witness.

F1tdulb4

```
 1            THE COURT:  I have heard your application, and we're
 2   going to go directly into the cross-examination of this
 3   witness.  If you --
 4            MR. DRATEL:  Then I am making a notice objection to
 5   the entirety of that level of his testimony --
 6            THE COURT:  The objection is overruled.  I think
 7   you've got your position well and truly stated on the record.
 8   If you have any additional positions you want to state, you can
 9   file it in a letter on the docket.
10            In terms of hearsay, there is no hearsay issue with
11   these documents, and certainly the foundation was well
12   established for these.  So those objections are similarly
13   overruled.
14            Mr. Howard, would you like to address or fill out the
15   record in any regard yourself?
16            MR. HOWARD:  Yes, your Honor.
17            The fact is, as you correctly stated, this door was
18   opened by the defense during their opening statement.  They
19   made a claim about the source of the bitcoins that were
20   recovered from the defendant's wallet files.  In response to
21   that, we performed an analysis with the help of outside
22   consultants.  As soon as that analysis was ready, we produced
23   the underlying data to the defense.  We produced some summary
24   charts today in court.
25            It should be noted that there was some time that was
```

Case 3:20-cr-07811-RS Document 3520490 Filed 08/26/23 Page 276 of 292
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 145 of 284    1706
F1tdulb4

1    required to produce the analysis, but at the end of the day it

2    is all based on public records showing one-to-one connections

3    between bitcoin addresses.  It is not anything very

4    complicated.  The time was spent on just getting the process to

5    get that together.

6         THE COURT:  All right.  If either party has any

7    additional positions that they would like to state on this that

8    they want to put in by letter -- obviously, you can't raise new

9    issues -- that you haven't had a full chance to air just now,

10   file something for tomorrow morning.

11        In terms of I had more issue, which is Juror No. 4.

12   We have heard back from Juror No. 4's employer, and they are

13   not -- it is disappointing, they are not willing to accommodate

14   the issue with Juror No. 4.

15        So the issue is as follows:  She is required to begin

16   taking vacation time after tomorrow -- after Monday.

17        Am I right?

18        THE CLERK:  Yes.

19        THE COURT:  Monday is the day, her timing where her

20   company will allow her just the time.

21        Now, she does not know that we have heard back,

22   because I wanted to talk about this with you folks and

23   determine how you believe we should proceed.  Obviously, there

24   are a couple of different things that we can do, one of which

25   is just -- I think it is fair to tell her that we've heard back

1    and that we understand that there is not going to be an

2    accommodation.  I need to understand from you folks whether

3    that should be done in the robing room or at sidebar, you know,

4    with you folks, or whether or not Joe can just convey that

5    simple message:  We've heard back from her employer.  We

6    understand that they are not going to alter the manner in which

7    they previously told her they were going to proceed.

8           Separately from that, I don't think we should solicit

9    whether or not she is going to now raise a hardship issue and

10   seek to be dismissed.  I think that we should wait and see what

11   she does and then respond step-by-step accordingly.  It may be

12   that she is prepared to take vacation time.  She did present

13   this issue to us, but I don't have any indication that she -- I

14   don't know one way or the other.  So I would just leave that.

15   See what the response is next.

16          One thing that I think would be helpful in that regard

17   would be to give the jury some sense as to where we are with

18   things with lots of room around the edges in case things

19   change.  But we've got one government witness left after

20   Mr. Yum, who is expected to take likely less than a day, and

21   then after that we'll be into the next phase.  So that's my

22   proposal.

23          So let me just summarize.  We would convey to Juror

24   No. 4 that we've heard back -- she may have heard herself, but

25   she may not, and we don't want her taking inadvertently

F1tdulb4

1    vacation time thinking that maybe there is some accommodation

2    that had been made.  So we should tell her that we've heard

3    back.  Leave that.  And then I would propose at the end of the

4    day to assess with you folks at our afternoon break where we

5    are in terms of timing and schedule and then give the jury just

6    some sense as to where we are going.

