**Case No(s). 22-15514, 22-16349**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

United States of America,

*Plaintiff-Appellee*,

v.

Ilija Matusko

*Claimant-Appellant*,

v.

Ross William Ulbricht,

*Respondent,*

Approximately 69,370 Bitcoin (Btc), Bitcoin Gold (Btg) Bitcion Sv
(Bsv) and Bitcoin Cash (Bch),

*Defendant.*

_____

On Appeal from the United States District Court
for the Northern District of California
No. 3:20-cv-07811-RS
Hon. Richard Seeborg

_____

**CLAIMANT-APPELLANT'S EXCERPTS OF RECORD
VOLUME 4 OF 4**

_____

Alexander H. Kugelman
KUGELMAN LAW, PC
21 Tamal Vista Blvd. Suite 202
Corte Madera, California, 94925
Telephone: 415.968.1780
Facsimile: 415.534.9441
e-mail: alex@kugelmanlaw.com

*Attorneys for Claimant-Appellant*
Ilija Matsuko

Because owners typically petition for the forfeited property itself, property should not be sold before a remission decision is issued if there is a pending owner petition. However, if the property is sold before remission is granted, an owner shall receive the proceeds of the sale, less any costs incurred by the government if the owner's petition is granted. The ruling official may waive these costs. *See* 28 C.F.R. § 9.7(a)(3).

### B. Lienholders

Lienholders may qualify for remission only if they can also demonstrate that they are innocent as defined by 18 U.S.C. § 983(d)(2)(A) or (3)(A). *See* 28 C.F.R. § 9.5(a)(1). If remission is granted to an innocent lienholder, the lienholder may receive: (1) the property itself, or (2) a payment up to the lienholder's net equity, less the expenses and costs incident to the forfeiture and sale of the property. *See* 28 C.F.R. § 9.7(b)(2)(ii). If the lienholder opts to claim the property itself, the lienholder must pay the United States the costs and expenses incident to the forfeiture and any value of the property exceeding the lienholder's net equity. *See* 28 C.F.R. § 9.7(b)(2)(i). If the lienholder agrees to the sale of the property, the lienholder may receive the amount up to their net equity, less the costs and expenses incident to the forfeiture and sale of the property. *See* 28 C.F.R. § 9.7(b)(2)(ii). The ruling official, at their discretion, may waive costs and expenses incident to the forfeiture. *See* 28 C.F.R. § 9.7(b)(2)(i) & (ii).

A general creditor holding an unsecured debt may not be granted remission or mitigation unless it otherwise qualifies as an owner, lienholder, or victim. *See* 28 C.F.R. § 9.6(a).

A creditor holding a judgment against the owner of the forfeited property will only be recognized as a lienholder if:

(1) the judgment was duly recorded before the seizure of the property for forfeiture;

(2) under applicable state or local law, the judgment constitutes a valid lien on the property that attached to it before the seizure of the property for forfeiture; and

(3) the petitioner had no knowledge of the commission of any act giving rise to the forfeiture at the time that the judgment became a lien on the forfeited property.

*See* 28 C.F.R. § 9.6(f)(1). A judgment creditor's lien must be registered in the district where the property is located if the judgment was obtained outside the district. *See* 28 C.F.R. § 9.6(f)(3).

### C. Mitigation

Mitigation is an alternative remedy for owners and lienholders. *See* 28 C.F.R. § 9.5(b). The ruling official may mitigate a forfeiture where an owner or lienholder has not met the minimum conditions for remission but the ruling official finds that some relief should be granted to avoid extreme hardship, mitigation will promote the interests of justice, and mitigation will not diminish the deterrent effect of the law. *See* 28 C.F.R. § 9.5(b)(1)(i). The ruling official may also grant mitigation to an owner or lienholder who has met the minimum conditions of remission but where the overall circumstances do not warrant complete relief. *See* 28 C.F.R. § 9.5(b)(1)(ii).

Non-innocent owners may qualify for mitigation in some cases. *See* 28 C.F.R. § 9.5(b)(2). The ruling official may grant mitigation to an owner or lienholder involved in the offense underlying

**ER-617**

the forfeiture when certain mitigating factors exist (such as the lack of a prior record or evidence of similar criminal conduct); if the violation does not include drug distribution, manufacturing, or importation; the fact that the violator has taken steps like drug treatment to prevent further criminal conduct; the fact that the violation was minimal and not part of a larger criminal scheme; the fact that the violator cooperated with law enforcement investigations relating to the criminal conduct underlying the forfeiture; or the fact that complete forfeiture of an asset is not necessary to achieve the legitimate purposes of forfeiture.

### D. Procedure for notice and processing petitions

In administrative forfeiture cases, the agency must notify potential owners and lienholders of the opportunity to file petitions for remission or mitigation of forfeiture.[2] *See* 28 C.F.R. § 9.3(a). In judicial cases, the USAO must notify potential owners and lienholders of the opportunity to file petitions for remission or mitigation of forfeiture. *See* 28 C.F.R. § 9.4(a). Petitioners who have filed a petition in an administrative forfeiture case are not required to refile a petition for remission or mitigation if the USAO institutes judicial forfeiture proceedings.

Once a seizing agency or the USAO receives a petition for remission or mitigation, the seizing agency must conduct an investigation of the petition and issue a decision in administrative forfeitures, or a report and recommendation in judicial forfeitures. For judicial forfeiture, the USAO then must prepare its own recommendation on the petition and send the petition, report, and recommendations to MLARS, along with any necessary supporting documentation. Although the USAO and seizing agency must provide their recommendations as to the grant or denial of a petition for remission for judicially forfeited assets, the final determination rests with MLARS. MLARS will notify the petitioner of its decision. Petitions are decided based on written documentation. There is no right to a hearing on the petition. *See* 28 C.F.R. § 9.4(g). Unsuccessful petitioners are entitled to one request for reconsideration, which is reviewed and decided by a different ruling official.

### E. Priority of payments

If the seizing agency and the USAO receive multiple petitions, innocent owners have first priority, followed by lienholders, federal financial institution regulatory agencies not constituting owners or lienholders, and victims. *See* 28 C.F.R. § 9.9(a). All pending petitions for remission or mitigation must be ruled on before any official use or equitable sharing of forfeited proceeds occurs.

### F. Cultural property

When the U.S. government forfeits cultural property that has been removed from a foreign country or tribal authorities, the government often seeks to return the property to its country of origin. A foreign government may submit a petition for remission for forfeited cultural property if it can demonstrate a valid, good faith, legally cognizable ownership interest in the forfeited cultural property. In many cases, cultural property is stolen from a government institution like a museum, and a foreign government can easily demonstrate that it was the titled owner of the property. In other cases,

---

[2]  For any asset identified within the public notices of forfeiture, forfeiture.gov's petition information page has updated public-facing forms and petition filing FAQs. For any asset seized by Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), USAO, or United States Postal Inspection Service (USPIS) that is identified within the public notices of forfeiture, a petition may also be filed on forfeiture.gov.

**ER-618**

cultural property may be returned to its country of origin even if the foreign government was not the titled owner. This is usually accomplished by recognizing foreign laws that establish governmental ownership of cultural property. If agencies and USAOs want to use this alternate theory of ownership, they should determine whether an appropriate cultural patrimony law exists before planning to return forfeited cultural property to a foreign government.[3] Agencies and USAOs should coordinate any communications about petitions for remission with a foreign governmental representative with either the Department's Office of International Affairs (OIA) or the seizing agency attaché. *See Justice Manual* § 9-13.540.

In judicial cases involving forfeitures pursuant to 19 U.S.C. § 2609 (Convention on Cultural Property Implementation Act (CPIA)), the government must first offer to return forfeited property to countries who are parties to CPIA. In these cases, MLARS will conduct a summary review of the case and issue a concurrence letter. USAOs should submit CPIA requests to MLARS just as they would submit typical remission petitions.

## II. Qui Tam Actions: Payment of Relator's Share

### A. Overview of the False Claims Act (FCA)

The False Claims Act (FCA) imposes civil liability on any person who submits a false or fraudulent claim to the government. *See* 31 U.S.C. §§ 3729–3733. An action may be filed by the Attorney General or a private person on behalf of the government. *See* § 3730(a)–(b). An action filed by a private person is known as a qui tam suit, and the private party filing the action is referred to as the relator. The government can intervene and take over the litigation of a qui tam suit or permit the relator to pursue the qui tam suit on their own. *See* § 3730(b)(4). If the qui tam suit is successful, the government recovers the judgment and pays part of it to the relator. *See* § 3730(d). The relator's share of any recovery depends in part on whether the government intervenes in the action. *See* § 3730(d)(1)–(2).

FCA permits the relator to object to a settlement of the relator's claim. *See* 31 U.S.C. § 3730(c)(2)(B). However, the government may settle notwithstanding a relator's objection if the court determines after a hearing that the settlement is "fair, adequate, and reasonable." *Id.*

In addition, FCA provides that in qui tam suits the government "may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." *See* 31 U.S.C. § 3730(c)(5). FCA further provides that "the person initiating the action shall have the same rights in such proceeding as such person would have if the action had continued under this section." *Id.*

The purpose of this "alternate remedy" provision is to provide the government with maximum flexibility to choose the best forum for pursuing its fraud claims against the defendant. *See* S. Rep. 99-345, 99th Cong., 2d Sess. 27, reprinted in 1986 U.S.C.C.A.N 5266, 5292. Thus, the alternate remedy provision authorizes the United States to stay the relator's FCA action and choose instead to pursue its fraud claims against the defendant through an alternative proceeding, in lieu of the relator's action under the FCA. *See* S. Rep. 99-345, 99th Cong., 2d Sess. 27. ("While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims.") To ensure that the relator is not prejudiced if the government

---

[3] Information about applicable cultural patrimony laws can be found in the UNESCO Database of Cultural Heritage Laws.

pursues an alternate remedy, the relator is granted the same rights in the alternative proceeding that the relator would have had in the civil action under FCA, including the right to participate in the proceedings, to object to any settlement of the proceeding, and to receive a share of any recovery as described in Section II.D in this chapter. *See* 31 U.S.C. § 3730(c)(5).

## B. Forfeiture proceedings as alternate remedies

The Department's view is that a forfeiture proceeding does not qualify under FCA as an alternate remedy giving rise to a relator share because the alternate remedy provision encompasses only those proceedings that are properly viewed as a substitute for the relator's civil claims under FCA. Thus, the alternate remedy provision is limited to alternative proceedings to redress the submission of false or fraudulent claims and does not extend to forfeiture or other criminal proceedings that do not serve as a substitute for such claims.

Several courts have considered the question of whether a criminal proceeding qualifies as an alternate remedy under FCA and concluded it does not. In *United States v. Lustman*, No. 4:05-CR-40082, 2006 WL 1207145, *3 (S.D. Ill. May 4, 2006), the Court rejected the relators' motion to intervene in, and obtain a share of the proceeds of, a criminal proceeding instituted against one of the defendants named in their qui tam action. As part of that criminal proceeding, the defendant was ordered to pay restitution. *Id*. at *1. The Court concluded that the alternate remedy provision did not encompass criminal proceedings. *Id*. at *3. The Court also concluded that the relators' motion was moot because the restitution paid by the defendant had already been disbursed. *Id*.

Similarly, in *United States ex rel. Oehm v. Nat'l Air Cargo, Inc.,* No. 1:05-CV-00242, 1 (W.D.N.Y. Feb. 15, 2008), the government executed a global settlement with the defendant that resolved the FCA claims as well as separate criminal and civil forfeiture proceedings. The Court rejected the relator's request for a share of the global settlement attributable to the criminal and civil forfeiture proceedings, reasoning that "the existence of an 'alternate remedy' can be found only if the government has not pursued the [FCA] claims instituted by the relator." *Id*. at 7–8.

In *United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 158 (5th Cir. 2014), two relators filed suit against their former employers, alleging that the defendants defrauded the government by filing tens of millions of dollars in fraudulent Medicare and Medicaid claims. However, the relators did not file their qui tam action until after the government's prosecution and during the pendency of the defendants' direct criminal appeal. Id. at 159. The district court held, and the appellate court affirmed, that because there was no qui tam action pending at the time the government pursued criminal charges, the criminal charges could not be deemed an alternate remedy under FCA. *Id*. at 161–162.

However, in *United States v. Bisig*, No. 1:00-CV-00335, 2005 WL 3532554, *4 (S.D. Ind. Dec. 21, 2005), the district court found that a criminal forfeiture proceeding constituted an alternate remedy under the FCA. In this case, the government sought to freeze the defendants' assets, and then subsequently filed an indictment against the defendants, which included a criminal forfeiture allegation. *Id*. at *1–2. One of the defendants named in the indictment was also named in a qui tam suit, which the government declined to take over. *Id*. The relator in the qui tam suit argued that the criminal forfeiture proceeding constituted an alternate remedy to its FCA action, and the Court agreed. *Id*. at *2. The Court noted that the relator was the first to uncover the fraud, the government had stayed the relator's case pending a resolution of the criminal proceeding, and the government's forfeiture action would leave the defendant without any assets. *Id*. at *4. The Court concluded on

**ER-620**

Case 3:20-cv-05787-RS Document 280-1 Filed 08/26/21 Page 17 of 204
Case 3:20-cv-05811-RS Document 230-990 Filed 08/26/21-5 Page 17 of 204

Chapter 13: Post-Forfeiture Third Party Interests

these facts that the government "had made an actual monetary recovery by the relator in the qui tam action either impossible or futile" and thus "in effect, elected to pursue its claim through an alternate remedy under [31 U.S.C.] § 3730(c)(5)." *Id.* The Court held that the alternate proceeding in that case, however, was just the criminal forfeiture proceeding, and thus the relator's right to participate as a party was limited to that proceeding, and not the entire criminal prosecution. *Id.* at *6. The Court agreed that allowing a relator to participate in criminal proceedings generally "would be an undesirable result." *Id.*

Thus, following the reasoning in *Bisig*, some courts may be inclined to find an alternate remedy where a criminal proceeding will recover most or all of a qui tam defendant's assets, particularly if the government also stayed the relator's qui tam suit in favor of the criminal case. Under such circumstances, the courts may conclude, as the *Bisig* court did, that the government deprived the relator of any meaningful opportunity to pursue the qui tam suit, and therefore the criminal proceeding was effectively a substitute for that suit. Accordingly, in such circumstances (i.e. where the criminal proceeding will render the defendant without assets to satisfy an FCA judgment, and particularly where the government has stayed the qui tam case to pursue the criminal case), it may be appropriate to consider a negotiated resolution of the alternate remedy issue, provided that other bases to challenge the relator's entitlement to a share do not exist.[4]

In all events, if a relator seeks to intervene or file a claim in any forfeiture proceeding, the prosecutor must immediately consult government counsel on the FCA action or the Director of the Department's Commercial Litigation Branch, Fraud Section, Civil Division.

## C.  Source of relator's right to recover

To the extent that a relator is awarded a share of any forfeiture proceeds under FCA's alternate remedy provision, the relator's entitlement to the proceeds arises strictly out of FCA and does not constitute a claim of ownership or interest in the specific property forfeited. Consequently, a qui tam relator does not qualify as a third party entitled to relief pursuant to 21 U.S.C. § 853(n) or 18 U.S.C. § 983(d). *See United States v. Bisig*, No. 1:00-CV-00335, 2005 WL 3532554, *6–7 (S.D. Ind. Dec. 21, 2005) (granting relator's motions to intervene and for adjudication of relator's interest in forfeited property despite the fact that relator does not qualify for relief under 21 U.S.C. § 853(n) because relator has a valid claim under FCA). Likewise, the qui tam relator is not a victim or third party generally entitled to recovery pursuant to the regulations governing petitions for remission. *See* 28 C.F.R. § 9.4(b) (providing that only petitioners as defined in 28 C.F.R. § 9.2(o) or attorneys and guardians on their behalf may file a petition for remission) and 28 C.F.R. § 9.2 (defining *petitioner* to include an owner, a lienholder, or a victim as defined in other subparts of 28 C.F.R. § 9.2).

---

[4] The following issues may constitute bases to challenge the relator's entitlement to a share of the judgment: (1) the validity of the qui tam action; (2) the relator's allegations are based on a "public disclosure" and the relator does not qualify as an original source of those allegations; or (3) jurisdictional and non-jurisdictional reasons (for example, where a relator is not the first to file or has failed adequately to plead a FCA claim) why a relator has failed to file a valid action. *See* 31 U.S.C. § 3730(e)(4); Department briefs filed in *United States ex rel. Hefner v. Hackensack Med. Ctr.*, 495 F.3d 103 (3d Cir. 2007), and *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003). Moreover, even where a relator's action is proper, the relator may be entitled only to a reduced share. *See* 31 U.S.C. § 3730(d)(1) & (3).

**ER-621**

### D. Relator's share is a percentage of the net forfeiture recovery

If a court orders—or the Commercial Litigation Branch decides—that the forfeiture constitutes an alternate proceeding and the relator is entitled to a share of the recovery, then the relator must be awarded a percentage of the net forfeiture recovery.[5] The exact percentage share to be received by the relator should be determined in FCA action by agreement of the parties or by adjudication.[6] While it is preferable for this determination to be made prior to the final disposition of the forfeited assets, this may not always occur. In fact, where FCA action will be litigated after the forfeiture proceeding, it is unlikely that the relator's share will be determined prior to the final disposition of the forfeited assets. In such instances, the relator might request that up to 25% of the total forfeiture recovery be escrowed in case such funds are later needed to satisfy the relator's share.[7] Because the proceeds of the forfeiture will be deposited into the Assets Forfeiture Fund (AFF), an escrow is not necessary and prosecutors should oppose the request.[8] Determining the dollar value of the relator's share is more complicated. In the context of a forfeiture, "the proceeds of the action" would be the amount of money available for deposit into the AFF—i.e. the net recovery, which can be defined as the value of the forfeited property less the value of any valid claims and the costs associated with the seizure, forfeiture, and disposal of the property. Consequently, the dollar value of the relator's share cannot be determined until all claims and expenses are paid and the amount available for deposit into the AFF is fixed.[9]

The dollar value of the relator's share is calculated in the same fashion when the forfeiture action is resolved by settlement. Where possible, the United States should obtain the relator's agreement to the forfeiture settlement. Pursuant to the statute, however, the United States may settle the action with the defendant notwithstanding the objection of the relator "if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *See* 31 U.S.C. § 3730(c)(2)(B).

---

[5] Under the FCA, the percentage of the proceeds that the relator is entitled to recover varies depending on whether the United States intervenes in the relator's action, as well as other factors. *See* 31 U.S.C. § 3730(d)(1) & (2). Assuming that the relator is not otherwise barred from claiming a share of the proceeds, determination of the relator's share will involve two related inquiries: first, the "percentage" of the proceeds of the action to be awarded to the relator, and second, the value of those "proceeds." Section 3730(c)(5) makes these inquiries applicable to a proceeding qualifying as an alternate remedy. The Civil Division has issued guidelines governing the determination of relator share percentages. The Fraud Section or government counsel in the FCA action—not forfeiture counsel—is responsible for determining or litigating the relator's share issue.

[6] Where the issue of the relator's share is addressed may well depend on the forum in which the relator chooses to pursue it; however, the government should advocate for the determination to be made in FCA action whenever such litigation remains viable.

[7] Relators have made similar requests regarding the escrow of funds paid toward restitution and criminal fines. Where the restitution is payable to governmental victims, the government may consider such requests, particularly where the FCA action will not be completed. However, prosecutors should always oppose requests for an escrow of funds due to individual victims or for criminal fines.

[8] Until the relator's share is determined, the Department will not know the amount of funds that will remain in the AFF. Therefore, final decision on any petition for remission or mitigation should be deferred until the relator's share is determined, unless the total value of all petitions for remission or mitigation is less than 75% of the net forfeiture recovery.

[9] On request of the relator, the United States may provide the total expenses incurred in connection with a forfeiture action. In the Department's view, relators have no right to challenge forfeiture expenses or intervene in property management issues, and therefore, are not entitled to a detailed itemization of forfeiture expenses, even if the forfeiture action is determined to be an alternate remedy.

## ER-622

### E.  Procedure for paying relator's share

Because the relator's share is mandated by Congress, it is a necessary expense incident to the forfeiture of the property as provided for in 28 U.S.C. § 524(c)(1)(A).The government should obtain an order in the FCA action that reflects the percentage share of the net recovery to be paid to the relator and should forward a copy of the order to the U.S. Marshals Service (USMS), directing the USMS to pay the relator's share.

The Department of the Treasury (Treasury) Forfeiture Program takes a similar approach on the legal theories supporting a relator's share as a necessary expense incident to the forfeiture of the property pursuant to 31 U.S.C. § 9705(a)(1)(A). Payment is coordinated through the seizing agency and the Treasury Executive Office for Asset Forfeiture (TEOAF) and is usually processed using a Form 7 refund package if the funds are already in the Treasury Forfeiture Fund (TFF). However, please contact the seizing agency counsel or TEOAF Legal Counsel for assistance.

**ER-623**

# Chapter 14:
# Forfeiture and Compensation for Victims of Crime

## I.    Overview

Forfeiture is a critical tool in the recovery of illicit gains arising from financial crimes such as fraud, embezzlement, and theft. Returning forfeited assets to victims through the remission and restoration processes is one of the primary goals of the Department of Justice's (Department) Asset Forfeiture Program.[1] *See* Chapter 13 of this *Manual*. Remission and restoration authority exists for virtually all offenses for which the government obtains a related administrative declaration of forfeiture, or civil or criminal forfeiture order.[2] *See* 18 U.S.C. § 981(e)(6) (civil forfeiture), and 21 U.S.C. § 853(i)(1) (while § 853(i) governs the procedures for disposing of property criminally forfeited under the drug abuse prevention and control laws, those procedures are incorporated by reference in 18 U.S.C. § 982(b)(1), which extends those procedures to most other criminal offenses). There are three primary means to pay victims—restitution, remission, and restoration. Restitution refers to the process of determining victim losses for purposes of sentencing and paying victims in criminal cases, often, but not always, through collections from defendants and via the Federal Debt Collections Procedures Act. Remission is a process whereby, in a civil or criminal forfeiture case, the Department solicits, considers, and rules on petitions for payment. The petitions can be submitted by, among other petitioners, victims. The federal regulations governing the remission of civil or criminal forfeiture are found at 28 C.F.R. Part 9.

Restoration is a hybrid process available in both civil and criminal forfeiture cases that are closely related to a criminal prosecution in which a court has issued a restitution order identifying victims and restitution losses for which a defendant is liable. The restoration procedure of the Department's Criminal Division enables the Attorney General to transfer forfeited funds to a court for satisfaction of a criminal restitution order, provided that all victims named in the order otherwise qualify for remission under the applicable regulations.

Remission, restoration, and criminal restitution all serve to compensate victims through related but distinct mechanisms. Remission and restoration are discretionary procedures for victim recovery from forfeitures and are available to persons who have incurred pecuniary losses from the offense underlying the forfeiture or from a related offense. Restitution is an equitable remedy intended to make crime victims whole and prevent unjust enrichment to the perpetrator. In many cases, restoration—the use of forfeited funds to pay restitution—is desirable, because the defendant may be left without assets to satisfy their restitution obligation following forfeiture.

---

[1]    *See The Attorney General's Guidelines on the Asset Forfeiture Program* (July 2018) (*AG Guidelines*), Sec. II.

[2]    Funds shared with the United States by a foreign government that have not been forfeited under U.S. law may not be eligible to be used for victim remission or restoration under the Money Laundering and Asset Recovery Section (MLARS). However, depending upon the circumstances of the case, it may be possible to employ other mechanisms for using such shared funds to make victims whole. If U.S. prosecutors or investigators assisted in a foreign case involving victims that resulted in a foreign forfeiture, they should also contact MLARS for guidance on potential alternative mechanisms and submission of a sharing request to that country. *See also* Chap. 8, Sec. XIII in this *Manual*.

**ER-624**

The Department of the Treasury Forfeiture Fund (TFF) has a similar procedure for remission and restoration.[3] Please consult the *Guidelines for Treasury Forfeiture Fund Agencies on Refunds Pursuant to Court Orders, Petitions for Remission, or Restoration Requests* (*Treasury Blue Book*).[4]

## II.  Returning Forfeited Assets to Victims

### A.  Remission

For administrative forfeitures, the seizing agency should provide notice to all parties believed to be victims. The notice should advise victims of the right to file a petition for remission under 28 C.F.R. Part 9. For judicial forfeitures, the U.S. Attorney's Office (USAO) should send such notice to all potential victims who did not submit a petition for remission following any administrative notice or who will not be included in a restitution order and related restoration request.

Once assets have been judicially forfeited, the authority to distribute them to owners, lienholders, and victims rests solely with the Attorney General. *See* 28 C.F.R. § 9. The Attorney General delegated the authority to decide petitions for remission in judicial cases to the Chief of the Money Laundering and Asset Recovery Section (MLARS). *See* 28 C.F.R. § 9.1(b)(2). In administrative forfeitures, the authority to decide petitions for remission or mitigation rests with the seizing agency.[5] Questions regarding administrative forfeiture policies and procedures should be directed to the seizing agency.

Whether a victim may receive remission is governed by regulation. *See* 28 C.F.R. § 9.8. MLARS decides petitions based on written documentation; there is no right to a hearing on the petition. *See* 28 C.F.R. § 9.4(g). Unsuccessful petitioners are entitled to one request for reconsideration, which is reviewed and decided by a different ruling official within MLARS. *See* § 9.4(k)(3). Judicial review of a denial of remission is not available.[6] Although the USAO and seizing agency must provide recommendations as to the allowance or denial of a judicial petition for remission, the final determination rests with MLARS. USAOs or seizing agencies must take care not to make representations to the court or potential victims as to whether remission will be granted.

When petitions have been filed for both administratively and judicially forfeited assets in the same case, the seizing agency must coordinate with MLARS and the forfeiture Assistant U.S. Attorney (AUSA) assigned to the case to ensure consistency in rulings.

Many forfeiture cases begin administratively and become judicial after a party files a claim challenging the agency's administrative forfeiture. Often the party files both a claim and petition. MLARS must eventually adjudicate the petition in a judicial forfeiture, but only after the claim is

---

[3]  TFF member agencies include the Internal Revenue Service-Criminal Investigation (IRS-CI), U.S. Immigration and Customs Enforcement-Homeland Security Investigations (ICE-HSI), U.S. Customs and Border Protection (CBP), U.S. Secret Service (USSS), and U.S. Coast Guard (USCG).

[4]  Download a copy of *Treasury Blue Book* from treasury.gov.

[5]  *See* 19 C.F.R. §§ 171 and 172.2; 26 C.F.R. § 403, Subpart D; 28 C.F.R. § 9.1(b)(1).

[6]  *See LKQ Corp. & Keystone Auto. Indus., Inc. v. DHS*, 369 F. Supp. 3d 577 (D. Del. 2019) (court lacked subject matter jurisdiction under Administrative Procedures Act to review decisions by CBP on petitions for remission because remission statutes provide CBP with wide discretion to make a determination on remission or mitigation; such decisions are unreviewable absent allegations of statutory or procedural violations); *United States v. Betancourt-Vega*, No. 3:12–CR–314, 2013 WL 6697811, *4 (N.D. Tex. Dec. 19, 2013) (because what claimant filed was a remission petition and not a claim under 18 U.S.C. § 983(a)(2), court's review is limited to ensuring that DEA acted in accordance with proper procedures in exercising its discretion); *Laconia Sav. Bank v. United States*, 116 F. Supp. 2d 248, 256 (D.N.H. 2000) (when claimant chooses to file remission petition instead of filing claim, court is without jurisdiction to review the denial of the petition on the merits or consider any constitutional claims even if denial was an abuse of discretion).

**ER-625**

resolved. However, the petitioner need not submit a second petition. The seizing agency should forward the petition to the USAO, which will submit to MLARS.[7]

### A.1   Standards for victims—28 C.F.R. Part 9

The factual basis and legal theory underlying the forfeiture will determine who qualifies as a victim. A "victim" for purposes of remission is "a person who has incurred a pecuniary loss as *a direct result of the commission of the offense underlying a forfeiture*." 28 C.F.R. § 9.2 (emphasis added).[8] Corporations, federal agencies, and other governmental entities may also qualify as victims under the regulations.

Victims may also recover losses caused by a related offense. *See* 28 C.F.R. § 9.8(a)(1). *Related offense* means: "(1) Any predicate offense charged in a federal Racketeer Influenced and Corrupt Organizations Act (RICO) count for which forfeiture was ordered; or (2) An offense committed as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered." *See* 28 C.F.R. § 9.2. In general, the ruling official will consider all the the crimes discussed in the charging documents or civil complaint as "related offenses" for purposes of victim compensation.

### A.2   Qualification to file

A victim may be granted remission of the forfeiture of property if the victim satisfactorily demonstrates that:

> (1) a pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and the loss is supported by documentary evidence including invoices and receipts; (2) the pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of a criminal offense; (3) the victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture; (4) the victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others; and (5) the victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.

28 C.F.R. § 9.8(b).

> "The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss."

28 C.F.R. § 9.8(c). The term "fair market value" is not defined in 28 C.F.R. Part 9. When the loss is property other than money, the date of the victim's loss and the fair market value of the property on that date must be decided to determine the victim's recoverable loss.

A victim's pecuniary loss must be supported by documentary evidence. Secondary losses to the principal loss, such as "interest foregone or for collateral expenses incurred to recover lost property

---

[7]   *See also* Chap. 13, Sec. I.A. n.1. in this *Manual*.
[8]   A *person* is "an individual, partnership, corporation, joint business enterprise, estate, or other legal entity capable of owning property." *See* 28 C.F.R. § 9.2.

or to seek other recompense," or attorneys' fees or other investigative expenses, are not eligible for remission. *See* 28 C.F.R. § 9.8(c).

Losses are also ineligible for remission if they result from property damage or physical injuries, or from a tort associated with illegal activity that formed the basis for the forfeiture, unless the tort constitutes the illegal activity itself. *See* 28 C.F.R. § 9.8(d). However, specific, documented pecuniary losses like medical and counseling bills in child exploitation cases may be eligible. Victims who "knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense that was the underlying basis for the forfeiture" are also ineligible for remission. *See* 28 C.F.R. § 9.8(b)(3). However, forced or unknowing participation in a crime, as in cases involving victims of human trafficking and forced labor, or cases in which elderly fraud victims lose money yet also unwittingly serve as "money mules"—that is, persons who transfer money acquired illegally—will not preclude victims from compensation under this provision.

Victims need not show that their specific funds are among the funds that have been forfeited to establish eligibility for remission.

Petitions should be made sworn under penalty of perjury. Petitioners should also submit any supporting documentation that the government does not already have to support their petitions and claims of qualifying pecuniary losses.

### A.3  Priority in multiple-victim remission cases

Priority in the distribution of forfeited assets is given to valid owners, lienholders, federal financial regulatory agencies,[9] and victims (in that order), who in turn have priority over official use requests and equitable sharing requests. Victim recovery is limited to the net proceeds of all assets in the case or related cases. In cases involving more than one victim, the ruling official will generally grant remission on a pro rata basis where the amount to be distributed is less than the value of the victims' losses. Additional exceptions are permitted only in rare situations, such as when a pro rata distribution would result in extreme hardship to a victim or when a victim has better evidence of loss than other victims. *See* 28 C.F.R. § 9.8(f). However, the tracing of a particular victim's funds into a forfeited account does not give that victim priority over the victims whose funds cannot be traced.

### A.4  Claims administrators

MLARS may opt to hire a trustee or claims administrator in large, multiple-victim cases to assist in notifying potential victims of the opportunity to seek remission, processing the petitions, and making decision recommendations. *See* 28 C.F.R. § 9.9(c). MLARS will coordinate with the USAO and lead seizing agency, as necessary, during the selection process. In addition, if a trustee has been appointed in parallel regulatory or bankruptcy actions, MLARS may approve transferring funds for distribution to the trustee for ultimate payment to the identified victim pool.

USAOs and agencies interested in using the services of a trustee or claims administrator to support the remission and restoration processes should consult early with MLARS. MLARS awarded a

---

[9]  A federal financial regulatory agency is generally entitled to priority of distribution over non-owner victims for losses and expenses incurred in its capacity as receiver of a failed institution. *See* 28 C.F.R. § 9.8(h). This priority applies only for reimbursement of the Federal Deposit Insurance Corporation (FDIC)'s payments to claimants and creditors of the institution or reimbursement of insurance fund losses under 18 U.S.C § 981(e)(3), and for fraud losses associated with the sale of assets held in receivership pursuant to § 981(e)(7).

national claims administration support contract that simplifies procurement actions and streamlines petition review and payment distribution in victim cases where highly experienced and expert firms are required to handle the volume of petitioners. Costs of an administration contract are deducted from the forfeited funds prior to any distribution.

### A.5  Additional grounds for denial of remission to victims

Remission to victims may be denied: (1) if determination of the pecuniary loss to be paid to individual victims is too difficult; (2) if the amount to be paid to victims is small compared to the expense incurred by the government in deciding the victims' claims; or (3) if the total number of victims is large and the amount available for payment to victims is so small as to make granting payments to victims impractical. *See* 28 C.F.R. § 9.8(e).

### A.6  Timeliness

Victims should file petitions for forfeited assets within the time period detailed in the notice.[10] However, when a victim fails to submit a timely petition, MLARS may allow exceptions for good cause based on the particular circumstances of the case. Victims may file claims in the Department's Asset Forfeiture Program Online Claims & Petitions portal up to 60 days after the date of forfeiture; after that date, they must submit paper forms.[11]

### A.7  Remission decisions

Deciding officials will send remission decisions to the victims along with instructions for obtaining payment. Victims must provide their own Social Security numbers (SSN) for purposes of the Treasury Offset Program (TOP), although they may choose to use their attorney's bank account for payment. MLARS, Treasury Executive Office for Asset Forfeiture (TEOAF), and the seizing agency do not have insight into whether an offset will occur. However, victims can call (800) 304-3107 for the Department of Treasury (Treasury) Bureau of the Fiscal Service's TOP interactive voice response system to determine whether an offset will occur. Because of unknown Treasury offsets and case expenses, MLARS refrains from quoting specific payment amounts to victims in their remission grant letter.

If the deciding official grants remission, it will notify both the forfeiture unit and the financial litigation unit at the USAO. It is the USAO's responsibility to record payment information for purposes of capturing any restitution "credit" to the defendant in remission cases and to coordinate with the local Financial Deputy Clerk of Court to ensure that the court is aware of the credit.

## B.  Restoration

Because forfeited assets are property of the government, courts and defendants lack authority to use them to satisfy a defendant's criminal debts, including fines or restitution obligations. *See United States v. Trotter*, 912 F.2d 964, 965–966 (8th Cir. 1990). However, in many cases, defendants are left with little or no property after the forfeiture is completed. Thus, under the restoration procedures, the Department may forfeit property and transfer the proceeds to the court in satisfaction of the defendant's order of restitution.

---

[10] If direct notice is provided, it can be sent by the USAO, seizing agency, or claims administrator, as appropriate.

[11] Victims should visit forfeiture.gov's petition information page for updated public-facing forms and FAQs.

**ER-628**

Restoration simplifies and accelerates the return of forfeited property to victims. Restoration is an alternative to petitions for remission in cases where both forfeiture and restitution have been ordered and is designed to accommodate victims and the courts to the furthest extent possible while still meeting the statutory and regulatory requirements for remission. Victims will not need to file petitions for remission, and the process of returning funds typically will be faster. The forfeiture will be completed so that costs can be recovered and third party rights extinguished. Proceeds from civil, criminal, and administrative[12] forfeitures can be handled together and applied to restitution. Assets will be distributed primarily as they would have been under the remission regulations. The restoration procedure permits victims to obtain compensation from the forfeited assets in accordance with the court's restitution order without having to file petitions for remission with the government and await decisions on them. These procedures apply where:

(1) both restitution to compensate victims and a related forfeiture (either civil, criminal, or administrative) have been ordered;

(2) the victims and amounts listed in the restitution order essentially conform to the victims and amounts that would have been paid through the remission process; and

(3) other property is not available to fully satisfy the order of restitution.

However, under no circumstances should the criminal AUSA make representations to a defendant or the court that forfeited funds will be used to satisfy restitution through the restoration process. However, the AUSA may represent in a plea agreement that the USAO will seek MLARS' approval to have forfeited funds applied to restitution, as appropriate under applicable regulations.

### B.1 How the restoration process works

Restoration requires both a court order of restitution *and* an order (or declaration) of forfeiture. Because restoration decisions must be approved by the Chief of MLARS (as delegated by the Attorney General), the USAO or court may not unilaterally direct forfeited assets to be applied to restitution, or decrease restitution orders by the value of forfeited assets.[13] However, when requested by the USAO, MLARS may undertake a preliminary review of the expected restitution and forfeiture, so that prosecutors may advise the court of the government's intended distribution of the property.

To request restoration, the USAO must send the Chief of MLARS a copy of the judgment in a criminal case containing the order of restitution and a copy of the forfeiture order, along with a written request signed by the U.S. Attorney, or a designee, that includes the representations outlined in Section II.B.2 below. If the restitution order is sealed, the USAO must submit the underlying list containing victim names and restitution amounts to MLARS. Once the Chief of MLARS has approved the request for restoration, MLARS notifies both the USAO and the custodian of the property. The custodian then transfers the net proceeds of the forfeiture to the clerk of court for distribution pursuant to the order of restitution. MLARS will not accept or approve

---

[12] In administrative forfeitures involving TFF member agencies, the USAO must obtain the written concurrence of the local or headquarters TFF seizing agency before MLARS may approve restoration of forfeited funds for purposes of criminal restitution. *See Treasury Blue Book*, Sec. VI.B.1.b. TEOAF policy does not permit the release of administratively forfeited funds to crime victims without the prior approval of the TFF seizing agency. *See Treasury Blue Book*, Sec. VI.B.1.b.ii.

[13] The Attorney General's restoration authority has been delegated to the Chief of MLARS pursuant to Attorney General Order No. 2088-97 (June 14, 1997).

restoration requests for assets that have been disposed of for over five years unless there are unique circumstances surrounding the delay.[14]

Restoration is appropriate only when the distribution pursuant to the restitution order is essentially the same as the distribution that would be obtained through the remission process. Prosecutors who plan to request restoration must work with the seizing agency, probation officer, and the court to ensure that the court's restitution order lists the names of all victims and the amount of restitution due to each. Updated payment addresses must also be provided to the court so that the funds are paid out to victims.

Restitution is generally available for a much broader range of harms than may be satisfied through remission, which is allowed only for pecuniary losses caused by the offense underlying the forfeiture or a related offense. Thus, restoration may not be used where a significant portion of the losses covered by the restitution order relate to bodily harm, property damage, future expenses, and collateral expenses like legal, accounting, or security expenditures incurred in trying to correct the harm caused by the crime. Moreover, 28 C.F.R. § 9.8(c) limits the victim's loss to the fair market value of the property of which the victim was deprived, as of the date of the loss. No allowance is made for interest forgone, lost profits, or collateral expenses incurred to recover lost property or to seek other recompense.

If the restitution order is not amenable to the restoration process, MLARS will advise the USAO, and the USAO may have to collect remission petitions to distribute forfeited funds to victims through the remission process. In some instances, a USAO may be able to use an existing victim impact statement as a substitute for a petition for remission, or a "hybrid" approach may be warranted. *See* Section II.F in this chapter.

