**Nos. 22-15514 & 22-16349**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

        v.

ILIJA MATUSKO,

     Claimant-Appellant,

        v.

APPROXIMATELY 69,370 BITCOIN (BTC), BITCOIN GOLD (BTG), BITCOIN SV (BSV), AND BITCOIN CASH (BCH),

     Defendant.

_____

**UNITED STATES'S ANSWERING BRIEF**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 20-CV-7811 RS
_____

**STEPHANIE M. HINDS**
United States Attorney

**MATTHEW M. YELOVICH**
Chief, Appellate Section
Criminal Division


**February 7, 2023**

**MERRY JEAN CHAN**
Assistant United States Attorney

450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7200

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTION AND TIMELINESS ................................................. 2

ISSUES PRESENTED ........................................................................ 4

STATEMENT OF FACTS .................................................................. 4

    A.    Bitcoin overview ................................................................ 4

    B.    Silk Road and bitcoin ....................................................... 6

    C.    Takedown of Silk Road and SDNY's October 2013 forfeiture action against bitcoin in wallets residing on Silk Road servers ........... 8

    D.    NDCA's November 2020 forfeiture action against the bitcoin seized from 1HQ3, which has given rise to the instant appeal ...................... 10

        1.    Individual X's consent to forfeiture ........................... 10

        2.    Government's complaint and notice .......................... 10

        3.    Timely claims and motions to intervene ................... 12

        4.    Untimely claims and motion to intervene ................. 13

        5.    Matusko's untimely claim ......................................... 14

        6.    The government's motion to strike Matusko's claim .............. 16

        7.    Matusko's opposition ................................................. 18

        8.    Government's reply .................................................... 23

        9.    The district court's order striking Matusko's claim ................ 25

SUMMARY OF ARGUMENT ......................................................... 26

i

ARGUMENT ........................................................................................27

    I.  The district court did not err in granting the government's motion to strike Matusko's claim ...............................................................27

        A.    Standards of review....................................................27

        B.    Legal principles.........................................................28

        C.    Because Matusko's claim failed to show facts supporting his ownership of any of the Defendant Property, the district court was right to strike his claim on the pleadings for lack of standing ...................................................................32

        D.    Dismissal by summary judgment was also justified................34

        E.    This Court may affirm the district court's decision on the alternate basis that Matusko's claim was untimely .................39

CONCLUSION ....................................................................................46

STATEMENT OF RELATED CASES ..................................................47

CERTIFICATE OF COMPLIANCE ......................................................48

## TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) ..........................3

*Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686 (9th Cir. 2018)........................3

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)......................34

*Hall v. Beals*, 396 U.S. 45 (1969) ..............................................................................3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................38

*Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957 (9th Cir. 2010) .................27

*Opara v. Yellen*, 57 F.4th 709 (9th Cir. 2023) ................................................. 27, 34

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) .................................................40

*Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823 (9th Cir. 2018) ................................28

*United States v. $20,193.39 U.S. Currency*, 16 F.3d 344 (9th Cir. 1994)..............37

*United States v. $69,292.00 in U.S. Currency*, 62 F.3d 1161 (9th Cir. 1995)........37

*United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110 (9th Cir. 2004).....41

*United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629
   (9th Cir. 2012)............................................................................................ *passim*

*United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006 (9th Cir. 2013).......28

*United States v. $25,000 U.S. Currency*, 853 F.2d 1501 (9th Cir. 1988)...............40

*United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342 (6th Cir. 2017).........32

*United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971 (8th Cir. 2019).......34

iii

*United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432 (9th Cir. 1985)......41

*United States v. Hernandez-Escobar*, 911 F.3d 952 (9th Cir. 2018).....................37

*United States v. Real Prop. Located at 17 Coon Creek Rd.,*
 *Hawkins Bar Cal., Trinity Cnty.*, 787 F.3d 968 (9th Cir. 2015)....... 27, 28, 29, 40

*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006)................................................3

*United States v. Twenty-Four Cryptocurrency, Accts.*, 473 F. Supp. 3d 1
 (D.D.C. 2020)................................................................................................ 43, 44

*United States v. Ulbricht*, No. 14-CR-68 KBF, 2015 WL 13893992
 (S.D.N.Y. Apr. 27, 2015)........................................................................6

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) .............................6

*United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039
 (S.D.N.Y. Oct. 10, 2014) ........................................................................6

*United States v. Ursery*, 518 U.S. 267 (1996) ................................................. 28, 37

## DOCKETED CASES

*United States v. Any and All Assets of Silk Road, Including but Not Limited to*
 *the Silk Road Hidden Website and Any and All Bitcoins Contained in Wallet*
 *Files Filing on Silk Road Servers, including the Servers Assigned the*
 *Following Internet Protocol Addresses [] and All Property Traceable Thereto*,
 No. CV-13-06919 (S.D.N.Y. filed Sept. 30, 2013) ..................................... 9, 10

## STATE CASES

*Bank of Am. Nat. Tr. & Sav. Ass'n v. California Sav. & Com. Bank*,
 218 Cal. 261 (1933) ................................................................................36

iv

## FEDERAL STATUTES

18 U.S.C. § 981 .................................................................. 2, 8, 28, 38

18 U.S.C. § 983 ............................................................................ *passim*

18 U.S.C. § 3231 .................................................................................2

18 U.S.C. § 3663A ............................................................................38

28 U.S.C. § 1291 .................................................................................2

## FEDERAL RULES

Fed. R. App. P. 4 ................................................................................2

Fed. R. Civ. P. 12 ........................................................................ 18, 27

Fed. R. Civ. P. 26 ........................................................................ 29, 30

Fed. R. Civ. P. 54 ................................................................................2

Fed. R. Civ. P. 56 ........................................................................ 18, 31

Fed. R. Civ. P. Supplemental Rule G ........................................... *passim*

**Nos. 22-15514 & 22-16349**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ILIJA MATUSKO,

Claimant-Appellant,

v.

APPROXIMATELY 69,370 BITCOIN (BTC), BITCOIN GOLD (BTG), BITCOIN SV (BSV), AND BITCOIN CASH (BCH),

Defendant.

_____

**UNITED STATES'S ANSWERING BRIEF**

The district court properly granted the government's motion to strike Claimant-Appellant Ilija Matusko's claim to the Defendant Property, the contents of the 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx Bitcoin address ("1HQ3"), that is, approximately 69,370 bitcoin ("BTC"), Bitcoin Gold ("BTG"), Bitcoin SV ("BSV"), and Bitcoin Cash ("BCH"). Matusko failed to plead facts sufficient to show that he owned the Defendant Property, and his claim was untimely. This Court should affirm.

## JURISDICTION AND TIMELINESS

The district court (Hon. Richard Seeborg) had jurisdiction under 18 U.S.C. §§ 981 and 3231.  The court granted the government's motion to strike Matusko's claims on March 25, 2022.  CR-104.[1]  Matusko filed a notice of appeal on April 7, 2022, resulting in C.A. No. 22-15514.  CR-108, 109.  After the parties filed responses to the Court's order to show cause why the appeal should not be dismissed for lack of jurisdiction because the challenged order was not final or appealable, this Court ordered briefing in the appeal to proceed, and "directed" the parties "to address the basis for this court's jurisdiction over these appeals, including whether an order striking claims in a civil forfeiture action is final or appealable prior to entry of final judgment."  C.A. No. 22-15514, Dkts. 2, 10–12.

After disposing of all of the claims against the Defendant Property, and declining to grant Matusko a separate judgment under Fed. R. Civ. P. 54(b), SER-31, the district court entered judgment on August 16, 2022.  CR-127; 1-ER-3–4.  Matusko timely entered a notice of appeal on September 7, 2022, resulting in C.A. No. 22-16349.  Fed. R. App. P. 4(a)(1)(B)(i); CR-129, 131.  This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "CR" refers to the district court clerk's record; "ER" to the excerpts of record filed by Matusko in this appeal; "SER" to the government's supplemental excerpts of record; and "AOB" to Matusko's opening brief.