7            Mr. Howard.

8            MR. HOWARD:  That sounds acceptable to the government.

9            THE COURT:  Mr. Dratel.

10           MR. DRATEL:  The only thing I have a position on right

11   now is that any communication should be with the Court and the

12   juror.  I think that would be the appropriate way to do it in

13   the robing room and that the communication be on that level.

14           THE COURT:  And by that you mean, with the Court, you

15   mean without --

16           MR. DRATEL:  When she is informed.  I think it is

17   appropriate, based on case law and everything, that the Court

18   informs the juror.

19           THE COURT:  Right.  My question to you is do you want

20   to be present for that?

21           MR. DRATEL:  Yes.

22           THE COURT:  Fine.

23           MR. DRATEL:  Because she may respond right there.

24           THE COURT:  Right.  I mean, that's always possible.

25   Obviously, if she did and it were just a communication with me,

F1tdulb4

1   I would not communicate back without conferring with you.  And

2   I would receive the communication, indicate to her that I

3   needed to proceed with counsel.  But we would proceed, believe

4   me, very carefully.

5            I'm happy, though, Mr. Dratel to have you folks --

6   what I would suggest is that we just do it in the robing room

7   just before we resume.  And the question then is is the

8   defendant willing to waive his appearance for that session?

9            MR. DRATEL:  Yes, your Honor.

10           THE COURT:  All right.  Thank you.

11           Then that's what we'll do in terms of informing her.

12           What's your view on the rest of it?  Sort of take it

13  as it comes?

14           MR. DRATEL:  Well, I'm not sure as to whether, if she

15  doesn't respond, whether it is appropriate to have some brief

16  voir dire about impact on her.  I'm not sure.  Can I think

17  about that?

18           THE COURT:  Why don't you think about it.  Why don't

19  we then resume ourselves and at least we can resume -- we will

20  need the defendant for this -- as to how you would like to

21  proceed with her at 1:45.

22           So I need the marshals to make sure that Mr. Ulbricht

23  is back at 1:45.  Will that be all right?  Yes.  I'm getting a

24  nod of the head.  Thank you.

25           So at 1:45 we'll resume and then we'll figure out if

F1tdulb4

1    you've got something else you would like us to ask.

2              MR. DRATEL:  OK.

3              THE COURT:  All right.  Thank you.

4              Anything further either of you would like to raise

5    right now?

6              MR. TURNER:  No, your Honor.

7              THE COURT:  Mr. Dratel?

8              MR. DRATEL:  No.

9              THE COURT:  We're adjourned.

10             THE CLERK:  All rise.

11             (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **A F T E R N O O N   S E S S I O N**

2                          1:51 p.m.

3         (Jury not present)

4         THE COURT:  All right.  Let's all be seated.

5         And the purpose for resuming at this point was to see

6    whether or not, Mr. Dratel, you had any additional questions

7    you would like me to ask of Juror No. 4 basically before she

8    expresses anything, or if she expresses something, you know, if

9    you have any views.

10        MR. DRATEL:  Well, I guess if she doesn't express

11   anything, I'm not sure there is any need to go further.  But if

12   she does express any anxiety about the time, we should probably

13   ask what the impact would be on her.

14        THE COURT:  All right.  The way I would word it is

15   would using her vacation time make her unable to be fair in

16   this case.  We'll see what she says.  It could go in a variety

17   of directions at that point.

18        Mr. Howard, Mr. Turner, do you have anything else that

19   you would like the Court to ask?

20        MR. TURNER:  I just think it might be worth noting how

21   much longer the trial is expected to continue.

22        THE COURT:  All right.  So in that regard, it's I

23   think relatively straightforward for me to say that the

24   government's case is likely to end on Monday and then we're

25   going to get into the defense case.  Actually, I can just be

F1tdulb4

1    vague and say we're -- you know, I don't want to commit to a

2    particular timeframe, but we're far along in this case and I

3    would think that this would be done in a week or shortly

4    thereafter.