### B.2  Representations

Restoration is designed to achieve results that are consistent with the results of the application of the remission standards for forfeited assets at 28 C.F.R. § 9.8. Therefore, the U.S. Attorney, or a designee, must inform MLARS, in writing and accompanied by a signature, as part of the request for restoration that:

> (1) **All known victims have been properly notified of the restitution proceedings and are properly accounted for in the restitution order**. This representation is intended to ensure that no victims have been left out of the restitution order and that all are treated fairly in the order. This is also to ensure that the restitution order reflects the proper priority of payment to victims, if applicable.[15]

---

[14] Treasury has issued a similar policy to not accept or approve restoration requests for assets that have been disposed of for over five years unless there are unique circumstances surrounding the delay.

[15] *See* Sec. II.B.3 in this chapter.

(2) **To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, the losses described in the restitution order have been verified, comport with the remission requirements, and reflect all sources of compensation received by the victims, including returns on investments, interest payments, insurance proceeds, refunds, settlement payments, lawsuit awards, and any other sources of compensation for their losses**. This is to avoid double recovery by victims who may already have been compensated for part of their losses.

(3) **To the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, reasonable efforts to locate additional assets establish that the victims do not have recourse reasonably available to obtain compensation for their losses from other assets, including those owned or controlled by the defendants**. This is to ensure that restoration does not confer an undue benefit on the defendant.

(4) **There is no evidence to suggest that any of the victims knowingly contributed to, participated in, benefitted from, or acted in a willfully blind manner, toward the commission of the offenses underlying the forfeiture or a related offense**. This is to prevent the return of forfeited property to those who essentially took part in the conduct that led to the forfeiture.

The USAO must also ensure that the time for filing an appeal challenging either the restitution order or the forfeiture has passed or all relevant appeals have been adjudicated before submitting the restoration request to MLARS.

Because restitution and forfeiture are mandatory and independent parts of a criminal sentence, the forfeited assets may not be used to satisfy the restitution order if other assets are available for that purpose. Typical examples of this situation might involve corporations that have extensive holdings that are not subject to forfeiture, or individuals who have property that exceeds the amount subject to forfeiture. The statutes governing restitution permit the government to enforce the restitution order as a final judgment against almost all of the defendant's property, not just facilitating property or fraud proceeds that may be subject to forfeiture. Asset forfeiture coordinators should coordinate with the financial litigation coordinators in their offices on the best approach to return all available assets to victims.

### B.3  Payment

To restore assets to the victims listed in the restitution order, MLARS will notify the USAO and property custodian. The custodian will then transfer the net forfeited proceeds of all assets in the case or related cases to the clerk of court for distribution pursuant to the restitution order, which should reflect proper priority of payment. Payments will be made *only* in accordance with the court's restitution order. If the forfeited assets are not sufficient to fully satisfy the order, payment will be made by the court as directed in the order. Federal government entities are compensated only after all non-federal agencies are compensated in full. *See* 18 U.S.C. § 3664(i); *see also* Section II.D in this chapter. Insurance companies must also be prioritized after direct victims. *See* 18 U.S.C. § 3664(j).

**ER-631**

## C. Preservation of assets for victims

To ensure that forfeited assets are made available for victims, the USAO and seizing agency must enter remission petitions in the Consolidated Asset Tracking System (CATS) immediately upon receipt. In addition, the USAO must place a restitution "hold" on the distribution of seized assets in CATS when a restoration request is anticipated. If assets are transferred for official use or equitable sharing prior to victim compensation, the transfer may be reversed at the discretion of the Chief of MLARS or the Director of TEOAF (for seizures by TFF member agencies) to make the property available for remission or restoration.

Because CATS is not the TFF's system of record, the USAO must request that the TFF preserve the asset in cases involving TFF agencies where restitution may be ordered or where remission or restoration may occur. To ensure the preservation of the forfeited property in judicial cases involving TFF agencies, the USAO must also timely notify and send a copy of the restoration request to the TFF seizing agency. *See Treasury Blue Book*, Sec. VI.B.1.[16]

## D. Special considerations for federal government victims

A federal government agency may qualify as a victim entitled to receive compensation through the restoration and remission procedures. A federal government agency victim, like other types of victims, must demonstrate that it suffered a pecuniary loss of a specific amount as a direct result of the commission of the offense, or related offense, underlying the forfeiture. *See* 28 C.F.R. §§ 9.2 and 9.8(b). Federal agencies are not required to submit detailed documentation of loss when an acceptable estimation of loss is provided.

Federal government agencies often suffer pecuniary losses as a result of crimes involving taxpayer-funded programs like Medicare or Medicaid healthcare, Supplemental Nutrition Assistance Program (SNAP) benefits, and U.S. Department of Housing and Urban Development (HUD) insured loans. In some cases, the federal investigating agency is also a victim of the offense that it is investigating. For instance, the Internal Revenue Service-Criminal Investigations (IRS-CI) may investigate and seize assets in a tax return scheme in which the IRS unknowingly paid tax refunds based on fraudulent tax returns. In these cases, the agency must ensure that the division of the agency providing the petition report and recommendation is separate from the petitioning division. For example, in an IRS-CI investigation involving a tax return scheme, IRS-CI could provide the remission petition report and recommendation, while a different IRS division submits the petition.

The act of forfeiting the seized assets and depositing the proceeds into the Assets Forfeiture Fund (AFF) or TFF does *not* mean that the seizing agency has received victim compensation. Rather, the victim agency should either: (1) be included in the restitution order, with a specified pecuniary loss amount, for restoration request purposes;[17] or (2) file a petition for remission requesting compensation for its losses from the proceeds of the forfeited assets.

---

[16] Download *Treasury Blue Book* from treasury.gov.
[17] If restoration is used pursuant to 18 U.S.C. § 3664(i) federal agencies will not receive compensation until all non-federal victims are compensated in full.

**ER-632**

### E. Special considerations for victims of human trafficking crimes

On May 29, 2015, the Justice for Victims of Trafficking Act (JVTA) was enacted.[18] JVTA directs the Attorney General to pay victim restitution orders in cases where a forfeiture occurs pursuant to 18 U.S.C. § 1594. *See* § 1594(f)(1). Accordingly, MLARS processes requests from USAOs in accordance with this statutory language regardless of whether the victims' losses are considered "pecuniary" as defined by the relevant remission regulations. If no restitution order exists in cases where a forfeiture occurs pursuant to § 1594, MLARS will consider petitions for remission that include a claim of lost wages (based on minimum wage) as the victim's pecuniary loss, along with any other losses permitted by 28 C.F.R. Part 9.

However, 18 U.S.C. § 1594 does not allow for innocent owner or lienholder priority in remission cases. *See* § 1594(f)(2). Therefore, the USAO must resolve all outstanding innocent owner and lienholder claims through the judicial forfeiture process rather than the remission process.

### F. Hybrid remission and restoration review

MLARS will process a restoration request together with petitions for remission in appropriate cases where a hybrid decision would be an efficient and just mechanism for compensating the victims. For example, the USAO may discover after the entry of a restitution order that, despite its due diligence, additional victims exist who were inadvertently omitted from the restitution order. In such a situation, it may be burdensome to require the victims in the existing restitution order to seek remission. MLARS may determine that a hybrid restoration and remission decision is appropriate in light of inter alia the number of victims listed in the existing restitution order, the number of victims omitted from the restitution order, the reasons why victims were omitted from the restitution order, and the amount of net proceeds available for distribution from the forfeited assets. However, this hybrid process is not suitable when a restitution order includes those who do not qualify as victims under the remission regulations.

### G. Termination of forfeiture and direct payment of assets to victims

If forfeiture tools and resources are used to seize an asset, the forfeiture process should be followed to completion. Termination of forfeiture is appropriate only in extremely limited circumstances and only if no final order of forfeiture has been entered. In these limited situations, it may be appropriate for the USAO to move to dismiss the forfeiture proceeding and request the court to direct the property be turned over directly as restitution pursuant to 18 U.S.C. § 3663A(b)(1)(A), or be transferred to the clerk of court to be paid to the victim. However, the USAO may not unilaterally direct a seizing agency or property custodian to send funds that have been seized for forfeiture but not forfeited to the clerk for restitution, absent a court order or agreement with the person from whom the funds were seized. *See* Chapter 1, Section I.E in this *Manual*. If that person has an outstanding restitution order in the TOP system when the funds are returned, the funds may be automatically offset and applied to the restitution order through that process.

Termination of forfeiture may be more appropriate than remission or restoration when the victim is entitled to restitution for non-pecuniary harm or other collateral costs that are not compensable under the remission regulations. In addition, termination of forfeiture may be appropriate in multiple-

---

[18] Justice for Victims of Trafficking Act of 2015, Pub. L. 114-22, May 29, 2015, 129 Stat. 227.

**ER-633**

victim fraud cases arising in jurisdictions with unfavorable caselaw concerning constructive trusts. *See* Section III in this chapter. If payment is to be made to the victim through the clerk of court, the property subject to forfeiture must be liquid, as the clerk cannot liquidate real or personal property. For example, the default method of sale to execute a restitution judgment is a sale by the U.S. Marshals Service (USMS) at the courthouse. *See* 28 U.S.C. § 3203(g)(1)(A)(i).

## H. Comparison of judicial remission and restoration

| Remission | Restoration |
|---|---|
| There is no need for a criminal conviction or restitution order. Only a forfeiture of assets related to the victim's loss is required. | A criminal conviction, an order of restitution, and a criminal, civil, or administrative forfeiture which is related to the victim's loss are all required. |
| The USAO, in cooperation with the investigative agency or a claims administrator, may send notice to all known victims of the offense underlying the forfeiture. | The USAO works with the investigative agency and probation office to identify victims and determine their losses to ensure inclusion in the restitution order. |
| The victim must file a petition in order to receive compensation. | The victim is not required to file a petition but may be required to submit information to the investigative agency or probation office prior to sentencing. |
| The USAO requests the investigative agency to prepare a report and recommendation. The USAO makes a recommendation and forwards the petition package to MLARS. | The USAO submits a restoration request, including the four required representations, to MLARS. *See* Section II.B.3 in this chapter. |
| MLARS decides petitions for remission of judicially forfeited assets. Seizing agencies decide petitions for remission of administratively forfeited assets. | The Attorney General, through MLARS, reviews the restoration request and may restore forfeited property to victims identified in the restitution order. |
| The custodian of the forfeited asset distributes the net proceeds directly to victims. | The custodian of the forfeited asset transfers the net proceeds directly to the Clerk of Court. |

ER-634

## III.  Constructive Trusts in Multiple-Victim Fraud Cases

While courts generally agree that fraud victims do not retain legal title in money paid voluntarily into a fraud scheme, some courts have recognized constructive trusts in favor of victims. Under this equitable remedy, the perpetrator of the fraud holds title to the victim's funds in trust for the benefit of the victim. A constructive trust generally requires a victim to trace their money to the seized funds, which may warrant extensive discovery and evidentiary hearings. This legal theory is troublesome in forfeiture cases involving multiple victims because it can transform the forfeiture case into a cumbersome liquidation proceeding in which all victims compete against each other and against the government for the seized funds. The government should generally oppose a claim of constructive trust in such cases so that the Attorney General can return the funds to the victims through the orderly remission or restoration process. However, government attorneys should consult the caselaw in their circuit and state in responding to constructive trust claims in their districts.

In *United States v. $4,224,958.57* (*Boylan*), 392 F.3d 1002, 1003–1005 (9th Cir. 2004), the Ninth Circuit held that victims of a large, fraudulent investment scheme established a sufficient legal interest in the seized proceeds through a constructive trust to confer on them standing to contest the forfeiture. Under this holding, government attorneys litigating forfeiture cases may be required to identify all potential victims of the fraud, notify them of the forfeiture action, and afford them an opportunity to file claims in the judicial proceeding. *Id.* Following *Boylan*, some judicial circuits have recognized that the forfeiture statutes do not preclude, as a matter of law, the imposition of a constructive trust. *See Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 238 (2d Cir. 2011).

Thus, in litigating forfeiture cases in circuits that recognize constructive trusts, government attorneys may elect to oppose victims' individual claims of constructive trust on the merits, and further argue that recognition of the trust would result in unfair priority to the claimant, contrary to the equitable principles underlying the trust. The courts should also be advised that forfeiture will enable all victims to have the opportunity to recover the funds on the pro rata basis through the Attorney General's remission authority. *See* 28 C.F.R. §§ 9.8(a)(1) and (f).

ER-635

# Chapter 15:
# Federal Official Use and Equitable Sharing

## I. Federal Official Use

### A. Overview

Federal retention, or "official use," means a law enforcement agency's use of forfeited assets in the direct performance of law enforcement activities. The transfer of "unique" assets, such as property of cultural or historical significance, to non-component federal agencies is also considered official use.

According to *The Attorney General's Guidelines on the Asset Forfeiture Program* (July 2018) (*AG Guidelines*),[1] Sec. V.F., "the Attorney General has the authority to retain or transfer property for official use to any federal agency. No seized property shall be placed into official use until a final determination of forfeiture has been made and the request to place the property into official use has been approved by the appropriate official."

Agencies must request specific assets for official use.[2] Federal agencies may not put into official use any cash or proceeds from the sale of forfeited property. The requests need not specify the exact intended use of the assets, but all official use must be for law enforcement purposes. This allows agencies to use forfeited property for operations, training, and other functions, including administrative and other mission support activities.

### B. Official use designations by the federal seizing agency

The head of the federal seizing agency, or designated headquarters official, decides whether to put assets seized by the agency into its own official use. Once an asset designated by the federal seizing agency for official use has been administratively or judicially forfeited and all third-party interests, including victim compensation, have been resolved, the seizing agency has 30 calendar days to inform the U.S. Marshals Service (USMS) of its final decision to place or decline to place the asset into official use. At the discretion of the USMS, a one-time extension of 15 calendar days may be granted. Requests for extensions must be made in writing to the USMS. Absent a response from the seizing agency within the initial 30 calendar days (or a time extension that has expired), or following a negative response within the specified time period, the USMS is authorized and directed to take the necessary steps to dispose of the asset in the usual manner, according to law and regulations.

In any instance where the property requested for federal official use is valued at over $50,000, the seizing agency and the USMS must provide the Money Laundering and Asset Recovery Section (MLARS) with advance notice and an opportunity to review the request.

### C. Official use requests by other federal agencies

If the lead federal seizing agency decides not to put the asset into its own official use, then any other Department of Justice (Department) investigative agency that participated in the case, Department

---

[1] *See* AG Guidelines.

[2] *See* Chap. 4, Sec. V.A. in this *Manual* regarding the authorities and guidelines for placing real property into official use.

**ER-636**

components, or non-seizing federal agencies, in that order, may request to put the asset into its own official use. These agencies may seek the transfer of property for official use only if the property is not required for victim compensation or for equitable sharing with a foreign, tribal, state, or local agency.[3]

Where one Department agency requests an asset for official use that was seized by another Department agency, the requesting agency must follow the official use request process of the seizing agency and the USMS (e.g. if the U.S. Department of Agriculture (USDA) wants to place a vehicle into official use that was seized by the Federal Bureau of Investigation (FBI)). If more than one Department component seeks to retain the same forfeited property for official use, MLARS will determine which agency may place the property into official use. All requests, other than those for retention by the lead federal seizing agency, must be submitted to the USMS. Agencies that are not members of either the Department or the Department of the Treasury (Treasury) forfeiture programs must request items for official use through the agencies and the USMS. No federal contribution form (FCF) is required, and the decision to transfer is made via the official use approval process, not the equitable sharing approval process.[4]

### D. Internal guidelines

Each agency is required to maintain internal guidelines governing official use requests. The internal guidelines shall:

- prohibit the placement into official use of any seized property before (1) the entry of a final determination of forfeiture, (2) resolution of all third-party interests, including victim compensation, and (3) the appropriate approval of the request to place the property into official use;

- require all seized property be recorded and tracked in an official inventory of seized property without regard to its intended disposition;

- require a written justification detailing the reasons why the forfeited property was placed into official use, and require retaining these justifications for three years;

- require a specific supervisory-level official be responsible and accountable for the decision to place each item of forfeited property into official use and for ensuring appropriate official use of such property following its transfer;

- require the property placed into official use be identified and tracked in an accountable property system; and

- state that the property may not be transferred or retained if it is primarily for purposes of trade or sale, or home-to-work transportation, or other uses not expressly authorized for property acquired through the expenditure of appropriated funds. There must be an intention to place the property into official use for two years.

---

[3] Requests for official use from tribal, state, and local law enforcement agencies are included as part of equitable sharing decisions as outlined in Sec. III.D in this chapter. Because these requests are part of equitable sharing, state, local, and tribal agencies may request forfeited assets only when they directly participated in the case leading to forfeiture. *See also Guide to Equitable Sharing for State, Local, and Tribal Law Enforcement Agencies* (July 2018), Sec. V.C.

[4] For assets seized by a Treasury Forfeiture Fund (TFF) member agency, *see* Treasury Executive Office of Asset Forfeiture (TEOAF) Directive 6: Transfer of Forfeited Property and Retention for Official Use, July 29, 2016.

ER-637

### E. Payment of liens on personal property placed into federal official use

Liens on personal property placed into official use by Department seizing agencies and the USMS may be paid from the Assets Forfeiture Fund (AFF) provided that:

- there remains sufficient funding from the agency's AFF allocation for payment of such liens;

- the agency intends to place the property into official use for at least two years, except when the property is a vehicle requested for use in an undercover capacity. In the case of a vehicle requested for use in an undercover capacity, the head of the seizing agency may decide to exchange the undercover vehicle for a similar vehicle(s) for use in an undercover capacity. No cash or remuneration of any kind may be received as part of any such exchange. All such exchanges shall be reported to the Chief of MLARS within 90 days after the end of each fiscal year;

- the total amount to be paid from the AFF amounts to less than one-third the appraised value of the property; and

- the total amount to be paid from the AFF is less than $25,000.

Seizing agencies must submit requests for exceptions to this policy in writing to the Chief of MLARS.

## II. Equitable Sharing

Federal law authorizes the Attorney General to share federally forfeited property with participating tribal, state, and local law enforcement agencies.[5] *See* 21 U.S.C. §§ 881(e)(1)(A) and (3); 18 U.S.C. § 981(e)(2); 31 U.S.C. § 9705(a)(1)(G) and (b)(4). Through equitable sharing, any tribal, state, or local law enforcement agency that directly participates in a law enforcement effort that results in a federal forfeiture may either request to put tangible forfeited property into official use or an equitable share of the net proceeds of the forfeiture. The exercise of this authority is discretionary. The Attorney General is not required to share property in any case.

Equitable sharing and official use requests will be granted only if forfeited property[6] or net proceeds[7] from the sale of forfeited property remain after all approved claims, petitions for remission, and restoration requests have been processed and paid. In addition, international sharing must be reviewed and approved prior to payment of domestic sharing.[8]

---

[5]  For more details and related publications on equitable sharing, please refer to MLARS Equitable Sharing Program page. The Treasury Forfeiture Fund (TFF) administers a substantially similar equitable sharing program.

[6]  Unlike other types of forfeited property, federally forfeited firearms and ammunition may not be sold. While forfeited firearms and ammunition may be put into federal official use, they may not be shared with tribal, state, or local agencies. *See* Chap. 5, Sec. IV.C in this *Manual*. Also, gift cards and other types of stored value cards seized by a Treasury member agency cannot be placed into official use or transferred to another federal agency. *See* TEOAF Directive 6: Transfer of Forfeited Property and Retention for Official Use, July 29, 2016.

[7]  In any case with underwater asset(s) (i.e. where the asset expenses are greater than income), the deciding official must offset the negative value of the underwater asset(s) against any asset(s) with a net income prior to distribution of any approved sharing.

[8]  *See* Chap. 8, Sec. XIII in this *Manual*.

## ER-638

## III. Processing Applications for Equitable Sharing

### A. Eligible participants

Any tribal, state, or local law enforcement agency that is a participant in the Equitable Sharing Program (Program) and directly participates in an investigation or prosecution resulting in a federal forfeiture may request an equitable share of the net proceeds of the forfeiture. To receive shared funds, the agency must comply with the Program guidelines and reporting requirements. *See* the *Guide to Equitable Sharing for State, Local, and Tribal Law Enforcement Agencies* (July 2018) (*Guide*), Sec. II.

MLARS determines the eligibility of a tribal, state, or local law enforcement agency to participate in the Program. MLARS will assess any request according to criteria outlined in the *Guide* and any subsequent updates to the *Guide*. *See* Secs. III and VII. No agency will be accepted into the Program until MLARS' determination is complete.

### B. Compliance

To participate in the Program, tribal, state, and local law enforcement agencies must first submit, and annually resubmit, an Equitable Sharing Agreement and Certification form (ESAC form) signed by both the head of the law enforcement agency and the head of the governing body having budgetary authority over the law enforcement agency. By signing the ESAC form, the signatories agree to be bound by, and comply with, the federal statutes and Department policies—including policies on the appropriate law enforcement purposes and functions of forfeiture—governing the Program. *See Guide* Sec. VII.A.

Any breach of the ESAC form by a tribal, state, or local law enforcement agency may render it non-compliant or ineligible to receive equitable sharing payments. Participation may be barred on either a temporary or permanent basis, and in some cases, an agency's pending equitable sharing distributions may be permanently extinguished where a requesting agency has failed timely to submit an ESAC form or UFMS Vendor Request Form (ACH form) or has failed to meet any other requirements as set forth in the *Guide*. *See* Sec. VII. While federal investigative agencies and U.S. Attorneys (USAOs) have no affirmative obligation to monitor an agency's eligibility, they are obliged promptly to report to MLARS any information that might affect an agency's eligibility to participate in the Program.

### C. Equitable sharing allocations

Equitable shares allocated to a law enforcement agency must bear a reasonable relationship to the agency's direct participation in the law enforcement effort resulting in the forfeiture. As a general rule, the recommended equitable sharing allocation should be based on a comparison of the workhours and qualitative contributions of each and every federal, tribal, state, and local law enforcement agency that participated in the law enforcement effort resulting in the forfeiture.[9] Qualitative factors that the decision maker may consider when determining a sharing percentage are outlined in Sec. IV.A. of the *Guide*.

---

[9] When a state forfeiture relates to a federal criminal prosecution, federal equitable sharing decisions should account for both state and federal forfeitures in the investigation. Consequently, federal agencies and USAOs should collectively review state and federal forfeitures stemming from a single investigation before making federal equitable sharing recommendations and decisions.

## ER-639

Equitable sharing percentages may also be awarded based on an agency's participation in a task force that has previously adopted a task force sharing arrangement consistent with Department policy. In these cases, all agencies participating in the task force must sign a memorandum of understanding (MOU) reflecting the task force sharing arrangement before any seizures may be made pursuant to the MOU. These MOUs should be updated periodically to reflect material changes in the agencies constituting the task force or in any agency's contribution to forfeitures credited to the task force. However, an MOU only governs the total contribution of the task force agencies. It may not bind Department agencies or non-task force agencies to a particular share. For further information regarding the calculation of the sharing percentage, *see Guide* Sec. IV.B.

Funds collected to satisfy a forfeiture money judgment are not eligible for equitable sharing where no collection efforts were expended by the participants in the underlying investigation. For example, if a Deputy U.S. Marshal (DUSM), U.S. Attorney's Office (USAO) employee, or other federal agency locates funds in satisfaction of a money judgment, those funds cannot be shared unless the tribal, state, or local agency assisted in the collection effort. Funds located and applied to the money judgment at the time the money judgment is entered could be eligible for sharing.

### D. Submission of requests for official use or equitable sharing

A tribal, state, or local law enforcement agency participating in the Program may request official use or an equitable share of forfeited property by submitting an equitable sharing request form (Form DAG-71) through the Department's Equitable Sharing Portal (eShare Portal). A separate Form DAG-71 must be completed by the requesting agency for each asset to be shared. An agency may not file a Form DAG-71 on behalf of another agency. For more information about the procedures for submitting a Form DAG-71, consult Sec. IV of the *Guide*.

Federal agencies are not eligible to receive equitable sharing funds. Federal law enforcement agencies that participated in the forfeiture must follow agency policy to submit a FCF to the lead or processing federal agency to record participation or, where applicable, request a fund-to-fund transfer (e.g. a transfer from the AFF to the Treasury Forfeiture Fund (TFF) or vice versa) for the assistance they provided.[10] A federal investigative agency shall not complete a FCF for another federal agency.

### E. Final decision maker

#### E.1 Investigative agency

If assets are administratively forfeited and the total appraised value of all items forfeited under a single Declaration of Administrative Forfeiture is less than $1 million, the head of the investigative agency, or designated agency headquarters official, decides the appropriate equitable share as to each asset and requesting agency.

#### E.2 U.S. Attorney

If the assets are judicially forfeited and the total appraised value of all of the assets forfeited in a single judicial forfeiture order is less than $1 million, the U.S. Attorney decides the appropriate equitable share as to each asset and requesting agency.

[10] *See* Sec. V in this chapter for additional information on the FCF.

### E.3   Deputy Attorney General (DAG)

Regardless of whether assets are administratively or judicially forfeited, the Deputy Attorney General (DAG), or a designee, decides the final equitable share as to each asset and requesting agency in:

(1) All cases in which the total appraised value of all of the assets forfeited under a single declaration of administrative forfeiture or judicial forfeiture order is $1 million or more. Assets forfeited under a single declaration of administrative forfeiture or judicial forfeiture order cannot be separated so that only the individual assets having a value greater than $1 million are submitted to the decision maker for sharing decisions;

(2) Cases involving the equitable transfer of real property;[11] or

(3) Cases involving the transfer of tangible items.

The appropriate decision maker with delegated decision-making authority from the DAG is generally determined by the value of the assets to be shared, as set forth below.

#### E.3.a   Assets valued between $1 and $5 million

The DAG delegated to the Chief of MLARS the authority to decide equitable sharing requests for judicially or administratively forfeited assets in which (1) the property to be shared is valued between $1 million and $5 million and (2) MLARS, the seizing agency, and the USAO agree on the sharing allocations. If the seizing agency, the USAO, and MLARS do not agree on the sharing allocations, the DAG must make the final decision.

#### E.3.b   Assets valued over $5 million

The DAG delegated to the Assistant Attorney General for the Criminal Division (AAG) authority to decide equitable sharing requests for judicially or administratively forfeited assets in which: (1) the property is valued in excess of $5 million and (2) the seizing agency, the USAO, and MLARS agree on the sharing allocations. If the seizing agency, the USAO, and MLARS do not agree on the sharing allocations, the DAG must make the final decision.

#### E.3.c   Transfer of tangible property

Regardless of the asset value, all transfers of tangible items to a state or local law enforcement agency require approval from MLARS. The state or local law enforcement agency must intend to use the property for law enforcement purposes and must specify the exact intended use of the requested asset(s). Should MLARS approve such a transfer, the recipient agency will be required to pay any expenses and the federal share. *See Guide* Sec. V.C.1.

---

[11] The transfer of real property to a tribal, state, or local law enforcement agency for official use is contingent upon the agency's demonstration of a compelling law enforcement need for the property. The recipient agency must sign an MOU before the transfer will be approved. *See Guide* Sec. V.C.2. All sharing requests involving the transfer of real property must be submitted to MLARS for processing, regardless of the value of the real property.

## ER-641

### F. Communication with the requesting agency

Until the final decision maker has rendered a decision, federal personnel and contractors involved in making, processing, or deciding an equitable sharing request must not represent the projected outcome of sharing requests.

### G. Reimbursement of federal costs and expenses

Tribal, state, and local law enforcement agencies that receive real property or tangible personal property must reimburse the AFF for any liens, accrued expenses,[12] costs of sharing with other agencies, and the "federal share," which is at least 20% but often more.[13] The requesting agency must pay within 30 calendar days of notification of the total expenses. If the requesting agency has no pending sharing requests or is unable or unwilling to pay the balance within 30 calendar days, the property must be sold and an equitable share will be distributed to the agency in lieu of transfer.

Payment of the costs and expenses or the federal share may not be waived, except in cases of extreme hardship where the requesting agency lacks sufficient funds from previous equitable sharing or other available funds to pay the total costs and expenses. The decision to waive the federal share and expenses rests with MLARS. The requesting agency must demonstrate in writing that it is unable to pay the total reimbursement, that the payment of such reimbursement would result in an immediate and extreme financial hardship to the requesting agency, and that the benefit of receiving the property outweighs the receipt of the agency's otherwise applicable equitable share. MLARS does not issue waivers except in unique circumstances (such as for property that would have otherwise been destroyed). In those cases, MLARS will consider the agency's submission and whether it is fiscally advantageous to transfer the property, as opposed to liquidating the property and transferring the proceeds, when determining whether to waive expenses.

## IV. Equitable Sharing Payments

The USMS makes equitable sharing payments only after final approval of the sharing appears on the applicable reports generated by the Consolidated Asset Tracking System (CATS). Payments will not happen unless all information required to authorize the payment has been entered in CATS by the investigative agency, the USAO, and MLARS, and the recipient agency complies with all reporting requirements.

The USMS electronically transfers all equitable sharing payments to tribal, state, and local law enforcement agencies. To electronically receive equitable sharing payments, a tribal, state, or local law enforcement agency must submit a completed ACH form to the USMS at AFD.ACHFORMS@usdoj.gov.[14] Note that approved sharing of less than $500 will not be processed.

---

[12] "Accrued expenses" includes reimbursement of the cost of contractor expenses that are allocated by the federal agency to the forfeited asset.

[13] The federal share is the amount retained in the AFF that represents the percentage corresponding to the federal participation in the law enforcement effort. If a tribal, state, or local agency opts to take an asset for official use as opposed to receiving the net proceeds, the agency must pay the value of the federal share that would have been retained had the asset been sold. In these instances, the federal share is based on the current appraised value of the asset. In no case shall the federal share be less than 20% of the appraised value of the asset.

[14] The ACH form is available on MLARS Equitable Sharing Program page. Contact the Treasury Executive Office of Asset Forfeiture (TEOAF) or the USPIS for information about payments from these agencies.

**ER-642**

All equitable sharing payments are subject to certain offsets under the Debt Collection Improvement Act of 1996 (DCIA), through which Treasury and other disbursing officials must offset federal payments to collect delinquent non-tax debts owed to the United States or state governments, and the Taxpayer Relief Act of 1997, which provides for the continuous levy of federal non-tax payments to collect delinquent tax debts. The Treasury Offset Program (TOP) collects Taxpayer Identification Numbers (TIN) and banking account information for the payee on any such offset payment.[15]

## V. Federal Contribution Form (FCF)

Each federal agency must complete the FCF to fully capture federal participation in the law enforcement effort leading to forfeiture, and when appropriate, must request a transfer of funds from one forfeiture fund (the AFF, TFF or U.S. Postal Inspection Service (USPIS) Forfeiture Fund[16]) to the fund of the recipient agency. Any forfeited funds or proceeds from the sale or other disposition of forfeited property may be transferred directly only to the appropriate forfeiture fund of the requesting agency, not to the requesting agency itself.

When federal agencies from the same forfeiture program participate in a joint investigation, no fund-to-fund monetary transfers occur. In these cases, the FCF serves the important function of documenting the participation of each federal agency and also provides necessary information to the sharing decision-maker who must evaluate the overall workhour and qualitative contributions of all participating federal, tribal, state, and local agencies when determining sharing percentages for "cash/proceeds" decisions.

When an AFF investigative agency participates in an investigation resulting in the seizure of property processed for forfeiture by another federal investigative agency, it can record the seizure in CATS by creating a "referral asset." A referral asset is another method for capturing statistics on seizures to document participation in an investigation.

An FCF may only be completed by the federal agencies listed in the chart below.

---

[15] On occasion, a delinquent debt giving rise to an offset may be attributable to another agency in the same governmental jurisdiction as the requesting agency. Agencies whose funds have been offset should review *Guide* Sec. V.E. for information relevant to seeking repayment of the offset funds from the responsible city, county, or state agency.

[16] The USPIS has the authority to directly receive asset forfeiture proceeds, expend funds, and manage its own asset forfeiture fund. *See* 39 C.F.R. §§ 2003 and 2601.

**ER-643**

| NCIC/ORI CODE | Agency |
|---|---|
| CBPAMO000 | Customs and Border Protection- Air Operations (CBP-AO) |
| CBPOBP000 | Customs and Border Protection- Border Patrol (CBP) |
| CBPOFO000 | Customs and Border Protection- Field Operations (CBP-FO) |
| DCATF0000 | Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) |
| DCDOS0000 | Department of State |
| DCICE0000 | Immigration and Customs Enforcement (ICE) |
| DCIS | Defense Criminal Investigative Service (DCIS) |
| DEA | Drug Enforcement Administration (DEA) |
| FBI | Federal Bureau of Investigation (FBI) |
| IRS | Internal Revenue Service (IRS) |
| MDFDA03T0 | Food and Drug Administration (FDA) |
| TTB | Tax and Trade Bureau (TTB) |
| USCG | U.S. Coast Guard (USCG) |
| USDAIG | U.S. Department of Agriculture, Office of Inspector General (USDA-OIG) |
| USMS | U.S. Marshals Service (USMS) |
| USPS00000 | U.S. Postal Service (USPS) |
| USSS | U.S. Secret Service (USSS) |

When a TFF agency becomes involved in an ongoing joint investigation involving an AFF agency and tribal, state, or local law enforcement agencies, and an existing MOU governs sharing between the AFF agency and the participating tribal, state, and local law enforcement agencies, the sharing percentages agreed on in the MOU must be reduced to include a transfer to the TFF in recognition of the Treasury agency's participation. When a federal agency is invited to join an ongoing investigation, the agency must immediately notify the lead agency and the USAO of its involvement. Any issues that cannot be resolved through communication between case agents should be submitted to the appropriate special agent-in-charge (SAC) for the involved agencies. Agency headquarters will not become involved in the resolution of issues unless the SAC from either of the participating agencies requests assistance. Prompt and accurate communication about sharing matters is important and should occur in the first instance at the field level.

The deadline for agencies to submit FCFs is 45 days after forfeiture. Agencies may submit FCFs for intra-fund joint investigations (i.e. from one Department seizing agency to another) electronically through the eShare Portal.[17]

## VI.   Reverse Sharing

The Department investigative agencies participating in an investigation resulting in the seizure of property that is processed for forfeiture by a tribal, state, or local law enforcement agency or foreign jurisdiction should create a "referral asset" in CATS to document their participation in the investigation. If any proceeds are received from the state, local, or tribal law enforcement agency or foreign jurisdiction through "reverse sharing," the agency's share will be deposited into the AFF.

---

[17] Agencies should continue to submit hard copies of the FCF to Treasury and Department of Homeland Security (DHS) agencies.

**ER-644**

## VII. International Sharing of Forfeited Assets

Department policy applicable to international sharing, as well as the forfeiture of assets located overseas, is in Chapter 8, Section XIII of this *Manual*. The Department encourages international asset sharing with countries that facilitate the forfeiture of assets under U.S. law. International sharing, which requires both Department of Justice and Department of State's approval and concurrence by Department of the Treasury, must be either approved or pre-approved before any domestic equitable sharing can take place. The percentage granted to a foreign country often depends upon international sharing agreements or factors that differ significantly from the "workhour and qualitative contribution" standard used in determining domestic sharing.

Funds shared with the United States by the foreign government that have not been forfeited under U.S. law may not be eligible for domestic equitable sharing. These funds would be eligible for domestic equitable sharing only if they are forfeited under U.S. law.[18] Nevertheless, if U.S. prosecutors or investigators assisted in a foreign case that resulted in a foreign forfeiture, they are encouraged to contact MLARS to determine if it might be appropriate to submit a sharing request to that country, as the funds still may be deposited into the AFF and be applied for Asset Forfeiture Program purposes. All requests to foreign countries for asset sharing must be submitted by MLARS in coordination with the Department's Office of International Affairs (OIA).

---

[18] *See also* Chap. 8, Sec. XIII in this *Manual*.