At Matusko's request, the two appeals were consolidated. C.A. No. 22-15514 at Dkt. 15; C.A. No. 22-16349 at Dkt. 5.

As Matusko concedes, AOB 1, because the district court issued a final judgment, which Matusko has appealed, whether this Court has jurisdiction to entertain appeal of the court's pre-judgment order striking of Matusko's claim is moot. *See*, *e.g.*, *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 701 (9th Cir. 2018) ("After the district court rendered its decision on the merits and final judgment, the en banc panel dismissed the interlocutory appeals of the denied preliminary injunctions as moot."), *on reh'g en banc sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).

Matusko has not made any argument for an exception to the mootness doctrine or for this Court's jurisdiction over his interlocutory appeal in his opening brief, and has therefore waived such argument. *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006). This Court should therefore dismiss the appeal under C.A. No. 22-15514 to "avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam).

3

## ISSUES PRESENTED

I.  Whether the district court properly struck Matusko's claim to the bitcoin seized from 1HQ3 for lack of Article III standing, where Matusko agreed that Individual X's theft of bitcoin from Silk Road had done nothing to affect Matusko's access to the 48 bitcoin in his own Silk Road user account.

II. Whether this Court may affirm on the alternative basis that Matusko's claim was untimely filed, where Matusko offered no valid justification for his delay, and the district court did not excuse it.

## STATEMENT OF FACTS

### A.     Bitcoin overview

Bitcoin is a type of virtual currency, also known as cryptocurrency or digital currency, which can function as "a medium of exchange, a unit of account, and/or a store of value." SER-17 at ¶ 11. It is not issued by any government or bank but "generated and controlled through computer software operating on a decentralized, peer-to-peer network." *Id.* When referring to the protocol, software, and community, "Bitcoin" is capitalized; when referring to units of currency, it is not. SER-17 n.1.

To send and receive bitcoin, parties use Bitcoin addresses, analogous to a bank account number, represented as a 26-to-35-character-long case-sensitive string of letters and numbers. SER-17 at ¶ 12.

4

Each Bitcoin address is controlled using a unique, private key that is the equivalent to a password or PIN. SER-17–18 at ¶ 12. Without this key, no one can access the funds in a Bitcoin address. *Id.* To send bitcoin in a Bitcoin address, the sender must have the private key to that Bitcoin address. SER-18 at ¶ 13. The sender does not require the private key to the receiving Bitcoin address to complete the transaction; the sender needs only the Bitcoin address of the receiving party. *Id.* The private key is necessary to use a particular Bitcoin address to digitally sign a message from that Bitcoin address. SER-18–19 at ¶ 17. Thus, sending a signed message from one particular Bitcoin address to another is the typical way a person proves that he or she owns the funds in the sending Bitcoin address. SER-18–19 at ¶¶ 17–18.

Although "wallet" and "address" are sometimes used interchangeably, a Bitcoin wallet may contain many Bitcoin addresses with their corresponding private keys, and is typically under the control of a single private individual or service. 4-ER-679 at ¶ 22.

When a sender initiates a Bitcoin transaction, the sender transmits a transaction announcement across the peer-to-peer Bitcoin network. SER-18 at ¶ 13. Once the announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records the Bitcoin addresses and amount involved in every Bitcoin transaction. *Id.*

5

The Bitcoin public ledger can be accessed from any computer connected to the Internet through a search program like Google, and anyone can see the balance and all transactions of any Bitcoin address. SER-18 at ¶¶ 15–16. Any person can input a Bitcoin address into the website blockchain.com and generate a screenshot of that address. SER-19 at ¶ 19.

"[R]arely" do either the private key or the Bitcoin address "reflect[] any identifying information about either the sender or the recipient." SER-18 at ¶ 13. However, investigators can use the blockchain to identify the owner of a particular Bitcoin address by using software analytics to conduct proprietary analysis that connects cryptocurrency addresses to real-world organizations by using aggregate data (if this exists). 4-ER-677 at ¶¶ 13–14; SER-18 at ¶ 14. Blockchain explorer and analytics software are publicly available. 4-ER-680 at ¶ 24.

## B. Silk Road and bitcoin[2]

From 2011 until October 2013, when it was seized by law enforcement, Silk Road operated as a criminal marketplace on the Internet for over 13,000 varieties of illegal drugs and other unlawful goods and services. 4-ER-700–01; 4-ER-742–

---

[2] For background, *see United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 13893992, at *1–*3 (S.D.N.Y. Apr. 27, 2015) (denying motion for new trial), *aff'd*, 858 F.3d 71 (2d Cir. 2017); *United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039, at *1–*2 (S.D.N.Y. Oct. 10, 2014) (describing some of government's investigation), *aff'd*, 858 F.3d 71 (2d Cir. 2017); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 546 (S.D.N.Y. 2014) (describing indictment).

43 at ¶¶ 7–10. Ross Ulbricht designed Silk Road for the purpose of facilitating black-market transactions. 4-ER-701. The only form of payment accepted on Silk Road was bitcoin. 4-ER-724–25 at ¶ 7; 4-ER-743 at ¶ 11.

Upon registering an account with Silk Road, a user was assigned a Bitcoin address, and bitcoin sent to that address was credited to the user's Silk Road account. 4-ER-700.

The payments on Silk Road were processed through a so-called "tumbler" to obfuscate the connection between a buyer and a vendor through blockchain. 4-ER-689; 4-ER-743–44 at ¶ 11, 13. The "tumbler" worked as follows: Silk Road would send an equivalent amount of bitcoin to the vendor as extracted from the buyer, but not the same bitcoin the buyer used to fund his Silk Road Bitcoin address. 4-ER-680 at ¶ 30. Ulbricht also created an escrow system, whereby he held a customer's bitcoin until the purchased drugs or other merchandise arrived in expected condition. 4-ER-702.

Silk Road generated sales revenue totaling over 9.5 million bitcoin, and collected over 600,000 bitcoin in commissions from these sales. 4-ER-743 at ¶ 12. Ulbricht, as the operator of Silk Road, had sole control over Silk Road's profits; his own user account received a steady stream of commission deposits of bitcoin. 4-ER-689–701.

On May 6, 2012, Individual X hacked Silk Road and stole 70,411.46 bitcoin from Bitcoin addresses controlled by the website—a general pool of Silk Road bitcoin which were not from particular user accounts—which Individual X then sent to two Bitcoin addresses that Individual X controlled. 4-ER-675, 702. On approximately April 9, 2013, Individual X then sent 69,471.082201 bitcoin from those two Bitcoin addresses to the 1HQ3 Bitcoin address. 4-ER-702.

When Ulbricht became aware of Individual X's online identity, he threatened Individual X for return of the cryptocurrency, but Individual X did not comply. *Id.*

## C. Takedown of Silk Road and SDNY's October 2013 forfeiture action against bitcoin in wallets residing on Silk Road servers

On October 1, 2013, Ulbricht was arrested in San Francisco, California, and charged in the Southern District of New York ("SDNY") with narcotics trafficking conspiracy, computer hacking conspiracy, and money laundering conspiracy. 4-ER-702. Having located a server containing the corresponding authentication key for the Silk Road website on the Tor network, law enforcement also took down the Silk Road website and seized its servers, including all bitcoin contained in wallets residing within them. 4-ER-679 at ¶ 20; 4-ER-702–03.

The next day, the U.S. Attorney's Office for the SDNY sought to forfeit, pursuant to 18 U.S.C. § 981(a)(1)(A), the Silk Road hidden website, all bitcoin contained in wallet files residing on Silk Road servers, and all property traceable

thereto. 4-ER-703; *see United States v. Any and All Assets of Silk Road, Including but Not Limited to the Silk Road Hidden Website and Any and All Bitcoins Contained in Wallet Files Filing on Silk Road Servers, including the Servers Assigned the Following Internet Protocol Addresses [] and All Property Traceable Thereto* (herein, "*Any and All Assets of Silk Road*"), No. CV-13-06919 (S.D.N.Y.), at Dkt. 4. On October 18, 2013, the government published a Notice of Forfeiture on the www.forfeiture.gov website for 30 days. 4-ER-704.