5          It's going to take, I think, if, Mr. Dratel, depending

6    on the length of his case, it's going to take at least until

7    Wednesday midday, I think, and that's if the defendant doesn't

8    testify.  If the defendant does testify, that could take

9    Wednesday, Thursday -- you know, I want to let that run its

10   natural course.  And so I don't want to commit us with a juror.

11         By the way, once we've previewed the timing to the

12   juror, I will need to tell the rest of the panel that as well

13   when they come out.  So I don't want to commit.  So it's

14   something that's sort of like we'll be done next week because

15   we may well not be done next week.  We may be done with the

16   testimony next week but it is hard for me to predict and she

17   can't predict how long deliberations will take.  You know,

18   they've got a number of counts.

19         So I would say that we are far -- you know, without

20   committing, we're far along in this case and I hope to be able

21   to give you another update.  And then once we know from

22   Mr. Dratel how long his case is going to be, we can maybe on

23   Monday give them a further update.

24         How does that sound, "far along," using that phrase?

25         MR. TURNER:  That sounds good to the government.

F1tdulb4

1           MR. DRATEL:  Yes, your Honor.

2           THE COURT:  Mr. Turner, is there anything you want me

3    to say more specifically, or Mr. Howard, than "far along"?

4           MR. TURNER:  No.  Thank you, your Honor.

5           THE COURT:  I would love to say that we are likely to

6    have the case go to the jury on Thursday, but I don't want to

7    do that because we may not.

8           MR. TURNER:  I understand.  The witness may have a

9    question and I just want to make sure --

10          THE COURT:  All right.  Well, I would actually preview

11   this to her when I -- if she says anything like, oh, that's

12   really too bad -- if she says something like, oh, that's really

13   too bad, then I think I would say is it going to affect your

14   ability to be fair in this case that you are going to have to

15   use your vacation time and see what she says.  And then after

16   that I could say, well, at least I can tell you that, you know,

17   we're very far along in this case.  OK?

18          All right.  So, Joe, do we know if she is here?

19          THE CLERK:  She is not here yet.

20          THE COURT:  She is not here yet.

21          All right.  So as soon as she gets in, we'll pick up

22   with her in my robing room.  So Joe will bring you folks in

23   first.  So stay in the vicinity.  Don't leave.  And with the

24   court reporter.  And then we'll pick up as soon as we're done

25   with her.  We'll just take a couple of minutes with her.  All

F1tdulb4

1   right?

2          MR. TURNER:  Your Honor, I just wanted to note that --

3   picking up from our conversation this morning about the jury

4   instructions --

5          THE COURT:  Yes.

6          MR. TURNER:  -- that I was incorrect about the

7   "organizer" language.  That does not come from a Second Circuit

8   case.  It comes from multiple other circuits that I can provide

9   the Court with the citations, if you would like, an hour later.

10          THE COURT:  Why don't you just state -- don't give me

11   the names, just give me the citations for those.  It will make

12   it a little faster.

13          MR. TURNER:  Sure.  885 F.2d 195, the Fourth Circuit;

14   965 F.2d 1390, the Sixth Circuit; 843 F.2d 421, the Tenth

15   Circuit; 734 F.2d 1030, that's Fifth Circuit --

16          THE COURT:  I'm sorry.  734?

17          MR. TURNER:  F.2d 1030 is a Fifth Circuit.

18          THE COURT:  Right.

19          MR. TURNER:  And then there is an NDNY case that

20   cites, as well, 912 F.Supp. 655.  There is also a related

21   Seventh Circuit case --

22          THE COURT:  That is not F.Supp.2d, it is F.Supp?

23          MR. TURNER:  F.Supp.

24          THE COURT:  All right.  Let me just ask you whether or

25   not the Second Circuit has had the question presented to them

F1tdulb4

1   so far as you are aware?