**ER-645**

# Appendix A:
# Approval, Consultation, and Notification Requirements Chart

## Adoption (State/Local Seizures)

| | | | |
|---|---|---|---|
| **Direct Adoption by U.S. Attorney** | Approval | AFPM Chap. 3.V.A | **MLARS** must authorize direct adoption by U.S. Attorney for firearms, ammunition, explosives, and any asset that does not meet the minimum net equity and value thresholds in AFPM Chap. 1.I.B.1 |
| **Direct Adoption by U.S. Attorney** | Approval | AFPM Chap. 3.V.A | **U.S. Attorney** may authorize direct adoption of assets that meet the applicable net equity and value thresholds and property associated with child pornography |
| **Direct Referral of Assets Other than Real Property by U.S. Attorney** | Approval | AFPM Chap. 3.V.B | **MLARS** must authorize direct referral by U.S. Attorney for real property |
| **Direct Referral by U.S. Attorney** | Approval | AFPM Chap. 3.V.B | **U.S. Attorney** may authorize direct referral of any asset other than real property |

## Attorneys' Fees

| | | | |
|---|---|---|---|
| **EAJA Awards** | Approval | AFPM Chap. 12.II.B; JM § 9-117.220 | **MLARS** must give approval to use funds to pay EAJA awards arising from third party petitioners in criminal forfeiture actions. |
| **Exempt Fees from Forfeiture** | Approval | AFPM Chap. 11.IX, Chap. 12.IV; JM §§ 9-113.600, 9-120.116 | **AAG** must give approval to enter into a formal or informal, written or oral agreement to exempt from forfeiture an asset transferred to an attorney as fees for legal services, including those restrained as substitute assets. |
| **Proceedings Against Fees** | Approval | AFPM Chap. 12.IV; JM § 9-120.112 | **AAG** must give approval for any action to institute a criminal or civil forfeiture proceeding against an asset transferred to an attorney as a fee for legal services. |

## Business Entities

| | | | |
|---|---|---|---|
| **Facilitating Property** | Approval | AFPM Chap. 1.I.D.5, Chap. 5.III.D.1.b | **U.S. Attorney** must provide written authorization before the USAO: (1) seizes or files a civil forfeiture complaint against an ongoing business based on a facilitation theory or (2) extends 60-day deadline to file civil forfeiture complaint against an ongoing business based on a facilitation theory. |

| | | | | |
|---|---|---|---|---|
| AAG | Assistant Attorney General | | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | | Treasury | Department of the Treasury |
| Department | Department of Justice | | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-646**

## Business Entities

| | | | |
|---|---|---|---|
| **Facilitating Property** | Approval | AFPM Chap. 5.III.D.1.b | **MLARS Chief** must provide written authorization before the Criminal Division or other Department component not partnering with the USAO may extend 60-day deadline to file civil forfeiture complaint against an ongoing business based on a facilitation theory. |
| **Losses or Liabilities, Post-Seizure** | Notify | AFPM Chap. 9.IV | USAO, USMS, or investigative agency must notify **MLARS** and **AFMS** when they learn that a restrained or seized business will lose money, has liabilities, or has insufficient equity. |
| **Net Losses, Planning for Seizure and Restraint** | Approval | AFPM Chap. 1.I.D.1 and 1.I.D.4, Chap. 9.IV | **MLARS** must give approval, in coordination with **AFMS** and **USMS**, if the restraint, seizure, or forfeiture of a business could create a deficit to the AFF for that business. |
| **Prior to Instituting Forfeiture Proceedings** | Consult | AFPM Chap. 1.I.D.4, Chap. 4.III.C, Chap. 9.II; JM §§ 9-105.330, 9-111.124 | USAO must consult **MLARS** and **USMS** prior to filing indictment, information, or complaint in any forfeiture action against, seeking the seizure of, or moving to restrain an ongoing business.<br><br>JM § 9-105.330 requires consultation with MLARS prior to seeking forfeiture of a business on the theory that it facilitated money laundering. JM 9-111.124 says that USAO must consult MLARS prior to initiating a forfeiture action against, or seeing the seizure of, or moving to restrain an operating business. MLARS will coordinate with EOUSA to update JM. |

## Civil Forfeiture Complaint

| | | | |
|---|---|---|---|
| **Facilitating Property** | Approval | AFPM Chap. 5.III.D | **U.S. Attorney** must provide written authorization before USAO files any civil forfeiture complaint based on a theory that the property facilitated or concealed underlying criminal activity. |
| **Facilitating Property** | Approval | AFPM Chap. 5.III.D | **MLARS Chief** must provide written authorization before the Criminal Division or other Department component not partnering with the USAO files any civil forfeiture complaint based on a theory that the property facilitated or concealed underlying criminal activity. |

## Correspondent Accounts

| | | | |
|---|---|---|---|
| **Restraining Order or Warrant** | Approval | AFPM Chap. 8.IX; AAG Chertoff Memorandum; USA Patriot Act, § 319, codified at 18 U.S.C. § 981(k) | **MLARS** must give approval before serving a restraining order, seizure warrant, or warrant of arrest on a correspondent bank account under 18 U.S.C. § 981(k) (**MLARS Chief** will get concurrence from **OIA director**). |

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Service |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-647**

## Correspondent Accounts

| Subpoena or Summons | Approval | AAG Chertoff Memorandum; AG order delegating authority to AAG; USA Patriot Act, § 319, codified at 31 U.S.C. § 5318(k) | **MLARS** must give approval before AAG can issue summonses or subpoenas to foreign banks that maintain correspondent accounts in the United States to get records (**MLARS Chief** will get approval from **OIA** as well). |
|---|---|---|---|

## Equitable Sharing

| Assets Valued $1 to $5 Million | Approval | AFPM Chap. 15.III.E.3.a | **MLARS Chief** has authority to rule on equitable sharing requests for judicially and administratively forfeited assets in which: (1) the property to be shared is valued between $1 and $5 million and (2) MLARS, seizing agency, and USAO agree on the sharing. |
|---|---|---|---|
| Assets Valued Over $5 Million | Approval | AFPM Chap. 15.III.E.3.b | **AAG** has the authority to rule on equitable sharing requests if: (1) the property is over $5 million and (2) MLARS, seizing agency, and USAO all agree on the sharing. |
| International Sharing | Approval | AFPM Chap. 8.XIII, Chap. 15.VIII; JM § 9-116.400 | **Secretary of State** and **AG** approval required before forfeited assets can be shared internationally. In cases involving the AFF, (1) **AAG** approves uncontested international sharing proposals over $5 million and (2) **MLARS Chief** approves uncontested international equitable sharing proposals for $5 million or less. |
| Multi-District / Real Property Transfer / Disagreement | Approval | AFPM Chap. 15.III.E.3.b JM § 9-116.210 | **DAG** must approve equitable sharing in cases involving: (1) multiple districts, (2) real property transfers to a state or local agency for law enforcement related use, or (3) disagreement among USAO, MLARS, and seizing agency on the sharing, regardless of the property value.<br><br>JM § 9-116.210 says that DAG must approve equitable sharing in cases involving: (1) $1 million or more in forfeited assets, (2) multi-district cases, or (3) cases involving real property transfers to a state or local agency for law enforcement related use. MLARS is coordinating with EOUSA to update JM. |
| Transfer of Tangible Items | Approval | AFPM Chap. 15.III.E.3.c | **MLARS** must approve equitable sharing in cases involving the transfer of tangible items. |

## International Forfeiture

| Businesses Located Abroad | Consult | AFPM Chap. 8.IV | **MLARS** must be consulted before the United States asks a foreign government to restrain or seize an ongoing business or its assets, or appoint a guardian, or similar fiduciary for the same. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-648**

## International Forfeiture

| | | | |
|---|---|---|---|
| **Civil Forfeiture** | Consult | AFPM Chap. 8.VIII; JM § 9-13.526 | **OIA** (which will consult with **MLARS**) must be notified before filing an in rem forfeiture action based on 28 U.S.C. § 1355(b)(2). |
| **Enforcement/ Recognition in Foreign Jurisdiction** | Consult | JM § 9-13.526 | **OIA** (which will consult with **MLARS**) must be consulted before taking steps to present to a foreign government, for enforcement or recognition, any civil or criminal forfeiture order entered in the United States for property located within the foreign jurisdiction. |
| **Enforcement of Foreign Judgments and Restraining Orders** | Approval | AFPM Chap. 8.XII.B | **MLARS** must authorize: (1) foreign forfeiture or confiscation judgments under 28 U.S.C. § 2467(b)(2) where the amount is $5 million or less; and (2) all foreign forfeiture restraining orders under § 2467(d)(3)(B)(ii). |
| **Repatriation** | Consult | AFPM Chap. 8.VI | **MLARS** and **OIA** must be consulted when seeking repatriation of forfeitable assets located abroad. |

## Net Equity Thresholds

| | | | |
|---|---|---|---|
| **Decrease Thresholds** | Approval | AFPM Chap. 1.I.D.1; JM § 9-111.120 | Supervisory-level approval, in writing, from the **USAO** (for **judicial forfeitures**) or **seizing agency** (for **administrative forfeitures**) required for any downward departure from the seizing thresholds. Reason for waiver must be explained in the case file. |
| **Increase Thresholds** | Consult | AFPM Chap. 1.I.D.1, Chap. 3.I n.2; JM § 9-111.120 | **USAO** (which will consult seizing agencies affected by the change) may institute higher district-wide thresholds for judicial forfeitures. |

## Official Use

| | | | |
|---|---|---|---|
| **Property Value $50,000 or More** | Notify | AFPM Chap. 15.I.B | Seizing agency and/or USMS must notify **MLARS** where property requested for official use is valued at over $50,000. |
| **Asset Seized by Its Own Agency** | Decision | AFPM Chap. 15.I.B | **Head of the seizing agency**, or a **designated headquarters official**, decides whether to put assets seized by the agency into its own official use. |
| **Requests by Other Federal Agencies** | Approval | AFPM Chap. 15.I.C | **Lead federal seizing agency** approves requests for official use by other federal agencies. If more than one Department component seeks to retain the same forfeited property for official use, **MLARS** will determine which agency may place the property into official use. |

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Service |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-649**

| **Official Use** | | | |
|---|---|---|---|
| **Payment of Liens on Personal Property Placed into Official Use** | Approval | AFPM Chap. 15.I.E | **MLARS Chief** must approve requests for exceptions for payment of liens on personal property placed into official use from the AFF. |

| **Plea Agreements or Settlements** | | | |
|---|---|---|---|
| **Interlocutory Sale of Cryptocurrency** | Consult | AFPM Chap. 2.V.B.3, Chap. 11.VIII.D n.17 | Consultation with **MLARS** is required prior to seeking an order for the interlocutory sale of cryptocurrency. |
| **Administrative Forfeiture, Return of Property** | Consult | AFPM Chap. 5.II.E, Chap. 11.I.B.4; JM § 9-113.103 | **Seizing agency** must be consulted before entering into plea agreements or settlements returning property that is the subject of administrative forfeiture proceedings. USAO should not agree to return property that is the subject of a pending administrative forfeiture proceeding, unless (1) **seizing agency** agrees to suspend administrative forfeiture or (2) **MLARS** approves the decision to return the property. |
| **Administrative Forfeiture, Return of Property** | Approval | AFPM Chap. 5.II.E, Chap. 11.I.B.4; JM § 9-113.104 | **Seizing agency** must be consulted before entering into plea agreements or settlements returning property that is the subject of administrative forfeiture proceedings. USAO should not agree to return property that is the subject of a pending administrative forfeiture proceeding, unless (1) **seizing agency** agrees to suspend administrative forfeiture or (2) **MLARS** approves the decision to return the property. |
| **Administrative Forfeiture Used to Effectuate Agreement** | Consult | AFPM Chap. 11.III.C; JM § 9-113.300 | **Seizing agency headquarters** must be consulted where an administrative forfeiture is necessary to effectuate an agreement.<br><br>JM § 9-113.300 requires consultation with **the seizing agency headquarters** where an administrative forfeiture is necessary to effectuate a settlement. MLARS will coordinate with EOUSA to update JM. |
| **Deferred Prosecution Agreement (DPA) or Non-Prosecution Agreement (NPA)** | Approval | AFPM Chap. 11.I.A | **TEOAF** counsel and **TFF seizing agency** must be consulted for additional guidance on plea agreements or settlements involving DPAs or NPAs. |
| **Management or Disposition** | Consult | AFPM Chap. 9.II, Chap. 10.I.D, Chap. 11.I.B.2 | USAO or seizing agency (in **administrative forfeitures**) should consult **USMS** before taking any property management or disposition actions. |

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-650**

## Plea Agreements or Settlements

| | | | |
|---|---|---|---|
| **Negotiations** | Consult | AFPM Chap. 11.I.B.2; JM § 9-113.103 | **USMS** and **seizing agency** must be consulted during settlement negotiation where appropriate. When a settlement involves complex assets, complex terms, or a risk of loss to the government, prosecutors should consult **USMS**. |
| **Settlement Over $2 Million and 15% of Amount Involved** | Approval | AFPM Chap. 11.II; JM § 9-113.200 | **DAG** must approve settlements where the amount to be released exceeds $2 million and 15% of the amount involved. |
| **Settlement over $1 Million but under $2 Million and 15% of Amount Involved** | Approval | AFPM Chap. 11.II; JM § 9-113.200 | **MLARS Chief** has authority to approve a forfeiture settlement over $1 million, unless the amount to be released exceeds 15% of the amount involved and is greater than $2 million. |
| **Settlement under $1 Million or between $1 and $5 Million if Released Amount Under 15% of Original Claim** | Approval | AFPM Chap. 11.II; JM § 9-113.200 | **U.S. Attorney** may approve any settlement in a criminal or civil forfeiture claim if (1) the amount involved is less than $1 million, regardless of the amount to be released or (2) the amount involved is between $1 and $5 million, if the amount to be released does not exceed 15% of the original claim. |
| **Taxes** | Notify | AFPM Chap. 11.I.B.9 | USAO should notify **appropriate agency** (like IRS) prior to any settlement that will release assets to claimant/defendant known (or likely to have) other outstanding obligations to the United States (like taxes). |
| **Unsecured Partial Payment** | Approval | AFPM Chap. 11.I.B.7; JM § 9-113.107 | USAO must obtain approval from **MLARS** (which will consult **USMS**) prior to any settlement that provides for unsecured partial payment. |
| **Unsecured Partial Payment** | Consult | AFPM Chap. 11.I.B.7; JM § 9-113.107 | USAO must obtain approval from **MLARS** (which will consult **USMS**) prior to any settlement that provides for unsecured partial payment. |

## Planning for Seizure/Restraint

| | | | |
|---|---|---|---|
| **Loss or Liabilities** | Consult | AFPM Chap. 1.I.D.1 and 1.I.D.3.b; JM § 9-111.123 | USAO must consult **USMS** and **seizing agency** (in **judicial forfeitures**) before seizing assets with potential liabilities. Seizing agency must consult **USMS** (in **administrative forfeitures**) in forfeiture of non-routine assets. |
| **Management or Disposition** | Consult | AFPM Chap. 9.II, Chap. 10.I.D | USAO should consult **USMS** before submitting or filing any proposed court orders to restrain, seize, or impose property or financial managment obligations on property in USMS custody. |

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Service |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-651**

## Planning for Seizure/Restraint

| | | | |
|---|---|---|---|
| **Planning Discussions** | Consult | AFPM Chap. 1.I.A–D; JM § 9-111.110 | **USMS** must be consulted as part of the planning process prior to seizure/restraint and forfeiture of complex assets. |
| **Third Party Contractors** | Approval | AFPM Chap. 1.I.B | **USAO** must give approval prior to the release of sensitive law enforcement information to third party contractors for the purpose of pre-seizure planning. |

## Real Property

| | | | |
|---|---|---|---|
| **Contaminated Real Property** | Consult | AFPM Chap. 4.I.E; JM § 9-111.400 | **Seizing agency**, **USMS**, **MLARS**, and **AFMS** must be consulted prior to seizure of contaminated real property. (JM says USAO should exercise its discretion.) |
| **Liens or Mortgages** | Approval | AFPM Chap. 10.III.A; JM § 9-113.800 | **MLARS** must approve any requests for payment of liens and mortgages in excess of sale proceeds. |
| **Net Loss, Planning for Seizure and Restraint** | Consult | AFPM Chap. 1.I.D.1, Chap. 4.I.A–B | Consultation between **MLARS**, **AFMS**, and **participating agencies** (USAO, seizing agency, USMS) is required if the restraint, seizure, or forfeiture of real property could create a deficit to the AFF for that property. |
| **Net Loss, Pre-Seizure** | Notify | AFPM Chap. 1.I.D.3.b.1, Chap. 4.I.B.2 | If USAO decides to continue with forfeiture, it must (1) notify **MLARS** and **AFMS** and (2) obtain approval in writing from supervisory-level official at **USAO**. |
| **Net Loss, Pre-Seizure** | Approval | AFPM Chap. 1.I.D.3.b.1, Chap. 4.I.B.2 | If USAO decides to continue with forfeiture, it must (1) notify **MLARS** and **AFMS**, and (2) obtain approval in writing from supervisory-level official at **USAO**. |
| **Transfer: Equitable Sharing** | Approval | AFPM Chap. 15.III.E.3 n.11, Chap. 4.V.A | **AAG** must approve real property transfers to state or local agencies for official use in fulfilling a compelling law enforcement need. |
| **Transfer: Federal Purpose** | Approval | AFPM Chap. 4.V.D | **DAG** must approve a real property transfer to a federal agency for use in fulfilling a law enforcement need, or for serving a significant and continuing federal purpose. |
| **Transfer: Operation Goodwill** | Approval | AFPM Chap. 4.V.C | **AG** must approve real property transfers to state or local governmental agencies, or its transferees, for use in the Operation Goodwill Program. |
| **Transfer: Recreational, Historic Preservation purpose** | Approval | AFPM Chap. 4.V.E | **DAG** must approve real property transfers to a state for use as a recreational or historic site, or for the preservation of natural conditions. |
| **Transfer: Weed and Seed** | Approval | AFPM Chap. 4.V.B; JM § 9-116.500 | **DAG** must approve real property transfers to state or local agencies for further transfer to other government agencies or non-profit agencies for use in Weed and Seed Program. |

| | | | |
|---|---|---|---|
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

## Real Property

| Facilitating Property | Approval | AFPM Chap. 5.III.D.1.c | **U.S. Attorney** must provide written authorization before USAO files a civil forfeiture complaint against personal residences based on a facilitation theory. **MLARS Chief** must provide written authorization before the Criminal Division or other Department component not partnering with the USAO files a civil forfeiture complaint against personal residences based on a facilitation theory. |
| --- | --- | --- | --- |
| Property Located in Another District | Consult | AFPM Chap. 4.I | When USAO identifies real property for forfeiture that is located in a different district, the USAO should consult with the **USAO district** where the property is located to discuss any state-specific issues relating to the forfeiture. |
| Property Located in Another District | Notify | AFPM Chap. 11.I.B.6 | To settle a forfeiture action involving property located in another district, the USAO handling the forfeiture must notify and coordinate with **USMS** in the district where the property is located. |
| Valuation | Consult | AFPM Chap. 4.I.B | Federal seizing agency and USAO are required to consult **USMS** to discuss valuation products, lien information, occupancy issues, and other factors that may impact seizure and forfeiture decisions. |

## Remission or Restoration

| Remission or Mitigation Petitions | Approval | AFPM Chap. 13.I, Chap. 14.II.A | **MLARS** must approve (in **judicial forfeitures**) petitions for remission or mitigation. **Seizing agency** must approve (in **administrative forfeitures**) petitions for remission or mitigation. |
| --- | --- | --- | --- |
| Restoration Requests | Approval | AFPM Chap. 14.II.B.1 | **MLARS** must approve requests for restoration. |

## Seized Cash Management

| Exceptions to Prompt Deposit | Approval | AFPM Chap. 2.VI; JM § 9-111.600 | **MLARS** must give approval for exceptions to the policy requiring prompt deposit of any seized cash into the SADF, unless the seized cash is less than $5,000. |
| --- | --- | --- | --- |

| | | | |
| --- | --- | --- | --- |
| AAG | Assistant Attorney General | JM | *Justice Manual* |
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-653**

## Structuring

| Seizure | Approval | AFPM Chap. 2.VII.A | If no criminal charges have been filed, **U.S. Attorney** must provide written authorization before the USAO seeks a warrant to seize structured funds where no probable cause that the structured funds were generated by unlawful activity or that the structured funds were intended for use in, or to conceal or promote, ongoing or anticipated unlawful activity. |
|---|---|---|---|
| Seizure | Approval | AFPM Chap. 2.VII.A | If no criminal charges have been filed, **MLARS Chief** must provide written authorization before the Criminal Division or other Department component not partnering with the USAO seeks a warrant to seize structured funds where no probable cause that the structured funds were generated by unlawful activity or that the structured funds were intended for use in, or to conceal or promote, ongoing or anticipated unlawful activity. The basis for linking the structured funds to additional unlawful activity must receive appropriate supervisory approval and be memorialized in the prosecutor's records. |
| 150-day deadline | Approval | AFPM Chap. 2.VII.C | **U.S. Attorney** must provide written authorization before the USAO may extend the 150-day deadline by 60 days to file criminal charges or a civil complaint against the asset. |
| 150-day deadline | Approval | AFPM Chap. 2.VII.C | **MLARS Chief** must provide written authorization before the Criminal Division or other Department component not partnering with the USAO may extend the 150-day deadline by 60 days to file criminal charges or a civil complaint against the asset. |

## Terrorism

| State Sponsor of Terrorism | Consult | AFPM Chap. 1.I.D.5, Chap. 10.III.D.6 | Consult with **MLARS** as early as possible in any forfeiture case involving a state sponsor of terrorism that may require deposits to the USVSST Fund. |
|---|---|---|---|

## Trustees and Monitors

| Appointment | Consult | AFPM Chap. 9.I.C | USAO must consult with **MLARS** before seeking appointment of a trustee, monitor, or similar fiduciary in any forfeiture case. |
|---|---|---|---|

| AAG | Assistant Attorney General | JM | *Justice Manual* |
|---|---|---|---|
| AFF | Assets Forfeiture Fund | MLARS | Money Laundering and Asset Recovery Section |
| AFMS | Justice Management Division, Asset Forfeiture Management Staff | OIA | Office of International Affairs |
| AFPM | *Asset Forfeiture Policy Manual* (2021) | SADF | Seized Assets Deposit Fund |
| AG | Attorney General | TFF | Department of the Treasury Forfeiture Fund |
| DAG | Deputy Attorney General | Treasury | Department of the Treasury |
| Department | Department of Justice | USAO | U.S. Attorney's Office |
| EAJA | Equal Access to Justice Act | USMS | U.S. Marshals Office |
| EOUSA | Executive Office for U.S. Attorneys | USVSST Fund | United States Victims of State Sponsored Terrorism Fund |

**ER-654**

1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   DAVID COUNTRYMAN (CABN 226995)
    CHRIS KALTSAS (NYBN 5460902)
5   CLAUDIA A. QUIROZ (CABN 254419)
    WILLIAM FRENTZEN (LABN 24421)
6   Assistant United States Attorneys

7        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
8        Telephone: (415) 436-7428
         FAX: (415) 436-7234
9        claudia.quiroz@usdoj.gov

10  Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA,              )   CASE NO. CV 20-7811 RS
                                           )
16          Plaintiff,                     )   **REPLY IN SUPPORT OF MOTION TO STRIKE**
                                           )   **THE CLAIMS OF CLAIMANTS BATTLE**
17       v.                                )   **BORN INVESTMENTS COMPANY, LLC,**
                                           )   **FIRST 100, LLC AND 1ST ONE HUNDRED**
18  Approximately 69,370 Bitcoin (BTC), Bitcoin )   **HOLDINGS, LLC**
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin )
19  Cash (BCH) seized from                 )   Hearing Date:    September 9, 2021
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx     )   Time:            1:30 p.m.
20                                         )   Court:           Hon. Richard Seeborg
                                           )
21          Defendant.                     )
                                           )
22  First 100, LLC, 1st One Hundred Holdings, )
    LLC, and Battle Born Investments       )
23  Company, LLC,                          )
                                           )
24          Claimants.                     )
                                           )
25

26

27

28

REPLY IN SUPPORT OF U.S. MOTION TO STRIKE BATTLE BORN'S CLAIM
CV 20-7811 RS
                              **ER-655**

# TABLE OF CONTENTS

I.   Introduction ............................................................................................................................1

II.  Argument ................................................................................................................................2

     A.   Claimants Fail to Provide a Legitimate Reason to Justify Their Untimely Claims .................2

     B.   Claimants' Statement of Facts is Riddled with Inaccuracies and Unsupported Assumptions
          about Ngan's Possession of 1HQ3 ..............................................................................................6

     C.   The Defendant Property Is Drug Money from Silk Road ........................................................8

     D.   Claimants' Challenge to the Source of the Defendant Property is Based on Flawed
          Assumptions and a Misreading of the Law ...............................................................................9

     E.   The Contents of the 1HQ3 Wallet Never Became Part of the Bankruptcy Estate ................11

     F.   Claimants' Challenge to the Relation Back Doctrine as it Applies to this Case is Deficient
          and Unsupported by the Facts ...................................................................................................12

     G.   Claimants' Discovery Plan ......................................................................................................14

III. Conclusion ............................................................................................................................15

# TABLE OF AUTHORITIES

## Federal Cases

*In re Arenas,*
   535 B.R. 845, 851 (B.A.P. 10th Cir. 2015) ......................................................... 12

*In re Burton,*
   610 B.R. 633, 637-38 (B.A.P. 9th Cir. 2020) ..................................................... 12

*In re Olson,*
   2018 WL 989263 (B.A.P. 9th Cir. 2018)............................................................ 12

*In re Rent-Rite Super Kegs West, Ltd.,*
   484 B.R. 799, 805-806 (D. Colo. 2012).............................................................. 12

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988, 1002 (9th Cir. 2018) ...................................................................... 8

*United States v. $25,790,*
   2010 WL 2671754 (D. Md. July 2, 2010).............................................................. 6

*United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft,*
   619 F.3d 1275, 1277 (11th Cir. 2010) ............................................................... 13

*United States v. Ritchie,*
   342 F.3d 903, 907-08 (9th Cir. 2003) .................................................................. 8

## Statutes

18 U.S.C. § 981 ......................................................................................................... 13

18 U.S.C. § 981(f) ..................................................................................................... 13

18 U.S.C. § 983(d)(3)(A) .......................................................................................... 13

18 U.S.C. § 983(d)(6)(A)-(B)………………………………………………………13

I.      INTRODUCTION

Claimants Battle Born Investments Company, LLC; First 100, LLC; and 1st One Hundred Holdings, LLC (collectively and hereinafter, "Claimants") come no closer to making a colorable claim in their opposition brief than they did in their verified claims or meet and confer discussions with government counsel. In plain terms, Claimants argue that they are entitled to special treatment with respect to lateness. As to standing, they make argumentative leaps amounting to nothing more than speculative assertions of ownership undermined by the very nature of the Defendant Property as illicit proceeds from a darknet marketplace.

Claimants provide no valid justification for their late filing. In fact, their rationale for asking the Court to give them a pass further militate in favor of dismissing their claims at this juncture. Claimants plainly admit that they did not know what the filing deadline was or even that it existed. To overcome this deficiency, they double down on their *mea culpa*, which actually has the effect of revealing the extent of their negligence in pursuing their claims. There may be situations where a late filing should be excused. This is not one of them.

Claimants also fail to demonstrate standing. Their arguments have evolved radically over a short period of time yet continue to miss the mark. Their claims are based on their purchase of the bankruptcy estate of Raymond Ngan, but there is no evidence that Ngan ever possessed, let alone legally owned, the bitcoin at issue. As an alternate theory, Claimants have argued that 13 different individuals purportedly associated with Ngan may be Individual X. Each of those guesses has been wrong, and there is no indication that those associations—such as being in the same city at the same time as Ngan—would make property stolen by another person the property of Ngan's bankruptcy estate.

The reasoning for this confusing line of argument is readily apparent—Claimants' attempt to discredit the government's conclusion regarding the source of the Defendant Property as originating in Silk Road is the only real avenue they have to overcome their lack of standing. According to the data preserved in Silk Road's servers, seized by the government in the prosecution of Ross Ulbricht and Silk Road in 2013, the Defendant Property in this case originated from the same addresses used by Silk Road users to purchase drugs and other illicit goods and services. In other words, before they were stolen and moved to 1BAD and 1BBq, the seized 69,370 bitcoins ("BTC") were located in wallets that were

1  subsequently seized and forfeited by the government in Ulbricht's criminal prosecution. This is

2  confirmed by blockchain analysis and Ulbricht's own admission that the Defendant Property consists of

3  proceeds traceable to criminal activity related to Silk Road, including narcotics trafficking and money

4  laundering. Claimants accordingly have no basis for their claims, and the Court should strike them now.

5      Finally, to avoid unnecessary and protracted litigation, and to the extent that revealing Individual

6  X's identity in a safe manner would assist the Court in evaluating the claims, the government is willing

7  to disclose the identity of Individual X to the Court, *ex parte*, and in camera.[1]

8  **II.   ARGUMENT**

9      **A.   Claimants Fail to Provide a Legitimate Reason to Justify Their Untimely Claims**

10     Claimants admit that they missed the deadline to file their claims because they did not know

11  what the deadline was or even that a deadline existed. Yet, they advance two main arguments to

12  counteract this insurmountable hurdle, both of which militate in favor of striking their claims.

13     First, Claimants argue that they were entitled to direct notice, and demand an opportunity to

14  conduct discovery to ascertain what steps the government took to identify them as potential claimants.[2]

15  Ngan is one of dozens of individuals who have claimed ownership of 1HQ3 without having the private

16  key to access or move the funds in the Bitcoin address.[3] All Claimants have connecting Ngan to 1HQ3

---

[1] There are real safety concerns for keeping the identity of Individual X confidential, including threats Individual X received from Ulbricht.

[2] Claimants also blame the government for not mentioning the deadline until the meet and confer on May 24, 2021. *See* Opp'n at 19 ("It was not until two months later, during a virtual meeting to discuss the claims on May 24, 2021, that the Government first mentioned that the claims were late."). Claimants insist on representing the nature of those discussions as settlement discussions. But as Jeffrey Nicholas states in his declaration, Claimants' counsel undertook a "process of compiling supporting documentation and preparing a memo outlining [their] position." Dkt. No 98-1 ⁋ 5. A discussion of that compilation and the basis of their claims so that the government could better understand the claims was precisely the reason for the meeting on May 24. There was nothing to settle because at no point have Claimants articulated a claim sufficiently valid to warrant any type of settlement.

[3] Because Bitcoin was designed to cut out intermediaries, holding the private key is critical. Indeed, there is a reason for the phrase "not your keys, not your bitcoin," because it "exemplifies the importance of actually possessing the private key to a Bitcoin address to establish true ownership." Haynie Decl., Dkt. No. 90-1 ⁋ 17. Claimants dismiss this reality by arguing that Bitcoin "lacks the traditional means of establishing ownership, or even possession . . . ." Opp'n at 8. But if Ngan was the true owner of 1HQ3, there is no reasonable explanation why other parties would have also had the private key to that address. If that was the case, the 69,370 BTC would not have lasted in 1HQ3 for a second—much less seven years. And if Individual X stole or illegitimately moved the bitcoin in 1HQ3 from Ngan—something not borne out by publicly available information on the blockchain—Ngan would have reported it to law enforcement. But Ngan did no such thing, because that did not occur.

is a screenshot of 1HQ3 from a publicly available website that Ngan sent in a text message to a private party. This screenshot, which could be generated by anybody, is insufficient to establish ownership, possession, or control. How this would trigger a direct notice requirement is incomprehensible.

According to Claimants, nothing in the record "suggests that the Government undertook an investigation concerning the identity of other persons or identities who may have an ownership interest in the 1HQ3 wallet." *See* Opposition Brief ("Opp'n"), Dkt. No. 98 at 13. This is simply incorrect. There is ample evidence of the investigation memorialized in each of the declarations submitted by Special Agent (SA) Haynie in this action. Moreover, the extent of the government's investigation into one of the most sophisticated online criminal marketplaces and subsequent prosecution of its owner cannot be overstated. When the government seized the Silk Road website in 2013, it preserved its servers, which contain the entire transaction history and users of the website. This includes a history of the transactions resulting in 70,411.46 BTC withdrawn from Silk Road on May 6, 2012 which, based on blockchain tracing, ended up in 1HQ3. The subsequent investigation of Silk Road's assets—including 1HQ3— revealed no connection whatsoever to Ngan or Claimants. Indeed, through its extensive investigation, the government found no other individual who would have a claim to the proceeds of Silk Road other than Ross Ulbricht. Claimants' argument that the government failed to conduct a proper investigation is smoke and mirrors, and nothing more than an attempt to conduct irrelevant discovery in this case.

Second, in simple terms, Claimants are asking for special treatment. Blaming the government for not providing direct notice is seemingly designed to circumvent Claimants' negligence in not pursuing timely claims despite—by their own admission—knowing about the 1HQ3 wallet's existence since at least 2019. *See* Opp'n at 11-12 (stating that Battle Born planned to compel Ngan to turn over the contents of 1HQ3 during an evidentiary hearing in the Bankruptcy Action in December 2019). Claimants argue that the value of the asset at issue must factor into the Court's evaluation of whether it should exercise its discretion to allow an untimely claim to proceed. Insofar as this case is concerned, the government wholeheartedly agrees. The value of the Defendant Property underscores Claimants' negligence in failing to make a timely claim. Given the sheer value of the Defendant Property—the seizure of 69,370 BTC from 1HQ3 is the largest seizure of cryptocurrency in the history of the Department of Justice and appears to be the most valuable asset ever seized under the Civil Asset

REPLY IN SUPPORT OF U.S. MOTION TO STRIKE BATTLE BORN'S CLAIM
CV 20-7811 RS

**ER-660**

1   Forfeiture Reform Act—combined with their knowledge of their purported right to claim this asset,

2   Claimants' failure to file timely claims is inexcusable. Claimants only needed to occasionally track the

3   1HQ3 wallet through the public blockchain, yet they failed to do even that with an asset valued in the

4   billions of dollars.

5       There is no justification for a party who has spared no expense in hiring an army of lawyers and

6   investigators not to file a claim for such a valuable asset on time. The Court does have the discretion to

7   allow an untimely claim to proceed despite a failure to comply with the pleading requirements. But this

8   case demonstrates precisely why courts have established a framework to guide courts in determining

9   whether they should exercise that discretion. None of the factors adopted by the Ninth Circuit militate in

10  favor of that exercise of discretion here. Saying "*mea culpa*, we missed the deadline, but give us a

11  chance because it is a lot of money" does not cut it. The government is not aware of any cases or law

12  that confer special rights to a wealthy party so that it can become richer. Under Claimants' argument, a

13  Claimant of modest means who makes a claim for an asset of lower value should not get a pass.

14      Notably, of the numerous lawyers working for Claimants, one bankruptcy attorney—Ryan

15  Andersen—reportedly "reviewed the docket entries in the forfeiture action on PACER" on January 29,

16  2021, the day after Jay Bloom reportedly received a text message from his business partner with a link

17  to an article about the government's seizure. Opp'n at 13-14. By his own admission, Andersen did not

18  review the limited entries on the docket. *See* Dkt. No. 98-5 ¶ 10 ("I did not see anything on the docket

19  report to indicate a deadline for claimants to file a claim for the seized Bitcoins. As of January 29, 2021,

20  the docket contained five entries entitled 'certificate of service' and I did not believe that a proof of

21  service form would provide information relevant to the Claimants' claims."). This attempted

22  justification is astounding. On January 29, 2021—the day Andersen reportedly reviewed the docket—

23  there were only 46 docket entries in this matter. Several potential claimants had appeared in the case,

24  which was patently clear on the face of the docket. Docket Entry No. 46, the last entry on the day

25  Andersen reviewed the docket, is an Order granting Ross Ulbricht's *request for an extension of time to*

26  *file a claim*, a description that was clearly stated in the minute entry. In fact, when Andersen reviewed

27  the docket, the phrase "extension of time to file" appeared in four separate docket minute entries. That

28  Andersen tries to hide behind the purported obscurity of certificates of service without bothering to open

a single one of them and choosing to overlook the fact that multiple claimants had filed motions to extend the time to file their claims is simply inexcusable, particularly when evaluating a potential recovery worth $2 billion dollars. Had Andersen taken a few minutes to look at the docket entries he would have seen that Dkt. No. 25, a three-page document titled "Declaration of Publication" filed on January 6, 2021, contained an attachment on page three stating that "[a]ny person claiming a legal interest in the Defendant Property must file a verified Claim with the court within 60 days from the first day of publication (November 27, 2020) of this Notice on this official government internet web site . . . ." Dkt. No. 25 at 3. Andersen further tries to justify his oversight by stating that his practice "specializes in bankruptcy matters and [he does] not have specific expertise in civil forfeiture." Dkt. No. 98-5 ¶ 10. But no specialty is necessary, much less required, for any lawyer to open a document on PACER and understand the meaning of a simple phrase setting out the framework for a filing deadline.

To further underscore Claimants' negligence, it is difficult to comprehend how, having the bitcoin deposit address of 1HQ3 available to them as early as December 2019, and "data scientists, forensic experts, private investigators, and attorneys [hired since 2017] to assist Claimants in tracking down [] Ngan's assets . . . to enforce a [$2 billion dollar] judgment against him, and to track down the assets . . ." nobody bothered to keep track of 1HQ3 on the publicly available blockchain. Had they done so even on a semi-regular basis, they would have seen that one of the most valuable bitcoin addresses moved its funds on November 3, 2020, something that was widely reported by multiple global news outlets.[4] Indeed, unrelated parties started commenting on the movement of the 1HQ3 funds in social media minutes after it occurred and before news outlets picked up the story a day later. It is incomprehensible that while uninterested parties were tracking 1HQ3, Claimants did not. Even more astonishing is Claimants' failure to file their claims for nearly seven weeks after learning of the pending action, as well as their failure to file a motion to extend the time to file a claim when discovering their claims were late on May 24, 2021. Opp'n at 14; Dkt. No. 90-2 ¶¶ 7-8.

Because Claimants have not presented an adequate excuse to their late filing, the Court should

---

[4] There are monitoring services designed to send alerts when a bitcoin address sends or receives bitcoin. One such service is https://cryptocurrencyalerting.com/, which was established in 2018.

1  dismiss their claims on this basis alone. Allowing their claims to proceed "would subvert the strict time

2  limits established by Supplemental G(5) and encourage claimants to litigate every untimely filing in a

3  forfeiture case." *United States v. $25,790*, 2010 WL 2671754, *4 (D. Md. July 2, 2010). If the Court lets

4  these Claimants, who failed to file a timely claim despite having significant resources at their disposal,

5  and whose justification amounts to nothing more than "we didn't know but we are sorry," then

6  anyone—literally anyone—can come forward to make a claim for the seized Silk Road proceeds,

7  making an unmanageable avalanche of claims a real possibility.

8  **B.   Claimants' Statement of Facts is Riddled with Inaccuracies and Unsupported**

9  **Assumptions about Ngan's Possession of 1HQ3**

10      At the outset of Claimants' involvement in this matter, they appeared to be quite convinced that

11  Ngan was Individual X or somebody associated with Individual X and structured their claims on that

12  assumption. Having now realized that Ngan is not Individual X, they have shifted their argument to

13  alleging Ngan's "association" with Individual X, no matter how removed. This is evident in their recent

14  "discovery" of "a possible connection between Mr. Ngan and an individual that may be the

15  Government's Individual X—Nikita Kislitsin." Opp'n at 30. Claimants attempt to draw a connection

16  based on the fact that Kislitsin, who was associated with foreign hacking efforts unrelated to this case,

17  "listed Las Vegas as his location on Twitter at roughly the same time Mr. Ngan lived there." *Id.* Nikita

18  Kislitsin is not Individual X and the connection drawn between Ngan and Kislitsin is nothing short of a

19  stretch. *See* Haynie Decl. ¶ 4. The Court should not entertain Claimants' endless guesswork.

20      As a preliminary matter, it is important to recognize that if the $2 billion judgment was against

21  Ngan, that Ngan was the one who declared bankruptcy, and that Claimants purchased the assets of the

22  bankruptcy estate which included the property interests of Ngan, then the claims should be limited to the

23  property of Ngan and not his associates. To be clear, the government denies that Individual X is even

24  associated with Ngan, but points this out to illustrate the legal impossibility of Claimants' assertions that

25  Ngan's associates may yield a claim to the Defendant Property. Ngan may have had access to

26  cryptocurrency, but that certainly did not include 1HQ3. Even assuming Ngan was prepared to sell

27  Bitcoin, none of the documents Claimants provide even mention 1HQ3 or the specific figure of 69,370

28  BTC except for the screenshot from the blockchain explorer and sent in a text message with no

1    additional explanation. *See* Declaration of Jacky Lee, Dkt. No 98-2 Exhibits 1-6, 9-11. Indeed,

2    depending on the document, Ngan was supposed to sell more than 69,370 BTC. *See id*., Ex. 1

3    ("1,000,000 BTC"); Ex. 2 ("100,000 BTC"); Ex. 3 ("in excess of 100,000 Bitcoins"); Ex. 9 ("3 million

4    BTC"). The numbers simply do not add up.

5         Claimants further argue that Ngan "would not have realized any profit unless he actually had

6    possession of the Bitcoin and was able to deposit it into the law firm's escrow account, from where it

7    could be transferred to the buyer." Opp'n 26. There are numerous reasons why someone would claim to

8    have assets they did not have. Indeed, that is the hallmark of criminal activity involving fraud—to lure

9    potential victims by gaining their trust, secure loans without real access to collateral, provide a false

10   sense of legitimacy, etc. The same question can be posed to Jay Bloom—what did Ngan have to gain by

11   offering to invest $160 million in his businesses ventures if he did not have the money? He likely did

12   not have the money, which is why he filed for bankruptcy and disappeared. The same thing happened

13   with the bitcoin "sale"—none of those transactions came to fruition and when Ngan was set to appear in

14   court, he vanished.

15        Despite all of this and recognizing that a mere screenshot might not be enough, Claimants

16   attempt—based on an inaccurate reading of the government's complaint—to convince the Court that

17   Ngan really did own the Bitcoin in 1HQ3. Specifically, Claimants argue that one of Ngan's associates

18   "deleted fifty-four files from Mr. Ngan's devices—*a number corresponding to the number of wallets*

19   *that originally held the Bitcoin* that was transferred into the 1HQ3 wallet at issue in this action." Opp'n

20   at 10-11 (emphasis added). Nowhere has the government ever claimed that the contents of 1HQ3 came

21   from 54 different wallets. What the government has said is that law enforcement officers "observed 54

22   transactions that were sent from Bitcoin addresses controlled by Silk Road." Dkt. No. 8 ¶ 15. Not 54

23   Bitcoin addresses or 54 Bitcoin wallets—54 *transactions*. This is, at best, a misreading of the

24   government's statements, and betrays a deep misunderstanding of how Bitcoin works.[5] Claimants'

25

26       [5] Although people often use them interchangeably, there is a significant distinction between a
     cryptocurrency wallet and an address. A wallet is a collection of private keys and corresponding

27   addresses. Haynie Decl. ¶ 22. It is typically under the control of a single private individual or service. *Id.*
     An address is a digital destination used to send and receive cryptocurrency funds. *Id.* ¶ 5. It is similar to
     a physical house address or an email address. Cryptocurrency wallets often contain many addresses. *Id.*

28   A Bitcoin address is a hash of the public key and consists of 26-35 alphanumeric characters. *Id.*

**ER-664**

1    argument also makes no sense because Bitcoin transactions are not saved in a hard drive as separate files

2    when they take place. Haynie Decl. ¶ 11.