On November 8, 2013, the government published a separate Notice of Forfeiture for property seized from Ulbricht's computer and residence, including all bitcoin on Ulbricht's computer hardware traceable to the operation of Silk Road with a particular public key, which was seized on or about October 25, 2013. 4-ER-704 n.5. Ulbricht filed a verified claim only as to the latter—for the bitcoin seized from the wallet on his computer. 4-ER-705. No claims were filed for the bitcoin seized in connection with the Silk Road website takedown, which would have included the bitcoin in individual user and vendor accounts. *Id.*

On January 15, 2014, the district court in SDNY entered a partial judgment by default and order of forfeiture of the Silk Road website and any and all bitcoin contained in the wallet files residing on Silk Road servers. *Id.*

In February 2014, Ulbricht was indicted on federal charges, and the next year, he was convicted by a jury of seven counts including conspiracy to distribute

9

narcotics and money-laundering. *Id.* He was sentenced to double life imprisonment plus forty years, without the possibility of parole, in connection with his ownership and operation of Silk Road. *Id.* In 2017, Ulbricht withdrew his claim to the bitcoin found on his computer, and that bitcoin was forfeited to the United States. *See Any and All Assets of Silk Road*, No. CV-13-06919 (S.D.N.Y.), at Dkt. 46.

### D. NDCA's November 2020 forfeiture action against the bitcoin sezied from 1HQ3, which has given rise to the instant appeal

#### 1. Individual X's consent to forfeiture

On November 3, 2020, Individual X signed a Consent and Agreement to Forfeiture with the U.S. Attorney's Office for the Northern District of California ("NDCA"), consenting to forfeit the approximately 69,370 Bitcoin in 1HQ3. 4-ER-705. The United States then took custody of the Defendant Property from 1HQ3. 4-ER-746 at ¶ 24. As widely reported, the publicly available blockchain reflects that 1HQ3's funds were at that time moved. 4-ER-662.

#### 2. Government's complaint and notice

Two days later, the U.S. Attorney's Office for the NDCA filed a complaint to civilly forfeit the Defendant Property. CR-1. The government amended the complaint on November 27, and filed a notice on www.forfeiture.gov the same day. CR-3, 8, 9; SER-10–11. This made any verified claim due 60 days later—that is, January 26, 2021—"[u]nless the court for good cause set[] a different

10

time," under Rule G(5)(a)(ii)(B) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, of the Federal Rules of Civil Procedure ("Supplemental Rule G" or "Supp. R. G"). The government also provided direct notice to Ulbricht, which made any verified claim he wished to file due December 30, 2020. SER-5.

The complaint explained how the government had identified Individual X as the owner of 1HQ3: A third-party Bitcoin attribution company had analyzed Bitcoin transactions executed by Silk Road and "observed 54 transactions that were sent from Bitcoin addresses controlled by Silk Road"—approximately 3,014 sending addresses, which were forfeited in the prosecution of Ulbricht, 4-ER-665—"to two Bitcoin addresses: 1BADznNF3W1gi47R65MQs754KB7zTaGuYZ" ("1BAD") and "1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN" ("1BBq") "totaling 70,411.46 BTC." 4-ER-744 at ¶ 15. The transferred amounts were in round amounts (*e.g.*, 2,500 bitcoin) atypical for Silk Road users, close in time, and "not noted in the Silk Road database as a vendor withdrawal or a Silk Road employee withdrawal" and so appeared to have been stolen from Silk Road. 4-ER-744 at ¶ 16. The 1BAD and 1BBq Bitcoin addresses then transferred 69,471.082201 bitcoin to 1HQ3, which in turn, in April 2015, sent 101 bitcoin to BTC-e, an unlicensed cryptocurrency exchange that was subsequently indicted federally. 4-ER-744–45

at ¶¶ 17–18.  The remaining balance in 1HQ3 was essentially untouched until November 2020.  4-ER-745 at ¶ 19.   Meanwhile, there were several hard forks[3] resulting in Bitcoin splitting into Bitcoin Cash, Bitcoin Gold, and Bitcoin SV.  4-ER-745 at ¶ 20.

As the government explained, "an investigation conducted by the Criminal Investigation Division of the Internal Revenue Service" ("IRS-CID") "and the U.S. Attorney's Office for the [NDCA]" determined that "Individual X, whose identity is known to the government" "was able to hack into Silk Road and gain unauthorized and illegal access to Silk Road and thereby steal the illicit cryptocurrency from Silk Road and move it into wallets that Individual X controlled."  4-ER-745–46 at ¶¶ 21–22.

### 3.  Timely claims and motions to intervene

In November 2020, Adesijuola Ogunjobi filed motions to intervene.  *See* CR-14–16, 20.  The district court denied these.  CR-19, 24.  Ogunjobi sought to appeal; his appeal was denied as frivolous.  CR-28–29, 41, 49, 66, 85.

On December 30, 2020, Ulbricht moved for an extension of time to file a notice of claim, which the district court granted.  CR-21, 46.  On February 3, 2021,

---

[3]  A "hard fork" refers to a blockchain splitting into other, separate blockchains that support other cryptocurrencies.  4-ER-745 at ¶ 20.  In the hard forks of the Bitcoin blockchain, each address that held bitcoin, including the 1HQ3 address, became an owner of an equivalent amount of Bitcoin Cash, Bitcoin Gold, and Bitcoin SV.  *Id.*

Ulbricht entered into a settlement agreement with the government, admitting that the Defendant Property was subject to forfeiture, and consenting to such forfeiture. 4-ER-706, 736–38.

On January 21, 2021, Caleb Bradberry filed a verified claim, which he withdrew on February 10, 2021. CR-35, 48.

On January 25, 2021, Roman Hossain and Lucas E. Buckley, trustee of Gox Victim Bitcoin Trust, filed separate verified claims. CR-42, 43. Normally, a claimant must serve and file an answer to the complaint within 21 days after filing the claim. Supplemental Rule G(5)(b). Both Hossain and Buckley sought and received an extension of time to file their answers. CR-50, 51, 52, 53, 60, 61. In an order dated March 25, 2022, the district court struck Hossain's claim. 1-ER-8–10. Hossein's pending appeal is under C.A. No. 22-16085. CR-123–24. The district court struck Buckley's claim in an order issued July 14, 2022. CR-122. Buckley's pending appeal is C.A. No. 22-16248. CR-125.

### 4. Untimely claims and motion to intervene

On March 16, 2021, Battle Born Investments Company LLC; First 100, LLC; and 1st One Hundred Holdings, LLC (herein, collectively, "Battle Born") filed their verified claims and statements of interest. CR-62; CR-89 (unsealing order). Battle Born filed their answers on April 5, 2021. CR-64.

On April 23, 2021, Nobuaki Kobayashi, the duly appointed foreign representative in the bankruptcy case of MtGox Co., Ltd., sought to intervene and have direct access to the case. CR-67.

Finally, on July 2, 2021, Matusko filed a verified claim. CR-87. He did not file an answer.

In the same March 25, 2022, order striking Hossain's claim (see above), the district court denied Kobayashi's motion to intervene, and struck the claims filed Battle Born and Matusko. 1-ER-8–13. Kobayashi has not appealed. Battle Born appealed from the March 25 order, C.A. No. 22-15513, as well as the subsequently filed final judgment ordering forfeiture, C.A. 22-16348. CR-107, 110, 127, 128, 130.

### 5. Matusko's untimely claim

In his July 2, 2021, "Verified Claim and Statement of Interest" pursuant to "18 U.S.C. § 983(a)(4)(A) Rule C(6)(a) & G(5)(a)," Matusko, a professional journalist living in Germany, claimed to be "the original, rightful, and innocent owner of at least 48 bitcoins" of the Defendant Property. 4-ER-730; 4-ER-731 at ¶¶ 1–2.