2           MR. TURNER:  I just searched for that specific

3   language.

4           THE COURT:  OK.

5           MR. TURNER:  I think the larger point is that you

6   don't have to actually control the people you are organizing.

7   They could be -- there is also a Seventh Circuit case, 847 F.2d

8   1233.  It doesn't use the exact same language but it was cited

9   along with those other case.

10          THE COURT:  Terrific.  Now, Juror No. 4 I am informed

11  has arrived.  So why don't counsel come with me and the court

12  reporter into the robing room right now.

13          As soon as we are in there, Joe, why don't you bring

14  Juror No. 4 in.  All right?

15          THE CLERK:  All rise.

16          (In the robing room)

17          MR. TURNER:  Who is the juror's employer?

18          THE COURT:  NYU Medical Center.

19          (Juror No. 4 present)

20          THE COURT:  Come on in.

21          JUROR NO. 4:  How are you?

22          THE COURT:  Just have a seat.  I'm sorry.

23          JUROR NO. 4:  I think I will.  I usually stand in the

24  other room.  That is OK.

25          THE COURT:  I'm sorry for the formality of all of us,

F1tdulb4

1    but we have to do things on the record all the time.

2              JUROR NO. 4:  Yes.

3              THE COURT:  And I wanted to let you know that we have

4    heard back from your employer, and they're not willing to

5    change what they've said is the policy that they have about the

6    vacation time.  We pushed back and they have just expressed an

7    unwillingness to do it.  So I wanted to let you know that.

8    That is the purpose for having you in.

9              JUROR NO. 4:  Oh.

10             THE COURT:  All right?

11             JUROR NO. 4:  OK.

12             THE COURT:  And so if -- one thing I can tell you is

13   that we are relatively far in and far along in this case.

14             JUROR NO. 4:  It feels that way, yeah.

15             THE COURT:  So, you know, if you have any other

16   concerns, you are to let us know.

17             JUROR NO. 4:  In terms of relatively, I mean, is

18   anybody able to say --

19             THE COURT:  You know, we'll have I think a better view

20   on this Monday.

21             JUROR NO. 4:  Mm-hmm.

22             THE COURT:  But the problem is, here's the issue.

23             JUROR NO. 4:  Right.

24             THE COURT:  Things are pretty uncertain.  If I tell

25   you one timeframe, I told you it could be as soon as the end of

Case 3:20-cr-07811-RBF-DacID 4352098 , FilcF 08/26/43 , Page 257 of 292     1717
Case 1:14-cr-00068-KBF   Document 212   Filed 02/25/15   Page 156 of 281
F1tdulb4

 1    next week, that could end up being wrong and it could go on for

 2    a week beyond that.  And if it is going to make a huge

 3    difference, then I don't want to have you get your sights set

 4    on a particular timeframe because you don't know how long you

 5    and your colleagues are going to want to deliberate and it is

 6    just going to be --

 7            JUROR NO. 4:  Yeah.

 8            THE COURT:  So there is always with trial a certain

 9    amount of uncertainty.

10            JUROR NO. 4:  OK.  Then I'm just curious, you know,

11    because I did Google that, you know, can your employer actually

12    do this, you know, require that you use vacation time for jury

13    service.  And according to the newyorkstate.gov website, no,

14    they can't.  So I'm just idly curious to know, you know, all

15    well and good if this is what they put in the employee

16    handbook, but how is that possible or where is the disconnect

17    there?

18            THE COURT:  You know, I don't know and I haven't

19    looked at that website.  But this is the federal system so I

20    don't know if there is a difference there.