3    **C.    The Defendant Property Is Drug Money from Silk Road**

4        The Court does not have to take the government's word for the conclusion that the Defendant

5    Property emanated from Silk Road. Various sources confirm this without the need for discovery.

6        First, before it was stolen and moved to 1BAD and 1BBq, the 69,370 BTC was located in wallets

7    that were subsequently seized and forfeited by the government in the criminal prosecution of Ross

8    Ulbricht.  Haynie Decl. ¶ 25. This is confirmed by Silk Road's own servers, which were seized and

9    reviewed by law enforcement. Haynie Decl. ¶¶ 7, 20, 21, 24. More specifically, Individual X sent the

10   stolen bitcoin to 1BAD & 1BBq in 54 separate transactions. Each of those transactions was funded by

11   multiple bitcoin addresses associated with Silk Road. In total, 1BAD & 1BBq were funded by

12   approximately 3,056 sending addresses. *Id.* ¶ 24. This figure can be obtained by looking at the number

13   of sending addresses for each of those transactions in any blockchain explorer or blockchain analytics

14   software, all of which is publicly available information. *Id.* Of the 3,056 sending addresses, 3,014 were

15   deposit addresses for Silk Road users. The IRS determined this by comparing each of the 3,056

16   addresses with the addresses stored in the data from the seized Silk Road servers. *Id.* This means that 98

17   percent of the sending addresses that funded 1BAD & 1BBq, and therefore 1HQ3, were addresses used

18   by Silk Road users to purchase drugs and other illicit goods and services. *Id.*

19       Second, blockchain analysis provides an indisputable trail of the bitcoins from Silk Road wallets

20   to 1HQ3, where the government took possession of 69,370 BTC. Exhibits 1 and 2 to SA Haynie's

21   declaration, which illustrate the analysis he conducted using blockchain analytics software and is based

22   on immutable transactions recorded on the blockchain, show a link between 1HQ3 and Silk Road.[6] *See*

23   Haynie Decl. ¶¶ Exhibit 16-20, Exs. 1-2. Exhibit 1 illustrates the progression of the Defendant Property

24   from Bitcoin addresses controlled by Silk Road to 1HQ3. SA Haynie used Chainalysis Reactor, an

25

26       [6] The Court can, and should, consider information from the blockchain as it forms the basis for
     the Amended Complaint and is derived from the public record. Courts are permitted to evaluate
27   materials attached to complaints and public records "without converting the motion to dismiss into a
     motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir.
28   2018); *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003) (citations omitted).

1   investigative software tool that connects cryptocurrency transactions and addresses to real-world entities

2   like Silk Road by using aggregate data. *Id.* ¶¶ 13, 15, 17. By inputting the 1HQ3 address into Reactor, its

3   algorithms automatically created a link between that address and Silk Road, which Chainalysis has

4   identified as a known entity based on several factors and data points. *Id.* ¶ 15. From this information, SA

5   Haynie was able to determine that the ultimate source of the funds in 1HQ3 originated from addresses

6   managed by the same entity—the Silk Road marketplace. *Id.* Exhibit 2 further illustrates that

7   Chainalysis identified and labeled the two seizures of Silk Road funds—the first in October 2013 and

8   the second in November 3, 2020. *Id.* ¶ 19.

9       Finally, it is the consensus among blockchain analytics companies like DMG Blockchain

10  Solutions ("DMG"), that the bitcoin at issue here originated from Silk Road. *Id.* ¶ 26. On or about

11  November 4, 2020, the day after the government's seizure of the bitcoin at issue and a day before it

12  announced the seizure, Elliptic Co-Founder and Chief Scientist Dr. Tom Robinson wrote, "…through

13  blockchain analysis we can determine that these funds likely originated from the Silk Road."

14  (https://www.elliptic.co/blog/1-billion-silk-road-bitcoins-are-on-the-move). *Id.* ¶ 27. Similarly, on or

15  about November 4, 2020, blockchain analytics company CipherTrace issued a similar article that stated

16  in part, "On November 3, more than 69,370 BTC originating from the Silk Road – one of the first

17  darknet markets – moved for the first time since April 2015…" (https://ciphertrace.com/nearly-1b-from-

18  silk-road-move-for-first-time-since-2015/). *Id.* ¶ 28. This further calls into question Lee's conclusion

19  that "the blockchain transactions show that the Bitcoins came from 58 sources," particularly given his

20  access to blockchain analytics tools and the fact that the origin of the bitcoin at issue here is clear to so

21  many major blockchain analytics companies who have conducted a similar analysis. *See id.* ¶ 19.

22      **D.      Claimants' Challenge to the Source of the Defendant Property is Based on Flawed
            Assumptions and a Misreading of the Law**

23

24      Claimants' argument that the Defendant Property came from 54 different Silk Road wallets is the

25  framework for their attempt to undermine the well-known origin of the Defendant Property. This is

26  Claimants' only real option, however, because only by questioning the provenance of the Defendant

27  Property can they respond to the chief reasons that their claims fail, namely, that (1) Ngan's bankruptcy

28  estate could not have contained the defendant Property because a thief does not have a legal interest in

1    stolen property; and (2) a criminal's interest in stolen property does not become part of his bankruptcy

2    estate because of the relation-back doctrine.

3          Claimants dismiss the government's position that Individual X stole the bitcoin in 2012,

4    transferred it to 1HQ3 in 2013, and gave it to the government on November 3, 2020 as "farfetched,"

5    "implausible," and "impossible." Opp'n at 26. If anything is farfetched, it is Claimants' attempt to

6    discredit the well-known origins of the Defendant Property by submitting the declaration of Jacky Lee, a

7    data scientist with DMG, which furthers Claimants' arguments in no meaningful way and consists of

8    nothing more than a vehicle through which Claimants have introduced irrelevant exhibits into the

9    record. Indeed, nothing submitted with Lee's declaration even mentions 1HQ3 or the specific amount of

10   Bitcoin at issue here except for the online screenshot of 1HQ3 and a text message from Ngan sharing it,

11   which anybody with an Internet connection and access to a cell phone with SMS capabilities could do.

12         Lee's analysis is incorrect, in part because it hinges on a misrepresentation of the government's

13   statements. According to his Declaration, one of the tasks Lee had was to determine "…where the

14   69,370 [BTC] in the 1HQ3 wallet came from…" Lee Declaration, Dkt. No. 98-2 ¶ 3. Lee determined

15   that it was "impossible for Individual X to gain these Bitcoins by hacking a single silk road wallet[],

16   because the blockchain transactions show that the Bitcoins came from 58 sources." *Id.* ¶ 17. DMG, has a

17   blockchain analytics product, called "BlockSeer" that Lee used to analyze 1HQ3. *Id.* ¶ 15. It seems

18   implausible that despite its blockchain analytics capabilities, BlockSeer did not identify the 54 transfers

19   as originating from Silk Road, one of the most sophisticated and extensive criminal marketplaces of its

20   time. Haynie Decl. ¶ 7. In fact, based on a Twitter post from @BlockSeer dated December 10, 2015,

21   BlockSeer was aware of Silk Road (*see* https://twitter.com/blockseer/status/674998974940508160).

22   According to DMG's website, "Blockseer is an analytics tool that enables the tracking of cryptocurrency

23   on both the Bitcoin and Ethereum blockchains. It examines cryptocurrency flows through wallets" and

24   performs various functions, including "creating private labels and graphs . . . accessing a more extensive

25   list of labels and clusters and additional analytics tools" and "importing and exporting analytics data

26   such as addresses, transactions, and labels." https://dmgblockchain.com/software-product/. Of the 18

27   paragraphs in Lee's declaration, only three of them are devoted to his own blockchain analysis. *See* Dkt.

28   No. 98-2 ¶¶ 15-17. The declaration provides no information to show that any meaningful analysis was

conducted, including a description of his methodology or any graphs to illustrate any specific findings.

E.   The Contents of the 1HQ3 Wallet Never Became Part of the Bankruptcy Estate

Acknowledging a connection between the Defendant Property and Silk Road would eviscerate Claimants' entire claims for a stake in the Bitcoin, which is why they have gone to such lengths to try to undercut that link. Because Claimants assert that their interest in the Defendant Property arises from their interest in Ngan's bankruptcy estate, it is essential to determine whether the bankruptcy estate ever maintained an interest in the Defendant Property. In evaluating the interests of the bankruptcy estate, the court must consider how property came into the possession of the debtor to determine the validity of its title to it. This is precisely why Claimants have manufactured so much doubt and conjecture about the source of the funds. As reiterated herein, the Defendant Property constitutes proceeds of narcotics trafficking and other unlawful activities. In addition, it was stolen from Silk Road. Thus, even assuming Ngan was Individual X—which he is not—the Defendant Property could not become part of the bankruptcy estate because it was stolen and represents the proceeds of crime.

The entirety of Claimants' rebuttal to the argument that a thief does not have a legal interest in stolen property boils down to four sentences riddled with misstatements about the government's position:

> [T]he Government does not suggest that Mr. Ngan stole 1HQ3, or even that he got it from Individual X, who the Government says stole it. Claimants do not yet know how Mr. Ngan obtained 1HQ3, but it could certainly have been from sources unrelated to Individual X or Silk Road. And he could have been a bona fide purchaser of the Bitcoin even if it was unlawfully acquired originally. The claims should not be dismissed based upon the Government's unsupported speculation that Mr. Ngan may have stolen it or did not innocently acquire it.

Opp'n at 27. Claimants are correct that the government does not suggest—or aver—that Ngan stole 1HQ3 or that he got it from Individual X. It is the government's position that Ngan has absolutely nothing to do with 1HQ3 other than invoke its mere existence for some purpose unrelated to this action. Rather, because 1HQ3 consists of proceeds of illicit activity and that it was stolen, it could not have become part of the bankruptcy estate and therefore Claimants have no legitimate claim to it.

Although Claimants also assert that the Defendant Property's origin as stolen Silk Road proceeds is "implausible, if not impossible," Opp'n at 19, this is flatly untrue. First, as noted above, there is no likelihood that Ngan had possession, let alone ownership, of the Defendant Property. Furthermore,

1   nothing about this theft is impossible. Bitcoin thefts of even larger proportions have taken place multiple

2   times, including the theft of approximately 850,000 from the Mt. Gox exchange. Haynie Decl.¶ 18.

3   These transactions are completely unrelated to the number of addresses used in a transfer of

4   cryptocurrency, and those transactions do not generate any documents unto themselves. *Id*. ¶¶ 5-6.

5   Finally, the existence of an unexecuted contract does little more but to cement Ngan's continued

6   attempts to scam others into believing that he could deliver billions of dollars' worth of Bitcoin in a

7   single sale. None of this establishes ownership or even possession.

8          Moreover, the Defendant Property is the proceeds of drug trafficking activity. This, too, excludes

9   the Defendant Property from the bankruptcy estate. Bankruptcy distribution plans that cannot "be

10  executed by lawful means," including the distribution of proceeds obtained in violation of the Controlled

11  Substances Act, are generally "forbidden by law." *In re Arenas*, 535 B.R. 845, 851 (B.A.P. 10th Cir.

12  2015); *see also In re Burton*, 610 B.R. 633, 637-38 (B.A.P. 9th Cir. 2020) (listing cases holding that

13  bankruptcy trustees cannot distribute the proceeds of violations of the Controlled Substances Act). This

14  prohibition is particularly strong in cases where "a trustee would be asked to accept proceeds of a drug-

15  related business, situations where federal law would clearly be violated." *In re Olson*, 2018 WL 989263,

16  at *7 (B.A.P. 9th Cir. 2018) (Tighe, J., concurring); *see also In re Rent-Rite Super Kegs West, Ltd.*, 484

17  B.R. 799, 805-806 (D. Colo. 2012) (concluding that federal courts cannot assist debtors with the

18  distribution of an asset held in violation of the Controlled Substances Act as a matter of principle, and

19  because of the ongoing danger that the asset in question would be subject to civil forfeiture). The

20  bankruptcy trustee and bankruptcy court were asked to do the same thing here—accept the distribution

21  and sale of an estate that included the stolen proceeds of various acts of crime.

22         In sum, Claimants never had ownership or possession of the Defendant Property because it could

23  not be distributed through Ngan's bankruptcy estate as it was derived from drug trafficking and other

24  criminal activity, as well as theft or fraud. As Claimants never could have legally owned or possessed

25  the Defendant Property, they lack standing as a matter of law and the Court should strike their claim

26  instead of allowing them to embark on a fruitless and time-wasting fishing expedition.

27  **F.      Claimants' Challenge to the Relation Back Doctrine as it Applies to this Case is
            Deficient and Unsupported by the Facts**

28

1       With respect to the government's argument that a criminal's interest in stolen property does not

2  become part of his bankruptcy estate because of the relation-back doctrine, Claimants' state that "the

3  argument assumes too much." Opp'n at 27. What Claimants refer to is the fact that the Defendant

4  Property came from Silk Road. An admission that it did would show that the Defendant Property vested

5  in the United States at the time the criminal activity was complete. Because Silk Road was in operation

6  between 2011 and 2013, this occurred long before Battle Born purchased Ngan's bankruptcy estate.

7       The "relation back" doctrine renders Claimants' standing arguments fruitless. It derives from 18

8  U.S.C. § 981(f), which provides that "[a]ll right, title, and interest in property described in subsection (a)

9  of [18 U.S.C. § 981] shall vest in the United States upon commission of the act giving rise to forfeiture

10  under this section." The innocent owner statute provides that the property of a "bona fide purchaser or

11  seller for value" who "did not know and was reasonably without cause to believe that the property was

12  subject to forfeiture" is not subject to forfeiture. 18 U.S.C. § 983(d)(3)(A). The essential elements of an

13  innocent owner claim require claimants to establish that they are "both innocent," "and an owner."

14  *United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1277

15  (11th Cir. 2010). In this case, title to the Defendant Property vested in the government at the time that

16  the transactions on Silk Road occurred. Dkt. No. 8 ¶ 7. As noted above, all available tracing tools and

17  publications, in addition to the documents on record in this case, indicate that the contents of the 1HQ3

18  wallet are traceable to Silk Road. Accordingly, all interest in the Bitcoin obtained by and laundered

19  through Silk Road vested in the government before Ross Ulbricht's arrest and trial.

20       Further, Claimants are not owners of the Defendant Property. An "owner" for purposes of the

21  innocent owner defense "means a person with an ownership interest in the specific property to be

22  forfeited," and does not include general unsecured creditors; bailees; or nominees with "no dominion or

23  control over the property." 18 U.S.C. § 983(d)(6)(A)-(B). Claimants were never owners of the property

24  because the Defendant Property never could have been a part of the bankruptcy estate.

25       Every available public record, docket entry, and brief is clear—the Defendant Property

26  represents the stolen proceeds of Silk Road, a massive organization responsible for drug trafficking and

27  other crimes. Claimants lack standing as the Defendant Property never became part of the bankruptcy

28  estate, and because the relation back doctrine vested all interests in the property in the United States.

REPLY IN SUPPORT OF U.S. MOTION TO STRIKE BATTLE BORN'S CLAIM
CV 20-7811 RS

G.    **Claimants' Discovery Plan**

Claimants' discovery plan makes it clear they intend to engage in protracted discovery about issues unrelated to this case. The fact that their plan includes taking the deposition of Ngan—a man who disappeared years ago and whose whereabouts are unknown—further underscores this. According to their own lawyers, Claimants have already conducted "substantial discovery efforts into Mr. Ngan's assets, including both domestic and international collection efforts" dating back to when "the underlying Nevada state action was filed against him in 2016" and "have incurred several hundred thousand dollars in costs alone" in those efforts. *See* Declaration of Joseph Gutierrez, Dkt. No 98-4 ¶¶ 7, 28, 29. Claimants' intended discovery is improper and deficient for several reasons.

First, Claimants' discovery plan includes at least six discovery items relating to Ngan's associates. *See* Declaration of Rees Morgan, Dkt. No. 98-6 ¶ 6(c-f, h-i). Those discovery efforts belong in the bankruptcy case, not in this action. Second, Claimants' discovery plan assumes the existence of a relationship between Ngan and Individual X. For instance, Claimants anticipate "Document requests and deposition of Agent [] Haynie regarding . . . Ngan's relationship both to Individual X and the 1HQ3 Wallet." *Id.* ¶ 6(b). The government has no evidence of any connection between Individual X and Ngan. Accordingly, requesting documents or depositions on this point will yield nothing. Third, Claimants intend to seek "[d]iscovery into expert reports referenced in Agent [] Haynie's Declaration." *Id.* ¶ 6(g). It is unclear what Claimants refer to here. There is no mention of experts in SA Haynie's declaration, and the word "report" appears only once, followed by a link to a publicly available news article citing to that reference. *See* Dkt. No. 90-1 ¶ 9. Fourth, Claimants intend to request documents and take SA Haynie's deposition on issues he has fully described under penalty of perjury. Specifically, they seek to depose him "regarding any investigation conducted to verify Individual X's claim to the wallet." Morgan Decl. ¶ 6(b). It is unclear what Claimants expect to receive beyond Individual X's consent and SA Haynie's analysis.

Finally, Morgan's Declaration lists a series of anticipated document requests in response to what they characterize as "the Government's assertion that if Mr. Ngan was in possession of the 1HQ3 Wallet then he must have stolen it . . . ." Dkt. No. 98-6 ¶ 7. The government has made no such characterization. To the contrary, the government has consistently stated that Ngan never possessed 1HQ3. To the extent

1    the government entertained such a theory, it was in response to Claimants' assumptions about Ngan's

2    possession of 1HQ3 and only to demonstrate that even if their assertions were true, their claims would

3    still fail.[7]  Accordingly, no discovery is needed on this issue.

4         This summarizes the extent of Claimants' discovery plan—it forecasts protracted discovery and

5    litigation into irrelevant matters that would undermine the purpose of the rules and eviscerate the

6    gatekeeping functions designed to minimize the danger of false claims.

7    **III.    CONCLUSION**

8         Claimants' claims are deficient. They offer nothing besides conclusory assertions of ownership

9    and possession of the Defendant Property; a failure to satisfy basic rules; impossible allegations; and

10   constantly changing facts. Claimants have no right to special treatment under the rules—indeed, more so

11   than most, Claimants had the means and the motivation to keep a close eye on the Defendant Property

12   and file a timely claim. Their admitted failure to keep track of a multi-billion asset they thought was

13   theirs should foreclose their claims with respect to timeliness. Moreover, Claimants clearly lack standing

14   as a matter of law—the bankruptcy estate they claim as the font of their ownership claim never could

15   have contained the Defendant Property. The Court must thus strike Claimants' claims. Allowing these

16   claims to proceed and permitting discovery would invite other meritless claims to these—and other—

17   forfeiture proceedings even if they lack a remote connection to property subject to forfeiture.

18   DATED:  August 24, 2021                    Respectfully submitted,

19                                              STEPHANIE M. HINDS
                                                Acting United States Attorney
20

21                                              *Claudia A. Quiroz*
                                                DAVID COUNTRYMAN
22                                              CHRIS KALTSAS
                                                CLAUDIA A. QUIROZ
23                                              WILLIAM FRENTZEN
                                                Assistant United States Attorneys
24

25   _____

26   [7] With respect paragraph 8 of Morgan's Declaration, (a) whether the Defendant Property is
     subject to forfeiture is a legal question that has been fully briefed in this action and not something that
     could be found in an interview report or determined by the case agents, *see id.* ¶ 8(a); (b) all relevant
27   tracing has been described in detail in various declarations and filings, including SA Haynie's
     Declaration submitted in support of this brief, *id.* ¶ 8(b); and (c) there is no disconnect between the
     government's tracing and Silk Road tumblers, *id.* ¶ 8(c). With respect to the last point, see SA Haynie's
28   Declaration ¶¶ 31-33 which provides additional background on this issue.

1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   DAVID COUNTRYMAN (CABN 226995)
    CHRIS KALTSAS (NYBN 5460902)
5   CLAUDIA QUIROZ (CABN 254419)
    WILLIAM FRENTZEN (LABN 24421)
6   Assistant United States Attorneys

7        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
8        Telephone: (415) 436-436-7428
         FAX: (415) 436-7234
9        claudia.quiroz@usdoj.gov

10   Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15   UNITED STATES OF AMERICA,          )   CASE NO. CV 20-7811 RS
                                        )
16          Plaintiff,                  )   DECLARATION OF JEREMIAH HAYNIE IN
                                        )   SUPPORT OF UNITED STATES' REPLY IN
17      v.                              )   SUPPORT OF MOTION TO STRIKE THE CLAIMS
                                        )   OF CLAIMANTS BATTLE BORN INVESTMENTS
18   Approximately 69,370 Bitcoin (BTC), Bitcoin )   COMPANY, LLC, FIRST 100, LLC AND 1ST ONE
     Gold (BTG), Bitcoin SV (BSV), and Bitcoin )   HUNDRED HOLDINGS, LLC
19   Cash (BCH) seized from              )
     1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx )
20                                      )
            Defendant.                  )   Hearing Date:    September 9, 2021
21                                      )   Time:            1:30 p.m.
                                        )   Court:           Hon. Richard Seeborg
22   ────────────────────────────────  )
     First 100, LLC, 1st One Hundred Holdings, )
23   LLC, and Battle Born Investments   )
     Company, LLC,                      )
24                                      )
            Claimants.                  )
25   ────────────────────────────────  )

26

27

28

DECLARATION OF JEREMIAH HAYNIE            1
CASE NO. CV 20-7811 RS               **ER-673**

I, JEREMIAH HAYNIE, state as follows:

1.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI"). I am a case agent assigned to this case. I respectfully submit this declaration to provide certain relevant information in support of the United States' Reply in Support of Motion to Strike the claims filed by Claimants Battle Born Investments Company, LLC; First 100, LLC; and 1st One Hundred Holdings, LLC ("Claimants"). I personally conducted the blockchain analysis of the bitcoin at issue in this case and was involved in the investigation from its inception to the present day. I have been a Special Agent with IRS – Criminal Investigation (IRS-CI) for approximately 19 years. Since 2015, I have been assigned to the IRS-CI Cyber Crimes Unit. I have conducted investigations involving cryptocurrency since 2014 and have traced different cryptocurrencies both manually and using blockchain analytics tools in dozens of cases. In addition, I hold an active Chainalysis Reactor Certification.

2.      I have reviewed the Opposition to Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC, and 1st One Hundred Holdings, LLC filed on August 10, 2021. I have also reviewed the supporting declaration of Jacky Lee, a data scientist at DMG Blockchain Solutions retained by counsel for the Claimants to conduct a forensic analysis related to the 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3") Bitcoin address (hereinafter "Lee Declaration"). Based on my knowledge and experience, including my experience conducting cryptocurrency tracing analysis in dozens of investigations, my assessment of Claimants' analysis linking the transactions executed by Individual X to files purportedly deleted from Ngan's computer is that it is flawed and incorrect.

3.      I personally conducted the tracing and analysis of the 1HQ3 Bitcoin address using the Chainalysis Reactor blockchain analytics software. In addition, my team and I conducted a manual analysis of the 54 bitcoin transactions at issue in this case and compared it against the data from the seized Silk Road servers, which showed a direct link between the addresses from which Individual X stole the bitcoin and Silk Road.

4.      Nikita Kislitsin is not Individual X.

5.      Ownership of a particular Bitcoin address can be shown by using the private key to sign a

message.  Ownership is not established by a screenshot.

**A.   Individual X Withdrew Funds from Silk Road by Exploiting a Vulnerability**

6.   On approximately May 6, 2012, Individual X stole 70,411.46 BTC from addresses controlled by Silk Road and transferred it to two Bitcoin addresses—1BADznNF3W1gi47R65MQs754KB7zTaGuYZ and 1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN (hereafter "1BAD" and "1BBq").  Individual X used a vulnerability that allowed Individual X to withdraw funds from Silk Road without authorization.  A vulnerability is a weakness or opening for hackers to gain unauthorized access to a website, a system that connects to a website, operating systems, web applications, software, networks, or other IT systems.

7.   Based on a review of the Silk Road seized servers, the transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular Silk Road user accounts.

**B.   Jacky Lee's Analysis**

8.   According to his Declaration, one of the tasks Jacky Lee had was to determine "…where the 69,370 Bitcoins in the 1HQ3 wallet came from…" Lee Declaration ⁋ 3.  Lee determined that it was "highly improbable for an individual to hack 58 wallets that sent Bitcoins to 1HQ3" because "the private key used for accessing bitcoin wallets is very secure and cannot be easily guessed with modern computers."  *Id.* ⁋ 17.  Lee further determined that it was "impossible for Individual X to gain these Bitcoins by hacking a single silk road wallet[], because the blockchain transactions show that the Bitcoins came from 58 sources."  *Id.*

9.   By using the vulnerability in Silk Road's vendor portal as described above, Individual X tricked Silk Road into sending bitcoin to 1BAD and 1BBq.  This is not a "far-fetched" or "improbable" scenario, as Claimants characterize it.  Many seemingly secure entities such as cryptocurrency exchanges have had cryptocurrency stolen from them.  For example, Mt. Gox, the largest cryptocurrency exchange of its day experienced a continuous theft of its bitcoin from 2011 to 2014 resulting in a loss of approximately 850,000 BTC, valued at approximately $480 million at the time (reuters.com/article/us-bitcoin-mtgox-bankruptcy-idUSBREA1R0FX20140228).  In August 2016, another exchange, Bitfinex, lost 119,756 BTC, valued at approximately $72 million at the time (fortune.com/2016/08/03/bitcoin-stolen-bitfinex-hack-hong-kong).  In May 2019, the CEO of Binance, a large cryptocurrency exchange,

announced that hackers executed one unauthorized transaction and withdrew 7,000 BTC valued at approximately $40 million from Binance's wallet (Binance.zendesk.com/hc/en-us/articles/360028031711-Binance-Security-Breach-Update). These are just three examples out of many instances where an individual or group has been able to gain unauthorized access to seemingly secure systems to steal cryptocurrency. These examples are offered to show that individuals are able to use unauthorized access to transfer bitcoin out of seemingly secure companies.

10.     Based on my and my team's analysis of the Bitcoin addresses associated with Silk Road, the bitcoin in 1HQ3 did not come from 58 sources and I am unable to ascertain the source of this statement based on Lee's declaration. As described in more detail below, based on my and my team's analysis of the Bitcoin addresses associated with Silk Road, the original source of bitcoin that funded 1HQ3 came from 3,056 addresses, 98 percent of which were addresses assigned to specific Silk Road users.

11.     Bitcoin transactions are not saved in a hard drive as separate files when they take place.

12.     Lee's company, DMG Blockchain Solutions (hereafter "DMG"), has a blockchain analytics product, called "BlockSeer" that Lee used to analyze 1HQ3. *Id.* ¶ 15. It seems implausible to me that despite its blockchain analytics capabilities, BlockSeer did not identify the 54 transfers as originating from Silk Road, one of the most sophisticated and extensive criminal marketplaces of its time. In fact, based on a Twitter post from @BlockSeer dated December 10, 2015, BlockSeer was aware of Silk Road (*see* https://twitter.com/blockseer/status/674998974940508160). According to DMG Blockchain Solutions' website, "Blockseer is an analytics tool that enables the tracking of cryptocurrency on both the Bitcoin and Ethereum blockchains. It examines cryptocurrency flows through wallets" and performs various functions, including "creating private labels and graphs . . . accessing a more extensive list of labels and clusters and additional analytics tools" and "importing and exporting analytics data such as addresses, transactions, and labels." https://dmgblockchain.com/software-product/. Despite these purported capabilities, Lee's Declaration and supporting exhibits provide no information about his methodology or any specific findings, charts, or analysis.

/ / /

**C.** <u>**Blockchain Analysis of 1HQ3 Using Chainalysis Reactor**</u>

13.     The majority of cryptocurrency volume flows through services, including legal entities like cryptocurrency exchanges, or illicit ones like darknet markets such as Silk Road.  While blockchains contain information on transactions between addresses, they do not provide information on the individuals or entities to which those addresses belong (i.e., who is conducting the transactions).  Software analytics companies like Chainalysis conduct proprietary analysis that connect cryptocurrency addresses to real-world organizations by using aggregate data.

14.     Chainalysis Reactor is an investigative software tool that connects cryptocurrency transactions and addresses to real-world entities such as dark net markets, enabling investigators like myself to understand and interpret activity on the blockchain.  Understanding which entities are connected to which addresses requires analytical tools to extract information and methodology to do the matching.  Chainalysis maps blockchain transactions to real-world entities by grouping addresses into clusters and identifying those clusters.  In simple terms, a cluster is a collection of addresses that are determined by Chainalysis to be controlled by one entity.  Chainalysis looks at the history of transactions and runs algorithms to group addresses in a cluster that it determines are managed by the same entity.  While Chainalysis generally clusters addresses and labels the cluster according to its category (e.g., cryptocurrency exchange, terrorist financing, darknet website, etc.), they also perform address-level identifications within clusters to name the cluster.  Based on this analysis, Chainalysis has identified and labeled a number of entities by name based on the transaction history and other associations.  This includes the Silk Road darknet marketplace as well as the two clusters of seized Silk Road funds—one from October 2013 and one from November 2, 2020 (i.e., the seized funds at issue in this case).

15.     By inputting the 1HQ3 address into Reactor, Chainalysis algorithms automatically created a link between that address and Silk Road, which Chainalysis has identified as a known entity based on a number of factors and data points as well as their algorithms and aggregate data.  From this information and my analysis, I was able to determine that the ultimate source of the funds in 1HQ3 originated from addresses managed by the same entity: the Silk Road marketplace.

16.     Attached hereto as Exhibit 1 and replicated below is a graph I created using Reactor to

illustrate the bitcoin transfers relevant to this matter.  The series of transactions begins on the left side of Exhibit 1, when on May 6, 2012, Individual X, without authorization, transferred 70,411.46 BTC from Silk Road to two Bitcoin addresses Individual X controlled, 1BAD and 1BBq.  The next relevant transaction occurred on April 9, 2013, when Individual X sent 69,471.082201 BTC from 1BAD & 1BBq to 1HQ3.



17.     As explained above, the references to Silk Road on the chart are not manual inputs by me but rather identifications made by Chainalysis based on the aggregate data and algorithms powering its software.

18.     The details of these transfers can be viewed by any member of the public by entering the Bitcoin addresses into a Blockchain Explorer such as Blockchair.com, one of the two websites referenced in paragraph 15 of the Lee Declaration.

19.     Attached hereto as Exhibit 2 and replicated below is an expansion of Exhibit 1 that I created using Reactor.  Exhibit 2 illustrates that, through its independent analysis, Chainalysis identified and labeled the two seizures of Silk Road funds:  (a) the October 2013 seizure by law enforcement and the United States Attorney's Office in the Southern District of New York when the Silk Road website was taken down and Ross Ulbricht was arrested; and (b) the November 3, 2020 seizure by the IRS-CI and the United States Attorney's Office in the Northern District of California following Individual X's consent to the forfeiture of the 69,370 BTC Individual X stole from Silk Road in 2012 to the United States government.

/ / /

/ / /

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

6

**ER-678**



20. The 173,992.92 BTC depicted in the graph above as "Silk Road Marketplace Seized Funds" in October 2013 consist of 27,618.69843, Silk Road marketplace bitcoins seized during the takedown of the website on October 02, 2013 and the bitcoins seized from Ulbricht's computer hardware, which were traceable to the operation of Silk Road. I know this based on two things: (1) the number of bitcoins seized from the Silk Road servers on or about October 2, 2013 as detailed in the Southern District of New York's Notice of Forfeiture; and (2) the number of bitcoins seized from Ulbricht's computer hardware traceable to the operation of Silk Road with public Key 1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 in San Francisco, CA as detailed in the Southern District of New York's subsequent Notice of Forfeiture.

**D.    Analysis of Silk Road Servers Seized in October 2013**

21. Blockchain analytics using proprietary software is not the only source of information about the origin of the Defendant Property. During the October 2013 takedown of Silk Road, law enforcement seized servers that contained Silk Road transaction data. This data confirmed that the 54 transfers at issue here originated from Silk Road.

22. Although people often use them interchangeably, there is a significant distinction between a cryptocurrency wallet and an address. A wallet is a collection of private keys and corresponding addresses. It is typically under the control of a single private individual or service. An address is a digital destination used to send and receive cryptocurrency funds. It is similar to a physical

1   house address or an email address.  Cryptocurrency wallets often contain many addresses. A Bitcoin

2   address is a hash of the public key and consists of 26-35 alphanumeric characters.

3       23.     In bitcoin transactions, multiple addresses can be used to fund a particular transaction.

4   For example, if an item costs 5 BTC, but the buyer only had 3 BTC in one address and 2 BTC in another

5   address, the buyer would use the funds from both addresses to make the payment.  This is often referred

6   to as a transaction having multiple "inputs" (in this example, two inputs and one output).

7       24.     In this case, Individual X sent the stolen bitcoin to 1BAD & 1BBq in 54 separate

8   transactions.  Each of those transactions was funded by multiple bitcoin addresses associated with Silk

9   Road.  In total, 1BAD & 1BBq were funded by approximately 3,056 sending addresses.  This figure can

10  be obtained by looking at the number of sending addresses for each of those transactions in any

11  blockchain explorer or blockchain analytics software, all of which is publicly available information.  Of

12  the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users.  I determined this by

13  having an IRS-CI analyst compare each of the 3,056 addresses with the addresses stored in the data from

14  the seized Silk Road servers.  This means that 98 percent of the sending addresses that funded 1BAD &

15  1BBq and therefore 1HQ3, were addresses used by Silk Road users to purchase drugs and other illicit

16  goods and services. The remaining 42 addresses were likely "change addresses," which is equivalent to

17  the change one would receive in a monetary transaction and from which associations can also be made

18  using Reactor.

19      25.     In short, before they were stolen and moved to 1BAD and 1BBq, the seized 69,370 BTC

20  were located in wallets that were subsequently seized and forfeited by the government in the criminal

21  prosecution of Ross Ulbricht.

22  **E.      Consensus Among Blockchain Analytics Companies Regarding the Source of the Seized
        69,370 Bitcoins**

23

24      26.     The consensus among blockchain analytics companies like DMG was that the bitcoin at

25  issue here originated from Silk Road.

26      27.     On or about November 4, 2020, the day after the Government's seizure of the bitcoin at

27  issue and a day before the Government announced the seizure, Elliptic Co-Founder and Chief Scientist

28  Dr. Tom Robinson wrote, "…through blockchain analysis we can determine that these funds likely

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

8

**ER-680**

1  originated from the Silk Road." (https://www.elliptic.co/blog/1-billion-silk-road-bitcoins-are-on-the-

2  move).

3       28.    Similarly, on or about November 4, 2020, blockchain analytics company CipherTrace

4  issued a similar article that stated in part, "On November 3, more than 69,370 BTC originating from the

5  Silk Road – one of the first darknet markets – moved for the first time since April 2015…"

6  (https://ciphertrace.com/nearly-1b-from-silk-road-move-for-first-time-since-2015/).

7       29.    Lee's conclusion that "the blockchain transactions show that the Bitcoins came from 58

8  sources" is surprising to me in light of his access to blockchain analytics tools and the fact that the origin

9  of the bitcoin at issue here is clear to so many major blockchain analytics companies who have

10  conducted a similar analysis.

11  **F.    Silk Road's "Bitcoin Tumbler"**

12       30.    Claimants state that there is a disconnect between the tracing of the bitcoins in 1HQ3 to

13  "proceeds of criminal activity by Silk Road and Ulbricht" and that Silk Road used a tumbler to

14  obfuscate the payments it received from the sale of drugs and other illicit goods and services. *See*

15  Declaration of Rees Morgan, Dkt. No 98-6 ⁋ 8(c) ("Morgan Declaration"). There is no disconnect

16  between these two things. Payments going into Silk Road were tumbled so that they could not be traced

17  to a particular user when bitcoin was withdrawn from the site. This approach was not very effective,

18  however, because any bitcoin coming out of the site could still be linked to the Silk Road website, the

19  sole purpose of which was to sell illicit goods and services. For example, if a buyer wanted to purchase

20  heroin from a Silk Road vendor, the buyer would send bitcoin to a bitcoin address assigned to the

21  buyer's account but controlled by Silk Road. The buyer's account would be credited with the requisite

22  amount of bitcoin. The buyer would use that credit to purchase heroin from the vendor. The actual

23  bitcoin received by the vendor was not the same bitcoin the buyer used to fund his account. This is what

24  Silk Road advertised as "tumbling;" however, all of the bitcoin was tainted because it all came from

25  individuals wishing to purchase illicit goods or services.

26       31.    Attached hereto as Exhibit 3 is a Wall Street Journal article dated February 24, 2015

27  titled "Silk Road Mastermind's Bitcoin Trail Wasn't Complicated." The article documented an

28  interview of Ilhwan Yum, a former FBI Special Agent who tied Ross Ulbricht to Silk Road through the

1  bitcoin money trail.  The article references the bitcoin tumblers the Silk Road marketplace used "to

2  mask the origin and destination of transactions conducted on the network."  In the interview, Yum stated

3  that he did not "'tumble' his own transactions moving money out of the network, making it simple to

4  establish the connection between Mr. Ulbricht and Silk Road."  According to Yum, tying Ulbricht to

5  Silk Road through the bitcoin money trail "didn't take any complicated analysis."  As the article notes,

6  although Ulbricht "may have had a complicated network to hide transactions within the Silk Road

7  marketplace, [] his extraction of funds from the network was easy to spot."

8       32.    Yum was also involved in the FBI seizure of servers and bitcoins that linked Ulbricht to

9  Silk Road.  Yum testified at Ulbricht's trial that he personally transferred the bitcoin linked to Ulbricht

10 to a government bitcoin address.  During the trial, Yum "tracked the transactions from Silk Road to

11 [Ulbricht's] laptop wallet."  According to Yum, those transactions were not tumbled, likely because

12 Ulbricht thought nobody would know who was linked to the address itself.  Yum added: "Among the

13 bitcoin he received to his laptop, over 88% of those transactions weren't tumbled. They were sent

14 directly from the marketplace to his wallet."

15      I declare under penalty of perjury that the foregoing is true and correct to the best of my

16 knowledge and belief.  Executed this 24th day of August 2021 in East Lansing, Michigan.

17

18                                    *Jeremiah Haynie*

19                                    JEREMIAH HAYNIE
                                      Special Agent
20                                    Internal Revenue Service – Criminal Investigation

21

22

23

24

25

26

27

28

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS
                                    10

# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3

## *Silk Road Mastermind's Bitcoin Trail Wasn't Complicated*

Dow Jones Institutional News

February 24, 2015 Tuesday 8:39 PM GMT

Copyright 2015 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2015, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 1007 words

**Byline:** By Samuel Rubenfeld

## Body

Ross Ulbricht, the convicted administrator of darknet marketplace Silk Road, was depicted as a criminal mastermind, but it was relatively easy for a cybercrime expert to follow his transactions.