Matusko asserted that he had "legally purchased 48 BTC from a third party in Germany for approximately €150 Euros" in December 2011. 4-ER-731 at ¶ 2. Matusko then "opened a user account on the Silk Road website under the user

14

identification 'hanson5,'" and transferred the 48 bitcoin to the "Silk Road public key / blockchain address / wallet that was associated with his user account." *Id.* According to Matusko, he never touched the bitcoin thereafter. *Id.*

Matusko was aware, through worldwide headlines, of the law enforcement takedown of Silk Road in 2013, and believed "that he most likely lost access to the user account and that he most likely lost access to his bitcoins." 4-ER-731–32 at ¶ 5. But Matusko did not make any inquiries or efforts to reclaim his bitcoin until "May 2021," when "the rapid increase in value of cryptocurrency, specifically BTC," to "approximately $42,450 per BTC," caused him to consult an attorney. 4-ER-732 at ¶ 6.

Matusko later learned about "this civil judicial forfeiture action." 4-ER-732 at ¶¶ 7–11. Matusko asserted his "belief" that the 1HQ3 wallet included "at least 48 BTC . . . associated with the Claimant's Silkroad user account 'hanson5'." 4-ER-733 at ¶ 12.

Regarding the timing of his filed claim, which was more than five months after the January 26, 2021, deadline to file a claim had passed, Matusko stated that he had not received direct notice from the government. 4-ER-732–33 at ¶¶ 5, 10. Nor had he seen the government's public notice. 4-ER-732–33 at ¶¶ 5, 11. He only became aware on June 8, 2021, "of this civil judicial forfeiture action when

advised by counsel of record of this specific pending judicial forfeiture." 4-ER-733 at ¶ 11.

### 6.    The government's motion to strike Matusko's claim

The government moved to strike Matusko's claims for lack of standing under Supplemental Rule G(8)(c)(i)(B), and for failing to comply with the pleading requirements of Supplemental Rule G(5). 4-ER-708. The government relied on a declaration by IRS-CID Special Agent Jeremiah Haynie, who had "personally conducted the blockchain analysis of the bitcoin at issue in this case and was involved in the investigation from its inception to the present day."[4] 4-ER-723 at ¶ 1.

The government argued that Matusko had no ownership interest in the Defendant Property because Individual X stole the bitcoin that funded 1HQ3 "from the general pool of Silk Road bitcoin and not from any particular user accounts, meaning that no user balances were impacted by the hack." 4-ER-698; *see* 4-ER-709; 4-ER-726–27 at ¶¶ 9–12. "[D]atabase records show that Matusko's account had a balance of 47.52 BTC for the seventeen months between Individual X's hack and the Silk Road takedown in 2013." 4-ER-698; *see* 4-ER-710, 727 at ¶ 12

---

[4] Special Agent Haynie's declaration described Silk Road's sales as being "[n]early 95% . . . for illegal drugs," and otherwise, primarily for illegal services and products. 4-ER-723–24 at ¶¶ 3, 5.

("Notably, the account was unaffected when Individual X stole bitcoin from Silk Road in May 2012.").

If Matusko had any valid claim, it was more likely to the Silk Road assets that were subject to the 2013 forfeiture action in the SDNY, not to the bitcoin seized from 1HQ3. 4-ER-699; *see* 4-ER-709.

The government also argued that Matusko's claim should be struck because it was over five months late. 4-ER-699; *see* 4-ER-712. In fact, the government noted that Matusko did not file his claim until a month after his attorney had communicated with the government and learned that it regarded any claim filed at that time to be untimely. 4-ER-717. The government argued that the district court should not exercise its discretion to extend Matusko's claim deadline for good cause because: Matusko was aware of the seizure of his bitcoin in 2013 but failed to take action to retrieve it until 2021; had no good reason (such as illness) for this delay; was represented by an attorney; had not prepared for trial; and had no standing. 4-ER-712–18. Matusko had also failed to seek an extension of his deadline, which was not, in any case, warranted. 4-ER-718, 720. Allowing Matusko's claim to proceed would prejudice the government, which had provided proper notice, because "time-consuming, protracted litigation over the claimant's standing to contest the forfeiture" creates uncertainty about the actual value of the Defendant Property, given the fluctuation in bitcoin's value. 4-ER-715–17.

17

The government also noted that allowing Matusko's claim to proceed would "signal to each and every individual" behind Silk Road's "over 100,000 buyer accounts and nearly 4,000 seller accounts" "that the Defendant Property is fair game." 4-ER-721; *see* 4-ER-723 at ¶ 2.

The government did not argue that Matusko's claim should be struck because he had failed to file an answer.

### 7. Matusko's opposition

Matusko opposed the government's motion to strike.

First, Matusko argued that the motion should be denied because the government had failed to specify whether it was seeking a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), or summary judgment, pursuant to Fed. R. Civ. P. 56. ER-102 n.4.

But Matusko argued that his claim should survive under either standard. *Id.* Matusko argued that his claim unequivocally asserted financial interest in the Defendant Property, and therefore should survive a motion for judgment on the pleadings. 2-ER-103.

Matusko believed that his claim should also survive a motion for summary judgment. 2-ER-104. Matusko's theory was that every person who had put bitcoin into a Silk Road user account—including himself—had an ownership interest in the bitcoin in 1HQ3 because Individual X had stolen it from Silk Road. 2-ER-89,

104–05. He reasoned that this was because Silk Road tumbled its users' bitcoin, which was fungible, and had exclusive control over their Bitcoin addresses. 2-ER-89, 104.

Even if the court rejected Matusko's theory, Matusko argued that one of the 3,014 Bitcoin addresses from which Individual X stole to fund 1HQ3 "*could* have been assigned to Mr. Matusko," raising "a material dispute of fact" and "confirm[ing] Mr. Matusko's colorable claim." 2-ER-105–06 (emphasis added).

Matusko claimed that Special Agent Haynie's declaration supported his arguments as to standing. 2-ER-87, 102. Matusko also relied on declarations he attached to his opposition, by himself, and Christopher Wajda, a retired IRS-CID Special Agent who had reviewed the filings related to Matusko's claim and various other documents. 2-ER-88; 2-ER-110–12, 115–17 at ¶¶ 1, 7.

Wajda stated that Ulbricht "maintained the Bitcoin server which contained the Bitcoin wallet for the Silk Road Marketplace." 2-ER-124 at ¶ 47. Ulbricht had the "private key(s)" to the Silk Road Bitcoin wallet. 2-ER-124 at ¶ 50. The wallet was in Iceland and had 2,105,527 "Bitcoin addresses (destination addresses)." 2-ER-124 at ¶¶ 47, 50. These addresses "represent Bitcoin addresses that were assigned (at least in part) to users of the Silk Road Marketplace when they created a profile." 2-ER-124 at ¶ 52. Users only knew the Bitcoin address (created through a hash of the public key) assigned to them, but did not have the private

19

key, which was necessary to authorize transfers of bitcoin from that address. 2-ER-121–22; 2-ER-125 at ¶¶ 34, 36, 56, 57. Nevertheless, Wajda asserted that "the Bitcoin in the Silk Road Marketplace wallet is the property of the Silk Road Market users, to include Mr. Matusko." 2-ER-129; 2-ER-136 at ¶¶ 82, 117. Furthermore, he believed that "[e]ach Silk Road Marketplace user, like Mr. Matusko, who had a profile credit at the time of the government seizure on or about of [sic] October 2, 2013, may have an ownership interest in Bitcoin seized by the government in or about October of 2013 and again in or about November of 2020." 2-ER-131 at ¶ 96.