21            But we checked with our jury department when this

22    first came up, and the reaction we got -- and they face

23    questions like this fairly frequently -- is if it's disclosed

24    in the employee handbook and it's there and it's been there and

25    it is not just for you for this case, then --

Case 3:20-cr-07811-RS Document 359-0 Filed 08/25/23 Page 258 of 292
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 157 of 281    1718
F1tdulb4

1          JUROR NO. 4:  It's tough.

2          THE COURT:  -- that's the way it is.

3          Now, I haven't done an independent investigation of

4    that.  We'll look at it again just to sort of be sure so that I

5    can look underneath it if you've seen something.

6          Let me ask you, are you going to be able to be fair in

7    this case if you have to use vacation time?  Is it going to be

8    a problem for you?

9          JUROR NO. 4:  No, that wouldn't be a problem.  I mean,

10   it just gets to be -- of course, since I went into work on a

11   snow day when the office was technically closed, I get an extra

12   vacation day.  It's these little things, but it does obviously

13   come down to like how many more witnesses we have, and I know

14   that there is a wildcard there.  So, you know, yes, I wouldn't

15   want to, you know, blow my entire bank.  I mean, it is

16   reasonably generous but, still, I've got kids, you know.

17         THE COURT:  If at any point in time you believe that

18   you are unable to be fair in this case because of that, you

19   should definitely let us know, and we'll then talk with you at

20   that time about it.  And I'll try to give you and the rest of

21   the jury panel an update on timing and give you something a

22   little more concrete.  Even if you can't predict length of

23   deliberations, etc., if you have a sense of when the end of the

24   case is going to be, that might help you some in your own mind

25   to gain some comfort.  So we need to sort of all talk about

**ER-302**

1   that.  OK?

2        JUROR NO. 4:  Yeah.  Then is the only way for me to

3   then get off is to claim that it would cloud my judgment?  I

4   mean, even if it wouldn't.  I mean, I wouldn't want to --

5        (Laughter)

6        THE COURT:  You are speaking like a human being.  Let

7   me just say that whenever a juror feels like there is something

8   external that is causing them to be unable to be fair, it's of

9   real concern to us and we need to explore it fully.  We would

10  press you hard on it and because, you know, jury selection

11  here, as you know, it was complicated and you guys filled out a

12  questionnaire.  You were accepted because of each juror's

13  individual qualifications.  We want the jurors that have been

14  selected for this group, but we want you also to be able to be

15  fair.  And if something is clouding that, we need to know.

16       JUROR NO. 4:  OK.  Yeah, I mean, I had no idea -- I

17  mean, while -- the classic thing, you know, like you are handed

18  a wrap of paper, you know, in HR and you sign it, you know, you

19  are giving me the employee handbook, have you read this, you

20  know.  So, I mean, I had no idea that that was actually the

21  policy.  And, anyway, you know, and having been selected for

22  jury duty two other times, it is like what are the chances that

23  I actually get it this time.  So, anyway.

24       THE COURT:  Once you have been selected twice, your

25  chances are pretty high.  That means there is something about

F1tdulb4

1   you that makes you --

2         JUROR NO. 4:  Was it just me, though?  I mean, how

3   could that be?

4         (Laughter)

5         THE COURT:  Let the record reflects laughter.

6         JUROR NO. 4:  So you're saying I would have to then

7   meet with you all again in order to -- you know --

8         THE COURT:  Yeah.  I don't want to make it seem like

9   there is some barrier with you.  But what I do want to do is I

10  want to suggest to you that I -- that if you really feel like

11  you cannot be fair, come back to us.

12        JUROR NO. 4:  OK.  I am nervous.

13        THE COURT:  Then come back to us.  All right?

14        JUROR NO. 4:  OK.

15        THE COURT:  We do need to question you.  That is just

16  the way the process works.  OK?

17        JUROR NO. 4:  Right.

18        THE COURT:  So everybody will be here.  Nobody bites.

19        But if it's that you feel like you can be fair but,

20  you know, you wish this didn't happen like this, that, you

21  know, that you weren't going to have to use your vacation time,

22  then I'm going to ask you just to hang on.

23        JUROR NO. 4:  OK.  All right.  So I think I have one

24  more day, Monday, right?