Ilhwan Yum, a senior director in the litigation consulting group of FTI Consulting, testified in Mr. Ulbricht's trial. In his testimony, Mr. Yum described his role in the Silk Road investigation, laying out how he, then as an agent in the New York office of Federal Bureau of Investigation, tied Mr. Ulbricht to the network through the bitcoin money trail, though he admitted it didn't take any complicated analysis.

Prosecutors said the Silk Road marketplace used a " bitcoin tumbler" to mask the origin and destination of transactions conducted on the network. But Mr. Yum didn't "tumble" his own transactions moving money out of the network, making it simple to establish the connection between Mr. Ulbricht and Silk Road, he said in an interview following Mr. Ulbricht's conviction. In other words, Mr. Ulbricht may have had a complicated network to hide transactions within the Silk Road marketplace, but his extraction of funds from the network was easy to spot.

Mr. Yum was also involved in the FBI seizure of servers and bitcoins that linked Mr. Ulbricht to the marketplace, testifying at Mr. Ulbricht's trial that he personally transferred the bitcoin linked to Mr. Ulbricht to a government bitcoin address.

Mr. Yum discussed his role in the investigation and explained the bitcoin trail in an interview with Risk & Compliance Journal. The conversation has been lightly edited for context.

The Silk Road case involved undercover agents exposing a marketplace located on the dark Web involving a currency not exactly recognized by the government. How does that process even begin?

The case was looked at by other agencies prior to my former FBI squad. We only specialized in computer intrusions. There was a criminal act going on, so it wasn't much that we were targeting bitcoin. It was a criminal enterprise, and it just so happened they chose bitcoin as their payment method.

What is a bitcoin blockchain?

Case 3:20-cv-07811-RS Document 159-20 Filed 08/24/21 Page 75 of 148
Case 3:15-cr-00319-RS Document 93-3 Filed 03/25/15 Page 2 of 3
Page 2 of 3

Silk Road Mastermind's Bitcoin Trail Wasn't Complicated

It's an open book on every transaction that occurs with bitcoin. I think most people understand that it's not truly anonymous any more. I think a lot of people mix up bitcoin, and the concept of anonymity. Bitcoin itself is just a string of numbers and letters; the parties behind the transactions are hard to identify. The beauty of bitcoin is the blockchain helps every transaction seem legitimate. At the same time, you're announcing every transaction conducted in bitcoin, which makes laundering more difficult.

A lot of people compare bitcoin to virtual cash. Cash transactions are hard to track, but imagine if every serial number [on a bill] used in a transaction was recorded and announced to the public. Limited to that alone, you can't track who made the transaction, but you can see a transaction happened.

What is a bitcoin tumbler and how does it exploit the bitcoin blockchain?

There are different ways to tumble things and different sites that promote their way of tumbling. What it does is it generates additional transactions, or ancillary transactions, in order to obfuscate what's being announced to the blockchain. It mixes your transactions with another transaction, making it hard to follow the money trail on the blockchain.

Why would someone use a tumbler?

You would use a tumbler if you realize bitcoin transactions don't have enough anonymity, and you don't want that address coming back to you. A [bitcoin] address is linked to an individual.

Is there a legitimate use for a tumbler?

If you truly valued your privacy, you could justify it. Regardless of the intention, the act itself can be considered money laundering. You may value your privacy but if you're trying to hide the source or trail of money, you're engaging in money laundering. I'm not a lawyer, though.

How did you crack the Silk Road tumbler's code?

The bitcoin transactions were supporting evidence [in the case]. We identified what he was doing on the marketplace. Our focus wasn't trying to crack the tumbler. In general terms, his tumbling wasn't as complicated as advertised. By that, I mean his method and logic of trying to mix the transactions. The exact detail of this, however, I can't get into.

Another example: During the trial, FTI, myself and a colleague of mine, we tracked the transactions from Silk Road to his laptop wallet. Those transactions weren't tumbled. If you go with the concept, you only know the transactions if you know the real-life link to that address. I can only assume Dread Pirate Roberts didn't bother to tumble it because he thought no one would know who was linked to the address itself.

Among the bitcoin he received to his laptop, over 88% of those transactions weren't tumbled. They were sent directly from the marketplace to his wallet.

Do you expect to see cases like this in the future?

Yeah, I think so. As you have seen in the news, almost right after Silk Road 1 was taken down, Silk Road 2.0 sprouted up. Silk Road 2.0 was taken down several months ago.

There are plenty of other marketplaces that serve as alternatives to Silk Road. They're all still using virtual currencies. They're getting better at the underlying technology behind bitcoins, and on how to obfuscate transactions. If your tumblering is successful in the middle of a transaction, you might be able to figure out who is sending and who is receiving money, but you can't really have a solid link or money trail. If you are the organization behind the tumbler, you can see the trail. But without the back end, it's hard to track.

Write to Samuel Rubenfeld at *Samuel.Rubenfeld@wsj.com* Follow him on Twitter @srubenfeld.

Silk Road Mastermind's Bitcoin Trail Wasn't Complicated

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-436-7428
    FAX: (415) 436-7234
    claudia.quiroz@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CV 20-7811 RS |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO** |
| v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx | Hearing Date:   September 9, 2021<br>Time:          1:30 p.m.<br>Court:          Hon. Richard Seeborg |
| Defendant. | |
| ILIJA MATUSKO, | |
| Claimant. | |

**TABLE OF CONTENTS**

I. Introduction ..................................................................................................2

II. Factual Background ........................................................................................3

    A. Silk Road and Ross Ulbricht ...................................................................3

    B. Theft of Bitcoin from Silk Road in 2012 ................................................6

    C. Takedown and Seizure of Silk Road Website in 2013 ............................6

    D. The United States Attorney's Office for the Southern District of New York Provided Notice to All Potential Claimants of Silk Road Assets Starting on October 18, 2013............…………..……8

    E. Ulbricht's Indictment and Conviction ....................................................9

    F. Both Individual X and Ulbricht Consented to Forfeiture of the 69,370 BTC .........................9

III. Procedural History .........................................................................................9

    A. Initiation of *In Rem* Forfeiture Action ...................................................9

    B. Notice of Forfeiture Action ...................................................................10

    C. Matusko's Claim ...................................................................................10

IV. Legal Standard .............................................................................................11

    A. The Claim Must Comply with the Requirements of Rule G(5)(a) ........11

    B. The Court May Strike a Claim Where the Claimant Lacks Standing......12

V. Argument .....................................................................................................13

    A. Matusko Lacks Standing to Bring His Claim Because His 48 BTC was Not Stolen by Individual X and is Not Contained in the Defendant Property .................................13

    B. Matusko's Claim is Untimely ...............................................................16

        1. Relevant Law on Deadlines in Civil Forfeiture Actions...................16

        2. The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00* Weigh in Favor of Striking Claimants' Untimely Claims Pursuant to Rule G(8)(c)(i)(A) ..............17

            a. In addition to Publication by the Government, the Seizure was Well Publicized, and Matusko Should Have Filed His Claim in the Southern District of New York by December 17, 2013 (First and Sixth Factors)............................18

b.  The Government Never Encouraged Delay and Provided Proper Notice (Second, Fourth, and Ninth Factors) ...................................................................................19

c.  Matusko's Delay Was Not Due to Health Problems (Third Factor) .........................20

d.  Allowing Matusko's Claim to Proceed Would Prejudice the Government (Fifth Factor) ..................................................................................................................................20

e.  Matusko Has Not Prepared for Trial (Seventh Factor) .............................................21

f.  Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor) ...............21

g.  Matusko is not Acting *Pro Se* (Tenth Factor) ...........................................................22

h.  Matusko Never Sought an Extension of Time (Eleventh Factor) .............................22

i.  The Claim is Insufficient Because Matusko Lacks Standing (Twelfth Factor) .........22

3.  Courts Regularly Strike Claims on Timeliness Grounds ...............................................23

4.  Only Extraordinary Circumstances Warrant an Extension ............................................24

VI. Conclusion ...............................................................................................................................25

1
2

**TABLE OF AUTHORITIES**

**Federal Cases**

3
4

*Clapper v. Amnesty Int'l USA,*
   133 S. Ct. 1138 (2013).................................................................................... 11

5
6

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)....................................................................................... 12

7
8

*United States v. 323 Forrest Park,*
   Dr., 521 F. App'x 379 (6th Cir. 2013)........................................................... 23

9

*United States v. 475 Martin Lane,*
   545 F.3d 1134 (9th Cir. 2008)........................................................................ 12

10
11

*United States v. 1982 Yukon Delta Houseboat,*
   774 F.2d 1432 (9th Cir. 1985) ....................................................................... 17

12
13

*United States v. 2840 S. Ocean Blvd., Apt. No. 209,*
   2017 WL 1533538 (E.D.N.Y. Apr. 21, 2017). ………………………………………….24

14
15

*United States v. 5208 Los Franciscos Way,*
   385 F.3d 1187 (9th Cir. 2004)........................................................................ 12

16

*United States v. $1,181,895.00,*
   2015 U.S. Dist. LEXIS 17448, 2015 WL 631394 (C.D. Cal. Feb. 12, 2015) ..................................... 12

17
18

*United States v. $7,000,*
   583 F. Supp. 2d 725 (M.D.N.C. 2008) ........................................................... 23

19
20

*United States v. $11,918.00,*
   2007 WL 3037307 (E.D. Cal. Oct. 17, 2007) ................................................. 23

21

*United States v. $12,126.00,*
   337 Fed. A'ppx 818 (11th Cir. 2009) ........................................................ 11, 23

22
23

*United States v. $13,970.00,*
   2007 WL 1231659 (M.D. Ga. 2007)............................................................... 11

24
25

*United States v. $25,790,*
   2010 WL 2671754 (D. Md. July 2, 2010)................................................... 17, 18

26
27

*United States v. $43,029,*
   U.S. Dist. LEXIS 141311 (N.D. Cal. July 3, 2008)..……………………...........17, 24

28

*United States v. $100,348.00,*
354 F.3d 1110 (9th Cir. 2004) ........................................................................ 11, 12, 17, 24

*United States v. $102,535.00,*
499 F. App'x 134 (3rd Cir. 2012) ........................................................................ 21, 23

*United States v. $133,420.00,*
672 F.3d 629 (9th Cir. 2012) ........................................................................ 12, 13, 14

United States v. $140,000,
2010 WL 1704966 (D.N.J. Apr. 26, 2010) ........................................................................ 23

*United States v. $144,650,*
2013 WL 6384646 (D.N.J. Dec. 6, 2013) ........................................................................ 23

*United States v. $175,918,*
755 F. Supp. 630 (S.D.N.Y. 1991) ........................................................................ 24

*United States v. $487,825.00,*
484 F.3d 662 (3d Cir. 2007) ........................................................................ 12

United States v. Cambio Exacto, S.A.,
166 F.3d 522 (2d Cir. 1999) ........................................................................ 12

*United States v. One-Sixth Share,*
326 F.3d 36 (1st Cir. 2003) ........................................................................ 16

*United States v. Real Prop. Known as the Lido Motel,*
135 F.3d 1312 (9th Cir. 1998) ........................................................................ 23

*United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,*
787 F.3d 968 (9th Cir. 2015) ........................................................................ 23

*United States v. Thirty-Five Firearms,*
123 F. App'x 204 (6th Cir. 2005) ........................................................................ 23

*United States v. Vehicle 2007 Mack 600 Dump Truck,*
680 F. Supp. 2d (E.D. Mich. 2010)………..………………………………………………….23

*United States v. 2840 S. Ocean Blvd.,* Apt. No. 209,
2017 WL 1533538……………………………………………………………………………….24

**Federal Statutes**

18 U.S.C. § 981 ........................................................................ 8

18 U.S.C. § 981(b) ........................................................................ 10

18 U.S.C. § 1956(a)(1) ......................................................................................... 9

18 U.S.C. § 983(a)(4)(A) ................................................................................ 11, 21

18 U.S.C. § 1030(a)(2) ......................................................................................... 9

18 U.S.C. § 1956 ................................................................................................. 7

18 U.S.C. §  981(a)(1)(A) ............................................................................... 7, 10

18 U.S.C. §  981(a)(1)(C) .................................................................................. 10

21 U.S.C. § 841(a)(1) ........................................................................................... 9

21 U.S.C. § 881(a)(6) .......................................................................................... 10

21 U.S.C. § 841 ................................................................................................... 9

21 U.S.C. § 843 .................................................................................................... 9

21 U.S.C. § 846 .................................................................................................... 9

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on September 9, 2021, at 1:30 p.m., or as soon thereafter as the

3   matter may be heard, in Courtroom 3 of the above-entitled court located at 450 Golden Gate Avenue,

4   San Francisco, California 94102, the United States of America hereby respectfully moves to strike the

5   Verified Claim of Claimant Ilija Matusko.

6         The Motion will be based on this Notice of Motion and Motion, the attached Memorandum of

7   Points and Authorities, the Declaration of IRS-CI Special Agent Jeremiah Haynie, attached hereto as

8   Exhibit "A," the Declaration of Assistant United States Attorney Claudia A. Quiroz, attached hereto as

9   Exhibit "B," along with all exhibits, and all other files and pleadings in this matter.

10

11  DATED:  July 28, 2021                                STEPHANIE M. HINDS
                                                         Acting United States Attorney
12

13                                                        _/s/ Claudia A. Quiroz_____

14                                                       DAVID COUNTRYMAN
                                                         CHRIS KALTSAS
15                                                       CLAUDIA A. QUIROZ
                                                         WILLIAM FRENTZEN
16                                                       Assistant United States Attorneys

17

18

19

20

21

22

23

24

25

26

27

28

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

**ER-697**

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.     INTRODUCTION**

3        The United States of America hereby moves, pursuant to Supplemental Rule G(8)(c)(i)(A) and

4    (B) of the Federal Rules of Civil Procedure ("the Supplemental Rules"), to strike the verified claim and

5    statement of interest filed by Claimant Ilija Matusko for failure to comply with the pleading

6    requirements of Rule G(5) and because he lacks standing to bring his claim under Rule G(8)(c)(i)(B).

7        Matusko—the ninth claimant seeking to obtain a portion of Silk Road's criminal proceeds in

8    this matter—argues that in December 2011, he transferred 48 bitcoins (BTC) he lawfully purchased for

9    €150 Euros to a Bitcoin wallet associated with his user account on the Silk Road website.  Matusko

10   asserts that he never purchased anything from Silk Road and thus his 48 BTC remained idle in his

11   account until law enforcement took down the Silk Road website and seized its servers and assets in

12   October 2013.  Aware of the highly publicized law enforcement action at the time but purportedly

13   unaware of any rights under U.S. law to make a claim for his 48 BTC, he did not seek to recover his

14   bitcoin until May 2021, after seeking advice from counsel (and after Bitcoin hit its all-time-highest

15   value of $64,374 USD per bitcoin on April 14, 2021).  Matusko's claim fails on two grounds:

16       First, Matusko lacks standing to bring his claim because his 48 BTC are not part of the

17   Defendant Property at issue in this case.  Individual X stole the 70,411.46 BTC from Silk Road in May

18   2012, long before the government takedown of Silk Road in October 2013.  Individual X did not hack

19   Matusko's account or steal his BTC.  In fact, the BTC Individual X stole came from the general pool of

20   Silk Road bitcoin and not from any particular user accounts, meaning that no user balances were

21   impacted by the hack.  Indeed, database records show that Matusko's account had a balance of 47.52

22   BTC[1] for the seventeen months between Individual X's hack and the Silk Road takedown in October

23   2013.  This means that Matusko could have withdrawn his bitcoin at any time after the theft by

24   Individual X.  Matusko recognizes that he lost his bitcoin when law enforcement took down Silk Road,

25   yet somehow claims that he is entitled to recover 48 BTC from the Defendant Property.  Because he

26

27   _____
        [1] Matusko has rounded up this amount to 48 BTC.  For purposes of this motion and for
28   simplicity's sake, the government will similarly round up the amount (even though it accounts for a
     difference of approximately $18,000 USD).

     U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
     CV 20-7811 RS

lacks standing to bring his claim, Matusko's claim must be stricken.

Second, Matusko's claim fails because it is untimely. As it relates to this matter, Matusko's claim is over five months late because the statutory deadline to file a verified claim was January 26, 2021, yet he did not file his claim until July 2, 2021. In reality, however, Matusko's claim is seven and a half years late and brought in the wrong jurisdiction. Matusko lost access to his Silk Road account and corresponding balance of 48 BTC in October 2013. He asserts that the United States never notified him of his rights in the 2013 forfeiture action via direct notice or any other publication. However, the United States Attorney's Office for the Southern District of New York—who prosecuted Silk Road's creator and operator Ross Ulbricht and filed a corresponding civil forfeiture action for all assets of Silk Road including all bitcoins residing on its servers—did in fact give notice to all potential claimants by publishing a Notice of Forfeiture in the www.forfeiture.gov website for 30 days. Accordingly, the deadline to file a claim for any Silk Road assets was December 17, 2013. If Matusko wanted to file a claim for 48 BTC, he should have done so by December 17, 2013 and in the Southern District of New York. Even if his claim was somehow proper in this district, there is no justification for filing five months late when proper notice was given. Accordingly, the Court should strike Matusko's claim pursuant to Supplemental Rule G(8)(c)(i)(A) as untimely.

Given the nature of Matusko's claim, there is nothing he can do to cure these defects. Because no other opportunities will change these facts, Matusko's claim must be stricken forthwith.

## II. FACTUAL BACKGROUND

### A. Silk Road and Ross Ulbricht

From its inception in 2011 until October 2013, when it was seized by law enforcement, the Silk Road hidden website ("Silk Road") was the most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black-market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were bought and sold regularly by the site's users. *See* Declaration of IRS-CI Special Agent Jeremiah Haynie ¶ 2 (hereinafter "Haynie Decl.") (attached hereto as Exhibit A). During its two-and-a-half years in operation, Silk Road was used by thousands of drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other illicit goods and services

to well over 100,000 buyers, and to launder hundreds of millions of dollars deriving from these unlawful transactions. *Id. See also id.* ¶¶ 3-5 (describing the types of drugs and other criminal goods and services sold on the website). Silk Road was owned and operated by its creator Ross William Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road" (hereinafter "Ulbricht"). *Id.* ¶ 6.

The only form of payment accepted on Silk Road was bitcoin. Haynie Decl. ¶ 7. Upon registering an account with Silk Road, users were assigned a Bitcoin address. *Id.* Bitcoin sent to the user's Bitcoin address was credited to the user's account. *Id.* According to the Silk Road wiki web page, Silk Road used a "tumbler" to send "all payments through a complex, semi-random series of dummy transactions, . . . making it nearly impossible to link your payment with any coins leaving the site." *Id.* In other words, if a buyer made a payment on Silk Road, the tumbler obscured any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the bitcoin end up—making it fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin addresses are both known. *Id.* The only function served by Silk Road's implementation of such "tumblers" is to assist with the laundering of criminal proceeds. *Id.* All told, Silk Road generated sales revenue totaling over 9.5 million BTC, and collected commissions from these sales totaling over 600,000 BTC. *Id.* The figures were, at the time of Ulbricht's initial charges by complaint, equivalent to approximately $1.2 billion USD in sales and approximately $80 million USD in commissions.[2] *Id.*

All of those bitcoins were subject to forfeiture as proceeds of the illegal activity conducted on Silk Road. As the government noted in its sentencing memorandum for Ulbricht in the Southern District in New York:

> Silk Road was an online black market of unprecedented scope. By the time it was shuttered in October 2013, over 13,000 offerings were listed on its homepage for illegal drugs of every conceivable variety. A wide variety of other illicit goods and services were sold on the site as well, including fake IDs and passports, computer-hacking tools and services, counterfeit goods and pirated media, criminal guidebooks and instruction manuals, and money laundering services. In total, over 1.5 million transactions were conducted over Silk Road, involving over 100,000 buyer

[2] Under a current valuation of $40,058.10 USD Bitcoin as of July 28, 2021, that would be equivalent to approximately $380 billion USD in sales and approximately $24 billion USD in commissions.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

4

accounts and nearly 4,000 seller accounts. Those transactions had a total value of nearly $214 million in U.S. currency. Nearly 95 percent of those sales were for illegal drugs – including at least $8.9 million in sales of heroin, $17.3 million in sales of cocaine, and $8.1 million in sales of methamphetamine. The buyers and sellers involved in these transactions were spread across the world, from Argentina to Australia, from the United States to the Ukraine.

Ulbricht specifically designed Silk Road for the purpose of facilitating black-market transactions. He hosted the site on the Tor network to enable users to conduct business anonymously. He implemented a Bitcoin-based payment system to enable them to make payments and cash out proceeds without leaving behind a traditional money trail. He provided instruction on "stealth" shipping methods and other ways to evade detection by law enforcement. And he created a slick user interface aimed at making the illicit commerce on the site as simple and frictionless as ordinary online shopping.

*See United States v. Ross William Ulbricht*, Case No. CR-14-68, Dkt. No. 256 at 2 (S.D.N.Y.) (internal citations omitted) (hereinafter "SDNY Sentencing Memo").

Ulbricht controlled and oversaw all aspects of Silk Road.  Haynie Decl. ¶ 6.  He maintained the computer infrastructure and programming code underlying the Silk Road website; he determined vendor and customer policies, including deciding what could be sold on the site; he managed a small staff of online administrators who assisted with the day-to-day operations of the site; and he alone controlled the massive profits generated from the operation of the business.  *Id.*  The contents of the Silk Road web server included Ulbricht's own user account page, which reflected, among other things, his history of Bitcoin transactions on the site.  *Id.*  Ulbricht's transaction history reflects that he received a continuous flow of Bitcoins into his Silk Road account.  For example, on July 21, 2013 alone, Ulbricht received approximately 3,237 separate transfers of Bitcoins into his account.  *Id.*  Virtually all of those transactions were labeled "commission" in the "notes" appearing next to them, indicating that the money represented commissions from Silk Road sales.  *Id.*  Ulbricht's account page further displayed the total amount of bitcoins deposited in his Silk Road account, which, as of July 23, 2013, equaled more than $3.4 million.  *Id.*  Thus, it is clear that Ulbricht received a steady stream of commissions from Silk Road in the form of bitcoins.  The government's investigation in that case did not uncover any legitimate sources of income for Ulbricht at the time of his arrest.  *Id.*

1    Ulbricht created an escrow system for the website, "enabling him to collect payment from his

2    customers remotely." SDNY Sentencing Memo at 4. He collected commissions automatically on every

3    Silk Road sale, and prominently banned users from transacting business "out-of-escrow" in order to

4    avoid these commissions—a prohibition that he and his support staff continually enforced. *Id.* at 15

5    (citing trial transcript). Ulbricht created this "escrow service—essentially himself—to hold the Bitcoins

6    of a customer until the drugs arrived in good condition, so the customer had some recourse if the pills or

7    powder didn't show up as expected." NATHANIEL POPPER, DIGITAL GOLD 72 (HarperCollins Publishers,

8    1st ed. 2016).

9    **B.      Theft of Bitcoin from Silk Road in 2012**

10    On May 6, 2012, Individual X, whose identity is known to the government, hacked Silk Road

11    and stole 70,411.46 BTC from Bitcoin addresses controlled by the website. Specifically, Individual X

12    used a vulnerability that allowed Individual X to withdraw funds from Silk Road without authorization.

13    Haynie Decl. ¶ 9. Individual X then sent the stolen Bitcoin to two Bitcoin wallet addresses that

14    Individual X controlled: 1BADznNF3W1gi47R65MQs754KB7zTaGuYZ ("1BAD") and

15    1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN ("1BBq"). *Id.* The transfers to 1BAD and 1BBq came

16    from the general pool of Silk Road bitcoin and not from any particular user accounts. *Id.*

17    On approximately April 9, 2013, Individual X sent 69,471.082201 BTC to

18    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3").[3]  Dkt. No. 8 (Amended Complaint) ¶ 17.

19    Ulbricht became aware of Individual X's online identity and threatened Individual X for return of the

20    cryptocurrency to Ulbricht. Individual X did not return the cryptocurrency, and instead kept it. *Id.* ¶ 22.

21    **C.      Takedown and Seizure of Silk Road Website in 2013**

22    On October 1, 2013, Ulbricht was arrested in San Francisco, California and charged in the

23    Southern District of New York via a criminal Complaint with narcotics trafficking conspiracy, computer

24    hacking conspiracy, and money laundering conspiracy.[4]  Haynie Decl. ¶ 8. Having located a server

25    _____

26    [3] As of November 3, 2020, 1HQ3 had a balance of 69,370.22491543 BTC. *See id.* ¶ 19.

27    [4] Ulbricht had moved to San Francisco, within the Northern District of California, prior to his
      arrest and was operating Silk Road from the Northern District of California. After his arrest he was
28    processed through the United States District Court for the Northern District of California before being
      removed to the Southern District of New York for prosecution. At the time of his arrest, Ulbricht was

1    containing the corresponding authentication key for the Silk Road website on the Tor network, law

2    enforcement simultaneously took down the website and seized its servers, including all bitcoins

3    contained in wallets residing within them.  *Id.*

4           The following day, on October 2, 2013, the United States commenced a civil action in the

5    Southern District of New York by filing a verified complaint seeking, among other things, forfeiture of

6    the Silk Road hidden website, any and all bitcoins contained in wallet files residing on Silk Road

7    Servers, and all property traceable thereto ("Defendants in Rem").  *See United States v. Any And All*

8    *Assets of Silk Road, Including But Not Limited To The Silk Road Hidden Website And Any And All*

9    *Bitcoins Contained In Wallet Files Residing On Silk Road Servers, Including The Servers Assigned The*

10   *Following Internet Protocol Addresses [] And All Property Traceable Thereto*, Case No. CV-13-06919,

11   Dkt. No. 4 (S.D.N.Y. Oct. 2, 2013) (hereinafter "SDNY Civil Forfeiture Action").  The complaint

12   sought forfeiture of the Defendants in Rem pursuant to Title 18, United States Code, Section

13   981(a)(1)(A), on the grounds that they constituted property involved in money laundering transactions,

14   in violation of 18 U.S.C. § 1956.  *Id.*  The complaint also sought the imposition of civil money

15   laundering penalties.  *Id.*

16          On October 1, 2013, the day of Ulbricht's arrest and the day prior to filing the forfeiture

17   complaint, the government filed a letter with the Court requesting the unsealing of the civil complaint,

18   the protective order, and any other documents in the civil forfeiture case.  SDNY Civil Forfeiture

19   Action, Dkt. No. 3.  In that letter, the government stated the following: "Ulbricht has now been arrested

20   in San Francisco on the charges in the Criminal Complaint.  The seizure of the Silk Road website and

21   the Bitcoins contained on Silk Road's servers is now underway, and is anticipated to be completed by

22   6:00 a.m. on October 2, 2013."  *Id.* at 1.  Recognizing the impact that this seizure would have on the

23   website's users, the government added the following in its letter:

24                  *The seizure of the Silk Road website will affect tens of thousands of the*
                    *website's users worldwide.*  Upon seizing the Silk Road website, the
25                  United States will post a notice on the website, stating that the website has
                    been seized pursuant to a court order.  *In order to allow the many users of*

26   _____

27   using a laptop, which was seized in connection with his arrest.  A subsequent search of his residence
     revealed several pieces of computer hardware belonging to him.  Federal law enforcement agents
28   recovered from the computer hardware a Bitcoin wallet containing approximately 144,336 Bitcoins.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

1  *this illegal website, and the public generally, to understand why this*
2  *website has been shut down*, the United States wishes to make public the
   Civil Complaint and Protective Order.

3  *Id.* at 1-2 (emphasis added).

4  **D.  The United States Attorney's Office for the Southern District of New York Provided**
       **Notice to All Potential Claimants of Silk Road Assets Starting on October 18, 2013**
5

6  On October 18, 2013, the United States Attorney's Office for the Southern District of New York

7  published a Notice of Forfeiture in the www.forfeiture.gov website for 30 days, which was attached to

8  its Declaration of Publication filed on January 2, 2014. *See* Declaration of Claudia A. Quiroz

9  (hereinafter "Quiroz Decl.") (attached hereto as Exhibit B) at Exhibit 1 (SDNY Civil Forfeiture Action,

10 Dkt. No. 13). The notice listed the property against which the government filed a verified Complaint for

11 Forfeiture pursuant to 18 U.S.C. 981. *Id.* at 3. This included "[a]ny and all assets of Silk Road,

12 including but not limited to Silk Road Hidden Website," "[a]ny and all assets of Silk Road, including

13 but not limited to any and all Bitcoins contained in wallet files residing on Silk Road servers, including

14 the servers assigned to" six different Internet Protocol Addresses; and "[a]ny and all assets of Silk Road,

15 including but not limited to 27,618.69843, Silk Road Market Place Bitcoins as of block chain Account

16 Number 262280 which was seized on or about October 02, 2013." *Id.* The notice further stated that

17 "[a]ny person claiming a legal interest in the Defendant Property must file a verified Claim with the

18 court within 60 days from the first day of publication (October 18, 2013) of this Notice on this official

19 government internet web site . . . ." *Id.* The Notice of Publication was available on the

20 www.forfeiture.gov website for 24 hours per day between October 18, 2013 and November 16, 2013.[5]

21 *Id.* at 4. Accordingly, pursuant to Rule G(5)(a)(ii)(C), the deadline to file a claim for any of those assets

22 was December 17, 2013, more than seven years prior to the date Matusko filed his claim.

23

24

25 [5] The government filed a separate and subsequent Notice of Forfeiture in the www.forfeiture.gov
   website for 30 additional days starting on November 8, 2013 through December 7, 2013 for the property
26 seized from Ulbricht's computer and residence, including "all proceeds of all Bitcoins on Ulbricht's
   computer hardware traceable to the operation of Silk Road with public Key:
27 1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 at 2825
   Diamond Street, San Francisco, CA." SDNY Civil Forfeiture Action, Dkt. No. 14.

28

1    Ulbricht was the only individual to file a verified claim for the Bitcoin seized from his computer

2    wallet.  *See* SDNY Civil Forfeiture Action, Dkt. No. 11.  No claims were filed for the bitcoin seized in

3    connection with the Silk Road website takedown, which would have included the bitcoin in individual

4    user and vendor accounts.

5    On January 15, 2014, the District Court in the Southern District of New York entered a Partial

6    Judgment by Default and Order of Forfeiture ordering the forfeiture of the Silk Road website and "any

7    and all Bitcoins contained in the wallet files residing on Silk Road servers" (i.e., the "Silk Road Server

8    Bitcoins").  *See* SDNY Civil Forfeiture Action, Dkt. No. 19.

9    **E.    Ulbricht's Indictment and Conviction**

10    Ulbricht was subsequently indicted by a federal grand jury on February 4, 2014, for narcotics

11    trafficking conspiracy (21 U.S.C. § 841(a)(1)), engaging in a continuing criminal enterprise (21 U.S.C.

12    §§ 841, 843, and 846), computer hacking conspiracy (18 U.S.C. § 1030(a)(2)), and money laundering

13    conspiracy (18 U.S.C. 1956(a)(1)) in connection with his operation of the Silk Road website.  *United*

14    *States v. Ross William Ulbricht*, Case No. CR-14-68 (S.D.N.Y.).  In February 2015, a federal jury

15    convicted Ulbricht on seven counts including conspiracy to distribute narcotics and money laundering

16    following a four-week trial.  Dkt. Nos. 1, 8 ¶ 14.  On May 29, 2015, Ulbricht was sentenced to

17    double life imprisonment plus forty years, without the possibility of parole, in connection with his

18    ownership and operation of Silk Road. [6]

19    **F.    Both Individual X and Ulbricht Consented to Forfeiture of the 69,370 BTC**

20    On November 3, 2020, Individual X signed a Consent and Agreement to Forfeiture with the U.S.

21    Attorney's Office, Northern District of California.  Dkt. No. 8 ¶ 23.  In that agreement, Individual X,

22    consented to the forfeiture of the Defendant Property to the United States government.  *Id.*  That same

23    day, the United States took custody of the Defendant Property from 1HQ3.  *Id.* ¶ 24.

24    **III.    PROCEDURAL HISTORY**

25    **A.    Initiation of *In Rem* Forfeiture Action**

26    On November 5, 2020, the government initiated an *in rem* forfeiture action against

27    

28    [6] *See* https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison.

1  approximately 69,370 BTC obtained from 1HQ3, ("Defendant Property"), by filing a Civil Complaint

2  for Forfeiture in this district.  Dkt. Nos. 1, 8 (Amended Complaint).  The government has traced the

3  Defendant Property in its entirety to proceeds of criminal activity by Silk Road and Ulbricht.  *Id.*

4  On January 22, 2021, Ulbricht entered into a Settlement Agreement with the government in

5  which he admitted that the Defendant Property was subject to forfeiture pursuant to 18 U.S.C. §§

6  981(a)(1)(A) and 981(b) (funds involved in laundering of criminal proceeds), 981(a)(1)(C) (proceeds

7  traceable to criminal activity), and 21 U.S.C. § 881(a)(6) (property traceable to narcotics trafficking) and

8  consented to its forfeiture to the United States.  Dkt. No. 47.

9  **B.   Notice of Forfeiture Action**

10  On November 5, 2020, simultaneous with the filing of its Complaint, the government filed a

11  Notice of Forfeiture Action, advising all persons asserting an interest in the Defendant Property and who

12  had received direct notice of the forfeiture action to file a verified claim with the Clerk of the Court

13  pursuant to Supplemental Rule G(5).  Dkt. No. 3.  The government sent direct notice to Ulbricht in

14  prison.  Ulbricht is the only individual known to the government with a potential interest in the

15  Defendant Property and is therefore the only person who received direct notice.

16  On November 27, 2020, the United States posted Notice of Civil Forfeiture on an official

17  government internet site (www.forfeiture.gov), which notified potential claimants that they had 60 days

18  to file a verified claim with the Court.  Dkt. No. 25 (Declaration of Publication).  The Declaration of

19  Publication stated that the Notice of Civil Forfeiture was posted for at least 30 days starting on

20  November 27, 2020, as required by Supplemental Rule G(4)(a)(iv)(C). *Id.*  Pursuant to the Supplemental

21  Rules, any potential claimants asserting a claim to the Defendant Property were thus required to file

22  claims on or before January 26, 2021.

23  **C.   Matusko's Claim**

24  Matusko claims that he is the "original, rightful, and innocent owner of at least 48 bitcoins . . . of

25  the 69,370 bitcoins (BTC) seized from . . . 1HQ3."  Dkt. No. 87 ¶ 2.  Matusko argues that he "legally

26  purchased 48 BTC from a third party in Germany for approximately €150 Euros."[7]  *Id.*  In December

27

28  [7] As of July 28, 2021, the value of that bitcoin is approximately $1.9 million USD.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

1  2011, Matusko opened an account on Silk Road under the username "hanson5" and transferred his 48

2  BTC to the Silk Road address associated with that user account.  *Id.*  According to Matusko, he did not

3  purchase any items from the Silk Road website and his 48 BTC remained idle in his account thereafter.

4  *Id.*  Matusko acknowledges that he was aware of the Silk Road takedown in 2013 and that he "most

5  likely" lost access to his user account and bitcoins at that time, yet he claims he was "unaware of any

6  third-party rights under U.S. law to make a claim for his legally obtain *[sic]* bitcoins."  *Id.* ¶ 3-5.

7       Matusko also argues that the United States did not "ever notify [him] of his rights in the 2013

8  forfeiture action via direct notice or any other publication of information associated with his Silk Road

9  user account."  *Id.* ¶ 5.  He also argues that he did not receive direct notice from the government in the

10  present case and claims that "[a]t no time was [he] aware of this civil judicial forfeiture action," even

11  though it was published on www.forfeiture.gov.  Matusko also recognizes that he now seeks recovery of

12  his Bitcoin to take advantage of the cryptocurrency's increased value since 2013.  *Id.* ¶ 6.

13  **IV.  LEGAL STANDARD**

14       **A.  The Claim Must Comply with the Requirements in Rule G(5)(a)**

15       Pleadings in civil forfeiture actions must be filed in accordance with the Supplemental Rules.

16  *See* 18 U.S.C. § 983(a)(4)(A).  Specifically, to pursue a claim, the claimant must demonstrate, in

17  addition to the usual requirement of establishing Article III standing, *see Clapper v. Amnesty Int'l USA*,

18  133 S. Ct. 1138, 1146 (2013), compliance with "the jurisdictional procedural requirements" set forth

19  in Supplemental Rule G(5).  *United States v. $100,348.00*, 354 F.3d 1110, 1126 (9th Cir. 2004).  Many

20  courts refer to the latter as "statutory standing" and have held that it is established through compliance

21  with Rule G.  *See id.*  At any point before trial, "the Government may move to strike the claimant's

22  claim on the grounds that the claim does not comply with Supplemental Rule G(5) . . . or that the

23  claimant lacks standing" pursuant to Supplemental Rule G(8)(c)(i)(A) & (B).  *United States v.*

24  *$41,471.00*, No. 15-cv-00696, 2016 U.S. Dist. LEXIS 10952, *10 (C.D. Cal. Jan. 5, 2016); *see also*

25  *United States v. $12,126.00,* 337 Fed. A'ppx 818, 820 (11th Cir. 2009); *United States v. $13,970.00*,

26  2007 WL 1231659 (M.D. Ga. 2007).

27       As many courts have recognized, there is a substantial danger of false claims in *in rem* actions

28

1  where the government files an action against the property, and anyone who has notice of the action can

2  file a claim.  Requiring strict compliance with the pleading requirements minimizes the danger of such

3  claims by forcing the claimants to assert their ownership interest under oath.  For that reason, the

4  pleading requirements are not treated as "mere procedural technicalit[ies]." *United States v.*

5  *$487,825.00*, 484 F.3d 662, 664-65 (3d Cir. 2007).

6  **B.      The Court May Strike a Claim Where the Claimant Lacks Standing**

7  To contest a forfeiture, a claimant must demonstrate both statutory and Article III

8  standing.  *United States v. $1,181,895.00*, 2015 U.S. Dist. LEXIS 17448, 2015 WL 631394, at *2 (C.D.

9  Cal. Feb. 12, 2015).  Standing is a threshold jurisdictional issue in civil forfeiture cases, *see United*

10  *States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526-27 (2d Cir. 1999), and the government is entitled to

11  "test" the veracity of the claimant's claim of ownership and interest any time after a claim is filed.  *See*

12  *United States v. $133,420.00*, 672 F.3d 629, 642 (9th Cir. 2012).  In a civil forfeiture proceeding,

13  standing is satisfied if the claimant can show "a colorable interest in the property, for example, by

14  showing actual possession, control, title, or financial stake."  *United States v. 475 Martin Lane*, 545 F.3d

15  1134, 1140 (9th Cir. 2008).  The burden for showing standing rests on the party asserting it.  *Lujan v.*

16  *Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

17  If the claimant does not have a real interest in the property, there is no "case or controversy," and

18  consequently no basis for the court to exercise jurisdiction under Article III of the Constitution.  *See*

19  *United States v. 5208 Los Franciscos Way,* 385 F.3d 1187, 1191 (9th Cir. 2004).  The *in rem* nature of

20  civil forfeiture actions creates a substantial danger that claims will be filed by persons with no real

21  interest in the property.  Entirely frivolous claims may be filed by people who have no connection with

22  the forfeiture case, except that they read about it on the Internet.  As the Ninth Circuit has explained,

23  because the danger of false claims in civil forfeiture proceedings is "substantial," courts require more

24  than "conclusory or hearsay allegations of some interest in the forfeited property."  *$100,348,* 354 F.3d

25  at 1118-19.