Wajda stated that the theft of bitcoin "by Individual X on or about May 6, 2012 came from the Silk Road Market Bitcoin wallet," and "affected the total credit of the Silk Road Marketplace wallet, by exactly 70,411.46 Bitcoin." 2-ER-129 at ¶¶ 77, 81. Wajda concluded that the bitcoin seized by the government in 2013 "came from the Silk Road Marketplace Bitcoin wallet" and was the "property of the Silk Road Marketplace users." 2-ER-129 at ¶ 77.

Attached to Wajda's declaration were excerpts of transcripts from Ulbricht's criminal trial, including the testimony of former FBI special agent Ilhwan Yum, describing the government seizure of Silk Road's bitcoins on October 2, 2013 (and additional seizures on other dates), and how he disabled the "program that reached out to the bitcoin server to get the current balance and [which] would update every

five minutes or periodically," as well as how the government posted on the Silk

Road website of a banner showing that it had been seized by the government. 2-

ER-220, 232–35. Yum explained bitcoin and the blockchain in his testimony. 2-

ER-245–256. He explained that there were, on "one side," "the Silk Road

bitcoins," found on two servers. 2-ER-263. These servers contained "22 Bitcoin

wallet files" corresponding to "2,105,527 unique addresses." 2-ER-268–69. On

the other side, there were bitcoin found on Ulbricht's laptop, in "at least three

wallet files" with private keys that showed the wallets contained "11,135 [B]itcoin

addresses." 2-ER 164, 167–68. There were thousands of bitcoin transactions

made regularly "from Silk Road Marketplace to the addresses that were found on

[Ulbricht's] laptop." 2-ER-275–76, 311. Yum explained that a Silk Road user was

"given an address where they could deposit the bitcoins that they personally own"

and "could withdraw" those bitcoin "rather than using them to purchase." 3-ER-

327–28. But the bitcoin was "in someone else's wallet management." 3-ER-328.

The transcripts attached to Wajda's declaration also included the Ulbricht

trial testimony of Brian Shaw, an information security engineer working for the

FBI, who testified that Ulbricht was in charge of Silk Road's operations. 3-ER-

333.

Regarding the timeliness of his claim, Matusko relied on declarations from

the lawyers he consulted, himself, and Wajda. 2-ER-108, 113. Matusko's own

21

declaration stated that he had used government unemployment compensation in December 2011 to purchase the 48 bitcoin he had sent to his assigned Silk Road Bitcoin address, and that "[s]ometime later," but before Silk Road was "taken down by the FBI" in 2013, he "realized" that he "had forgotten [his] password" to his Silk Road user account and "no longer had access." 2-ER-111–12 at ¶¶ 3–11.

Matusko argued that the government should have provided him (and the other "100,000-plus Marketplace users") with direct notice,[5] and his delay in filing his claim was the fault of the government's failure to do so. 2-ER-91. Matusko relied on Wajda, who though conceding that, unless the owner chose to identify himself, the Bitcoin address owner's identity was generally anonymous in the blockchain, asserted that the government could determine the identity of such owners through its access to law enforcement data and software. 2-ER-132 at ¶ 100.

Moreover, Matusko argued that the government's notice was insufficient because it was "posted on a U.S. government website in English only" when "it was known potential claimants were located abroad," and that the government's entire forfeiture action was void. 2-ER-95.

---

[5] With respect to the government's argument that any claim Matusko had was as to the Silk Road assets forfeited in 2013 by the SDNY, Matusko asked the district court to "estop the government from arguing that this verified claim is precluded by the earlier forfeiture action." 2-ER-102, 106. But he felt he should have received direct notice of that action as well. 2-ER-106.

If the district court was inclined to find Matusko's claim untimely, he asked the court to excuse his tardiness.  2-ER-95–96.  Matusko argued that the relevant factors weighed in favor of the court exercising its discretion in this manner.  2-ER-96–101.

Citing a Wikipedia entry, Matusko also argued that Silk Road was not only a marketplace for illegal goods, but also for "lawful goods and services, to include art, apparel, and books."  2-ER-91.  Accordingly, Matusko argued that the government could not forfeit bitcoin simply for being in Silk Road.  *Id.*

### 8. Government's reply

The government filed a reply, attaching two additional declarations.  2-ER-17–79.

One declaration included, as attachments, several of the government's trial exhibits from the Ulbricht prosecution.  2-ER-38–38 at ¶¶ 6–13.  This included a buyer's guide for Silk Road users explaining that a user account "has a built-in eWallet for Bitcoins, so you can buy and sell here without ever having to worry about third-party services at all."  2-ER-51–52.  "When you sell something, your account is credited, and when you buy something, it is debited."  *Id.*  "Silk Road employs a built-in tumbler that mixes all incoming bitcoins through a series of dummy transactions before they ever leave."  *Id.*  "The tumbler sends all payments through a complex, semi-random series of transactions, each with a new, *one-use*

receiving address, making it nearly impossible to link your payment with any coins leaving the site. The quantity, frequency, and number of transactions are all varied chaotically in a way that mimics the transactions of the bitcoin economy as a whole." *Id.* (emphasis added). Moreover, Silk Road's escrow system "means that when [a buyer] make[s] a[n] order the bitcoins are deducted from you[r] wallet, moves into a temporary escrow account, then after the vendor sends t[he] order they confirm it being sent." *Id.* Only after the buyer confirms receipt does the vendor receive the bitcoin payment. *Id.*

The second declaration was by Special Agent Haynie, describing the way bitcoin flowed through Silk Road. 2-ER-72–73 at ¶¶ 5–10. Once a user deposited bitcoin, his account was "credited with" the bitcoin, but the "actual bitcoin contained within the Bitcoin address assigned to the user could then be used by Silk Road as needed." 2-ER-72 at ¶ 5. This was similar to the way banks work. 2-ER-72 at ¶ 6. Individual X's theft did not affect the balance of the hanson5 account. 2-ER-72 at ¶ 7. The stolen bitcoin "originated from bitcoin addresses that were assigned to Silk Road users as deposit addresses," but did not affect the balance of the associated user accounts. *Id.* "Ulbricht did not deduct the user account balances by the amount that was stolen because the funds were not taken from specific user accounts." *Id.* Although Silk Road users did not have the

private keys to their assigned Bitcoin addresses, they "could withdraw bitcoin from their account by simply accessing their account." 2-ER-72–73 at ¶ 9.

### 9. The district court's order striking Matusko's claim

On March 25, 2022, the district court granted the government's motion to strike Matusko's claim. 1-ER-11–12.

The district court found that Matusko had filed his claim w "[m]any months after the deadline for filing claims in this matter." 1-ER-11.

"Even assuming Mat[us]ko should be relieved from the filing deadline," the court found that he had "not presented a colorable claim to any of the seized Bitcoin." *Id.* He "does not dispute that his Bitcoin remained in his account at Silk Road and available for his use or withdrawal at all times up until the 2013 government seizure and shut down. Accordingly, it forms no part of the Bitcoin stolen from Silk Road in 2012 that was later seized in this action." *Id.* Matusko's fungibility argument "is not persuasive" "because it would in effect mean that Mat[us]ko's Bitcoin was simultaneously held at Silk Road *and* in the 1HQ3 wallet." *Id.* To the extent that Matusko could have filed a claim in the 2013 forfeiture action, "[t]here is no basis to use this case as a collateral attack on the judgment and forfeiture order entered in New York many years ago." 1-ER-11–12.

## SUMMARY OF ARGUMENT

The district court correctly struck Matusko's claim on the pleadings. Although Matusko asserted an ownership interest in 1HQ3, he did not plead facts to support that assertion. He merely stated that he had deposited 48 bitcoin in Silk Road in 2011, and that the provenance of the bitcoin in 1HQ3 was Silk Road. Accordingly, Matusko lacked Article III standing in this case.

The district court's order striking Matusko was also proper as a matter of summary judgment. Matusko's evidence did not establish his ownership interest in 1HQ3. He agreed that his Silk Road user account balance of 48 bitcoin was unaffected by Individual X's theft of Silk Road bitcoin, which funded 1HQ3. Matusko's theory for ownership was that he was a general creditor of Silk Road because Silk Road could use his deposit as it wished, so long as it maintained his balance of 48 bitcoin. But this Court's cases and 18 U.S.C. § 983 both make clear that an unsecured creditor is not an owner of his debtor's assets.