25        THE COURT:  One more day in your --

Case 3:20-cr-07811/R52  Doc. ID: 12520900  Filed 09/26/23  Page 161 of 292   1721
Case 1:14-cr-00068-RBF  Document 212  Filed 02/25/15  Page 160 of 291

F1tdulb4

 1              JUROR NO. 4:  In my --

 2              THE COURT:  Allotted time.

 3              JUROR NO. 4:  In my allotted time, right.

 4              THE CLERK:  Since jury selection, we have had nine

 5     trial days.

 6              THE COURT:  You should count yourself and make sure

 7     what your count is.  All right?

 8              JUROR NO. 4:  OK.

 9              THE COURT:  Then I'll try.  We are going to try to

10     assess, as we have been doing as things go along, how much

11     longer and try to give you guys what guidance we can.  All

12     right?

13              JUROR NO. 4:  Right.

14              THE COURT:  Without causing undue expectations in any

15     direction.  OK?

16              JUROR NO. 4:  All right.

17              THE COURT:  Thank you.  Thank you for coming in here

18     with this multitude --

19              JUROR NO. 4:  Thank you.

20              (Juror not present)

21              THE COURT:  We are off the record.  Actually, stay on

22     the record a minute in light of that.

23              Anybody have any view as to anything else that we

24     should do at this time?

25              MR. DRATEL:  No, your Honor.

F1tdulb4

1              MR. TURNER:  No.  I don't think so, your Honor.

2              THE COURT:  All right.  Then let's go off the record

3    and we will then head on out.

4                   (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Let's all be seated.  Thank you.

3          I wanted as a housekeeping matter, to give you folks a

4    sense of where we are in the case.  We are what I would

5    characterize as far along in the case.  I don't want to be

6    anymore specific than that right now because things can

7    fluctuate some.  I'm going to try very hard to give you a

8    better sense of where we are on Monday.  Right now, I just

9    wanted to use those words to sort of give you a general sense

10   of where we are in the case, all right.

11         Thank you.  Let's continue with Mr. Yum.

12         Mr. Howard.

13         MR. HOWARD:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. HOWARD:

16   Q.  Good afternoon, Mr. Yum.

17   A.  Good afternoon.

18         MR. HOWARD:  Mr. Evert, can we please go back to page

19   one of Government Exhibit 608 that was admitted for

20   demonstrative purposes.

21   Q.  I just want to clarify a couple things about bitcoin log

22   files real briefly.

23   A.  Sure.

24   Q.  Earlier you testified a bitcoin wallet can contain multiple

25   bitcoin addresses, correct?

**ER-307**

F1tgulb5                       Yum - direct

1    A.  Yes.

2    Q.  Can each bitcoin address only contain one bitcoin or can it

3    contain many bitcoins?

4    A.  It can contain many bitcoins and you can use it in multiple

5    transactions.

6    Q.  In fact, earlier you testified that you moved the 144,000

7    bitcoins from the defendant's wallet file to one FBI bitcoin

8    address, correct?

9    A.  Correct.  So in that instance, I had to create a wallet

10   file for the government and in that wallet file create one

11   address, the address that was depicted before starting 1FfmbH.

12   And to that -- to that one single address, I made over 400

13   transactions in increments of somewhere around 300 bitcoins.

14   So that whole 144,000 bitcoins all went to one single address.

15   So you could reuse the same address over and over or create

16   multiple addresses and spend it or send it how ever you want

17   between all the addresses.

18          MR. HOWARD:  Mr. Evert, can we please go to page four

19   of Exhibit 609, which was also admitted for demonstrative

20   purposes.

21   Q.  Mr. Yum, earlier you testified that as part of your

22   analysis, you were focusing on simply one-to-one transactions,

23   correct?