26  / / /

27  / / /

28

**V. ARGUMENT**

**A. Matusko Lacks Standing to Bring His Claim Because His 48 BTC was Not Stolen by Individual X and is Not Contained in the Defendant Property**

Matusko cannot demonstrate a valid ownership or possessory interest in the Defendant Property and therefore lacks standing to bring his claim. *See United States v. $133,420.00*, 672 F.3d 629, 637-38 (9th Cir. 2012). He asserts that his interest in the Defendant Property arises from his Silk Road account balance of 48 BTC, which was wiped out when law enforcement took down the website and seized its servers in October 2013.

When Individual X stole 70,411.46 BTC from Silk Road in May 2012, Individual X withdrew the funds from the general pool of Silk Road bitcoin and not from any particular user accounts. This means that after these transfers were made, no user balances were impacted, including the balance of hanson5, Matusko's Silk Road moniker. Haynie Decl. ¶ 9. Indeed, Matusko's 48 BTC remained in his hanson5 account until Silk Road was taken down and its servers seized in October 2013—almost a year and a half after the Defendant Property left Silk Road. Matusko therefore does not have a colorable claim to the Defendant Property, particularly because he acknowledges that he lost control over his 48 BTC when law enforcement took down Silk Road in October 2013, and not when Individual X hacked it in May 2012. *See* Dkt. No. 87 ¶ 5.

By way of illustration, Matusko's situation is different from another notable theft of bitcoin from Silk Road, namely that by former U.S. Secret Service Special Agent Shaun Bridges. Haynie Decl. ¶ 10. Bridges was involved in the investigation and arrest of a Silk Road moderator. *Id.* The moderator provided the investigation team, including Bridges, with his Silk Road administrative login credentials. *Id.* Bridges used these credentials to reset specific vendor passwords which allowed him to take over the accounts of multiple Silk Road vendors. *Id.* Bridges used his access to the vendor accounts to withdraw bitcoin contained within the accounts to Bitcoin addresses he controlled. *Id.* The difference here is that Bridges stole bitcoin from specific Silk Road vendor accounts and the balances of those accounts were reduced accordingly within the Silk Road database. *Id.* Individual X, on the other hand, stole bitcoin from a pool of Silk Road bitcoin. *Id.* Therefore, no particular vendor or user accounts were impacted.

*Id.*

Further, after Ulbricht realized that funds had been stolen from particular vendors during the Bridges theft, Ulbricht restored the vendors' balance back to what it was pre-theft. *Id.* ¶ 11. Conversely, after Individual X stole from Silk Road, Ulbricht did not need to restore account balances because the theft was not from any particular Silk Road account. *Id.* In addition, Ulbricht did not disclose the theft of bitcoin and the theft did not have an impact on the users' ability to withdraw bitcoins for use in transactions on Silk Road. *Id.*

The theft of bitcoin by Individual X had no impact on the hanson5 Silk Road account balance. *Id.* ¶ 12. A copy of the Silk Road server when it was seized in October 2013 showed that the hanson5 account received 47.52 bitcoin in December 2011. *Id.* The hanson5 Silk Road account had the same balance when the server was seized in October 2013, demonstrating that the account was unaffected when Individual X stole bitcoin from Silk Road in May 2012. *Id.* At any time from December 2011 to October 2013, the owner of the hanson5 account could have withdrawn bitcoin from the account. *Id.*

Silk Road was not a bank—it was a marketplace for narcotics and not a logical place for anyone to store their bitcoin. Although the government does not question Matusko's assertion that he did not purchase any items from Silk Road using his hanson5 account, his deposit of 47.52 BTC was the common first step for all purchasers of illicit goods and services on Silk Road. For illustrative purposes, below is a flowchart depicting Silk Road's payment system, which was entered into evidence at Ulbricht's trial as Exhibit 113A.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**SILK ROAD PAYMENT SYSTEM**

Buyer exchanges currency for BTC

Vendor exchanges BTC for currency

EXCHANGER

EXCHANGER

Buyer transfers BTC to SR account

BTC held in escrow until order finalized

Vendor moves BTC from SR account

BUYER

Buyer makes purchase

Vendor is paid

VENDOR

Silk Road takes commission

GOVERNMENT
EXHIBIT
113 A
14 Cr. 68 (KBF)

Although Silk Road had over 100,000 users, nobody filed a claim to the bitcoin seized when Silk Road was shut down and its servers with all of the bitcoin was seized—including all of Ulbricht's commissions, all of the bitcoin in escrow, and all funds in users' accounts. The appropriate time for anyone using Silk Road for legitimate purposes to file a claim was on or prior to December 17, 2013, the last day of the Southern District's claims period after Silk Road was shut down. Matusko accordingly has no standing in this action, as none of the funds he claims ever made it to 1HQ3 and were instead seized as part of the larger forfeiture action advanced by the Southern District of New York. Thus, if Matusko ever had standing and a valid claim for his bitcoin, he should have brought his claim at that time in the Southern District of New York.

In short, because the bitcoin stolen by Individual X was not stolen from hanson5/Matusko, did not impact Matusko's Silk Road account balance, and did not prevent the withdrawal of funds from Matusko's account, Matusko does not have standing to bring a claim in this action and must therefore be stricken.

/ / /

**B.    Matusko's Claim is Untimely**

Matusko filed his claim on July 2, 2021—eight months after the government filed its Complaint in this matter and five months after the deadline to file a claim expired.  *See* Dkt. No. 87.  While Matusko's claim appears to be is untimely by five months, it is actually seven and a half *years* late.

**1.    Relevant Law on Deadlines in Civil Forfeiture Actions**

In a civil forfeiture case, the government is the plaintiff and initiates the action by the filing of a verified complaint; the property is the defendant; and the claimant is an intervenor seeking to challenge the forfeiture.  *See United States v. One-Sixth Share*, 326 F.3d 36, 40 (1st Cir. 2003).  Once a complaint for forfeiture is filed, the government must provide notice to potential claimants by publication and, in some cases, by direct notice.  First, the government must publish notice, which is typically done by posting notice on an official government forfeiture website for at least 30 consecutive days.  *See* Supp. Rule G(4)(a)(iv)(C).  Second, the government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)."  Supp. Rule G(4)(b)(i).  The rule also states that "[a] potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice."  Supp. Rule G(4)(b)(v).

Supplemental Rule G(5)(a)(ii) sets the time within which any potential claimants must file claims to the defendant property identified in the complaint, stating in relevant part:

> Unless the court for good cause sets a different time, the claim must be filed:
>
> (A) by the time stated in a direct notice sent under Rule G(4)(b); [or]
>
> (B) if notice was published but direct notice was not sent to the claimant or the claimant's attorney, no later than 30 days after final publication of newspaper notice or legal notice under Rule G(4)(a) or no later than 60 days after the first day of publication on an official internet government forfeiture site.

Supp. Rule G(5)(a)(ii).

The purpose of these strict time limitations "is to force claimants to come forward as soon as possible after forfeiture proceedings have been initiated so that all interested parties can be heard and the

1    dispute resolved without delay." *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1436

2    (9th Cir. 1985).  Supplemental Rule G(5) does grant district courts discretion to extend these claim

3    deadlines for good cause, but that discretion "is not unbounded," and should only be exercised where

4    "the goals underlying the time restriction and the verification requirement are not thwarted." *1982*

5    *Yukon Delta Houseboat*, 774 F.2d at 1435-

6          The Ninth Circuit has identified certain factors that lower courts should consider in ruling on an

7    untimely claim.[8]  These factors include:  (1) when claimant became aware of the currency's seizure; (2)

8    whether the United States Attorney may have encouraged the delay; (3) the claimant's health; (4)

9    whether the claimant was properly served; (5) any prejudice to the government in permitting the claims

10   to go forward; (6) whether the claimant informed the government and the court of its interest before the

11   claims deadline; (7) whether the claimant expended resources preparing for trial; (8) the claimant's good

12   faith; (9) whether the government complied with its procedural rules; (10) whether the claimant was

13   acting *pro se*; (11) whether the claimant petitioned for an enlargement of time; and (12) the sufficiency

14   of the proposed claim.  *$100,348.00*, 354 F.3d at 1118.  *See also United States v. $1,546,076.35 in Bank*

15   *Funds Seized*, No. 18-cv-08420, 2021 U.S. Dist. LEXIS 70873, at *5-6 (C.D. Cal. Jan. 6, 2021); *United*

16   *States v. $43,029*, No. 06-cv-07421, 2008 U.S. Dist. LEXIS 141311, at *8 (N.D. Cal. July 3, 2008).

17         Courts are particularly strict in enforcing the timeliness requirements in forfeiture actions.  As

18   one court stated, "[t]he intent of Supplemental Rule G(5) plainly is that claimants who fail to timely file

19   forfeit their claims unless they possess an adequate excuse.  Allowing a late filing would subvert the

20   strict time limits established by Supplemental Rule G(5) and encourage claimants to litigate every

21   untimely filing in a forfeiture case." *United States v. $25,790*, 2010 WL 2671754, *4 (D. Md. July 2,

22   2010).

23         **2.    The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00***
              **Weigh in Favor of Striking Claimants' Untimely Claims Pursuant to Rule**
24            **G(8)(c)(i)(A)**

25         In this case, timely claims to the Defendant Property had to be filed no later than January 26,

26   2021, yet Matusko filed his claims over five months late.  To excuse this untimely filing, the Court must

27   _____

28         [8] The Ninth Circuit has also further adopted factors articulated by the Fourth and Seventh
     Circuits, which are also discussed here.
     U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
     CV 20-7811 RS

find good cause, which it cannot do under the facts and circumstances present here. Although Matusko's claim is actually seven-and-a-half years late and filed in the wrong jurisdiction, his claim must nonetheless be stricken as untimely even if it were appropriately brought here.

> a. **In Addition to Publication by the Government, the Seizure was Well Publicized, and Matusko Should Have Filed His Claim in the Southern District of New York by December 17, 2013 (First and Sixth Factors)**

Matusko admits that he was aware of the seizure of his 48 BTC in 2013. In his claim, he states that he was "generally aware" of the government's action in 2013 "as it made headlines worldwide." Dkt. No. 87 ¶ 5. He also applies this *general awareness* to the fact that he "most likely" lost access to his user account and "most likely" lost access to his bitcoins at that time. *Id.* Matusko absolutely lost access to his user account and bitcoins when the government shut down Silk Road and seized its servers in 2013 and would have known this upon attempting to log on to his account. Indeed, any Silk Road user who attempted to access the website would have seen this takedown notice placed by law enforcement in lieu of the homepage following its seizure:



Haynie Decl. ¶ 8.

1    Certainly, federal prosecutors in the Southern District of New York recognized that the takedown

2    of the Silk Road website would "affect tens of thousands of the website's users worldwide" and asked to

3    make public the Civil Complaint and Protective Order "[i]n order to allow the many users of this illegal

4    website, and the public generally, to understand why this website has been shut down." SDNY Civil

5    Forfeiture Action, Dkt. No. 3 at 1-2. Proper notice was given. The deadline to file a claim was

6    December 17, 2013.

7    The Silk Road takedown and Ulbricht's arrest were publicized worldwide. A simple Google

8    search for "Silk Road" or "Ulbricht" reveals countless articles starting in 2013 reporting on the issue.

9    Years later, the seizure of the Defendant Property also became well known. Given its sheer value and

10   the fact that 1HQ3 was one of the most sought-after Bitcoin addresses, its seizure was highly publicized

11   in multiple national news outlets, including the Wall Street Journal, Forbes, The Guardian, and many

12   others. The fact that the seizure was associated with Silk Road further enhanced its notoriety. Indeed,

13   the government's seizure of the 69,370 Bitcoin on November 3, 2020 was—and still is—the largest

14   seizure of cryptocurrency in the history of the Department of Justice.

15   Despite all of this, Matusko never advised the Court or the government of his interest in the

16   Defendant Property before the claim deadline. Accordingly, the first and sixth factors weigh in favor of

17   striking Matusko's pleadings.

18          **b.**    **The Government Never Encouraged Delay and Provided Proper**
19                  **Notice (Second, Fourth, and Ninth Factors)**

20   The government never encouraged a delay with respect to any of the claimants participating in

21   this action. At the time of seizure, the government's sole objective was to give notice to the public and

22   known claimants as quickly as possible. The government provided direct notice to the only individual it

23   knows to have an interest in the Defendant Property—Ross Ulbricht—because it constitutes stolen

24   proceeds of Silk Road and its associated sales of drugs and other illegal goods and services. The

25   government further adhered to the noticing requirements set forth in Rule G by issuing notice by

26   publication without delay.

27

28

1    Matusko states in his claim that the United States did not notify him "of his rights in the 2013

2    forfeiture action via direct notice or any other publication of information associated with his Silk Road

3    user account. *See* Dkt. No. 87 ¶ 5. This statement is incorrect, as the United States Attorney's Office

4    for the Southern District of New York provided adequate notice via publication on a government

5    website. *See* Quiroz Decl., Ex 1.

6    With respect to the instant action, the government similarly provided adequate notice and

7    followed all relevant procedural rules. For these reasons, the second, fourth, and ninth factors similarly

8    weigh in favor of striking Matusko's claim.

9              **c.      Matusko's Delay Was Not Due to Health Problems (Third Factor)**

10   With respect to the third factor (physical health), Matusko's health does not appear to be a basis

11   for the failure to file a timely claim.

12             **d.      Allowing Matusko's Claim to Proceed Would Prejudice the
                          Government (Fifth Factor)**

13

14   The fifth factor, prejudice to the government, similarly weighs against finding good cause here.

15   The Defendant Property is cryptocurrency. The inherent and continuous change in the value of Bitcoin

16   prejudices the United States because it adds to the uncertainty of the value of the Defendant Property it

17   is seeking to forfeit. Indeed, at its highest point in mid-April, Bitcoin reached over $63,000 in value.[9]

18   By June 26, 2021, the value of Bitcoin fell to under $31,000, representing a drop in value of over fifty

19   percent from its peak just two months prior.[10] Matusko's continued participation in these proceedings

20   would not only overly complicate the matters before the Court—it would also contribute to the

21   uncertainty of the value of the Defendant Property.

22   Moreover, permitting the claims to proceed would expose the government and the Court to

23   exactly the type of time-consuming, protracted litigation over the claimant's standing to contest the

24   forfeiture that the pleading requirements were designed to avoid. As discussed above, Matusko lacks

25   standing to bring his claims for reasons separate from timeliness, rendering his continued participation

26

27        [9] *See* https://www.cnbc.com/2021/04/13/bitcoin-hits-new-all-time-high-above-62000-ahead-of-coinbase-debut.html.

28        [10] https://www.coindesk.com/price/bitcoin.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

in this action a general a waste of government and judicial resources. In that same vein, allowing

Matusko—a Silk Road account holder—to proceed in this action, would result in prejudice to the

government by inviting potentially thousands of other parties with no standing to attempt to intervene,

resulting in a waste of judicial resources and significantly adding to the time the government would need

to effectively resolve the other timely claims to the Defendant Property. Indeed, permitting this baseless

claim to move forward would further undermine one of Rule G's central goals—to "minimize[] the

danger of false claims." *United States v. $102,535.00*, 499 F. App'x 134, 136 (3rd Cir. 2012) (citation

omitted). For these reasons, the fifth factor weighs in favor of striking Matusko's pleadings.

### e. Matusko Has Not Prepared for Trial (Seventh Factor)

Striking the claim is proper pursuant to the seventh factor, given that there is no indication that

Matusko has spent any time preparing for trial.

### f. Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor)

On June 1, 2021, Alexander Kugelman, Matusko's counsel, sent an email to Assistant United

States Attorney ("AUSA") David Countryman stating that his client had recently learned of the seizure,

that he might be making a claim, and that he was hoping to get an update on the current status of the

action, including any timeline for filing a claim. *See* Quiroz Decl., Ex. 2. AUSA Countryman

responded the same day, advising Mr. Kugelman that "[t]he Notice of Civil Forfeiture was posted on

November 27, 2020, as required by Supplemental Rule G(4)" and accordingly "pursuant to 18 U.S.C.

983(a)(4)(A), the deadline to file a verified Claim with the Court expired on January 26, 2021." *Id.*

AUSA Countryman attached the Declaration of Publication to his email and added that "[a]ny claim

filed at this time would be untimely and subject to dismissal." *Id.*

In his email, Kugelman acknowledged that Matusko had just found out about the seizure, which

is a clear statement as to why he did not make a claim sooner. Whether or not it is true that a journalist

who had previously published articles on Bitcoin and Silk Road[11] did not learn about the highly

---

[11] *See* https://taz.de/2-Zahlen-mit-Bitcoins/!142670/ (last visited July 23, 2021). *See also*
https://taz.de/Schlag-gegen-Online-Drogenhandel/!5057921/ (last visited July 23, 2021).

publicized seizure of one of the most sought-after Bitcoin addresses in history containing criminal proceeds from a dark net website with which he himself had a user account until eight months after it happened, the fact remains that the government provided adequate notice by publication in this action. Even then, it took Matusko an entire month to submit a four-page claim after his attorney reached out to government counsel, who told him that the deadline had passed and that any claim filed at that time would be untimely and subject to dismissal.

### g. Matusko is not Acting *Pro Se* (Tenth Factor)

The tenth factor also weighs in favor of striking Matusko's claim. Here, we are not dealing with a *pro se* claimant without access to legal counsel. Matusko, who seems to have some knowledge about Bitcoin and Silk Road, is represented by counsel. Unlike other cases involving *pro se* litigants, there is no excuse for counsel to have filed as late as he did, especially without warning to the government or filing a motion to permit a late claim. Indeed, when counsel for Matusko reached out to the government it was already too late.

### h. Matusko Never Sought an Extension of Time (Eleventh Factor)

The eleventh factor also weighs against Matusko, as he made no request to extend his time to file a claim. The burden is on Matusko to provide information on when they learned of the action. Given that the government's seizure of the 69,370 Bitcoin was highly publicized, Matusko cannot possibly articulate an adequate basis for his delay, especially after alerting the government that a claim was forthcoming a month before filing it.

### i. The Claim is Insufficient Because Matusko Lacks Standing (Twelfth Factor)

As explained in detail above, Matusko has no standing to bring a claim in this action because the bitcoin stolen by Individual X was not stolen from his Silk Road account, did not impact his account balance, and did not prevent the withdrawal of funds from his account at any time prior to the October 2013 takedown. Along with the other factors, the twelfth factor accordingly weighs in favor of striking Matusko's claim.

/ / /

### 3. Courts Regularly Strike Claims on Timeliness Grounds

Courts "have emphasized that forfeiture claimants must strictly adhere to the filing requirements [of Rule G] to perfect statutory standing." *$102,535.00*, 499 F. App'x at 136.[12]  The Ninth Circuit has similarly stated that standing to contest a forfeiture action can be conditioned on "strict compliance with filing requirements." *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.*, 787 F.3d 968, 974 (9th Cir. 2015) (internal citations omitted).  This includes making a timely filing pursuant to Supplemental Rule G(5)(ii).  The timely filing of a claim is vital because it "allows the court to hear all interested parties and to resolve the dispute without delay," and of particular importance here, "it also minimizes the danger of false claims." *$102,535.00*, 499 F. App'x at 136.  Rule G(8)(c)(1) provides that the government may move to strike a claim because a claimant lacks standing. *Id. at 973*.

Several courts have strictly enforced the mandate set forth in Rule G.  For example, in *United States v. Vehicle 2007 Mack 600 Dump Truck*, the court concluded that a claimant's filing of a claim forty days after the expiration of the claims period merited striking the claim.  680 F. Supp. 2d 618, 824-825 (E.D. Mich. 2010).  Although the government attempted direct notice and notice by publication in that case, the court's reasoning is instructive.  Specifically, the court relied on the putative claimant's failure to present any "mitigating factors," or "evidence of a good faith attempt to file a timely claim," as well as the lack of evidence indicating the claimants' reliance on "some misinformation provided by the Government." *Id.* at 824.  The court further cited "[t]he policies favoring timely disposition of assets, judicial economy, and finality of judgements" which "support application of a rule of strict compliance." *Id.* (quoting *United States v. $11,918.00*, 2007 WL 3037307, at \*7 (E.D. Cal. Oct. 17, 2007).[13]

---

[12] *See also United States v. $12,126.00*, 337 F. App'x 818, 820 (11th Cir. 2009) ("We have emphasized that claimants must strictly adhere to the procedural requirements of the Supplemental rules to achieve statutory standing to contest a forfeiture action.");  *United States v. Thirty-Five Firearms*, 123 F. App'x 204, 206 (6th Cir. 2005); *United States v. Real Prop. Known as the Lido Motel*, 135 F.3d 1312, 1317 (9th Cir. 1998).

[13] *See also United States v. 323 Forrest Park Dr.*, 521 F. App'x 379, 384-85 (6th Cir. 2013) (striking pro se claim filed 2 days late); *United States v. $140,000*, 2010 WL 1704966 (D.N.J. Apr. 26, 2010) (two days late); *United States v. $7,000*, 583 F. Supp. 2d 725, 735 (M.D.N.C. 2008) (three months late). *United States v. $144,650,* 2013 WL 6384646 (D.N.J. Dec. 6, 2013) (one month late).

1          **4.      Only Extraordinary Circumstances Warrant an Extension**

2          In *United States v. 2840 S. Ocean Blvd., Apt. No. 209*, a claimant failed to file a claim or an

3   answer within the requisite time after provision of notice.  2017 WL 1533538 at *2 (E.D.N.Y. Apr. 21,

4   2017).  The Court noted that it had "discretion from the strict compliance ordinarily required by the

5   Supplemental Rules," but that "such leniency [was] not warranted under [those] circumstances."  *Id.*

6   Notwithstanding that claimant's *pro se* status, the court explained that "departing from the strict

7   compliance standard is appropriate when, for example, 'claimants have timely placed the court and

8   government on notice of their interest in the property and intent to contest the forfeiture, recognizing

9   both the good-faith effort put forth and the lack of prejudice to the government under such

10  circumstances.'"  *Id.* (quoting *United States v. $175,918*, 755 F. Supp. 630, 633 (S.D.N.Y. 1991)).  No

11  such circumstances are present here.

12         In *$43,029*, a court in this district similarly declined to extend its discretion to permit a forfeiture

13  case to proceed after the late filing of a complaint.  There, the claimant filed an answer to a forfeiture

14  complaint over fifteen months late.  2008 U.S. Dist. LEXIS 141311, at *4.  The court concluded that the

15  exercise of discretion to permit a late filing under the factors set forth in *$100,348* was inappropriate in

16  light of the claimant's knowledge of the seizure of the property; his good health; the lack of evidence as

17  to the government's contributions to the delay; the claimant's failure to request an extension; and the

18  claimant's failure to notify the government of his interest in the defendant property until well after the

19  claims deadline had passed.  *Id.* at *4-5.  The court so held notwithstanding the claimant's purported

20  lack of ability with the English language; difficulty in accessing resources in prison; and his *pro se*

21  status.  *Id.*

22         The Court should strike Matusko's claim forthwith—the facts present here do not warrant the

23  Court's exercise of discretion to allow the claims to proceed and doing so may thwart the goals

24  underlying the limitation on filing claims.  *See $100,348.00*, 354 F.3d at 1117-18.  Because Matusko

25  cannot possibly demonstrate good cause for his late filing, the Court should follow the cases strictly

26  applying Rule G and strike his claim.  If the Court elects to exercise its discretion and permits Matusko's

27

28

1  claim to proceed notwithstanding his failure to follow the pleading requirements, other defects in his

2  claim prove fatal to his cause.

3  **VI.     CONCLUSION**

4        Approximately eight months after the government filed the instant complaint seeking to forfeit

5  69,370 BTC constituting proceeds of thousands of illegal drug sales and property involved in money

6  laundering transactions, and over five months after the deadline to file a claim expired, individuals and

7  corporate entities continue to come forward filing untimely claims for these tainted funds.  Although

8  Matusko argues that he purchased his 48 BTC legitimately and used it for no illegal purpose, he

9  nonetheless deposited it in a criminal marketplace.  While he is but one individual, it is important to

10  note that Silk Road had over 100,000 buyer accounts and nearly 4,000 seller accounts.  Over 1.5

11  million illegal transactions were conducted over Silk Road.  The government recognized in 2013 that

12  the seizure of Silk Road would affect tens of thousands of the website's users worldwide.  It did.

13  Matusko is one of those individuals.  If the Court allows the claim of someone like Matusko—a Silk

14  Road account holder—to proceed, it will signal to each and every individual who had an account with

15  Silk Road that the Defendant Property is fair game and that claims for seized Bitcoin are welcome.

16  For this reason, the Court should grant the government's motion to strike Matusko's claim before

17  exposing the government and the Court to time-consuming, protracted litigation over Matusko's

18  standing to contest the forfeiture, and before additional parties flood the Court with baseless claims.

19
20  DATED:  July 29, 2021                      Respectfully submitted,

21                                      STEPHANIE M. HINDS
      Acting United States Attorney

22
23        */s/ Claudia A. Quiroz*
      DAVID COUNTRYMAN

24        CHRIS KALTSAS
      CLAUDIA A. QUIROZ

25        WILLIAM FRENTZEN
      Assistant United States Attorneys

26
27
28

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

**ER-721**
25

1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA A. QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-436-7428
        FAX: (415) 436-7234
9       claudia.quiroz@usdoj.gov

10 Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15 UNITED STATES OF AMERICA,           )  CASE NO. CV 20-7811 RS
                                        )
16       Plaintiff,                     )  **DECLARATION OF JEREMIAH HAYNIE IN**
                                        )  **SUPPORT OF UNITED STATES' MOTION TO**
17    v.                                )  **STRIKE THE VERIFIED CLAIM OF**
                                        )  **CLAIMANT ILIJA MATUSKO**
18 Approximately 69,370 Bitcoin (BTC), Bitcoin )
   Gold (BTG), Bitcoin SV (BSV), and Bitcoin  )  Hearing Date:    September 9, 2021
19 Cash (BCH) seized from                 )  Time:            1:30 p.m.
   1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx )  Court:           Hon. Richard Seeborg
20                                       )
         Defendant.                      )
21                                       )
   _____)
22 ILIJA MATUSKO,                        )
                                        )
23       Claimant.                       )
                                        )
24                                       )
   _____)
25

26

27

28

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

1

**ER-722**

I, JEREMIAH HANYIE, state as follows:

1.    I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI").  I am a case agent assigned to this case.  I respectfully submit this declaration to provide certain relevant information in support of the United States' Motion to Strike the Verified Claim of Ilija Matusko.  I personally conducted the blockchain analysis of the bitcoin at issue in this case and was involved in the investigation from its inception to the present day.

2.    From its inception in 2011 until October 2013, when it was seized by law enforcement, Silk Road was the most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black-market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were bought and sold regularly by the site's users.  During its two-and-a-half years in operation, Silk Road was used by thousands of drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other unlawful goods and services to well over 100,000 buyers, and to launder hundreds of millions of dollars derived from these unlawful transactions.

3.    For example, contemporaneous with its seizure, there were nearly 13,000 listings for controlled substances on the website, listed under the categories "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants," among others. Clicking on the link for a particular listing brings up a picture and description of the drugs being offered for sale, such as "HIGH QUALITY #4 HEROIN ALL ROCK" or "5gr UNCUT Crystal Cocaine!!".  Nearly 95% of all sales on Silk Road were for illegal drugs.

4.    During its operation, law enforcement agents made over 100 individual undercover purchases of controlled substances from Silk Road vendors. The substances purchased in these undercover transactions have been various Schedule I and II drugs, including ecstasy, cocaine, heroin, LSD, and others. Samples of these purchases were laboratory-tested and have typically shown high purity levels of the items that were advertised by Silk Road. Based on the postal markings of the packages in which the drugs arrived, these purchases appear to have been filled by vendors located in over ten different countries, including the United States. Law enforcement agents also made undercover purchases of hacking services on Silk Road, including purchases of malicious software such as password stealers and remote access tools.

5. Contemporaneous with the seizure of Silk Road, there were 159 listings on the site under the category "Services." Most concerned computer services: for example, one listing was by a vendor to hack into Facebook, Twitter, and other social networking accounts of the customer's choosing, offering that "You can Read, Write, Upload, Delete, View All Personal Info"; another offered tutorials teaching "22 different methods" for hacking ATM machines. Other listings offered services that were likewise criminal in nature. For example, one listing was for "HUGE Blackmarket Contact List," which described lists of "connects" for "Services" such as "Anonymous Bank Accounts," "Counterfeit Bills (CAD/GBP/EUR/USD)," "Firearms + Ammunition," "Stolen Info (CC [credit card], Paypal)," and "Hitmen (10+ countries)."

6. Silk Road was owned and operated by its creator Ross William Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road" (hereinafter "Ulbricht"). Ulbricht controlled and oversaw all aspects of Silk Road. He maintained the computer infrastructure and programming code underlying the Silk Road website; he determined vendor and customer policies, including deciding what could be sold on the site; he managed a small staff of online administrators who assisted with the day-to-day operations of the site; and he alone controlled the massive profits generated from the operation of the business. The contents of the Silk road web server included Ulbricht's own user account page, which reflected, among other things, his history of Bitcoin transactions on the site. Ulbricht's transaction history reflects that he received a continuous flow of Bitcoins into his Silk Road account. For example, on July 21, 2013 alone, Ulbricht received approximately 3,237 separate transfers of Bitcoins into his account. Virtually all of those transactions were labeled "commission" in the "notes" appearing next to them, indicating that the money represented commissions from Silk Road sales. Ulbricht's account page further displayed the total amount of Bitcoins deposited in his Silk Road account, which, as of July 23, 2013, equaled more than $3.4 million. Thus, Ulbricht received a steady stream of commissions from Silk Road in the form of Bitcoins. The government's investigation in that case did not uncover any legitimate sources of income for Ulbricht at the time of his arrest.

7. The only form of payment accepted on Silk Road was bitcoin. Upon registering an account with Silk Road, users were assigned a Bitcoin address. Bitcoin sent to the user's Bitcoin address was credited to the user's account. According to the Silk Road wiki web page, Silk Road used a

"tumbler" to send "all payments through a complex, semi-random series of dummy transactions, . . . making it nearly impossible to link your payment with any coins leaving the site." In other words, if a buyer makes a payment on Silk Road, the tumbler obscures any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the bitcoin end up—making it fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin addresses are both known. The only function served by Silk Road's implementation of such "tumblers" is to assist with the laundering of criminal proceeds.  All told, Silk Road generated sales revenue totaling over 9.5 million bitcoin, and collected commissions from these sales totaling over 600,000 bitcoin.  The figures were, at the time of Ulbricht's initial charges by complaint, equivalent to approximately $1.2 billion in sales and approximately $80 million in commissions.[1]

8.     On October 1, 2013, Ulbricht was arrested in San Francisco, California and charged in the Southern District of New York via a criminal Complaint with narcotics trafficking conspiracy, computer hacking conspiracy, and money laundering conspiracy.[2]  Having located a server containing the corresponding authentication key for the Silk Road website on the Tor network, law enforcement simultaneously took down the website and seized its servers, including all bitcoins contained in wallets residing within them.  Below is an image of the takedown notice placed on the Silk Road website:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] Under today's valuation, with a price per Bitcoin of $31,774.20 USD, that would be equivalent to $302 billion in sales and approximately $19 billion in commissions.

[2] Ulbricht had moved to San Francisco, within the Northern District of California, prior to his arrest and was operating Silk Road from the Northern District of California.  After his arrest he was processed through the United States District Court for the Northern District of California before being removed to the Southern District of New York for prosecution.  At the time of his arrest, Ulbricht was using a laptop, which was seized in connection with his arrest.  A subsequent search of his residence revealed several pieces of computer hardware belonging to him.  Federal law enforcement agents recovered from the computer hardware a Bitcoin wallet containing approximately 144,336 Bitcoins.



9.     On approximately May 6, 2012, Individual X stole 70,411.46 BTC from addresses controlled by Silk Road and transferred it to two Bitcoin addresses—

1BADznNF3W1gi47R65MQs754KB7zTaGuYZ (hereafter "1BAD") and

1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN (hereafter "1BBq").  Individual X used a vulnerability that allowed him to withdraw funds from Silk Road without authorization.  The transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular user accounts.  Meaning after these transfers were made, no user balances were impacted including the balance of hanson5.

10.     This is different from another notable theft of bitcoin from Silk Road, namely that by former U.S. Secret Service Special Agent Shaun Bridges.  Bridges was involved in the investigation and arrest of a Silk Road moderator.  The moderator provided the investigation team, including Bridges, with his Silk Road administrative login credentials.  Bridges used these credentials to reset specific vendor passwords which allowed him to take over the accounts of multiple Silk Road vendors.  Bridges used his access to the vendor accounts to withdraw bitcoin contained within the accounts to Bitcoin addresses he controlled.  The difference here is that Bridges stole bitcoin from specific Silk Road vendor

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

5
**ER-726**

accounts and the balances of those accounts were reduced accordingly within the Silk Road database. Individual X, on the other hand, stole bitcoin from a pool of Silk Road bitcoin. Therefore, no particular vendor or user accounts were impacted.

11.     Further, after Ulbricht realized that funds had been stolen from particular vendors during the Bridges theft, Ulbricht restored the vendors' balance back to what it was pre-theft. Contrarily, after Individual X stole from Silk Road, Ulbricht did not need to restore account balances because the theft was not from any particular Silk Road account. In addition, Ulbricht did not disclose the theft of bitcoin and the theft did not have an impact on the users' ability to withdraw.

12.     The theft of bitcoin by Individual X had no impact on the hanson5 Silk Road account balance. A copy of the Silk Road server when it was seized in October 2013 showed that the hanson5 account received 47.52 bitcoin in December 2011. The hanson5 Silk Road account had the same balance when the server was seized in October 2013. Notably, the account was unaffected when Individual X stole bitcoin from Silk Road in May 2012. At any time from December 2011 to October 2013, the owner of the hanson5 account could have withdrawn bitcoin from the account.

## BITCOIN OVERVIEW

13.     Through my training and experience, and through reference to open-source information available via the Internet, I know the following:

14.     Bitcoin is a type of virtual currency.[3] Virtual currency (also known as cryptocurrency or digital currency) is a digital representation of value that can function as a medium of exchange, a unit of account, and/or a store of value.[4] Virtual currency is not issued by any government or bank. It is generated and controlled through computer software operating on a decentralized, peer-to-peer network. Virtual currency is not illegal in the United States and may be used for legitimate financial transactions. However, virtual currency is frequently used in conjunction with illegal or restricted activities,

---

[3] Bitcoin is both a cryptocurrency and a protocol; because of this, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

[4] For the purposes of this affidavit, "digital currency," "cryptocurrency," and "virtual currency" address the same concept.

DECLARATION OF JEREMIAH HAYNIE
CASE NO. CV 20-7811 RS

6

**ER-727**

including, for example, purchasing illegal narcotics on darknet markets.

15.     To send and receive bitcoin, the parties involved in a transaction use Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  Each Bitcoin address is controlled through the use of a unique, private key.  This key is the equivalent of a password or PIN and is necessary to access the funds associated with a Bitcoin address.  Only the holder of a Bitcoin address' private key can authorize transfers of bitcoin from that address to other Bitcoin addresses.  Users can operate multiple Bitcoin addresses at any given time and can use a unique Bitcoin address for each transaction.

16.     When a sender initiates a Bitcoin transaction, the sender transmits a transaction announcement across the peer-to-peer Bitcoin network.  To complete a transaction, a sender needs only the Bitcoin address of the receiving party and the sender's own private key.  This information on its own rarely reflects any identifying information about either the sender or the recipient.  As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a Bitcoin transaction itself.  Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin transaction.  The blockchain logs every Bitcoin address that has ever received bitcoin and maintains records of every transaction for each Bitcoin address.

17.     While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless the owner chooses to make information about the owner's Bitcoin address publicly available), investigators can often use the blockchain to identify the owner of a particular Bitcoin address.  Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to, among other recipients, virtual currency exchanges.

**REVIEWING THE BITCOIN PUBLIC LEDGER**

18.     The Bitcoin public ledger can be accessed from any computer connected to the internet simply by searching for it in a search program like Google.  As noted above, the entire Bitcoin public ledger is stored on most of the computers that make up the peer-to-peer network.

19.     Importantly, once a Bitcoin address is used, it becomes traceable by the history of all transactions that the address is involved with.  Anyone can see the balance and all transactions of any

address.  This information is part of the public ledger.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 28th day of July, 2021 in East Lansing, Michigan.

_____/s/_____
JEREMIAH HAYNIE
Special Agent
Internal Revenue Service – Criminal Investigation

ALEXANDER KUGELMAN (SBN 255463)
Kugelman Law, P.C.
21 Tamal Vista Blvd., Suite 202
Corte Madera, CA 94925
Telephone: (415) 968-1780
Facsimile: (415) 534-9441
alex@kugelmanlaw.com

Attorney for Intervenor Claimant
ILIJA MATUSKO

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,<br><br>Defendant.<br><br>ILIJA MATUSKO,<br><br>Claimant. | Case No. CV 20-7811 RS<br><br>Judge: Hon. Richard Seeborg<br>United States District Judge<br><br>**VERIFIED CLAIM AND STATEMENT OF INTEREST OF ILIJA MATUSKO PURSUANT TO 18 U.S.C. § 983(a)(4)(A) RULE C(6)(a) & G(5)(a), SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS**<br><br>Judge: Hon. Richard Seeborg<br>United States District Judge |

## NOTICE OF CLAIM

Pursuant to 18 United States Code, sections 983(a)(4)(A) and Rules C(6) and G(5) of the Federal Supplemental Rules for Admiralty or Maritime Claims or Forfeiture Actions, claimant Ilija Matusko ("Claimant"), by and through his counsel of record, Alexander Kugelman, hereby claims an interest in a portion of the defendant property that are the subject of this forfeiture action brought by the United States of America (the "United States").

**<u>CLAIM</u>**

1.      Claimant is a citizen of the state of Germany.  At all times relevant, Claimant has resided in Germany, he has and continues to be employed as a professional journalist, and for all relevant periods he has continuously resided in Germany.

2.      Claimant is the original, rightful, and innocent owner of at least 48 bitcoins (not including any past or future bitcoin forks, including but not limited to BTG, BSV, BCH, etc.) of the 69,370 bitcoins (BTC) seized by the United States from public key / blockchain address 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3 wallet"). In December 2011, Claimant legally purchased 48 BTC from a third party in Germany for approximately €150 Euros. In December 2011, Claimant opened a user account on the Silk Road website under the user identification "hanson5".  Claimant thereafter transferred these 48 BTC to the Silk Road public key / blockchain address / wallet that was associated with his user account. At no time did the Claimant purchase any items, legal or illegal, from the Silk Road website. The 48 BTC remained idle in the Claimant's Silk Road account thereafter.

3.      In October 2013 the FBI and other US law enforcement agencies ("United States Law Enforcement") seized the Silk Road's website, servers and any tangible assets and intangible assets that may have been associated with the Silk Road website that where within reach of United States Law Enforcement and the United States.

4.      At the time of the United States Law Enforcement coordinated take down of the Silk Road website, the fair market value of one bitcoin was approximately $133 per bitcoin.

5.      Claimant was generally aware of this 2013 United States Law Enforcement action as it made headlines worldwide, that he most likely lost access to the user account and that he most likely lost access to his bitcoins.  However, Claimant was unaware of any third-party rights under U.S. law to make a claim for his legally obtain bitcoins.  Nor did United States ever notify

Claimant of his rights in the 2013 forfeiture action via direct notice or any other publication of information associated with his Silk Road user account.