Alternatively, this Court may affirm on the basis that Matusko's claim was untimely. It is undisputed that Matusko filed his claim over five months after the statutory deadline and that the district court did not either find this to be timely or excuse the untimeliness. The government has preserved its timeliness objection throughout the litigation. Because this Court can affirm on any basis with support

in the record, the untimeliness of Matusko's claim provides an independent ground

to do so.

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR IN GRANTING THE GOVERNMENT'S MOTION TO STRIKE MATUSKO'S CLAIM

### A. Standards of review

This Court reviews the district court's interpretation of the Federal Rules of

Civil Procedure de novo, as does it whether a claimant has standing.[6] *United*

*States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar Cal., Trinity*

*Cnty.*, 787 F.3d 968, 972 (9th Cir. 2015).

This Court reviews de novo a district court's dismissal on the pleadings

pursuant to Fed. R. Civ. P. 12(c), as it does a court's grant of summary judgment.

*Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 963 (9th Cir. 2010).    This

Court may affirm on any ground supported by the record even if it differs from the

rationale of the district court.  *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023).

This Court reviews the district court's dismissal of a forfeiture claim for

failure to comply with procedural requirements for abuse of discretion.  *17 Coon*

---

[6]  Matusko agrees that the district court's order is subject to de novo review, although he characterizes the order as a dismissal under Fed. R. Civ. P. 12(b)(6). AOB 9.  But the government's motion was to strike for lack of standing and for lack of compliance with the procedural rules of Supplemental Rule G, and the district court plainly granted the government's motion on the basis that Matusko had failed to present a colorable claim to any of the Defendant Property.  1-ER-11.

*Creek Rd.*, 787 F.3d at 972. Likewise, it reviews a district court's refusal to continue a hearing on summary judgment pending further discovery for abuse of discretion. *Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018).

"A district court abuses its discretion if it does not apply the correct legal standard, or if it fails to consider the factors relevant to the exercise of its discretion." *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011–13 (9th Cir. 2013) (internal citations omitted) (explaining that factors relevant to whether to overlook failure to strictly conform with Rule G include whether deficiency prejudiced government, whether it was a strategic attempt to gain some advantage, and whether claimant could cure deficiency if given an adequate opportunity).

## B. Legal principles

Property "involved in" or "traceable to" money laundering offenses is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). *In rem* civil forfeiture proceeds against such property. *United States v. Ursery*, 518 U.S. 267, 274 (1996).

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983 et seq., governs all *in rem* civil forfeiture proceedings commenced on or after August 23, 2000. *17 Coon Creek Rd.*, 787 F.3d at 972. These forfeiture proceedings are also governed by Supplemental Rule G and the Federal Rules of

28

Civil Procedure. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 634 (9th Cir. 2012).

Once the government has filed a verified *in rem* complaint, any person wishing to intervene and assert an interest in the property must file a verified claim and answer. *Id.* at 635 (citing 18 U.S.C. § 983(a)(4)(A), (B); Supp. R. G(5)).

It is the claimant's burden to establish Article III standing, which is necessary to "meet the case-or-controversy requirement." *Id.* at 637, 644. A claimant must also establish so-called "statutory standing" by meeting certain requirements of Supplemental Rule G. *17 Coon Creek Rd.*, 787 F.3d at 976; Supp. R. G(5) (requiring a verified claim to "state the claimant's interest in" the specific property claimed). Requiring a claimant to establish his relationship to the defendant property does not improperly shift the government's burden of proving the merits that the property is subject to forfeiture. *$133,420.00*, 672 F.3d at 644. Claimants can establish Article III standing "by showing that they have a colorable interest in the property, which includes an ownership interest or a possessory interest." *Id.* at 637 (internal quotations and citations omitted).

Fed. R. Civ. P. 26(a)(1)(B)(ii) exempts the government from initial disclosures in a forfeiture action *in rem* arising from a federal statute. Otherwise, Rule 26(a)(3) governs pretrial disclosures, and Rule 26(b) provides for discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense

and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

"Unlike in typical civil proceedings, the government may commence limited discovery immediately after a verified claim is filed," without court leave, to gather information bearing on the claimant's standing, "to test the veracity" of the claimant's interest in the property, as broadly asserted in the verified claim. *$133,420.00*, 672 F.3d at 634–35 (citing Supp. R. G advisory committee's note (subdivision (6)), 642–43. "The general civil discovery rules of the Federal Rules of Civil Procedure otherwise apply." *Id.* at 634 (citing Supp. R. G(1)).

"At any time before trial, the government may move to strike a claim or answer" for its failure to comply with Supplemental Rule G(5), or for the claimant's failure to respond to special interrogatories pursuant to Supplemental Rule G(6), or "because the claimant lacks standing." Supp. R. G(8)(c)(i).

Such a motion "must be decided before any motion by the claimant to dismiss the action" and "*may be presented* as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment

whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(5)(c)(ii)(B) (emphasis added).

"If the claim shows facts that would support standing, those facts can be tested by a motion for summary judgment." Supp. R. G advisory committee's note (subdivision (8), Paragraph (c)(ii)). "If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing." *Id.* "The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden." *Id.*

Federal Rule of Civil Procedure 56 governs summary judgment. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

**C.    Because Matusko's claim failed to show facts supporting his ownership of any of the Defendant Property, the district court was right to strike his claim on the pleadings for lack of standing**

Matusko's claim did not show facts that supported his assertion of ownership to the bitcoin in 1HQ3. Accordingly, the district court was correct in finding that Matusko did "not present[] a colorable claim." 1-ER-11. This Court should affirm.

"[A] claimant's unequivocal assertion of an ownership interest in the property is sufficient by itself to establish standing" "[a]t the motion to dismiss stage." *$133,420.00*, 672 F.3d at 638. An assertion of possessory interest, however, must be supported by allegations regarding how the claimant came to possess and control the property. *Id.* But "[i]f a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings." Supp. R. G advisory committee's note (subdivision (8), Paragraph (c)(ii)); *see United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 351 (6th Cir. 2017) ("Here, where the government alleged that it took a bundle of cash from a claimant's suitcase, and each claimant stated that he owned the cash, there is a clear allegation of ownership that satisfies Article III. And the claimant's making of such a statement is what satisfies Rule G's statutory standing requirement.").

Here, Matusko's claim of ownership did not establish standing. Although he did unequivocally claim to be "the original, rightful, and innocent owner of at least

32

48 bitcoins . . . of the 69,370 bitcoins (BTC) seized by the United States from"
1HQ3, the facts Matusko alleged did not support this claim. 4-ER-731 at ¶ 2.
Matusko claimed that he had funded a Bitcoin address associated with his Silk
Road user account, under the "hanson5" identifier, with 48 bitcoin in 2011. *Id.*
But he admitted that Silk Road's website, servers and any tangible assets and
intangible assets within the reach of the government had been seized in 2013. 4-
ER-731 at ¶ 3. This seizure meant that he most likely lost access to his Silk Road
user account and "his bitcoins" therein. 4-ER-731–32 at ¶ 5.

Nonetheless, Matusko theorized that because "the source" of the bitcoin in
1HQ3—seized in 2020—"was ultimately from the Silk Road market place that
eluded United States Law Enforcement and United States seizure efforts in 2013,"
he had an ownership interested in 1HQ3. 4-ER-732 at ¶ 7.

This did not state a colorable claim of ownership interest in 1HQ3. Matusko
never alleged any link between his specific Silk Road user account or related
Bitcoin address and 1HQ3.

Because Matusko did not establish standing in his claim, the district court
was entitled to dismiss his claim by judgment on the pleadings. Supp. R. G
advisory committee's note (subdivision (8), Paragraph (c)(ii)).