24   A.  Correct.

25   Q.  Can you explain a little bit more what that's about.

Case 3:20-cr-07811-RBF Document 212 Filed 02/25/15 Page 165 of 292    1725
Case 1:14-cr-00068-RBF Document 212 Filed 02/25/15 Page 164 of 291
F1tgulb5                    Yum - direct

1  A.  Yes.  So perhaps I could use an analogy where your wallet

2  is kind of similar to -- if you put it simply, it's like your

3  own personal bank, so you don't have to work with any financial

4  institution.  Your wallet contains the addresses which kind of

5  works like your bank accounts.  So wallet is your bank and you

6  can open up as many bank accounts that you want.

7       So in here, all the wallets that were found on Silk

8  Road Marketplace, the Silk Road Marketplace created all these

9  different addresses and each one of these addresses would be

10 similar to a bank account.  And on the right side, the

11 defendant's laptop contained wallet files with all these

12 addresses.  So his wallet, his bank, contained all these

13 different accounts that could receive bitcoins.

14      So, the analysis that I did, I didn't do any

15 complicated analysis.  It was very -- it was a very simple

16 direct one-to-one transfer.  So if I have a bank account and I

17 want to wire somebody else money, all I'm doing is

18 wiring -- using my bank to wire-transfer money directly to

19 someone else's bank account.

20      So the analysis that I did was wire transfers that

21 occurred straight from Silk Road Marketplace directly to the

22 bank -- to the accounts that were found on the defendant's

23 laptop.

24 Q.  And to be clear, all of that information is publicly

25 available on the block chain, correct?

1  A.  Right.  So the beauty of bitcoin is the block chain

2  contains every single transaction that's occurred in the

3  history of bitcoin.  So if this was actually a bank, we would

4  have to figure out what the bank is and subpoena the bank to

5  get the bank transaction records.

6         In this case, block chain is on the Internet every --

7  by all the bitcoin users, so I could reliably go to this block

8  chain and get the same results that I would normally have to

9  request the bank to provide the transaction records.

10 Q.  So now, let's go back to Government Exhibit 620B, please,

11 which is where we left off before the lunch break.

12 A.  Yes.

13 Q.  Mr. Yum, what does the entire pie here represent?

14 A.  The entire pie is all the transactions that came to the

15 addresses found on the defendant's laptop.

16 Q.  And what does the red area depict?

17 A.  The red area -- out of all the bitcoins that the

18 defendant's laptop received, the red area came directly --

19 straight wire transfer from the accounts that are found on the

20 Silk Road Marketplace.

21 Q.  And those are the one-to-one transactions you were talking

22 about?

23 A.  The one-to-one transactions.

24 Q.  What does the blue area represent?

25 A.  The blue area is everything that is not a one-to-one

F1tgulb5                          Yum - direct

1    transaction.  So the defendant's wallet file received those

2    89,854 bitcoins and I can't link that directly back to Silk

3    Road Marketplace.

4    Q.  So if Silk Road wallets were used to send bitcoins to an

5    address that was not in the defendant's laptop file and then it

6    was transferred --

7               MR. DRATEL:  Objection.

8               THE COURT:  Sustained.

9               MR. HOWARD:  Mr. Evert, can you please publish

10   Government Exhibit 601, which is already in evidence.

11   Q.  Mr. Yum, did you do any analysis of transactions that went

12   from the Silk Road servers to Ross Ulbricht's laptop that were

13   not one-to-one transactions?

14              MR. DRATEL:  Objection.

15              THE COURT:  Hold on.

16              MR. DRATEL:  Objection to form.

17              THE COURT:  I'll allow it.

18              You may answer.

19   A.  I'm sorry.  Can you repeat the question.

20   Q.  Did you do any analysis of transactions from the Silk Road

21   server bitcoin addresses to the Ross Ulbricht laptop addresses

22   that were not one-to-one transactions?

23   A.  No, I did not.

24   Q.  So Mr. Yum, Government Exhibit 601 is a screenshot of the

25   block chain we discussed earlier, correct?