6. In May 2021, due to the rapid increase in value of cryptocurrency, specifically BTC, Claimant sought advice from counsel in Germany about the possibility of recovering the 48 bitcoins from the original United States Law Enforcement take down of the Silk Road marketplace. The average fair market value of BTC in May of 2021was approximately $42,450 per BTC. The current fair market value of BTC is approximately $34,020.

7. On November 5, 2020, the United States Government filed a complaint for forfeiture involving the seizure of approximately 69,370 BTC, BTG, BSV and BCH from 1HQ3 wallet. From this filing and related court filings it clear that the source of the 69,370 BTC, BTG, BSV, BCH was ultimately from the Silk Road market place that eluded United States Law Enforcement and United States seizure efforts in 2013.

8. Also on November 5, 2020, the United States Government filed a notice of forfeiture action seeking forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 981(b), and 21 U.S.C. § 881(a)(6) in the United States District Court for the Northern District of California against the *in rem* defendant, approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3 wallet.

9. This filing states all persons asserting an interest in or claim against the defendant and who received direct notice of the forfeiture action must file a verified claim with the Clerk of this Court pursuant to Rule 5(g) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims, within thirty-five (35) days after the notice is sent; or if notice was published but direct notice was not sent to the claimant or the claimant's attorney, a claim must be file not later than sixty (60) days after the first day of publication on an official internet government forfeiture website (www.forfeiture.gov); or within the time that the court allows (emphasis added).

10. At no time did the Claimant receive direct notice from the government even though he may have an interest in the intangible assets seized by the government in this civil forfeiture action.

11. At no time was the Claimant aware of this civil judicial forfeiture action, even though it was published on www.forfeiture.gov. The Claimant only recently became aware, specifically June 8, 2021, of this civil judicial forfeiture action when advised by counsel of record of this specific pending judicial forfeiture.

12. On information and belief, Claimant believes that this seizure by the United States from 1HQ3 wallet includes at least 48 BTC (not including any past or future bitcoin forks, including but not limited to BTG, BSV, BCH, etc.), associated with the Claimant's Silkroad user account "hanson5".

13. Claimant contests forfeiture of the Defendants Property, as it relates to at least 48 BTC (not including any past or future bitcoin forks, including but not limited to BTG, BSV, BCH, etc.), in this action and seeks the return of the Property (and any other portion of Defendant property that belongs to Claimant due to past or future bitcoins forks including but not limited to BTG, BSV, BCH, etc.) to Claimant as original, rightful, and innocent owner of such property.

14. As a result a claim pursuant to Rule G(5) of the supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims is being filed.

Dated: June 23, 2021                    Respectfully submitted,

                                        Kugelman Law, P.C.

**<u>VERIFICATION</u>**

I, Ilija Matusko, hereby declare under penalty of perjury under the laws of the United

States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June **30**, 2021

ILIJA MATUSKO
*Claimant*

Represented by:

Dated: June **30**, 2021                     Kugelman Law, P.C.

*/s/ Alexander H. Kugelman* .
ALEXANDER H. KUGELMAN

*Attorney for Intervenor Claimant*
*Ilija Matusko*

## <u>CERTIFICATE OF SERVICE</u>

I, Alexander H. Kugelman, hereby certify that I have electronically filed the above-captioned document with the Clerk of the Court using the CM/ECF system, which will automatically send an e-mail notification of such filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 30, 2021                                  Respectfully submitted,

*/s/ Alexander H. Kugelman                    .*
Alexander H. Kugelman (SBN 255463)
21 Tamal Vista Blvd., Suite 202
Corte Madera, CA 94925
Telephone: (415) 968-1780
Facsimile: (415) 534-9441
Email: alex@kugelmanlaw.com

*Attorney for Intervenor Claimant*
*Ilija Matusko*

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7303
        FAX: (415) 436-7234
9       david.countryman@usdoj.gov

10 Attorneys for United States of America

11                     UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14

15 UNITED STATES OF AMERICA,          ) CASE NO. 20-CV-07811-RS
                                      )
16         Plaintiff,                 ) SETTLEMENT AGREEMENT AND STIPULATED
                                      ) FORFEITURE
17    v.                              )
                                      )
18 Approximately 69,370 Bitcoin (BTC), Bitcoin )
   Gold (BTG), Bitcoin SV (BSV), and Bitcoin )
19 Cash (BCH) seized from             )
   1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx; )
20                                    )
           Defendant.                 )
21                                    )
                                      )
22

23        IT IS HEREBY STIPULATED by and between plaintiff United States of America and potential

24 claimant Ross William Ulbricht ("Ulbricht", collectively the "parties"), through their respective counsel

25 of record, to compromise and settle their interests in the following described property (the "Subject

26 Property"):

27            a.      Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and

28 Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx.

STIPULATION TO FORFEITURE              **ER-736**

1

2      1.     On or about November 20, 2020, plaintiff filed its amended complaint seeking forfeiture
3  of the subject property. Docket No. 8.

4      2.     On June 3, 2015, the United States District Court for the Southern District of New York
5  entered a Preliminary Order of Forfeiture/ Money Judgment against Ulbricht in United States v. Ulbricht,
6  SI 14 Cr. 68 (KBF) (the "Money Judgment").

7      3.     The parties agree that the resolution of this potential claim is based solely on the terms
8  stated in this Settlement Agreement. It is expressly understood that this Agreement has been freely and
9  voluntarily entered into by the parties. The parties further agree that there are no express or implied
10  terms or conditions of settlement, whether oral or written, other than those set forth in this Agreement.
11  This Agreement shall not be modified or supplemented except in writing signed by the parties. The
12  parties have entered into this Settlement Agreement in lieu of continued protracted litigation and District
13  Court adjudication.

14      4.     Ulbricht hereby agrees that the Subject Property is subject to forfeiture pursuant to 18
15  U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 981(b), and 21 U.S.C. § 881(a)(6). Ulbricht withdraws any claim
16  and stipulates to the forfeiture of the Subject Property to the United States (administrative or judicial,
17  civil or criminal) without further notice to him. Ulbricht further relinquishes all right, title and interest in
18  the Subject Property and agrees that said property shall be forfeited to the United States and disposed of
19  according to law by the United States. Ulbricht agrees not to assist any other individual or entity in any
20  effort to contest this forfeiture. Ulbricht further waives all constitutional and statutory challenges in any
21  manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in
22  accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive
23  fine or punishment, and including any statute of limitations.

24      5.     The parties agree that the net proceeds realized from the sale of the Subject Property
25  forfeited pursuant to this agreement shall be credited toward any unpaid balance of the Money Judgment.

26      6.     Ulbricht, his heirs, representatives and assignees, agree to hold harmless the United States,
27  any and all agents, officers, representatives and employees of same, including all federal, state and local
28  enforcement officers, for any and all claims, defenses, actions, or liabilities arising out of or related to

STIPULATION TO FORFEITURE

**ER-737**

1  this action against the Subject Property.

2       7.     The parties agree that each party shall pay its own attorneys' fees and costs.

3

4  IT IS SO STIPULATED:

5

6  Dated: 1/22/2021

7                              ROSS WILIAM ULBRICHT

8                              Potential Claimant

9  DATED: 1/28/2021

10

11                              DAVID A. WARRINGTON, ESQ.
                               Attorney for Potential Claimant

12

13  DATED: 2/3/21

14                              /S David Countryman

15                              DAVID COUNTRYMAN
                               Assistant United States Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION TO FORFEITURE           **ER-738**

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID B. COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7200
        Facsimile: (415) 436-7234
9       Email: david.countryman@usdoj.gov

10 Attorneys for United States of America

11            UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14 UNITED STATES OF AMERICA,          ) CASE NO: CV 20-7811 RS
                                      )
15         Plaintiff,                 )
                                      )
16     v.                             ) CERTIFICATE OF SERVICE
                                      )
17                                    )
   Approximately 69,370 Bitcoin (BTC), Bitcoin )
18 Gold (BTG), Bitcoin SV (BSV), and Bitcoin )
   Cash (BCH) seized from              )
19 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx, )
                                      )
20                                    )
           Defendant.                 )
21 ─────────────────────────────────────

22         The undersigned hereby certifies that she is an employee in the Office of the United States

23 Attorney for the Northern District of California and is a person of such age and discretion to be

24 competent to serve papers. The undersigned further certifies that she caused a copy of

25         •   Amended Complaint for Civil Forfeiture;

26         •   Amended Notice of Forfeiture Action;

27         •   Amended Warrant of Arrest of Property *in Rem*;

28

CERTIFICATE OF SERVICE
CV 20-7811 RS

**ER-739**

1  • Related Case Order;

2  • Judge Seeborg's Standing Order re: Initial Case Management Conferences;

3  • Judge Seeborg's Guidelines for Final Pretrial Conference in Jury Cases;

4  • Judge Seeborg's Standing Order for Civil Bench Trial;

5  • Standing Order for All Judges of the Northern District of California;

6  • Notice of Availability of Magistrate Judge to Exercise Jurisdiction;

7  • Dispute Resolution Procedures in the Northern District of California; and

8  • ECF Registration Information

9 to be served this date via United States Certified Mail and United States First Class mail delivery upon

10 the person(s) below at the place(s) and address(es) which is the last known address(es):

| | |
|---|---|
| Ross William Ulbricht<br>Register Number: 18870-111<br>U.S. Penitentiary, USP Tucson<br>P.O. Box 24550<br>Tucson, AZ 85734 | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 25th day of November, 2020, at San Francisco, California

/S/ *Carolyn Jusay*
CAROLYN JUSAY
FSA Paralegal Asset Forfeiture Unit

CERTIFICATE OF SERVICE
CV 20-7811 RS

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7303
        FAX: (415) 436-7234
9       david.countryman@usdoj.gov

10  Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA,           ) CASE NO. CV 20-7811 RS
                                         )
16       Plaintiff,                      ) AMENDED COMPLAINT FOR FORFEITURE
                                         )
17    v.                                 )
                                         )
18  Approximately 69,370 Bitcoin (BTC), Bitcoin )
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin )
19  Cash (BCH) seized from                )
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx,  )
20                                        )
         Defendant.                       )
21                                        )
                                         )
22  ────────────────────────────────────

23                   NATURE OF THE ACTION

24       1.      This is a judicial forfeiture action, as authorized by 18 U.S.C. §§ 981(a)(1)(A),

25  981(a)(1)(C), 981(b), and 21 U.S.C. § 881(a)(6), involving the seizure of the following property:

26       •  Approximately 69,370.22491543 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV),

27          Bitcoin Cash (BCH), obtained from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx;

28  (hereinafter, collectively, the "Defendant Property"), as property constituting, or derived from, any

AMENDED COMPLAINT FOR FORFEITURE
CV 20-7811 RS                       **ER-741**

1  proceeds of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1030(a)(2) and (a)(4) (Computer Hacking),

2  property furnished or intended to be furnished by a person in exchange for a controlled substance, or

3  money traceable to such an exchange, or money used or intended to be used to facilitate such a violation

4  (Narcotics Sales), and property involved in violations of 18 U.S.C. § 1956 and 1956(h) (Money

5  Laundering and Conspiracy), and thereby forfeitable pursuant to 18 U.S.C. §§ 981(a)(l)(A), 981(a)(1)(C),

6  981(b), and 21 U.S.C. § 881.

7  **JURISDICTION AND VENUE**

8      2.    This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355(a), and 18 U.S.C. §§

9  981(a)(l)(A), 981(a)(1)(C), 981(b), and 21 U.S.C. § 881.

10      3.    Venue is proper because the defendant currency was seized in the Northern District of

11  California. 28 U.S.C. §§ 1355(b) and 1395.

12      4.    Intra-district venue is proper in the San Francisco Division within the Northern District of

13  California.

14  **PARTIES**

15      5.    Plaintiff is the United States of America.

16      6.    The Defendant Property is approximately 69,370.22491543 Bitcoin (BTC),

17  69,370.10730857 Bitcoin Gold (BTG), 69,370.10710518 Bitcoin SV (BSV), and 69,370.12818037

18  Bitcoin Cash (BCH), obtained from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx on or about

19  November 3, 2020.

20  **FACTS**

21      7.    From 2011 until October 2013, when it was seized by law enforcement, Silk Road was the

22  most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black

23  market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were

24  bought and sold regularly by the site's users. While in operation, Silk Road was used by thousands of

25  drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other

26  unlawful goods and services to well over 100,000 buyers, and to launder hundreds of millions of dollars

27  derived from these unlawful transactions.

28

8.      For example, contemporaneous with its seizure, there were nearly 13,000 listings for controlled substances on the website, listed under the categories "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants," among others. Clicking on the link for a particular listing brings up a picture and description of the drugs being offered for sale, such as "HIGH QUALITY #4 HEROIN ALL ROCK" or "5gr UNCUT Crystal Cocaine!!".

9.      During its operation, law enforcement agents made over 100 individual undercover purchases of controlled substances from Silk Road vendors. The substances purchased in these undercover transactions have been various Schedule I and II drugs, including ecstasy, cocaine, heroin, LSD, and others. Samples of these purchases were laboratory-tested and have typically shown high purity levels of the items that were advertised by Silk Road. Based on the postal markings of the packages in which the drugs arrived, these purchases appear to have been filled by vendors located in over ten different countries, including the United States. Law enforcement agents also made undercover purchases of hacking services on Silk Road, including purchases of malicious software such as password stealers and remote access tools.

10.      Contemporaneous with the seizure of Silk Road, there were 159 listings on the site under the category "Services." Most concerned computer services: for example, one listing was by a vendor to hack into Facebook, Twitter, and other social networking accounts of the customer's choosing, offering that "You can Read, Write, Upload, Delete, View All Personal Info"; another offered tutorials teaching "22 different methods" for hacking ATM machines. Other listings offered services that were likewise criminal in nature. For example, one listing was for "HUGE Blackmarket Contact List," which described lists of "connects" for "Services" such as "Anonymous Bank Accounts," "Counterfeit Bills (CAD/GBP/EUR/USD)," "Firearms + Ammunition," "Stolen Info (CC [credit card], Paypal)," and "Hitmen (10+ countries)."

11.      The only form of payment accepted on Silk Road was Bitcoin.

12.      All told, Silk Road generated sales revenue totaling over 9.5 million Bitcoin, and collected commissions from these sales totaling over 600,000 Bitcoin.

13.      Silk Road used a so-called "tumbler" to process Bitcoin transactions in a manner designed to frustrate the tracking of individual transactions through the Blockchain. According to the Silk Road

1  wiki web page, Silk Road's tumbler "sends all payments through a complex, semi-random series of

2  dummy transactions, . . . making it nearly impossible to link your payment with any coins leaving the

3  site." In other words, if a buyer makes a payment on Silk Road, the tumbler obscures any link between

4  the buyer's Bitcoin address and the vendor's Bitcoin address where the Bitcoins end up—making it

5  fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's

6  and vendor's Bitcoin addresses are both known. The only function served by Silk Road's implementation

7  of such "tumblers" is to assist with the laundering of criminal proceeds.

8      14.    In February 2015, a federal jury convicted Silk Road creator Ross Ulbricht on seven

9  counts including conspiracy to distribute narcotics and money laundering. Ulbricht had moved to San

10  Francisco, within the Northern District of California, prior to his arrest and was operating Silk Road from

11  the Northern District of California. He was arrested in San Francisco and processed through the United

12  States District Court for the Northern District of California before being removed to the Southern District

13  of New York for prosecution.

14      15.    In 2020, law enforcement officers used a third party bitcoin attribution company to

15  analyze Bitcoin transactions executed by Silk Road. From this review they observed 54 transactions that

16  were sent from Bitcoin addresses controlled by Silk Road, to two Bitcoin addresses:

17  1BADznNF3W1gi47R65MQs754KB7zTaGuYZ and 1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN

18  totaling 70,411.46 BTC (valued at approximately $354,000 at the time of transfer).

19      16.    The individual amounts that were transferred were mainly round Bitcoin amounts and

20  close together in time. For example, 10 of the transfers occurred at approximately 3:59 a.m. and each

21  transfer was for exactly 2,500 Bitcoin. This pattern of withdrawals and the amount that was withdrawn

22  was not typical for a Silk Road user. Specifically, a review of other withdrawals from Silk Road revealed

23  Bitcoin amounts that were mostly less than 100 Bitcoin. These 54 transactions were not noted in the Silk

24  Road database as a vendor withdrawal or a Silk Road employee withdrawal and therefore appear to

25  represent Bitcoin that was stolen from Silk Road.

26      17.    On approximately April 9, 2013, the Bitcoin addresses that received the 70,411.46 Bitcoin

27  from Silk Road sent 69,471.082201 (approximately $14 million at the time of transfer) to

28  1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx (hereafter "1HQ3").

AMENDED COMPLAINT FOR FORFEITURE
CV 20-7811 RS

**ER-744**

18.     On approximately April 23, 2015, 1HQ3 sent 101 Bitcoin (approximately $23,700) to BTC-e, a company that provided Bitcoin related services and operated as an unlicensed cryptocurrency exchange. In January 2017, BTC-e and a Russian operator of BTC-e were indicted in the Northern District of California for operating an unlicensed money transmitting business and for money laundering through the exchange.

19.     Between April 2015 and November 2020, the remainder of the funds, 69,370.082201 BTC, remained in 1HQ3.[1] As of November 3, 2020, 1HQ3 had a balance of 69,370.22491543 Bitcoin (valued at approximately $1 Billion as of November 4, 2020).

20.     In August 2017, Bitcoin split into two cryptocurrencies, commonly known as a hard fork. Hard fork coin splits are created via changes of the blockchain rules and share a transaction history with Bitcoin up to the time of the split. The first hard fork split occurred on August 1, 2017, resulting in the creation of Bitcoin Cash (BCH). When this split occurred, any Bitcoin address that had a Bitcoin balance now had the same balance on the Bitcoin blockchain and on the Bitcoin Cash blockchain. A search for 1HQ3 on the Bitcoin Cash blockchain revealed a balance of approximately 69,370.12818037 BCH prior to the Government's seizure. Much like the aforementioned hard fork of Bitcoin and BCH, there were subsequent hard forks of Bitcoin that resulted in the creation of Bitcoin Gold (BTG) and Bitcoin SV (BSV). Review of the BTG and BSV blockchains revealed that 1HQ3 held a balance of 69,370.10730857 BTG and 69,370.10710518 BSV prior to the Government's seizure.

21.     Individual X, whose identity is known to the government, was determined to have been involved in a transaction that related to 1HQ3.

22.     According to an investigation conducted by the Criminal Investigation Division of the Internal Revenue Service and the U.S. Attorney's Office for the Northern District of California, Individual X was the individual who moved the cryptocurrency from Silk Road. According to the investigation, Individual X was able to hack into Silk Road and gain unauthorized and illegal access to Silk Road and thereby steal the illicit cryptocurrency from Silk Road and move it into wallets that

---

[1] Because Bitcoin addresses are public, individuals are able to identify Bitcoin addresses with large balances. Individuals will often send minimal amounts of Bitcoin to these addresses for unknown reasons. For example, on November 3, 2020, 1HQ3 received 0.00010999 bitcoin (approximately $1.51) from an unknown individual.

1  Individual X controlled.  According to the investigation,  Ulbricht became aware of Individual X's online
2  identity  and threatened Individual X for return of the cryptocurrency to Ulbricht.  Individual  X did not
3  return the cryptocurrency but kept it and did not spend it.

4         23.     On November 3, 2020, Individual  X signed a Consent and Agreement to Forfeiture  with
5  the U.S. Attorney's Office, Northern District of California.  In that agreement, Individual  X, consented to
6  the forfeiture of the Defendant Property to the United States government.

7         24.     On November 3, 2020, the United States took custody of the Defendant Property from
8  1HQ3.

9                                      **VIOLATION**

10        The United States incorporates by reference the allegations  in paragraphs one through 24 as
11  though fully set forth.

12        Title  18, United States Code, Section 981(a)(1)(A) provides for civil and criminal  forfeiture of
13  any property, real or personal, involved  in a transaction or attempted transaction in violation  of Title  18,
14  United States Code, Sections 1956, 1957, or 1960, and any property traceable to such property.

15        Title  18, United States Code, Section 981(a)(1)(C) provides for the civil  forfeiture of any property,
16  real or personal,  which constitutes or is derived from proceeds traceable to any offense constituting a
17  "specified unlawful activity" or a conspiracy to commit such offense. Title  18, United States Code, Sections
18  1956(c)(7) and 1961(1) define specified unlawful activity to include  Computer Hacking, in violation of Title
19  18, United States Code, Section 1030, and conspiracy to commit Computer Hacking.

20        Title  21, United States Code, Section 881(a)(6) provides for the forfeiture of all moneys,
21  negotiable  instruments,  securities,  or other things of value furnished or intended to be furnished by any
22  person in exchange for a controlled  substance or listed chemical, all proceeds traceable to such an
23  exchange and all money used or intended to be used to facilitate any violation  of Subchapter I, Chapter
24  13, Subchapter I of Title  21 United States Code.

25        In light of the foregoing,  and considering  the totality of the circumstances, there is probable  cause
26  to believe that the Defendant Property represents proceeds traceable to computer hacking in violation  18
27  U.S.C. § 1030(a) and conspiracy in violation  of 18 U.S.C. § 371.  As such, the Defendant Property is
28  forfeitable  pursuant to 18 U.S.C. § 981(a)(l)(C).  Additionally,  there is probable cause to believe that the

1  Defendant Property represents property traceable to narcotics trafficking. As such, the Defendant

2  Property is forfeitable pursuant to 21 U.S.C. § 881(a)(6). To the extent the Defendant Property includes

3  funds that did not originate as proceeds from the illegal activities discussed herein, those funds were

4  "involved in" money laundering in violation of 18 U.S.C. § 1956 because they were comingled with and

5  used to conceal and disguise the nature, location, source, ownership or control of the criminal proceeds,

6  or were involved in a conspiracy to launder such proceeds. Accordingly, the Defendant Property is

7  forfeitable pursuant to 18 U.S.C. §§ 981(a)(l)(A) and 981(b).

8    WHEREFORE, plaintiff United States of America requests that due process issue to enforce the

9  forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show

10  cause why forfeiture should not be decreed; that judgment of forfeiture be entered; that the Court enter

11  judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as

12  may be proper and just.

13

14  DATED: 11/20/2020

15                                    Respectfully submitted,
                                      DAVID L. ANDERSON
16                                    United States Attorney

17
                                      __/s/ David Countryman_____
18                                    DAVID COUNTRYMAN
                                      CHRIS KALTSAS
19                                    CLAUDIA QUIROZ
                                      WILLIAM FRENTZEN
20                                    Assistant United States Attorneys

21

22

23

24

25

26

27

28

VERIFICATION

I, Jeremiah Haynie, state as follows:

1.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI"). I am a case agent assigned to this case. As such, I am familiar with the facts, and the investigation leading to the filing of this Amended Complaint for Forfeiture.

2.      I have read the Amended Complaint and believe the allegations contained in it to be true.

\*      \*      \*      \*      \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of November, 2020 in East Lansing, Michigan.


_____
JEREMIAH HAYNIE
Special Agent
Internal Revenue Service - Criminal Investigation

AMENDED COMPLAINT FOR FORFEITURE
CV 20-7811 RS

**ER-748**

# UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** NORTHERN DISTRICT OF CALIFORNIA

### Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 20-cv-07811-RS

      Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 11/05/2020

Date of judgment or order you are appealing: 08/16/2022

Docket entry number of judgment or order you are appealing: 127

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

○ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Ilija Matusko

Is this a cross-appeal? ○ Yes  ● No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ● Yes  ○ No

If yes, what is the prior appeal case number? 22-15514

Your mailing address (if pro se):

City:    State:    Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Alexander H. Kugelman   **Date** Sep 7, 2022

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

Ilija Matusko

Name(s) of counsel (if any):

Alexander H. Kugelman

Address: | 21 Tamal Vista Blvd. Suite 202 Corte Madera, CA 94925

Telephone number(s): | (415) 968-1780

Email(s): | alex@kugelmanlaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

United States of America

Name(s) of counsel (if any):

David Countyman; Chris Kaltas; Claudia Quiroz

Address: | 450 Golden Gate Avenue, Ninth Floor, San Francisco, CA 94102

Telephone number(s): | (415) 436-7200

Email(s): | david.countryman@usdoj.gov; chris.kaltas2@usdoj.gov; claudia.quiroz@usdoj.gov; ➕

*To list additional parties and/or counsel, use next page.*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 6**                    **ER-750**                    *New 12/01/2018*

APPEAL,CLOSED,E-ProSe,ProSe

**U.S. District Court**
**California Northern District (San Francisco)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-07811-RS**

| | |
|---|---|
| United States of America v. Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH) | Date Filed: 11/05/2020 |
| Assigned to: Judge Richard Seeborg | Date Terminated: 08/16/2022 |
| | Jury Demand: None |
| Relate Case Case: 3:15-cr-00319-RS-1 | Nature of Suit: 690 Forfeit/Penalty: Other |
| Case in other court: USCA, 21-15111 | Jurisdiction: U.S. Government Plaintiff |

Case in other court: USCA, 21-15111
Ninth Circuit Court of Appeals, 22-15513
Ninth Circuit Court of Appeals, 22-15514
For the Ninth Circuit, 22-16085
For the Ninth Circuit, 22-16348
For the Ninth Circuit, 22-16349

Cause: 21:881 Forfeiture Property-Drugs

**Plaintiff**

**United States of America**                        represented by **Chris Kaltsas**
United States Attorney's Office
NDCA
450 Golden Gate Avenue
Room 9-544
San Francisco, CA 94102
415-436-6915
Email: chris.kaltsas2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Claudia A. Quiroz**
United States Attorney's Office
450 Golden Gate Avenue
9th Floor
San Francisco, CA 94102
415-436-7428
Fax: 415-436-7234
Email: claudia.quiroz@usdoj.gov
*ATTORNEY TO BE NOTICED*

**David Countryman**
US Attorney's Office
Criminal Division, Asset Forfeiture
450 Golden Gate Ave.
11th Floor
San Francisco, CA 94102
415-436-7303
Fax: 415-436-6748
Email: david.countryman@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Pla**

**Adesijuola Ogunjobi**                        represented by **Adesijuola Ogunjobi**
10200 Belle Rive Blvd.
Bldg 6 Unit 45
Jacksonville, FL 32256
904-894-1466
Email: adesijuolaogunjobi@gmail.com
PRO SE

V.

**Defendant**

**Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH)**

V.

**Respondent**

**Ross William Ulbricht**                        represented by **Rebecca Louise Wilson**
Kutak Rock LLP
5 Park Plaza, Suite 1500

**ER-751**

Irvine, CA 92614
(949) 417-0999
Fax: (949) 417-5394
Email: Rebecca.Wilson@KutakRock.com
*ATTORNEY TO BE NOTICED*

**Claimant**

**Caleb Bradberry**
represented by **Isaac Michael Safier**
Law Office of Rebecca Feigelson
Law Chambers Building
345 Franklin Street
San Francisco, CA 94102
(415) 967-0125
Fax: (415) 789-4305
Email: IsaacSafier@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen P New**
Stephen P. New, L.C.
430 Harper Park Drive
PO Box 5516
Beckley, WV 25801
United Sta
304-250-6017
Fax: 304-250-6012
Email: steve@newlawoffice.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claimant**

**Mr. Roman Hossain**
represented by **Yasin Mohammad Almadani**
Almadani Law
4695 MacArthur Ct.
Suite 1100
Newport Beach, CA 92660
United Sta
213-335-3935
Fax: 213-296-6278
Email: yma@lawalm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claimant**

**Lucas E Buckley**
*as%20Trustee%20of%20the%20Gox%20Victim%20Bitcoin%20Trust%20*
represented by **Kathryn Lee Boyd**
Hecht Partners LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(213) 291-9169
Email: lboyd@hechtpartners.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maxim Price**
125 Park Avenue, 25th Floor
New York, NY 10017
212-852-6821
Email: mprice@hechtpartners.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alan M Alvela**
Hecht Partners LLP
125 Park Avenue, 25th Floor
New York, NY 10017
212-851-6821
Email: aalvela@hechtpartners.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Lawrence Hecht**
125 Park Avenue, 25th Floor
New York, NY 10017
212-852-6821
Email: dhecht@hechtpartners.com

**ER-752**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claimant**

**First 100 LLC**                                    represented by **Jaemin Chang**
Fox Rothschild LLP
345 California Street
Suite 2200
San Francisco, CA 94104-2670
(415) 364-5540
Fax: (415) 391-4436
Email: jchang@foxrothschild.com
*TERMINATED: 06/07/2021*
*LEAD ATTORNEY*

**Jonathan R. Bass**
Coblentz Patch Duffy & Bass, LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500
(415) 391-4800
Fax: (415) 989-1663
Email: EfilingJRB@cpdb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rees Ferriter Morgan**
Coblentz, Patch, Duffy & Bass LLP
One Montgomery Street
Suite 3000
San Francisco, CA 94104
415-772-5754
Fax: 415-989-1663
Email: EfilingRFM@cpdb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dwight Craig Donovan**
Fox Rothschild LLP
345 California Street, Suite 2200
San Francisco, CA 94104
415-364-5540
Fax: 415-391-4436
Email: ddonovan@foxrothschild.com
*ATTORNEY TO BE NOTICED*

**Mari Sahakyan Clifford**
Coblentz Patch Duffy & Bass LLP
One Montgomery Street
Suite 3000
San Francisco, CA 94104
415-391-4800
Email: mclifford@coblentzlaw.com
*ATTORNEY TO BE NOTICED*

**Ryan A Andersen ,**
Andersen Law Firm
3199 E Warm Springs Rd
STE 400
Las Vegas, NV 89120
United Sta
702-522-1992
Fax:
Email: ryan@vegaslawfirm.legal
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Elizabeth Peterson**
Coblentz Patch Duffy & Bass
One Montgomery Street
Suite 3000
San Francisco, CA 94104
415-391-4800
Email: ef-sep@cpdb.com
*ATTORNEY TO BE NOTICED*

**Stanley Gracey Roman**
Coblentz Patch Duffy & Bass LLP

**ER-753**

One Montgomery Street, #3000
San Francisco, CA 94104
415-772-5752
Fax: 415-989-1663
Email: ef-sgr@cpdb.com
*ATTORNEY TO BE NOTICED*

**William Inkyoo Abramovitz**
Coblentz Patch Duffy & Bass LLP
One Montgomery Street
Suite 3000
San Francisco, CA 94104
415-391-4800
Fax: 415-989-1663
Email: Wabramovitz@coblentzlaw.com
*ATTORNEY TO BE NOTICED*

**Claimant**

**Battle Born Investments Company, LLC**                represented by **Jaemin Chang**
(See above for address)
*TERMINATED: 06/07/2021*
*LEAD ATTORNEY*

**Jonathan R. Bass**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rees Ferriter Morgan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dwight Craig Donovan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mari Sahakyan Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan A Andersen ,**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Elizabeth Peterson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stanley Gracey Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Inkyoo Abramovitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claimant**

**1st One Hundred Holdings LLC**                represented by **Jaemin Chang**
(See above for address)
*TERMINATED: 06/07/2021*
*LEAD ATTORNEY*

**Jonathan R. Bass**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rees Ferriter Morgan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dwight Craig Donovan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ER-754**

**Mari Sahakyan Clifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan A Andersen ,**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Elizabeth Peterson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stanley Gracey Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Inkyoo Abramovitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claimant**
**Ilija Matukso**

represented by **Alexander Hughes Kugelman**
Kugelman Law, P.C.
21 Tamal Vista Boulevard, Suite 202
Corte Madera, CA 94925
(415) 968-1780
Fax: (415) 534-9441
Email: alex@kugelmanlaw.com
*ATTORNEY TO BE NOTICED*

**Intervenor**
**Nobuaki Kobayashi**
*In his capacity as the Civil Rehabilitation Trustee and Foreign Representative of MtGox Co., Ltd., a/k/a MtGox KK*

represented by **Stephen R. Cook**
Brown Rudnick LLP
2211 Michelson Drive
Seventh Floor
Irvine, CA 92612
949-752-7100
Fax: 949-252-1514
Email: scook@brownrudnick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Fisher Kerns**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
212-209-4800
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David J. Molton**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(212) 209-4822
Email: dmolton@brownrudnick.com
*ATTORNEY TO BE NOTICED*

**Gerard Thomas Cicero**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
212-209-4800
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/05/2020 | 1 | COMPLAINT *(Complaint for Forfeiture)* against Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH). Filed byUnited States of America. (Attachments: # 1 Civil Cover Sheet)(Countryman, David) (Filed on 11/5/2020) (Entered: 11/05/2020) |
| 11/05/2020 | 2 | Case assigned to Judge Vince Chhabria. |

**ER-755**

| | | |
|---|---|---|
| | | Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. (anjS, COURT STAFF) (Filed on 11/5/2020) (Entered: 11/05/2020) |
| 11/05/2020 | 3 | NOTICE by United States of America *(Notice of Forfeiture Action)* (Countryman, David) (Filed on 11/5/2020) (Entered: 11/05/2020) |
| 11/05/2020 | 4 | Proposed Warrant. (Countryman, David) (Filed on 11/5/2020) (Entered: 11/05/2020) |
| 11/05/2020 | 5 | Warrant Issued as to Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH). (mclS, COURT STAFF) (Filed on 11/5/2020) (Entered: 11/05/2020) |
| 11/16/2020 | 6 | NOTICE by United States of America *(Related Case)* (Kaltsas, Chris) (Filed on 11/16/2020) (Entered: 11/16/2020) |
| 11/16/2020 | 7 | **ORDER RELATING CASES 3:15-cr-00319 RS and 3:20-cv-07811 VC re 6 Notice of Related Case. Signed by Judge Richard Seeborg on 11/16/2020. (clS, COURT STAFF) (Filed on 11/16/2020) (Entered: 11/16/2020)** |
| 11/17/2020 | | Case reassigned to Judge Richard Seeborg. Judge Vince Chhabria no longer assigned to the case. (haS, COURT STAFF) (Filed on 11/17/2020) (Entered: 11/17/2020) |
| 11/20/2020 | 8 | AMENDED COMPLAINT *(Amended Complaint for Forfeiture)* against Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH). Filed byUnited States of America. (Countryman, David) (Filed on 11/20/2020) (Entered: 11/20/2020) |
| 11/20/2020 | 9 | NOTICE by United States of America *(Amended Notice of Forfeiture Action)* (Countryman, David) (Filed on 11/20/2020) (Entered: 11/20/2020) |
| 11/20/2020 | 10 | Proposed Warrant. (Countryman, David) (Filed on 11/20/2020) (Entered: 11/20/2020) |
| 11/23/2020 | 11 | Amended Warrant Issued as to Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG) Bitcoin SV (BSV) and Bitcoin Cash (BCH). (mclS, COURT STAFF) (Filed on 11/23/2020) (Entered: 11/23/2020) |
| 11/25/2020 | 12 | CERTIFICATE OF SERVICE by United States of America re 11 Warrant Issued, 9 Notice (Other), 7 Order, 8 Amended Complaint (Countryman, David) (Filed on 11/25/2020) (Entered: 11/25/2020) |
| 11/25/2020 | 13 | Letter from Adesijuols O. Ogunjobi. (Attachments: # 1 Envelope) (gbaS, COURT STAFF) (Filed on 11/25/2020) (Entered: 12/01/2020) |
| 11/25/2020 | 14 | MOTION to Intervene filed by Adesijuola Ogunjobi. Responses due by 12/9/2020. Replies due by 12/16/2020. (gbaS, COURT STAFF) (Filed on 11/25/2020) (Entered: 12/01/2020) |
| 11/25/2020 | 15 | MEMORANDUM of Points and Authorities in Support of 14 MOTION to Intervene filed by Adesijuola Ogunjobi. (Related document(s) 14 ) (gbaS, COURT STAFF) (Filed on 11/25/2020) (Entered: 12/01/2020) |
| 11/25/2020 | 16 | MOTION to Appoint Counsel filed by Adesijuola Ogunjobi. (gbaS, COURT STAFF) (Filed on 11/25/2020) (Entered: 12/01/2020) |
| 12/01/2020 | 17 | MOTION to Continue *Hearing Date* filed by United States of America. (Kaltsas, Chris) (Filed on 12/1/2020) (Entered: 12/01/2020) |
| 12/01/2020 | 18 | CERTIFICATE OF SERVICE by United States of America re 17 MOTION to Continue *Hearing Date* (Kaltsas, Chris) (Filed on 12/1/2020) (Entered: 12/01/2020) |
| 12/01/2020 | 19 | **ORDER Denying 14 Motion to Intervene; Denying 16 Motion to Appoint Counsel; Finding as Moot 17 Motion to Continue. Signed by Judge Richard Seeborg (clS, COURT STAFF) (Filed on 12/1/2020) (Entered: 12/01/2020)** |
| 12/21/2020 | 20 | MOTION to file Motion for Intervention filed by Adesijuola Ogunjobi. Responses due by 1/4/2021. Replies due by 1/11/2021. (Attachments: # 1 Proposed Motion to Intervene, # 2 Envelope)(mclS, COURT STAFF) (Filed on 12/21/2020) (Entered: 12/28/2020) |
| 12/30/2020 | 21 | MOTION for Extension of Time to File *Notice of Claim or otherwise Respond to Plaintiff's Amended Civil Complaint* filed by Ross William Ulbricht. (Attachments: # 1 Declaration of David A. Warrington, # 2 Exhibit A to Declaration of David A. Warrington, # 3 Proposed Order, # 4 Certificate/Proof of Service)(Wilson, Rebecca) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 01/04/2021 | 22 | OPPOSITION/RESPONSE (re 20 MOTION to file Motion for Intervention ) filed byUnited States of America. (Kaltsas, Chris) (Filed on 1/4/2021) (Entered: 01/04/2021) |
| 01/05/2021 | 23 | CERTIFICATE OF SERVICE by United States of America re 22 Opposition/Response to Motion (Kaltsas, Chris) (Filed on 1/5/2021) (Entered: 01/05/2021) |
| 01/05/2021 | 24 | **ORDER by Judge Richard Seeborg Denying 20 Second Motion Regarding Intervention. (clS, COURT STAFF) (Filed on 1/5/2021) Modified on 1/5/2021 (clS, COURT STAFF). Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 01/05/2021)** |
| 01/06/2021 | 25 | CERTIFICATE OF SERVICE by United States of America *(Declaration of Publication)* (Kaltsas, Chris) (Filed on 1/6/2021) (Entered: 01/06/2021) |
| 01/08/2021 | | Set/Reset Deadlines as to 21 MOTION for Extension of Time to File *Notice of Claim or otherwise Respond to Plaintiff's Amended Civil Complaint*. Motion Hearing set for 2/4/2021 at 1:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. (clS, COURT STAFF) (Filed on 1/8/2021) (Entered: 01/08/2021) |
| 01/13/2021 | 26 | *** **ERRONEOUS ENTRY** *** NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Adesijuola Ogunjobi. (Appeal fee FEE NOT PAID.) (Attachments: # 1 Certificate/Proof of Service, # 2 Declaration, # 3 Supplement, # 4 Exhibit, # 5 Affidavit)(Ogunjobi, Adesijuola) (Filed on 1/13/2021) Modified on 1/14/2021 (mclS, COURT STAFF) (Entered: 01/13/2021) |
| 01/14/2021 | | Electronic filing error. **The Notice of Appeal form needs to be completed with all necessary information. Appeal fee in the amount of $505.00 also needs to be paid.** T his filing will not be processed by the clerks office.Please re-file in its entirety. Re: 26 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi (mclS, COURT STAFF) (Filed on 1/14/2021) (Entered: 01/14/2021) |