33

**D. Dismissal by summary judgment was also justified**

Even if Matusko had met the "low threshold for claimants initially to establish statutory standing," undisputed evidence submitted by the government and Matusko made clear that Matusko did not actually have standing, and warranted summary judgment for the government on this basis. *United States v. $284,950.00 in U.S. Currency*, 933 F.3d 971, 973 (8th Cir. 2019) ("If a claimant's assertions of ownership in his initial claim are undermined by his answers to the special interrogatories, his standing could then be challenged on a motion for summary judgment, where the claimant would have to 'carry the burden of establishing standing by a preponderance of the evidence.'" (quoting Supp. R. G(8)(c)).

"[T]o withstand a motion for summary judgment on the ground that the [claimant] lacks standing," the claimant "cannot rely on mere allegations but rather must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *$133,420.00*, 672 F.3d at 638 (internal quotations and citation omitted). Although the evidence must be viewed in the light most favorable to the nonmoving party, *Opara*, 57 F.4th at 721, "'a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.'" *Id.* (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). The

district court will grant summary judgment for the government unless there is evidence on which a fair-minded jury could reasonably find that the claimant has an ownership or possessory interest in the defendant property, that is, unless there is a genuine issue for trial. *Id.* Such evidence may be simply a claim of ownership, combined with the fact that the property claimed was actually seized from the claimant's possession. *Id.*

In his submissions opposing the government's motion to strike his claim for lack of standing, Matusko did not dispute that the bitcoin in 1HQ3 had been stolen by Individual X from Silk Road in 2012, or that the theft had not affected his ability to withdraw or use his 48 bitcoin. 2-ER-90 ("Those 48 bitcoin remained in the Marketplace's wallet until the government seized the Bitcoin wallet."); 2-ER-91 ("On May 6, 2012, a third party stole 70,411.62 bitcoin from 'addresses controlled by Silk Road and transferred it to two Bitcoin addresses [1BAD] and [1BBq].'" (quoting 4-ER-722–29)). In fact, Matusko indicated that he had forgotten his Silk Road account password *before* the government's seizure in 2013, and that it was the 2013 seizure that had affected his ability to access his bitcoin. 2-ER-90; 2-ER-111–12 at ¶¶ 3–11.

In light of these admissions, a fair-minded jury could not possibly conclude that Matusko had an ownership interest in 1HQ3, and the district court correctly struck Matusko's claim. 1-ER-11.

Matusko's primary theory of ownership on appeal remains that because bitcoin is fungible, and because Silk Road controlled the actual bitcoin deposited into user accounts through its exclusive control of the private keys to the Bitcoin addresses and its "tumbling," every Silk Road user with a positive bitcoin account balance had an ownership interest in *all* of Silk Road's assets. *See* AOB 12–14. But this theory of ownership was untenable, as a legal matter. Under this theory, if, prior to closing down Silk Road, the government had filed a complaint against the Bitcoin address linked to a specific drug dealer's Silk Road user account, Matusko and every other Silk Road user would have had standing to contest its forfeiture.

Matusko argued, in essence, that Silk Road operated as does a bank. "In the case of a general deposit in a bank, the relationship of the bank and depositor is that of debtor and creditor, and the funds deposited become a part of the general assets of the bank, which it may use in making loans and investments and otherwise conducting a general banking business." *Bank of Am. Nat. Tr. & Sav. Ass'n v. California Sav. & Com. Bank*, 218 Cal. 261, 273–74 (1933). In funding his Silk Road user account with 48 bitcoin, Matusko urges that he in effect became a creditor to Silk Road. AOB 15–16.

But whatever rights Matusko might have had in a bankruptcy proceeding initiated by Silk Road or Ulbricht, AOB 17, are irrelevant to this appeal, which

36

concerns the distinct civil forfeiture of bitcoin stolen from Silk Road (which Ulbricht took as a loss instead of passing on to Silk Road users; user account balances and users' ability to withdraw their bitcoin were unaffected, 4-ER-726–27 at ¶¶ 9–12). "Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct." *Ursery*, 518 U.S. at 284; *see id.* at 290–92. This Court has been unequivocal in holding that "general creditors cannot claim an interest in any particular asset that makes up the debtor's estate," and therefore "do not have standing to challenge the civil forfeiture of their debtors' property." *United States v. $20,193.39 U.S. Currency*, 16 F.3d 344, 346 (9th Cir. 1994); *see also United States v. Hernandez-Escobar*, 911 F.3d 952, 959 (9th Cir. 2018). Indeed, 18 U.S.C. § 983(d)(6)(B)(i) specifically excludes from its definition of "owner" a person "with only a general unsecured interest in, or claim against, the property or estate of another."

Thus, even accepting all of Matusko's factual assertions as true—that he was a general creditor of Silk Road, and that the bitcoin in 1HQ3 was Silk Road's estate (as opposed to, for example, Ulbricht's or Individual X's)—he would still not have standing to challenge the civil forfeiture of 1HQ3. *Compare United States v. $69,292.00 in U.S. Currency*, 62 F.3d 1161, 1165–66 (9th Cir. 1995)

(summary judgment not appropriate where a fact-finder might make factual findings resulting in finding that claimant was innocent owner).

To the extent that Matusko finds this inequitable, this Court should recall that, by his own admission, Matusko understood Silk Road to be an illegal marketplace (and not a bank insured by the Federal Deposit Insurance Corporation), and he nevertheless chose to leave his 48 bitcoin there even though a balance was not even necessary to maintain a Silk Road user account. AOB 16. Moreover, when Matusko forgot his Silk Road password, he took no measures to recover it so as to retrieve his bitcoin. Nor did Matusko investigate any possibility he might have of recovering his bitcoin when he learned of the government's forfeiture of Silk Road's assets in 2013. He also failed to move to set aside the 2013 forfeiture, which is distinct from the forfeiture in this case, within the five years allowed, pursuant to 18 U.S.C. § 983(e). And finally, to the extent that Matusko considers himself a victim, he could have sought restitution through Ulbricht's criminal prosecution, under 18 U.S.C. § 3663A, and may seek restoration from the Attorney General under 18 U.S.C. § 981(e)(6).

Matusko's secondary theory of ownership is that one of the 3,014 Bitcoin addresses from which Individual X stole to fund 1HQ3 might have been assigned to him. *See* AOB 14 ("One of those addresses may have been assigned to Mr. Matusko."). But this is *entirely* speculative. *Lujan v. Defenders of Wildlife*, 504

38

U.S. 555, 560–61 (1992) (to establish Article III standing, plaintiff must establish an invasion of a legally-protected interest that is not merely conjectural or hypothetical). Nothing in Special Agent Haynie's declaration (supporting the striking of Battle Born's claims) explaining that 98% of the 3,056 Bitcoin addresses that had funded 1BAD and 1BBQ were Silk Road deposit addresses, 4-ER-681 at ¶ 30, even states that the addresses were ones associated with Silk Road user accounts, as opposed to Bitcoin addresses in which Ulbricht maintained Silk Road commissions and used—after bitcoin was transferred from user Bitcoin addresses—to effect "tumbling" or masking or true origin.

It is also largely beside the point. By Matusko's own account, Silk Road users had no control over the actual Bitcoin addresses assigned to their user accounts; only Ulbricht held the private keys to those Bitcoin addresses and could make withdrawals. AOB 3; 2-ER-88–89. What Silk Road users controlled and owned were the bitcoin equivalents credited to their user accounts.

### E. This Court may affirm the district court's decision on the alternate basis that Matusko's claim was untimely

The government moved to strike Matusko's claim below on the independent ground that it was untimely.[7] This Court may affirm on that basis as it has

---

[7] Matusko also failed to file an answer, as required by Supplemental Rule G(5)(b), but the government did not raise this as a basis for striking his claim before the district court.

significant support in the record.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th Cir. 2015) ("We may affirm . . . on any ground raised below and fairly supported by the record." (internal quotation marks and citation omitted)); *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 n.1 (9th Cir. 1988) (applying rule in civil forfeiture context).