**ER-311**

Case 3:20-cr-07811-JRE-DEA Document 250 Filed 08/26/21 Page 268 of 292
Case 1:14-cr-00068-KBF Document 212 Filed 02/25/15 Page 167 of 281

1728

F1tgulb5                          Yum - direct

1  A.  Correct.

2         MR. HOWARD:  Could we zoom in on the bottom-two

3  transactions here, Mr. Evert.

4  Q.  Did you do any further analysis of these two transactions?

5  A.  Yes, I did.

6  Q.  And generally what did you do?

7  A.  I looked at all the addresses, the accounts that are making

8  this transfer.  The one on the bottom is 1,670 bitcoins.  The

9  four addresses you see on the left were used to send that 1,670

10  bitcoins to that address on the right starting 1MwvS1.

11  Similarly, the transaction on top, there are three bitcoin

12  addresses accounts that sent 3,000 bitcoins to that same

13  address starting 1MwvS1.

14  Q.  And what specifically did you look into regarding these

15  transactions?

16  A.  I checked to see if I could locate any of these addresses

17  on the left, three from the top, four from the bottom, and

18  those addresses were found within the list of addresses, list

19  of accounts that I located on the defendant's laptop.

20  Q.  Could you please take a look at what's been marked in your

21  binder as 631 -- 630 and 631 for identification purposes.  Do

22  you recognize these exhibits?

23  A.  Yes, I do.

24  Q.  What are these exhibits?

25  A.  It's a series of screenshots that I put together to explain

1    a transaction.

2    Q.  Were those the transactions we just described on the block

3    chain?

4    A.  Yes.

5    Q.  Did you participate in the creation of these exhibits?

6    A.  Yes, I did.

7    Q.  Are they a true and accurate screenshots of the bitcoin

8    address list taken from the defendant's laptop as well as the

9    bitcoin address list from -- sorry -- just from the laptop,

10   correct?

11   A.  Just from the laptop.

12   Q.  And does it also include a true and accurate screenshot

13   from the block chain?

14   A.  Yes.

15          MR. HOWARD:  The government offers Government

16   Exhibit 630 and 631.

17          MR. DRATEL:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibits 630, 631 received in evidence)

20          MR. HOWARD:  Mr. Evert, can you please publish

21   Government Exhibit 630.

22   Q.  Mr. Yum, can you please describe what is depicted here.

23   A.  So I want to start with the screenshot up top up here.

24   That is a screenshot segment of this transaction you see appear

25   identify with transaction ID 4a0a5b.  Block chain info, if you

Case 3:20-cv-07811-RS Document 11-20 Filed 08/26/21 Page 169 of 292
Case 1:14-cr-00068-RBF Document 112 Filed 02/25/15 Page 169 of 281    1730
F1tgulb5                        Yum - direct

1  look at that transaction, it shows on March 31, 2013, these

2  four addresses sent 1,670 bitcoins to this address on the right

3  beginning with 1MwvS1.

4          So my interest was the addresses on the left.  I took

5  each one of those addresses and compared it against the list of

6  addresses that I got from the defendant's laptop and every

7  single one of those were found within the addresses acquired

8  from the defendant's laptop.

9  Q.  Were the private keys for those four addresses on the

10 defendant's laptop found on the defendant's laptop?

11 A.  Right.  I'm able to get this list of addresses because I

12 have access to the entire wallet, which includes the private

13 keys.

14         So private keys are essentially -- it's like a

15 password or a key allowing you to access the bitcoins that are

16 linked to these public addresses.  It allows me to figure out

17 what this public address is and also the keys allow the user to

18 spend the bitcoins in those addresses the way they want, how

19 ever they want.

20 Q.  So to be clear, the addresses on the left-hand side of the

21 column, you identified as being addresses on the defendant's

22 laptop, correct?

23 A.  Correct.

24 Q.  So what does this show overall about this transaction?

25 A.  It shows that the defendant's lap -- that the wallet file