| | | |
|---|---|---|
| 01/14/2021 | 31 | RESPONSE re 22 Opposition/Response to Motion by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 1/14/2021) (Entered: 01/21/2021) |
| 01/14/2021 | 32 | OPPOSITION/RESPONSE (re 21 MOTION for Extension of Time to File *Notice of Claim or otherwise Respond to Plaintiff's Amended Civil Complaint* ) filed byAdesijuola Ogunjobi. (Attachments: # 1 Envelope)(mclS, COURT STAFF) (Filed on 1/14/2021) (Entered: 01/21/2021) |
| 01/15/2021 | 27 | *** **ERRONEOUS ENTRY** *** NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Adesijuola Ogunjobi. (IFP Request was previously e-filed with the Court). (Attachments: # 1 Affidavit, # 2 Supplement, # 3 Supplement, # 4 Supplement, # 5 Exhibit, # 6 Affidavit, # 7 Exhibit)(Ogunjobi, Adesijuola) (Filed on 1/15/2021) Modified on 1/19/2021 (mclS, COURT STAFF). (Entered: 01/15/2021) |
| 01/19/2021 | | Electronic filing error. **This is the SECOND Clerk's notice regarding incomplete appeals form. E-filer needs to complete the form with all pertinent information instead of submitting a BLANK form. If e-filer wants to waive the appeals fee, a motion for leave to appeal in forma pauperis also needs to be filed.** This filing will not be processed by the clerks office. Re: 27 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 1/19/2021) (Entered: 01/19/2021) |
| 01/20/2021 | 28 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Adesijuola Ogunjobi. (IFP Request was previously e-filed with the Court). (Attachments: # 1 Motion for permission to proceed in forma pauperis, # 2 Motion for appointment of counsel # 3 Supplement, # 4 Supplement, # 5 Affidavit, # 6 Exhibit, # 7 Exhibit)(Ogunjobi, Adesijuola) (Filed on 1/20/2021) Modified on 1/21/2021 (mclS, COURT STAFF). (Entered: 01/20/2021) |
| 01/21/2021 | 29 | USCA Case Number 21-15111 for 28 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 1/21/2021) (Entered: 01/21/2021) |
| 01/21/2021 | 30 | Mailed request for payment of docket fee to appellant (cc to USCA) (mclS, COURT STAFF) (Filed on 1/21/2021) (Entered: 01/21/2021) |
| 01/21/2021 | 33 | MOTION for Leave to Appeal in forma pauperis filed by Adesijuola Ogunjobi. (Attachments: # 1 Supplement)(Ogunjobi, Adesijuola) (Filed on 1/21/2021) (Entered: 01/21/2021) |
| 01/21/2021 | 34 | **ORDER by Judge Richard Seeborg Denying 33 Motion for Leave to Appeal in forma pauperis. (clS, COURT STAFF) (Filed on 1/21/2021) (Entered: 01/21/2021)** |
| 01/21/2021 | 35 | CLAIM Verified Claim byCaleb Bradberry. (Safier, Isaac) (Filed on 1/21/2021) (Entered: 01/21/2021) |
| 01/22/2021 | 36 | First MOTION for leave to appear in Pro Hac Vice *Stephen P. New* ( Filing fee $ 317, receipt number 0971-15476741.) filed by Caleb Bradberry. (New, Stephen) (Filed on 1/22/2021) (Additional attachment(s) added on 1/28/2021: # 1 certifcate of good standing) (clS, COURT STAFF). (Entered: 01/22/2021) |
| 01/22/2021 | 37 | CERTIFICATE OF SERVICE by Caleb Bradberry re 35 Claim (Safier, Isaac) (Filed on 1/22/2021) (Entered: 01/22/2021) |
| 01/22/2021 | 38 | OPPOSITION/RESPONSE (re 36 First MOTION for leave to appear in Pro Hac Vice *Stephen P. New* ( Filing fee $ 317, receipt number 0971-15476741.) ) filed byAdesijuola Ogunjobi. (Ogunjobi, Adesijuola) (Filed on 1/22/2021) (Entered: 01/22/2021) |
| 01/22/2021 | 39 | Motion and Affidavit for permission to proceed in forma pauperis filed by Adesijuola Ogunjobi. (Ogunjobi, Adesijuola) (Filed on 1/22/2021) Modified on 1/25/2021 (mclS, COURT STAFF). (Entered: 01/22/2021) |
| 01/22/2021 | 40 | Response to 34 Order filed byAdesijuola Ogunjobi. (Ogunjobi, Adesijuola) (Filed on 1/22/2021) Modified on 1/25/2021 (mclS, COURT STAFF). (Entered: 01/22/2021) |
| 01/25/2021 | 41 | ORDER of USCA as to 28 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 1/25/2021) (Entered: 01/25/2021) |
| 01/25/2021 | 42 | CLAIM - VERIFIED CLAIM byRoman Hossain. (Almadani, Yasin) (Filed on 1/25/2021) (Entered: 01/25/2021) |
| 01/25/2021 | 43 | CLAIM - Verified Claim byLucas E Buckley. (Boyd, Kathryn) (Filed on 1/25/2021) (Entered: 01/25/2021) |
| 01/27/2021 | 44 | NOTICE of Appearance by Claudia A. Quiroz (Quiroz, Claudia) (Filed on 1/27/2021) (Entered: 01/27/2021) |
| 01/28/2021 | 45 | **ORDER by Judge Richard Seeborg granting 36 Motion for Pro Hac Vice as to Stephen P. New. (clS, COURT STAFF) (Filed on 1/28/2021) (Entered: 01/28/2021)** |
| 01/28/2021 | 46 | **ORDER by Judge Richard Seeborg granting 21 Motion for Extension of Time to File. (clS, COURT STAFF) (Filed on 1/28/2021) (Entered: 01/28/2021)** |
| 02/03/2021 | 47 | STIPULATION *(Settlement Agreement and Stipulated Forfeiture)* filed by United States of America. (Countryman, David) (Filed on 2/3/2021) (Entered: 02/03/2021) |
| 02/10/2021 | 48 | WITHDRAWAL of Claim re 35 Claim byCaleb Bradberry. (Safier, Isaac) (Filed on 2/10/2021) (Entered: 02/10/2021) |
| 02/11/2021 | 49 | ORDER of USCA as to 28 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 2/11/2021) (Entered: 02/11/2021) |
| 02/11/2021 | 50 | *Unopposed* Ex Parte Application for Extension of Time to File Answer filed by Roman Hossain. (Almadani, Yasin) (Filed on 2/11/2021) Modified on 2/12/2021 (slhS, COURT STAFF). (Entered: 02/11/2021) |
| 02/16/2021 | 51 | **ORDER by Chief Judge Richard Seeborg granting 50 Motion for Extension of Time to Answer. (clS, COURT STAFF) (Filed on 2/16/2021) (Entered: 02/16/2021)** |
| 02/16/2021 | 52 | Joint MOTION for Extension of Time to File Answer filed by Lucas E Buckley. (Boyd, Kathryn) (Filed on 2/16/2021) (Entered: 02/16/2021) |
| 02/17/2021 | 53 | **ORDER by Chief Judge Richard Seeborg granting 52 Motion for Extension of Time to Answer. (clS, COURT STAFF) (Filed on 2/17/2021) (Entered: 02/17/2021)** |
| 02/22/2021 | 54 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15602291.) filed by Lucas E Buckley. (Price, Maxim) (Filed on 2/22/2021) (Entered: 02/22/2021) |
| 02/22/2021 | 55 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15602310.) filed by Lucas E Buckley. (Hecht, |

**ER-757**

|  |  | David) (Filed on 2/22/2021) (Entered: 02/22/2021) |
|---|---|---|
| 02/22/2021 | 56 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15602321.) filed by Lucas E Buckley. (Alvela, Alan) (Filed on 2/22/2021) (Entered: 02/22/2021) |
| 02/22/2021 | 57 | **ORDER by Chief Judge Richard Seeborg granting 54 Motion for Pro Hac Vice as to Maxim Price. (clS, COURT STAFF) (Filed on 2/22/2021) (Entered: 02/22/2021)** |
| 02/22/2021 | 58 | **ORDER by Chief Judge Richard Seeborg granting 55 Motion for Pro Hac Vice as to David L. Hecht. (clS, COURT STAFF) (Filed on 2/22/2021) (Entered: 02/22/2021)** |
| 02/22/2021 | 59 | **ORDER by Chief Judge Richard Seeborg granting 56 Motion for Pro Hac Vice as to Alan Alvela. (clS, COURT STAFF) (Filed on 2/22/2021) (Entered: 02/22/2021)** |
| 03/08/2021 | 60 | ANSWER to 8 Amended Complaint by Roman Hossain. (Almadani, Yasin) (Filed on 3/8/2021) Modified on 3/9/2021 (mclS, COURT STAFF). (Entered: 03/08/2021) |
| 03/09/2021 |  | Electronic filing error. Document not properly linked. [err102]Corrected by Clerk's Office. No further action is necessary. Re: 60 Answer to Amended Complaint filed by Roma Hossain. (mclS, COURT STAFF) (Filed on 3/9/2021) (Entered: 03/09/2021) |
| 03/09/2021 | 61 | ANSWER TO COMPLAINT FOR FORFEITURE 8 Amended Complaint *with Demand For Jury Trial* byLucas E Buckley. (Price, Maxim) (Filed on 3/9/2021) (Entered: 03/09/2021) |
| 03/16/2021 | 62 | Administrative Motion to File Under Seal filed by First 100 LLC, Battle Born Investments Company, LLC. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Redacted Version of First 100 LLC claim, # 4 Redacted version of Battle Born claim, # 5 Unredacted version of First 100 LLC claim, # 6 Unredacted version of Battle Born claim)(Chang, Jaemin) (Filed on 3/16/2021) (Entered: 03/16/2021) |
| 04/01/2021 | 63 | **ORDER by Chief Judge Richard Seeborg Granting 62 Administrative Motion to File Under Seal. (clS, COURT STAFF) (Filed on 4/1/2021) (Entered: 04/01/2021)** |
| 04/05/2021 | 64 | Administrative Motion to File Under Seal filed by Battle Born Investments Company, LLC, First 100 LLC, 1st One Hundred Holdings LLC. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Redacted Verified Verified Answer of Battle Born, # 4 Redacted Verified Answer of First 100 Claimants, # 5 Unredacted Verified Answer of Battle Born, # 6 Unredacted Verified Answer of First 100 Claimants) (Chang, Jaemin) (Filed on 4/5/2021) (Entered: 04/05/2021) |
| 04/08/2021 | 65 | **ORDER by Judge Richard Seeborg granting 64 Administrative Motion to File Under Seal. (tlS, COURT STAFF) (Filed on 4/8/2021) (Entered: 04/08/2021)** |
| 04/14/2021 | 66 | ORDER of USCA as to 28 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 4/14/2021) (Entered: 04/14/2021) |
| 04/23/2021 | 67 | MOTION to Intervene *Notice of Motion and Motion for Direct Access and Intervention* filed by Nobuaki Kobayashi. Motion Hearing set for 6/3/2021 01:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 5/7/2021. Replies due by 5/14/2021. (Attachments: # 1 Exhibit A - Verified Answer to First Amended Verified Complaint for Forfeiture in Rem, # 2 Exhibit B - Declaration of Stephen R. Cook in Support of Motion for Direct Access and Intervention, # 3 Exhibit C - Order Modifying Recognition Pursuant to Bankruptcy Code Section 1517(D) and Recognizing Foreign Main Proceeding and Granting Related Relief, # 4 Proposed Order Granting Motion for Direct Access and Intervention)(Cook, Stephen) (Filed on 4/23/2021) (Entered: 04/23/2021) |
| 04/30/2021 | 68 | CLERK'S NOTICE Continuing Motion Hearing as to 67 MOTION to Intervene *Notice of Motion and Motion for Direct Access and Intervention*. Motion Hearing previously set for 6/3/2021 is continued to 6/10/2021 at 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(clS, COURT STAFF) (Filed on 4/30/2021) (Entered: 04/30/2021) |
| 04/30/2021 | 69 | MOTION to Strike 42 Claim *(Notice of Motion and Motion to Strike Claimant Roman Hossain's Claim for Lack of Standing and Failing to Comply with Supplemental Rule G(5))* filed by United States of America. Motion Hearing set for 6/10/2021 01:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 5/14/2021. Replies due by 5/21/2021. (Attachments: # 1 Declaration Special Agent Jeremiah Haynie, # 2 Declaration AUSA Claudia Quiroz, # 3 [Proposed] Order Granting Motion to Strike Claimant Roman Hossain's Claim)(Quiroz, Claudia) (Filed on 4/30/2021) Modified on 5/3/2021 (mclS, COURT STAFF). (Entered: 04/30/2021) |
| 05/06/2021 | 70 | MOTION for leave to appear in Pro Hac Vice *of Ryan A. Andersen* ( Filing fee $ 317, receipt number 0971-15934121.) filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. (Chang, Jaemin) (Filed on 5/6/2021) (Entered: 05/06/2021) |
| 05/06/2021 | 71 | **ORDER by Judge Richard Seeborg granting 70 Motion for Pro Hac Vice as to Ryan A. Andersen. (clS, COURT STAFF) (Filed on 5/6/2021) (Entered: 05/06/2021)** |
| 05/07/2021 | 72 | OPPOSITION/RESPONSE (re 67 MOTION to Intervene *Notice of Motion and Motion for Direct Access and Intervention* ) *(United States' Opposition to Nobuaki Kobayashi Motion for Direct Access and Intervention)* filed byUnited States of America. (Attachments: # 1 Declaration of Michael Gronager in Support of the US' Opposition, # 2 Exhibit 1, # 3 Exhibit 2)(Quiroz, Claudia) (Filed on 5/7/2021) Modified on 5/7/2021 (mclS, COURT STAFF). (Entered: 05/07/2021) |
| 05/07/2021 | 73 | Administrative Motion to File Under Seal *Exhibits Submitted in Support of its Opposition to Nobuaki Kobayashi's Motion for Direct Access and Intervention* filed by United States of America. (Attachments: # 1 Declaration Declaration of Claudia Quiroz, # 2 Proposed Order, # 3 Exhibit Exhibit 1 (to be filed under seal), # 4 Exhibit Exhibit 2 (to be filed under seal))(Quiroz, Claudia) (Filed on 5/7/2021) (Entered: 05/07/2021) |
| 05/10/2021 | 74 | OPPOSITION/RESPONSE (re 67 MOTION to Intervene *Notice of Motion and Motion for Direct Access and Intervention* ) *by Nobuaki Kobayashi* filed by1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. (Chang, Jaemin) (Filed on 5/10/2021) (Entered: 05/10/2021) |
| 05/12/2021 | 75 | MOTION for leave to appear in Pro Hac Vice *of G* ( Filing fee $ 317, receipt number 0971-15955911.) filed by Nobuaki Kobayashi. (Molton, David) (Filed on 5/12/2021) (Entered: 05/12/2021) |
| 05/12/2021 | 76 | MOTION for leave to appear in Pro Hac Vice *of Daniel Fisher Kerns* ( Filing fee $ 317, receipt number 0971-15955914.) filed by Nobuaki Kobayashi. (Molton, David) (Filed on 5/12/2021) (Entered: 05/12/2021) |

| | | |
|---|---|---|
| 05/12/2021 | 77 | NOTICE of Appearance by David J. Molton , Stephen R. Cook, Gerard T. Cicero and Daniel F. Kerns as attorneys for Nobuaki Kobayashi, in his capacity as the Civil Rehabilitation Trustee and Foreign Representative of MtGox Co., Ltd., a/k/a MtGox KK (Molton, David) (Filed on 5/12/2021) (Entered: 05/12/2021) |
| 05/12/2021 | 78 | **ORDER by Judge Richard Seeborg granting 75 Motion for Pro Hac Vice as to Gerard Thomas Cicero. (clS, COURT STAFF) (Filed on 5/12/2021) (Entered: 05/12/2021)** |
| 05/12/2021 | 79 | **ORDER by Judge Richard Seeborg granting 76 Motion for Pro Hac Vice as to Daniel Fisher Kerns. (clS, COURT STAFF) (Filed on 5/12/2021) (Entered: 05/12/2021)** |
| 05/14/2021 | 80 | Brief re 67 MOTION to Intervene *Notice of Motion and Motion for Direct Access and Intervention - Reply Brief in Support of Motion for Direct Access and Intervention* filed byNobuaki Kobayashi. (Attachments: # 1 Exhibit A - Kuroda Declaration)(Related document(s) 67 ) (Molton, David) (Filed on 5/14/2021) (Entered: 05/14/2021) |
| 05/14/2021 | 81 | OPPOSITION/RESPONSE (re 69 MOTION to Strike 42 Claim *(Notice of Motion and Motion to Strike Claimant Roman Hossain's Claim for Lack of Standing and Failing to Comply with Supplemental Rule G(5))* ) filed byRoman Hossain. (Almadani, Yasin) (Filed on 5/14/2021) (Entered: 05/14/2021) |
| 05/21/2021 | 82 | REPLY (re 69 MOTION to Strike 42 Claim *(Notice of Motion and Motion to Strike Claimant Roman Hossain's Claim for Lack of Standing and Failing to Comply with Supplemental Rule G(5))* ) (Reply in Support of Motion to Strike Claimant Roman Hossain's Claim for Lack of Standing and Failing to Comply with Supplemental Rule G(5)) filed byUnited States of America. (Quiroz, Claudia) (Filed on 5/21/2021) (Entered: 05/21/2021) |
| 06/01/2021 | 83 | CLERK'S NOTICE THE MOTIONS [#67, #69] SCHEDULED FOR HEARING ON JUNE 10, 2021 AT 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (clS, COURT STAFF) (Filed on 6/1/2021) (Entered: 06/01/2021) |
| 06/02/2021 | 84 | NOTICE of Appearance by Dwight Craig Donovan (Donovan, Dwight) (Filed on 6/2/2021) (Entered: 06/02/2021) |
| 06/07/2021 | 85 | MANDATE of USCA as to 28 Notice of Appeal to the Ninth Circuit, filed by Adesijuola Ogunjobi. (mclS, COURT STAFF) (Filed on 6/7/2021) (Entered: 06/07/2021) |
| 06/07/2021 | 86 | NOTICE by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC *of Disassociation of Counsel Jaemin Chang* (Chang, Jaemin) (Filed on 6/7/2021) (Entered: 06/07/2021) |
| 07/02/2021 | 87 | CLAIM Verified Claim byIlija Matukso. (Kugelman, Alexander) (Filed on 7/2/2021) (Entered: 07/02/2021) |
| 07/13/2021 | 88 | STIPULATION WITH PROPOSED ORDER *STIPULATION TO UNSEAL THE CLAIMS AND ANSWERS OF CLAIMANTS BATTLE BORN INVESTMENTS COMPANY, LLC, FIRST 100, LLC AND 1ST ONE HUNDRED HOLDINGS, LLC; [PROPOSED] ORDER* filed by United States of America. (Quiroz, Claudia) (Filed on 7/13/2021) (Entered: 07/13/2021) |
| 07/13/2021 | 89 | **ORDER by Chief Judge Richard Seeborg GRANTING 88 STIPULATION TO UNSEAL THE CLAIMS AND ANSWERS OF CLAIMANTS BATTLE BORN INVESTMENTS COMPANY, LLC, FIRST 100, LLC AND 1ST ONE HUNDRED HOLDINGS, LLC. (clS, COURT STAFF) (Filed on 7/13/2021) (Entered: 07/13/2021)** |
| 07/13/2021 | 90 | Notice of Motion and Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC and 1st One Hundred Holdings, LLC filed by United States of America.<br><br>Motion Hearing set for 8/20/2021 at 1:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 7/27/2021. Replies due by 8/3/2021. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 [Proposed] Order Granting Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC and 1st One Hundred Holdings, LLC)(Quiroz, Claudia) (Filed on 7/13/2021) Modified on 7/13/2021 (jlgS, COURT STAFF). Modified on 7/14/2021 (mclS, COURT STAFF). (Entered: 07/13/2021) |
| 07/14/2021 | 91 | CLERK'S NOTICE Continuing Motion Hearing as to 90 MOTION to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC. Motion Hearing previously set for 8/20/2021 is Advanced to 8/19/2021 at 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*,(clS, COURT STAFF) (Filed on 7/14/2021) (Entered: 07/14/2021) |
| 07/15/2021 | 92 | NOTICE of Appearance by Rees Ferriter Morgan , *Jonathan R. Bass, Stan Roman, Mari Sahakyan Clifford and William Abramovitz as attorneys for First 100, LLC, 1st One Hundred Holdings, LLC and Battle Born Investments Company, LLC* (Morgan, Rees) (Filed on 7/15/2021) (Entered: 07/15/2021) |
| 07/21/2021 | 93 | STIPULATION WITH PROPOSED ORDER re 90 MOTION to Strike 63 Order on Administrative Motion to File Under Seal, 65 Order on Administrative Motion to File Under Seal *(Notice of Motion and Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC )* filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. (Attachments: # 1 Proposed Order Granting Stipulation to Extend Time to Respond to Motion to Strike, # 2 Declaration of Mari Sahakyan Clifford in support of Stipulation to Extend Time to Respond to Motion to Strike)(Sahakyan Clifford, Mari) (Filed on 7/21/2021) (Entered: 07/21/2021) |
| 07/22/2021 | 94 | **ORDER GRANTING re 93 STIPULATION TO EXTEND TIME TO RESPOND TO MOTION TO STRIKE THE CLAIMS OF CLAIMANTS BATTLE BORN INVESTMENTS COMPANY, LLC, FIRST 100, LLC AND 1ST ONE HUNDRED HOLDINGS, LLC. Signed by Chief Judge Richard Seeborg on 07/22/2021.**<br><br>**Responses due by 8/10/2021. Replies due by 8/24/2021. Motion Hearing previously set for 8/19/2021 is rescheduled to 9/9/2021 01:30 PM by Videoconference Only before Chief Judge Richard Seeborg.**<br><br>**(bxsS, COURTSTAFF) (Filed on 7/22/2021) (Entered: 07/22/2021)** |
| 07/29/2021 | 95 | MOTION to Strike 87 Claim *(Notice of Motion and Motion to Strike the Verified Claim of Claimant Ilija Matusko)* filed by United States of America. Motion Hearing set for 9/9/2021 01:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 8/12/2021. Replies due by 8/19/2021. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 [Proposed] Order Granting |

**ER-759**

| | | |
|---|---|---|
| | | Motion to Strike the Verified Claim of Claimant Ilija Matusko)(Quiroz, Claudia) (Filed on 7/29/2021 Modified on 7/29/2021 (mclS, COURT STAFF). (Entered: 07/29/2021) |
| 08/06/2021 | 96 | STIPULATION WITH PROPOSED ORDER *to Continue Hearing Date and Extend Time to Respond to Motion to Strike the Verified Claim* filed by Ilija Matusko. (Attachments: # 1 Proposed Order, # 2 Certificate of Service)(Kugelman, Alexander) (Filed on 8/6/2021) Modified on 8/6/2021 (mclS, COURT STAFF). (Entered: 08/06/2021) |
| 08/06/2021 | 97 | **ORDER by Judge Richard Seeborg GRANTING 96 STIPULATION TO CONTINUE HEARING DATE AND EXTEND TIME TO RESPOND TO MOTION TO STRIKE THE VERIFIED CLAIM OF ILIJA MATUSKO. (cls, COURT STAFF) (Filed on 8/6/2021)** (Entered: 08/06/2021) |
| 08/06/2021 | | Set/Reset Deadlines as to 95 MOTION to Strike 87 Claim *(Notice of Motion and Motion to Strike the Verified Claim of Claimant Ilija Matusko).* Motion Hearing previously set for 9/9/2021 is continued to 9/30/2021 at 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. (clS, COURT STAFF) (Filed on 8/6/2021) (Entered: 08/06/2021) |
| 08/10/2021 | 98 | OPPOSITION/RESPONSE (re 90 MOTION to Strike 63 Order on Administrative Motion to File Under Seal, 65 Order on Administrative Motion to File Under Seal *(Notice of Motion and Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC ) Opposition to Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC and 1st One Hundred Holdings, LLC* filed by1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. (Attachments: # 1 Declaration of Jeffrey Nicholas in support thereof, # 2 Declaration of Jacky Lee in support thereof, # 3 Declaration of Jay Bloom in support thereof, # 4 Declaration of Joseph Gutierrez in support thereof, # 5 Declaration of Ryan Andersen in support thereof, # 6 Declaration of Rees Morgan in support of Claimants Opposition to Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC and 1st One Hundred Holdings, LLC; Or, in the Alternative, Request for Continuance Per Rule 56(d))* (Morgan, Rees) (Filed on 8/10/2021) (Entered: 08/10/2021) |
| 08/24/2021 | 99 | REPLY (re 98 OPPOSITION to MOTION to Strike *(Reply in Support of Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC and 1st One Hundred Holdings, LLC)* filed by United States of America. (Attachments: # 1 Declaration of Claudia A. Quiroz, # 2 Declaration of Jeremiah Haynie)(Quiroz, Claudia) (Filed on 8/24/2021) Modified on 8/24/2021 (jlgS, COURT STAFF). (Entered: 08/24/2021) |
| 08/26/2021 | 100 | OPPOSITION (re 95 MOTION to Strike 87 Claim *(Notice of Motion and Motion to Strike the Verified Claim of Claimant Ilija Matusko) Opposition to Motion to Strike the Verified Claim of Claimant Ilija Matusko* filed byIlija Matusko. (Attachments: # 1 Declaration of Tom Westermann in support thereof, # 2 Declaration of Ilija Matusko in support thereof, # 3 Declaration of Alexander Kugelman in support thereof, # 4 Declaration of Christopher Wajda in support thereof, # 5 Exhibit 1 to Declaration of Christopher Wajda, # 6 Exhibit 2 to Declaration of Christopher Wajda, # 7 Exhibit 3 to Declaration of Christopher Wajda, # 8 Exhibit 4 to Declaration of Christopher Wajda, # 9 Exhibit 5 to Declaration of Christopher Wajda, # 10 Certificate of Service)(Kugelman, Alexander) (Filed on 8/26/2021) Modified on 8/27/2021 (mclS, COURT STAFF). Modified on 8/31/2021 (clS, COURT STAFF). (Entered: 08/26/2021) |
| 09/02/2021 | 101 | CLERK'S NOTICE Continuing Motion Hearing as to 90 MOTION to Strike.Motion Hearing previously set for 9/9/2021 is continued to 9/30/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (Related documents(s) 90 )(clS, COURT STAFF) (Filed on 9/2/2021) (Entered: 09/02/2021) |
| 09/09/2021 | 102 | REPLY (re 95 MOTION to Strike 87 Claim *(Notice of Motion and Motion to Strike the Verified Claim of Claimant Ilija Matusko) ) United States' Reply in Support of Motion to Strike the Verified Claim of Claimant Ilija Matusko* filed byUnited States of America. (Attachments: # 1 Declaration Declaration of Claudia Quiroz in Support of United States' Reply in Support of Motion to Strike the Verified Claim of Ilija Matusko, # 2 Declaration Declaration of Jeremiah Haynie in Support of United States' Reply in Support of Motion to Strike the Verified Claim of Ilija Matusko)(Quiroz, Claudia) (Filed on 9/9/2021) (Entered: 09/09/2021) |
| 09/27/2021 | 103 | CLERK'S NOTICE THE MOTIONS TO STRIKE [#90, #95] SCHEDULED FOR HEARING ON SEPTEMBER 30, 2021 AT 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (clS, COURT STAFF) (Filed on 9/27/2021) (Entered: 09/27/2021) |
| 03/25/2022 | 104 | **ORDER denying 67 Motion for Direct Access and Intervention; granting 73 Administrative Motion to File Under Seal; granting 69 Motion to Strike Claimant Roman Hossain's Claim, granting 90 Motion to Strike the Claims of Claimants Battle Born Investments Company, LLC, First 100, LLC; granting 95 MOTION to Strike Verified Claim of Claimant Ilija Matusko.(rslc1, COURT STAFF) (Filed on 3/25/2022)** (Entered: 03/25/2022) |
| 04/04/2022 | 105 | MOTION to Strike 43 Notice of Motion and Motion to Strike Claimant Lucas Buckley's and the Gox Victim Bitcoin Trust's Verified Claim for Lack of Standing filed by United States of America. Motion Hearing set for 5/12/2022 01:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 4/18/2022. Replies due by 4/25/2022. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Kaltsas, Chris) (Filed on 4/4/2022) Modified on 4/5/2022 (cjl, COURT STAFF). (Entered: 04/04/2022) |
| 04/05/2022 | 106 | CLERK'S NOTICE Continuing Motion Hearing as to 105 MOTION to Strike. TO A DATE THE COURT IS AVAILABLE FOR HEARING.<br><br>The filing party is reminded to review Judge Seeborg's Scheduling Notes section on his webpage for a list of available dates for hearing.The change in hearing date does not impact the briefing schedule set at the filing of the motion.<br><br>Motion Hearing previously set for 5/12/2022 is continued to 5/19/2022 at 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg.<br><br>(cl, COURT STAFF) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 04/06/2022 | 107 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. Appeal of Order on Motion to Intervene,, Order on Motion to Strike,, Order on Administrative Motion to File Under Seal,,,,, 104 (Appeal fee of $505 receipt number ACANDC-17063308 paid.) (Attachments: # 1 Form 6 Representation Statement)(Sahakyan Clifford, Mari) (Filed on 4/6/2022) (Entered: 04/06/2022) |
| 04/07/2022 | 108 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Ilija Matusko. Appeal of Order on Motion to Intervene,, Order on Motion to Strike,, Order on Administrative Motion to File Under Seal,,,,, 104 (Appeal fee of $505 receipt number ACANDC-17067412 paid.) (Attachments: # 1 Supplement Form 6 Representation Statement)(Johnson, Alexander) (Filed on 4/7/2022) (Entered: 04/07/2022) |

| 04/08/2022 | 109 | USCA Case Number 22-15514 Ninth Circuit Court of Appeals for 108 Notice of Appeal to the Ninth Circuit, filed by Ilija Matukso. (cjl, COURT STAFF) (Filed on 4/8/2022) (Entered: 04/11/2022) |
|---|---|---|
| 04/08/2022 | 110 | USCA Case Number 22-15513 Ninth Circuit Court of Appeals for 107 Notice of Appeal to the Ninth Circuit, filed by 1st One Hundred Holdings LLC, First 100 LLC, Battle Born Investments Company, LLC. (cjl, COURT STAFF) (Filed on 4/8/2022) (Entered: 04/11/2022) |
| 04/15/2022 | 111 | STIPULATION WITH PROPOSED ORDER re 105 MOTION to Strike 43 Notice of Motion and Motion to Strike Claimant Lucas Buckley's and the Gox Victim Bitcoin Trust's Verified Claim for Lack of Standing filed by Lucas E Buckley, United States of America. (Boyd, Kathryn) (Filed on 4/15/2022) Modified on 4/15/2022 (cjl, COURT STAFF). (Entered: 04/15/2022) |
| 04/18/2022 | 112 | **ORDER by Judge Richard Seeborg GRANTING 111 STIPULATION AND ORDER TO CONTINUE HEARING DATE AND EXTEND TIME TO RESPOND TO MOTION TO STRIKE THE VERIFIED CLAIM OF LUCAS E. BUCKLEY FOR LACK OF STANDING. (cl, COURT STAFF) (Filed on 4/18/2022) (Entered: 04/18/2022)** |
| 04/18/2022 | | Reset as to 105 MOTION to Strike 43 Notice of Motion and Motion to Strike Claimant Lucas Buckley's and the Gox Victim Bitcoin Trust's Verified Claim for Lack of Standing. Motion Hearing previously set for 5/19/2022 is continued to 6/9/2022 at 01:30 PM in San Francisco, - Videoconference Only before Judge Richard Seeborg. (cl, COURT STAFF) (Filed on 4/18/2022) (Entered: 04/18/2022) |
| 05/02/2022 | 113 | MOTION for Entry of Judgment under Rule 54(b) filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. Motion Hearing set for 6/9/2022 01:30 PM in San Francisco, Courtroom 03, 17th Floor before Judge Richard Seeborg. Responses due by 5/16/2022. Replies due by 5/23/2022. (Attachments: # 1 Proposed Order)(Sahakyan Clifford, Mari) (Filed on 5/2/2022) (Entered: 05/02/2022) |
| 05/03/2022 | 114 | NOTICE of Appearance by Sarah Elizabeth Peterson (Peterson, Sarah) (Filed on 5/3/2022) (Entered: 05/03/2022) |
| 05/04/2022 | 115 | First MOTION for Entry of Judgment under Rule 54(b) filed by Ilija Matukso. Motion Hearing set for 6/9/2022 01:30 PM before Judge Richard Seeborg. Responses due by 5/25/2022. Replies due by 6/1/2022. (Attachments: # 1 Proposed Order)(Kugelman, Alexander) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/06/2022 | 116 | OPPOSITION/RESPONSE (re 105 MOTION to Strike 43 Notice of Motion and Motion to Strike Claimant Lucas Buckley's and the Gox Victim Bitcoin Trust's Verified Claim for Lack of Standing ) filed byLucas E Buckley. (Attachments: # 1 Declaration Declaration of Richard A. Sanders, # 2 Proposed Order)(Price, Maxim) (Filed on 5/6/2022) (Entered: 05/06/2022) |
| 05/16/2022 | 117 | OPPOSITION/RESPONSE (re 115 First MOTION for Entry of Judgment under Rule 54(b), 113 MOTION for Entry of Judgment under Rule 54(b)) filed by United States of America. (Countryman, David) (Filed on 5/16/2022) Modified on 5/20/2022 (kkp, COURT STAFF). (Entered: 05/16/2022) |
| 05/23/2022 | 118 | REPLY (re 113 MOTION for Entry of Judgment under Rule 54(b) ) filed by1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. (Morgan, Rees) (Filed on 5/23/2022) (Entered: 05/23/2022) |
| 05/26/2022 | 119 | CLERK'S NOTICE: MOTIONS [#105,#113,#115] SCHEDULED FOR HEARING ON JUNE 9, 2022 AT 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (cl, COURT STAFF) (Filed on 5/26/2022) (Entered: 05/26/2022) |
| 06/03/2022 | 120 | REPLY in Support of re (re 105 MOTION to Strike, 43 Notice of Motion and Motion to Strike Claimant Lucas Buckley's and the Gox Victim Bitcoin Trust's Verified Claim for Lack of Standing) filed by United States of America. (Attachments: # 1 Declaration)(Kaltsas, Chris) (Filed on 6/3/2022) Modified on 6/3/2022 (kkp, COURT STAFF). (Entered: 06/03/2022) |
| 06/07/2022 | 121 | First MOTION for Leave to File Motion for Reconsideration of Order Striking Mr. Hossain's Claim filed by Roman Hossain. (Almadani, Yasin) (Filed on 6/7/2022) Modified on 6/7/2022 (kkp, COURT STAFF). (Entered: 06/07/2022) |
| 07/14/2022 | 122 | **ORDER by Judge Seeborg GRANTING 105 MOTION TO STRIKE BUCKLEY CLAIM, DENYING 121 MOTION FOR LEAVE TO SEEK RECONSIDERATION OF ORDER STRIKING HOSSEIN CLAIM, AND DENYING MOTIONS 113 115 TO ENTER SEPARATE JUDGMENTS. (rslc1, COURT STAFF) (Filed on 7/14/2022) (Entered: 07/14/2022)** |
| 07/20/2022 | 123 | NOTICE of APPEAL to the 9th Circuit Court of Appeals filed by Roman Hossain. Appeal of Order on Motion to Strike, Order on Motion for Entry of Judgment under Rule 54(b), Order on Motion for Leave to File, 122 , Order on Motion to Intervene,, Order on Motion to Strike, Order on Administrative Motion to File Under Seal, 104 (Appeal fee of $505 receipt number ACANDC-17367241 paid.) (Almadani, Yasin) (Filed on 7/20/2022) Modified on 7/21/2022 (kkp, COURT STAFF). (Entered: 07/20/2022) |
| 07/22/2022 | 124 | USCA Case Number 22-16085 for the Ninth Circuit for 123 Notice of Appeal to the Ninth Circuit filed by Roman Hossain. (kkp, COURT STAFF) (Filed on 7/22/2022) (Entered: 07/25/2022) |
| 08/12/2022 | 125 | NOTICE of APPEAL to the 9th Circuit Court of Appeals filed by Lucas E Buckley. Appeal of Order on Motion to Strike, Order on Motion for Entry of Judgment under Rule 54(b), Order on Motion for Leave to File, 122 (Appeal fee of $505 receipt number ACANDC-17437042 paid.) (Price, Maxim) (Filed on 8/12/2022) Modified on 8/15/2022 (kkp, COURT STAFF). (Entered: 08/12/2022) |
| 08/15/2022 | 126 | Proposed Judgment and Order of Forfeiture by United States of America. (Countryman, David) (Filed on 8/15/2022) Modified on 8/15/2022 (kkp, COURT STAFF). (Entered: 08/15/2022) |
| 08/16/2022 | 127 | **JUDGMENT AND ORDER OF FORFEITURE. ***Civil Case Terminated.Signed by Chief Judge Richard Seeborg on 8/16/2022. (cl, COURT STAFF) (Filed on 8/16/2022) (Entered: 08/16/2022)** |
| 09/07/2022 | 128 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC. Appeal of Judgment, Terminated Case 127 (Appeal fee of $505 receipt number ACANDC-17512673 paid.) (Roman, Stanley) (Filed on 9/7/2022) (Entered: 09/07/2022) |
| 09/07/2022 | 129 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Ilija Matukso. Appeal of Judgment, Terminated Case 127 (Appeal fee of $505 receipt number ACANDC-17514170 paid.) (Johnson, Alexander) (Filed on 9/7/2022) (Entered: 09/07/2022) |
| 09/08/2022 | 130 | USCA Case Number 22-16348 For the Ninth Circuit for 128 Notice of Appeal to the Ninth Circuit, filed by 1st One Hundred Holdings LLC, First 100 LLC, Battle Born Investments Company, LLC. (kkp, COURT STAFF) (Filed on 9/8/2022) (Entered: 09/08/2022) |
| 09/08/2022 | 131 | USCA Case Number 22-16349 For the Ninth Circuit for 129 Notice of Appeal to the Ninth Circuit filed by Ilija Matukso. (kkp, COURT STAFF) (Filed on 9/8/2022) (Entered: 09/08/2022) |

| 09/23/2022 | 132 | STIPULATION WITH PROPOSED ORDER re 127 Judgment, Terminated Case, 128 Notice of Appeal to the Ninth Circuit, *TO STAY EXECUTION OF JUDGMENT PENDING APPEAL* filed by 1st One Hundred Holdings LLC, Battle Born Investments Company, LLC, First 100 LLC, Roman Hossain, Lucas E Buckley and Ilija Matukso. (Roman, Stanley) (Filed on 9/23/2022) Modified on 9/26/2022 (kkp, COURT STAFF). (Entered: 09/23/2022) |
|---|---|---|
| 09/26/2022 | 133 | **ORDER by Chief Judge Richard Seeborg GRANTING 132 STIPULATION TO STAY EXECUTION OF JUDGMENT PENDING APPEAL. (cl, COURT STAFF) (Filed on 9/26/2022) (Entered: 09/26/2022)** |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 11/10/2022 11:32:06 | | |
| **PACER Login:** | ajohnson09 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cv-07811-RS |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

# ER-762