This Court has noted that standing to contest a forfeiture action can be conditioned on strict compliance with filing requirements.  *17 Coon Creek Rd.*, 787 F.3d at 974.  Under Supplemental Rule G(a)(2)(B), all claims to the bitcoin seized from 1HQ3—except for those by individuals who had received direct notice— were due by January 26, 2021.  Matusko did not file his claim until July 2, 2021. CR-87.  The district court found this to be "[m]any months after the deadline," and did not retroactively extend Matusko's filing deadline, 1-ER-11–12 ("Even assuming Mat[us]ko should be relieved from the filing deadline in this action . . . ."), despite Matusko's vigorous argument in his opposition to the government's motion to strike that any untimeliness should be excused, 2-ER-95–101, and that his claim was *not* untimely to begin with because the government should have provided him with direct notice, but did not.  2-ER-92–95.

The district court's decision not to exercise its discretion to excuse Matusko's untimeliness is well-justified.  *Contra* AOB 22.  A court should only exercise its discretion to grant additional time "where the goals underlying the time

restriction and the verification requirement are not thwarted." *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1435–36 (9th Cir. 1985). And the factors this Court has considered to determine whether a district court should excuse lateness of a claim support the district court's decision not to excuse the lateness of Matusko's claim. *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1117–18 (9th Cir. 2004). He was aware that Silk Road's assets had been seized in 2013. Matusko's delay was not due to illness or death. Matusko had not expended resources preparing for trial. Matusko was represented by an attorney. And the government was prejudiced by the late filing, in the sense that delayed claims delayed the resolution of its forfeiture action against the Defendant Property, and, with the unpredictability of the schedule, increased the risk that the Defendant Property's value would plummet, given cryptocurrency's volatility.

The government also did not encourage any delay, but properly posted notice of the forfeiture. As he did in district court, Matusko alleges that the government should have, but failed to, provide him with direct notice.[8] AOB 19. To the extent it is appropriate to consider this assertion in connection with the

---

[8] Matusko also complains that he did not receive direct notice of the 2013 forfeiture in the SDNY, but, as the district court pointed out, 1-ER-11–12, that is not before this Court.

government's contention that Matusko's claim was untimely,[9] it is clear that the government did not have a duty to provide direct notice to Matusko. Supplemental Rule G(4)(b)(i) requires the government to provide direct notice to "any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule (5)(a)(ii)(B)"—here, January 26, 2021. Supp. R. G(4)(a), (5)(a)(ii). There is no evidence that the government had any reason to believe that Matusko was a potential claimant prior to January 26, 2021, or even afterwards, for that matter. Matusko alleges that because of the government's access to data and software, it could have and should have identified the users. *See* AOB 19–21. Given that Silk Road was an illegal marketplace, not a cryptocurrency deposit or exchange, it was reasonable for the government to believe that Silk Road's users could not successfully claim to be innocent owners of the bitcoin they had deposited into their Silk Road user accounts. Moreover, Supplemental Rule G(4)(b)(i) does not impose upon the government a duty to investigate and unearth potential claimants, but rather a duty to inform those "who reasonably appear[]" to be potential

---

[9] The remedy for failure to provide direct notice is that a person entitled to such notice may move to set aside a declaration of forfeiture if he did not receive such notice. 18 U.S.C. § 983(e). Matusko has not so moved.

claimants based "on the facts known to the government" before a particular deadline.

Finally, it is pure conjecture on Matusko's part that the government could assess (without expending extraordinary resources, at least) the identity of Silk Road users—particularly a user like Matusko who was not active on Silk Road and so provided few digital clues—given that Silk Road was expressly designed to keep its users' identities and transactions anonymous. That the government was able to identify potential claimants in *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1 (D.D.C. 2020), cited at AOB 20, has little bearing on whether the government had either the obligation or the information to identify Silk Road users.

In *Twenty-Four Cryptocurrency Accts.*, the child pornography website at issue "'generally identified' which customers were associated with which payments to the Website." 473 F. Supp. 3d at 3. Law enforcement was also able to trace payments to the Website from 24 cryptocurrency accounts, hosted by three different Bitcoin exchanges, and to identify the account holders through "'know-your-customer' information collected by the Exchanges." *Id.* at 2–3. Upon filing a verified complaint for forfeiture *in rem* against the 24 cryptocurrency accounts, the government sent direct notices to the account holders. *Id.* at 4. They did so

because the account holders were potential claimants of the accounts subject to the forfeiture action, and because the government had identified the account holders.

Analogously, in this case the government filed a complaint to forfeit the contents of 1HQ3, and, having identified the account holder as Individual X, would have been required to provide Individual X direct notice if Individual X had not had actual notice and consented to the forfeiture. 4-ER-705. On information that Individual X had stolen the bitcoin from Silk Road accounts controlled by Ulbricht, the government provided Ulbricht with direct notice. SER-8 at ¶ 4.

Because bitcoin is fungible, because Silk Road "tumbled" its users' deposits, and because individual Silk Road user accounts were not affected by Individual X's theft of bitcoin from Silk Road, it was meaningless to chase down the identities of the people behind Bitcoin addresses from which Individual X stole bitcoin. Additionally, there was no reason to believe that identifying over 100,000 Silk Road users within the allotted time was reasonably feasible for the government, as it was feasible for the government to identify 24 cryptocurrency accounts in *Twenty-Four Cryptocurrency Accts*. Besides the numerosity of user accounts at issue here, Silk Road did not require identifying information, and there was no evidence that the bitcoin deposits made into Silk Road Bitcoin addresses

could be traced to Bitcoin addresses hosted on cryptocurrency exchanges with identifying information.[10]  *See* 2-ER-70–74 at ¶¶ 3–15.

In sum, although this Court need not reach the timeliness issue because it may affirm on the ground relied upon by the district court—that Matusko failed to establish a colorable claim of ownership—the record clearly supports the government's consistent position that Matusko's claim was untimely.

At a minimum, this Court may not reverse the district court on a view that Matusko's claim was timely, *contra* AOB 19–23, because, in addition to being meritless, the district court did not explicitly rely on this basis to strike his claim.

---

[10]  The district court struck two claims and denied one motion to intervene in the case against the Defendant Property which alleged that part of the bitcoin seized from 1HQ3 was from the Mt. Gox cryptocurrency exchange.  *See supra* at pp. 13–14 (Hossein, Buckley, Kobayashi).

## CONCLUSION

For the forgoing reasons, this Court should dismiss the appeal in C.A. No.

22-15513 and affirm the district court's judgment in C.A. No. 22-16348.

Dated:  February 7, 2023                    Respectfully submitted,

                                            STEPHANIE M. HINDS
                                            United States Attorney

                                            MATTHEW M. YELOVICH
                                            Chief, Appellate Section, Criminal Division

                                            _____*/s/ Merry Jean Chan*_
                                            MERRY JEAN CHAN
                                            Assistant United States Attorney

                                            Attorneys for Plaintiff-Appellee
                                            UNITED STATES OF AMERICA

46

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 17. STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**    22-15514, 22-16349

The undersigned attorney or self-represented party states the following:

[ ]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[x]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

- *United States v. Battle Born Investments Co. LLC, et al.*, Nos. 22-15513 & 22-16348 (claimants' appeal out of the same district court civil action)
- *United States v. Lucas E. Buckley, as Trustee of the Gox Victim Bitcoin Trust*, No. 22-16248 (claimant's appeal out of the same district court civil action)
- *United States v. Roman Hossain*, No. 22-16085 (claimant's appeal out of the same district court civil action)

**Signature**  */s/ Merry Jean Chan*                **Date**  Feburary 7, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

47

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS
*Instructions for this form:*
http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  22-15514, 22-16349

I am the attorney or self-represented party.

This brief contains **10,283** words, including   0   words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**       *s/ Merry Jean Chan*              **Date** February 7, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

48